# 13-324-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



MARCUS WEBB,

*Plaintiff-Appellant,*

*v.*

SYLVESTER STALLONE, MILLENNIUM FILMS, NU IMAGE FILMS, LIONS GATE FILMS, INC.,
LIONS GATE HOME ENTERTAINMENT, INC., ALTA VISTA PRODUCTIONS, INC.,
ALTA VISTA PRODUCTIONS, LLC, DOUBLE LIFE PRODUCTIONS, INC.,

*Defendants-Appellees,*

*and*

DAVID E. CALLAHAM, LIONS GATE ENTERTAINMENT CORPORATION,

*Defendants.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

David M. Kohane
David S. Gold
COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.
*Attorneys for Plaintiff-Appellant*
900 Third Avenue, 16th Floor
New York, New York 10022
212-752-8000

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT ...........................................................5

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................5

STATEMENT OF THE CASE...................................................................6

STATEMENT OF FACTS ........................................................................8

SUMMARY OF ARGUMENT ...............................................................18

STANDARD OF REVIEW .....................................................................20

ARGUMENT ..........................................................................................20

   I.   Credibility Issues Permeate The Entire Summary Judgment Record, Precluding Summary Judgment On The Issue Of Copying. ........................22

      A.   The District Court Found Issues Of Fact As To Access, Yet Still Granted Summary Judgment...................................................................26

      B.   The District Court Found Issues Of Fact As To Copying, Yet Still Granted Summary Judgment....................................................30

      C.   The Striking Similarities Between *Cordoba* and *Expendables* Should Have Precluded Summary Judgment. .......................................................33

   II.   The District Court Erred In Suggesting That The Evidence Submitted "Appeared" Insufficient To Show Actionable Similarities Between The Works. ...................................................................44

CONCLUSION .......................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arica Inst. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) ................................................47

*Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946) ....................................23, 24, 33, 34

*Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) ..........................21, 26, 27, 29

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d (2d Cir. 1998) ......................................................................................................20, 47

*Denker v. Uhry*, 820 F.Supp. 722 (S.D.N.Y. 1992) .................................................24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ......3, 20, 44, 45, 47

*Fischl v. Armitage*, 128 F.3d 50 (2d Cir. 1997) ......................................................22

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119 (2d Cir. 1994) .......46

*Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) .................. 21, 22, 26, 34, 35, 36

*Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165 (2d Cir. 2006) ......................................................................................................22

*Hamil Am. Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999) ................................................46

*Herzog v. Castle Rock Entm't*, 193 F.3d 1241 (11th Cir. 1999) .............................21

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46 (2d Cir. 2003) .......................3, 20, 21

*Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996 (2d Cir. 1995) ...................45, 46, 47

*Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir. 1995) ................................21, 23, 24, 33

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 1997) ...................................................22

*Medical Ed. Dev. Servs., Inc. v. Reed Elsevier Group*, PLC, 2008 WL 4449412 (S.D.N.Y. Sept. 30, 2008) .................................................................23

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292 (2d Cir. 2003) ....................20

*Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429 (S.D.N.Y. 2011), *aff'd*, 2012 WL 5439910 (2d Cir. Nov. 8, 2012) ....................................35

*Peter F. Gaito Architecture v. Simone*, 602 F.3d 57 (2d Cir. 2010) ................45, 46

*Price v. Fox Entertainment Group, Inc.*, 2007 WL 241398 (S.D.N.Y. Jan. 26. 2007) ........................................................................................................23, 24

*Redd v. N.Y. State Div. of Parole*, 678 F.3d 166 (2d Cir. 2012)..............................22

*Repp v. Webber*, 132 F.3d 882 (2d Cir. 1997), *cert. denied*, 525 U.S. 815 (1998) ..............................................................................21, 22, 33, 34, 35

*Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976) ...............47

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) .....................................................22

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127 (2d Cir. 2003).........................................................................................20, 46

*Vargas v. Transeau*, 514 F.Supp.2d 439 (S.D.N.Y. 2007), *aff'd*, 352 Fed.Appx. 458 (2d Cir. 2009)............................................... 21, 30, 31, 34, 41, 42

*Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986), *cert. denied*, 476 U.S. 1159 (1986).........................................................................................49

*Warner Bros. Inc. v. Am. Broadcasting Co., Inc.*, 720 F.2d 231 (2d Cir. 1983) ...................................................................................................45, 49, 50

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001).............................45

## STATUTES

28 U.S.C. § 1291 ........................................................................................................5

28 U.S.C. § 1331 ........................................................................................................5

28 U.S.C. § 1338 ........................................................................................................5

Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.* ...................................................5

## RULES

Fed. R. Civ. P. 56(c)(3)........................................................................................43, 44

Fed. R. Evid. 702 ......................................................................................36

Federal Rule of Appellate Procedure 32(a)(7)........................................55

**TREATISES**

NIMMER ON COPYRIGHT, § 13.02[A]................................................27, 28

NIMMER ON COPYRIGHT, § 13.03[A][1] .................................................47

NIMMER ON COPYRIGHT, § 13.03[D]........................................................21

49441/0001-9526339v1

## INTRODUCTION

In early 2006, Plaintiff-Appellant Marcus Webb ("Webb") authored a screenplay entitled *The Cordoba Caper* ("*Cordoba*").  Over the next three years, Webb submitted *Cordoba* to eight screenwriting competitions, including well-known competitions in Los Angeles and New York.  On August 13, 2010, *The Expendables* ("*Expendables*") was released in theaters.  *Expendables* was attributed to Sylvester Stallone ("Stallone"), produced by defendant-appellee Nu Image Films ("Nu Image"), and its affiliates, Millennium Films ("Millennium"), Alta Vista Productions, Inc., Alta Vista Productions, LLC, and Double Life Productions, Inc., and distributed by Lions Gate Films, Inc. and Lions Gate Home Entertainment, Inc. (collectively, "Defendants").

*Cordoba* and *Expendables* share numerous similarities.  Both works involve a small group of mercenaries who accept a mission to overthrow a Latin American dictator named General Garza who, along with his accomplice and eventual assassin, are persecuting their country's peasantry to increase cocaine production. In both works, the mercenaries initially decline the mission but ultimately take the assignment because a woman's life is at stake.

In both works, on their reconnaissance of the small nation, the mercenaries ally with a local female rebel closely related to General Garza who assists the mercenaries in overthrowing the regime.  In both works, General Garza and his

1

accomplice have a marriage of convenience only and are actually antagonists.  In both works, the accomplice rummages through the heroine's apartment and arrests her, and there follows a torture scene in which the accomplice attempts to elicit critical information about the mercenaries from the heroine.

In both works General Garza gives a speech to his people from the presidential palace shortly before his accomplice shoots and kills him.  In both works, the mercenaries execute their coup and save the captured heroine.  Both works conclude by suggesting a future romantic relationship between the hero and heroine.  These and other striking similarities between *Cordoba* and *Expendables* – protectable elements original to *Cordoba* which unfold in a similar sequence in both works – could easily permit a reasonable jury to conclude that Stallone had access to and copied *Cordoba*.

Defendants' primary defense to Webb's infringement claim has been unique to this case.  Defendants have defended on the ground that *Expendables*, and all its protectable elements, were copied not from *Cordoba* but instead from another screenplay entitled *Barrow*.  Yet nearly every defendant – *before* this case began – vehemently denied any similarity between *Expendables* and *Barrow*.  As the district court recognized: "It is only now, when it is in his self interest, that Stallone admits to copying <u>Barrow</u>.  In the face of such inconsistency, the question of whether to credit Stallone's declaration that he has never seen <u>Cordoba</u> and

wrote <u>The Expendables</u> entirely independent of <u>Cordoba</u> is for the factfinder to decide."  SPA9.

This correct finding cannot co-exist with the district court's grant of summary judgment.  As discussed below, to establish copyright infringement, Webb has to establish: (i) ownership a valid copyright (which is not disputed here); and (ii) unauthorized copying, which may be shown through circumstantial evidence of access and probative similarity.  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003), citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).  Where the similarities between the two works are "so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access."  *Id.*

The district court found issues of fact as to both access ("the question of whether to credit Stallone's declaration that **he has never seen Cordoba**") and copying ("the question of whether to credit Stallone's declaration that **he … wrote The Expendables entirely independent of Cordoba**").  SPA9 (emphasis added).  The district court's recognition that issues of fact exist as to the entire second prong of the infringement analysis (the first prong, ownership, having been conceded) required a denial of Defendants' summary judgment motion.

Failing to recognize the questions of fact pervading the summary judgment record, the district court improperly rejected Webb's striking similarity analysis in

3

large part based on the testimony of Stallone (whose credibility had been undermined), hearsay evidence from outside the record, and the court's own subjective interpretation of only three of the many similarities presented by Webb. The district court also failed to consider Webb's expert, a long-time screenwriting veteran and Writers Guild of America (West) ("WGA") credits arbiter and consultant, despite Second Circuit precedent endorsing the use of such experts in a striking similarity analysis.

Having incorrectly found no issue of fact on the actual copying element of the infringement analysis, the district court, in a footnote, stated it did "not reach the issue" of whether a reasonable juror would be able to find that Stallone copied protectable elements of *Cordoba*. SPA19. Nonetheless, the district court went on to speculate, without analysis, that no protectable elements of *Cordoba* were infringed. *Id.* As explained below, in doing so, the district court appears to have misunderstood or misapplied well-settled Second Circuit precedent governing originality and protectability in copyright.

In light of Defendants' utter lack of credibility, Defendants' unique defense in which they attribute the numerous striking similarities between *Cordoba* and *Expendables* to *Barrow* after emphatically denying those similarities, the district court's express recognition of issues of fact as to both access and copying, Webb's distribution of *Cordoba* in the industry, the district court's reliance on questionable

4

statements made by Stallone and unauthenticated hearsay evidence in its analysis of the similarities between the works, the district court's improper rejection of Webb's expert witness, and for the additional reasons discussed below, the district court's decision to grant summary judgment was erroneous and should be reversed.

## JURISDICTIONAL STATEMENT

Webb brought this action under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*. The district court had original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. By "bottom-line order" dated June 25, 2012 (SPA1), and by Memorandum Order dated December 27, 2012 (SPA2), the district court (Rakoff, J.) granted Defendants' motion for summary judgment.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. This appeal was timely taken by Notice of Appeal entered on January 25, 2013 from a final order that disposed of all claims. A1078.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the district court (Rakoff, J.) erred in granting summary judgment to Defendants, dismissing Webb's copyright infringement claim where:

(1) Defendants' recognized lack of credibility led the district court to correctly conclude that genuine issues of material fact exist as to whether Stallone had access to and copied *Expendables*;

(2)   Webb presented numerous elements that would, individually and collectively, permit a jury to infer Defendants' access to Webb's work based on the striking similarities between *Expendables* and *Cordoba*;

(3) The district court based its striking similarity analysis on the testimony of Stallone (whose credibility had been undermined), hearsay evidence from outside the record, and the district court's own subjective interpretation of three of the many striking similarities presented;

(4)  The district court disregarded the opinion of Webb's expert, who opined that there is no reasonable possibility that Stallone authored the screenplay for *Expendables* without access to and copying *Cordoba*, despite Second Circuit precedent providing that expert testimony should be considered in a striking similarity analysis; and

(5) The district court, in a footnote in *dictum*, appears to have misapplied well-settled Second Circuit precedent governing originality and protectability in copyright.

## STATEMENT OF THE CASE

On October 24, 2011, Webb, a professional writer and author of the original screenplay, *Cordoba*, filed a complaint in the United States District Court for the Southern District of New York alleging Defendants infringed his copyright in *Cordoba* through the creation, reproduction, distribution, performance and

exploitation of the *Expendables* screenplay and motion picture.[1]  Webb cited, among other things, his dissemination of *Cordoba* in the industry and the numerous striking similarities between *Cordoba* and *Expendables*.  In defense of Webb's infringement claim, Defendants primarily argued that *Barrow*, a screenplay by former defendant David Callaham,[2] rather than *Cordoba*, was the actual source material for *Expendables*.  Discovery revealed, however, that nearly every defendant repeatedly and strenuously denied any connection between *Barrow* and *Expendables* before this litigation began.

On March 15, 2012, Defendants moved for summary judgment.  On June 25, 2012, the district court granted Defendants' motion by "bottom-line" order.  SPA1.  Six months later, on December 27, 2012, the district court entered a Memorandum Order outlining the basis for its decision.  SPA2.  In light of Defendants' numerous contradictory statements concerning the source material for *Expendables*, the district court denied Defendants summary judgment on independent creation, recognizing that "the question of whether to credit Stallone's declaration that he

---

[1] Webb twice amended his Complaint to add and remove defendants. References to Webb's Complaint herein refer to the Second Amended Complaint, filed February 15, 2012.

[2] Webb initially named Callaham as a defendant based on Callaham's story and screenplay credit for *Expendables*.  Despite early ambiguity as to Callaham's contributions to *Expendables*, Webb later determined he should dismiss Callaham from the litigation based on discovery showing Callaham had no involvement in *Barrow* after it was sent to Warner Bros. in January 2006.  *See* A1057.

has never seen <u>Cordoba</u> and wrote <u>The Expendables</u> entirely independent of *Cordoba* is for the factfinder to decide." SPA9. Despite Stallone's recognized lack of credibility, and the acknowledged issues of fact on both access (whether Stallone had seen *Cordoba*) and copying (whether Stallone wrote *Expendables* independently of *Cordoba*) resulting therefrom, the district court granted summary judgment, holding that there was insufficient evidence for the factfinder to conclude Stallone had access to and copied *Cordoba*.

## STATEMENT OF FACTS

### *The Cordoba Caper*

Webb is the author of the original screenplay and short story entitled *The Cordoba Caper*. Webb filed the screenplay with the United States Copyright Office on June 08, 2006 (Registration Number: PAu003049981). A36-42.

*Cordoba* tells the story of a team of mercenaries who undertake a mission to topple General Garza, the dictator of a small Latin American country. *Cordoba* evolves this theme into a story involving unique and original details, including, among other things, six mercenaries, two allied but adverse villains (one ultimately assassinating the other), and a local heroine/freedom fighter who turns out to be General Garza's niece and who aids the mercenaries in overthrowing him. *See* A66-182 (hereinafter, "*Cordoba Screenplay*"), *passim*.

Between 2006 and 2009, Webb submitted *Cordoba* to eight established screenwriting competitions with varying levels of success: (1) the AAA Screenplay Contest (hosted by *Creative Screenwriting Magazine*);[3] (2) the Austin Film Festival; (3) the Big Break International Screenwriting Contest (hosted by Final Draft, Inc.); (4) the American Zoetrope Screenplay Contest; (5) the PAGE International Screenwriting Awards Competition; (6) the ASA Screenplay Competition (hosted by Gotham Writers' Workshop).  *Cordoba* received some acclaim when it was chosen as a quarterfinalist in the 2009 PAGE Screenwriting Competition and received a "consider" rating at the AAA Screenwriting Competition.  A781, 794, 804.

### The Expendables

In early to mid-2008, approximately two years after Webb wrote *Cordoba*, and after Webb began circulating his work in the industry, Stallone decided he wanted to do "an action-oriented ensemble piece" that would become *Expendables*. A734-35.  *Expendables* would be produced by defendant Nu Image, and its affiliates, Millennium, Alta Vista Productions, Inc., Alta Vista Productions, LLC,

---

[3] The AAA Screenplay Contest did not initially respond to Webb's subpoena *duces tecum* requesting documents and information concerning the judges and staff who reviewed and/or had access to *Cordoba*.  In a follow-up telephone call with a former manager of the AAA Screenplay Contest, Webb's counsel was advised that, to their knowledge, no documents concerning the submission or judging of *Cordoba* were available.  A951-52.

and Double Life Productions, Inc., and distributed by Lions Gate Films, Inc. and Lions Gate Home Entertainment, Inc.

Rather than writing an original work, Stallone had his agents search for screenplays that would provide the basis for *Expendables*.  A457, 733-35.  Stallone received approximately 15 screenplays from his agents, 14 of which Defendants have not identified.  A733-37, 1000.  Stallone does not know where his agents obtained those screenplays.  A736, 763.  Although Stallone "assumes" all these screenplays came from the William Morris Agency, he admits he never asked where the screenplays came from.  A736.  One of the screenplays provided to Stallone was entitled *Barrow* written by David Callaham.  A457.

According to Trevor Short, the Chief Financial Officer of defendant Nu Image, the process of writing *Expendables* was "chaotic, at the best of times." A810-11.  According to Short:

> "The Expendables" was a movie we were going to make and it began with a script and **thousands of people had contributions to it and there were all sorts of different ideas floating around between Mr. Stallone and his camp as to what the movie was going to be**, within my own company of the various executives there as to what it should be, and the thing was becoming a, in my colloquialism, bun fight.
>
> [A808 (emphasis added).]

10

***Defendants' Pre-Litigation Denial of Barrow***

Defendants' principal argument in support of their motion for summary judgment, and throughout this litigation, has been that *Expendables* was the result of Stallone's use of *Barrow* rather than *Cordoba*.  *See* SPA7-8; *see also* Def's. Mem. of Law in Supp. of Their Mot. for Summ. J., pp. 1-3, 6-7, 11, 13, 18, 20-23. Before Webb filed this action, however, nearly all Defendants adamantly denied any connection or similarities between *Expendables* and *Barrow*.[4]

In a signed credits arbitration statement submitted to the WGA on or about August 27, 2009, Stallone stated that he "read and considered 'Barrow' but ultimately set it aside" and "started writing [his] own screenplay for 'The Expendables' in the Spring of 2008[.]"  A827.  In an interview for *Creative Screenwriting Magazine* conducted on May 24, 2010, Stallone similarly claimed that *Expendables* "doesn't use one word, one comma, one iota from [*Barrow*]." A957.  At his deposition, Stallone stated that *Expendables* is "radically different" from *Barrow*.  A739.

Stallone also denied any similarities between *Expendables* and *Barrow* when attempting to prevent Callaham from receiving any credit for *Expendables* by

---

[4] It appears that Stallone initially used *Barrow* without permission of the copyright owner, Warner Bros.  Nu Image only purchased the rights to *Barrow* after Warner Bros. learned of *Expendables* and threatened a lawsuit.  A814, 855.

seeking "sole 'Story by' and sole 'Screenplay by' credit" from the WGA.  *See* A832, 838.  In related submissions to the WGA, Stallone's attorney stated:

> [A] comparative analysis between "The Expendables" and "Barrow" reveals there are **absolutely no similarities between the two scripts**, save one log line – a corrupt dictator on an island nation who must be removed from power.  Aside from that one unoriginal idea or theme, **there are no similarities between the two scripts**.
>
> [A833-34 (emphasis added).]

Specifically, Stallone's attorney denied any similarities between the scenes and plots:

> There is also no dispute that **every single scene in The Expendables differs from that of Barrow**.  Indeed, the story beats, the plot twists, the key plot points, all differ in The Expendables from those found in Barrow.  And, all of the action set pieces differ, something even the arbiters found.  **There simply are no cross-over plot points** between The Expendables and Barrow.
>
> [A836-37 (emphasis added).]

Stallone's attorney also denied all similarities between the characters in the two works:

> Notably, there is **no overlap between any of the characters found in The Expendables from those in Barrow**.  In fact, all of the characters in The Expendables are wholly original.  This fact is underscored by the different backgrounds of the characters in The Expendables from those found in Barrow.
>
> [A837 (emphasis added).]

In sum, Stallone's attorney completely denied that *Barrow* was in any way the source for *Expendables*:

> In short, aside from the unoriginal idea of staging a coup against a corrupt dictator on an island nation, **everything else in The Expendables has been created by [Stallone]. [Stallone] created original scenes. [Stallone] created original dialogue. [Stallone] created original characters. [Stallone] created original plots and twists**. . . .

> [*Id.* (emphasis added).]

Other Defendants – including Callaham, *Barrow's* author – likewise denied any similarities between *Barrow* and *Expendables* before this litigation began.  For example:

- Callaham wrote: "HOLY S--- [*The Expendables*] SCRIPT IS AWFUL . . . I want you to know that it's nothing like what I wrote."  A825.

- Callaham wrote: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine.  Everything else . . . I plead the fifth."  A885.

- Short of Nu Image wrote:  "[*The Expendables*] project … bears no resemblance to or similarity with the project entitled "Barrow", which we understand is owned by Warner Bros."  A820.

- Avi Lerner, the Owner of Nu Image, wrote: "[W]e will prove that barrow [*sic*] is A [*sic*] different script then Expendables."  A867.

- Lonnie Ramati, Vice President of Business and Legal Affairs at Millennium, wrote: "We are willing to do that deal which is a favor to the producers since our film and our

13

script and our story, 'The Expendables' are definitely <u>not</u> 'Barrow.'  A823.

In its insurance application for *Expendables*, Nu Image responded "N/A" to an inquiry concerning any "underlying works" for the film and did not check the box indicating *Expendables* was "[b]ased on another work."  A858, 860.  Later, upon learning of Webb's Complaint, Callaham wrote:

> **[W]hat's interesting is that while I clearly didn't steal [Webb's] script, I guess it's not entirely out of the realm of possibility that Stallone did.  The specifics mentioned in the article as similarities are things that Stallone added…  I didn't have that opening scene and my general wasn't named Garza.  And at this point would it be shocking to discover that [Stallone] stole the script from not one but two people?**

> [A872 (emphasis added).]

### *Striking Similarities Between Cordoba and Expendables*

Webb learned of the impending release of *Expendables* in late 2009 or early 2010.  A401.  After obtaining a copy of the *Expendables* screenplay and watching the film, Webb discovered that *Expendables* was remarkably similar to *Cordoba*.  A777.  Among the most apparent similarities:

- In both works, American mercenaries overthrow a Latin American dictator, named General Garza, who is persecuting his country's peasantry to increase cocaine production.  *See Cordoba Screenplay*, *passim*; *Expendables* Motion Picture (hereinafter, *Expendables* DVD).

- In both works, the villain is bifurcated into General Garza and his accomplice, who is adverse to General Garza and maintains his own power base and security personnel.  *Id.*

14

- Both works open with a hostage rescue at sea. *See Cordoba Screenplay* at A67-69; *Expendables* DVD.

- In both works, the mercenaries meet a local female freedom fighter closely related to General Garza who assists the mercenaries in overthrowing the regime. *See Cordoba Screenplay*, *passim*; *Expendables* DVD.

- In both works, the accomplice rummages through the heroine's apartment, arrests her, and reveals her identity to General Garza. In both works a torture scene follows in which the accomplice seeks to elicit critical information from the heroine. *See Cordoba Screenplay* at A154-60; *Expendables* DVD.

- In both works, General Garza gives a speech to his people from the presidential palace and is shot and killed by the accomplice – not the hero – before the mercenaries execute their coup and rescue the heroine from the accomplice. *See Cordoba Screenplay* at A155-64, 170-78, *passim*; *Expendables* DVD.

- In both works, the hero is initially reluctant to take the mission, but later changes his mind because a woman's life is at stake. *See Cordoba Screenplay*, *passim*; *Expendables* DVD.

- The description of the presidential palace, including a statue of General Garza in the courtyard, a balcony overlooking an outdoor central staircase, an outdoor swimming pool, neoclassical architecture, and a series of interconnected tunnels, cells and torture chambers, all of which play identical roles in the two stories. *See Cordoba Screenplay* at A70, 133, 145-46, 157, 182, *passim*; *Expendables* DVD.

### Webb's Expert, Michael Elias

To obtain a second professional opinion as to the perceived similarities and differences between *Cordoba* and *Expendables*, and in light of Defendants'

insistence that *Expendables* was based on *Barrow* rather than *Cordoba*, Webb retained Elias, a 40-plus-year screenwriting veteran and long-time credits arbiter and consultant to the WGA.  A959-61.  Elias' opinion confirmed Webb's suspicion that "there is no reasonable possibility that Stallone authored the screenplay for *Expendables* without access to, and copying, [*Cordoba*]."  A961.

### *Defendants' Motion for Summary Judgment*

On March 15, 2012, Defendants moved for summary judgment.  A15.  On June 25, 2012, the district court granted Defendants' motion by "bottom-line" order.  SPA1.  Six months later, on December 27, 2012, the district court entered a Memorandum Order stating the basis for its decision.  SPA2.  The district court recognized Defendants' complete, incredible about-face concerning *Expendables'* origin:

> The fact that Stallone now admits <u>Barrow</u> was a source for <u>The Expendables</u> is not by itself sufficient to warrant summary judgment on the ground of independent creation.  **Indeed, the admission smacks more than a little of hypocrisy.**  Stallone previously asserted in a signed letter submitted in his Writer's Guild of America arbitration with defendant Callaham, <u>Barrow</u>'s author, that although he read <u>Barrow</u>, he "set it aside," and that Expendables was "an . . . original . . . and doesn't use one word, one comma, one iota from [<u>Barrow</u>]."  The arbitration panel rejected Stallone's argument, and awarded Callaham "story by" credit and shared "screenplay by" credit.  **It is only now, when it is in his self interest, that Stallone admits to copying Barrow.  In the face of such inconsistency, the question of whether to credit Stallone's declaration that he has never seen Cordoba and wrote The**

**Expendables entirely independent of Cordoba is for the factfinder to decide.**

[SPA8-9 (citations omitted)(emphasis added).]

In regard to Defendants' denial of access to *Cordoba*, the district court recognized that "Stallone testified that he gets screenplays from his agents, but **does not know where his agents obtain those screenplays**." SPA11 (emphasis added). The district court further noted that "[b]efore writing The Expendables, Stallone reviewed fifteen screenplays from **unknown sources**." *Id.* (emphasis added). Finally, the district court mentions Trevor Short's admission "that writing the Expendables was **'chaotic, at the best of times,'' with 'contributions,' from 'thousands of [unidentified] people**.'" *Id.* (emphasis added).

Despite these statements, the district court found Webb's direct access argument to fail as a matter of law. The district court rejected Webb's "striking similarity" analysis based, in large part, on statements made by Stallone (whose credibility had already been undermined) and hearsay information obtained from sources outside the record, including the Internet Movie Database ("IMDB" or "IMDB.com") and Grantland.com. SPA14, 17. After discussing only three of the numerous striking similarities between *Cordoba* and *Expendables*, and without discussing the strikingly similar arrangement of these elements in the two works, the district court held that Webb "failed to show the [*sic*] Cordoba and Expendables are so strikingly similar as to permit a reasonable juror to infer

17

access[.]"  SPA19.[5]  Accordingly, the district court granted Defendants' motion and this appeal followed.

## SUMMARY OF ARGUMENT

The district court's decision to grant summary judgment for Defendants was error and should be reversed.  The district court found issues of fact as to both access and copying, the second and only contested prong of the copyright infringement test (the first prong, ownership, was conceded).  Specifically, the district court concluded that "the question of whether to credit Stallone's declaration that he has never seen Cordoba and wrote The Expendables entirely independent of Cordoba is for the factfinder to decide."  SPA9.  The question as to Stallone's credibility was critical to this litigation because Defendants' primary defense to Webb's infringement claim was that Stallone copied *Barrow*, rather than *Cordoba*, when "writing" *Expendables*.  Prior to this litigation, in contrast, nearly every defendant adamantly denied any connection between *Barrow* and *Expendables*.  As the district court correctly recognized, "[i]t is only now, when it is in his self interest, that Stallone admits to copying Barrow."  *Id.*

---

[5] In a footnote, the Court also noted: "Although the Court therefore does not reach the issue of whether defendants infringed elements of plaintiff's work that are legally protectable, the evidence put forth by plaintiff likewise appears insufficient to show any infringement by The Expendables of protected elements in Cordoba."  SPA19.

Although the district court properly recognized the existence of disputed issues of fact and credibility issues as to access and copying, the district court failed to recognize that Stallone's utter lack of credibility permeated every argument presented by Defendants. These issues of fact resulting from Stallone's recognized lack of credibility on access and copying should have alone precluded summary judgment. The district court then moved to an erroneous striking similarity analysis that relied almost entirely on the testimony of Stallone (whose credibility had been undermined), hearsay evidence from outside the record, and the court's own subjective interpretation of only three of the many similarities presented. That analysis was also reversible error.

In its flawed striking similarity analysis, the district court also discarded the opinion of Webb's expert, a screenwriting veteran and WGA credits arbiter and consultant, who, among other salient points, concluded that "there is no reasonable possibility that Stallone authored the screenplay for *Expendables* without access to, and copying, [*Cordoba*]." A961. It is well-settled that expert testimony is permissible on striking similarity and should have been considered.

Finally, the district court suggested (in *dictum*, in a concluding footnote and without analysis) that no reasonable juror could find "protectable" similarities between the two works indicative of infringement. In doing so, the district court appears to have misunderstood or misapplied well-settled Second Circuit precedent

19

governing originality and protectability in copyright.

For these reasons and the reasons set forth below, summary judgment should have been denied. The judgment should be reversed and the case remanded for a jury trial.

## STANDARD OF REVIEW

This Court reviews "the District Court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to … the non-moving party." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003); *see also Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).

## ARGUMENT

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright;[6] and (ii) unauthorized copying of the copyrighted work." *Jorgensen*, 351 F.3d at 51, citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991). "To satisfy the second element of an infringement claim … a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" *Id.*, quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d, 137 (2d Cir. 1998).

---

[6] Webb's ownership was conceded for purposes of Defendants' summary judgment motion. SPA6-7.

"Actual copying may be established by direct or indirect evidence." *Id.*, citing *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001). "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyright material,' and that there are similarities between the two works that are 'probative of copying.'" *Id.*, quoting *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1249 (11th Cir. 1999); *Repp v. Webber*, 132 F.3d 882, 889-90 (2d Cir. 1997), *cert. denied*, 525 U.S. 815 (1998).

"There is an inverse relationship between access and probative similarity such that 'the stronger the proof of similarity, the less the proof of access is required." *Id.* at 56, quoting NIMMER ON COPYRIGHT, § 13.03[D] (2013). Accordingly, under the doctrine of "striking similarity," this Court has "held that were the works in question are 'so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.'" *Id.*, quoting *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995); *see also Repp*, 132 F.3d at 889 (reversing district court's grant of summary judgment where striking similarity was shown to be a genuine issue of fact); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067-68 (2d Cir. 1988)(finding sufficient evidence to "permit the jury to infer access based on striking similarity"). "**[S]triking similarity is a question of fact to be left to the jury where reasonable minds could differ**."

*Vargas v. Transeau*, 514 F.Supp.2d 439, 443 (S.D.N.Y. 2007), *aff'd*, 352 Fed.Appx. 458 (2d Cir. 2009), citing *Repp*, 132 F.3d at 890-91 and *Gaste*, 863 F.2d at 1068-69.

Applying these doctrines to this case, the grant of summary judgment was error and should be reversed.

## I. CREDIBILITY ISSUES PERMEATE THE ENTIRE SUMMARY JUDGMENT RECORD, PRECLUDING SUMMARY JUDGMENT ON THE ISSUE OF COPYING.

This Court has long recognized the "settled rule that '[c]redibility assessments … are matters for the jury, not for the court on a motion for summary judgment.'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 1997), quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996); *see also Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 174 (2d Cir. 2006)("[C]redibility, in the ordinary course of things, if for a fact-finder to evaluate.")  Accordingly, "summary judgment is proper only when, with all permissible inferences **and credibility questions** resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict, *i.e.*, it is quite clear what the truth is." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (emphasis added) (internal quotation marks omitted).  Here, it is far from clear that the truth lies with Defendants. Rather, credibility questions precluded summary judgment.

In the context of allegations of copyright infringement, courts of this Circuit have held that "where … credibility, including that of the defendant, is crucial, summary judgment becomes improper and a trial indispensible." *Arnstein v. Porter*, 154 F.2d 464, 471 (2d Cir. 1946); *see also Lipton*, 71 F.3d at 472 ("Determinations of credibility are within the province of the jury and may not be resolved on summary judgment"); *Medical Ed. Dev. Servs., Inc. v. Reed Elsevier Group*, PLC, 2008 WL 4449412, *5 (S.D.N.Y. Sept. 30, 2008)(denying summary judgment, in part, on the issue of copying; holding that the resolution of whether defendant had possession of the subject work at the time she wrote the infringing works "involves credibility determinations properly reserved for a jury"); *Price v. Fox Entertainment Group, Inc.*, 2007 WL 241398, *9 (S.D.N.Y. Jan. 26. 2007)(denying summary judgment; holding the question of whether a jury could find "a reasonable possibility" of access based on the evidence presented involved "issues of credibility … that must be decided by the jury").

Similar to the present case, in *Arnstein*, there was evidence that some of the subject works had been disseminated and/or performed on a limited basis. *Arnstein*, 154 F.2d at 467, 469-70.  The defendant, like Stallone, "categorically denied that he had ever seen or heard any of plaintiff's compositions or had any acquaintance with any persons said to have stolen any of them." *Id.* at 467.  The

Court went on to hold that summary judgment was improper, in part, because of

defendant's credibility as to whether he had access to plaintiff's works:

> If, after hearing both parties testify, the jury disbelieves defendant's denials, it can, from such facts, reasonably infer access. **It follows that, as credibility is unavoidably involved, a genuine issue of material fact presents itself. With credibility a vital factor, plaintiff is entitled to a trial where the jury can observe the witness while testifying**.[7]
>
> [*Id.* at 469 (emphasis added).]

This case presents an even clearer case than *Arnstein* that issues of fact exist on

access and copying. In *Arnstein*, this Court found credibility questions to preclude

summary judgment despite the fact that "plaintiff … by his affidavits … offered

nothing which discredit[ed] the honesty of the defendant." *Id.* at 471. Credibility

questions are significantly more apparent here, where the district court expressly

recognized issues of fact as to access and copying based on Defendants' numerous

inconsistent statements and "hypocri[tical]" defenses regarding the source material

for *Expendables*. SPA8.

This case is unique in that the district court granted summary judgment on

access and copying after explicitly holding that, due to Stallone's lack of

---

[7] While it is recognized that the summary judgment standard as set forth in *Arnstein* has evolved over time (specifically, the modification of the "slightest doubt" test (*see, e.g., Denker v. Uhry*, 820 F.Supp. 722, 729 (S.D.N.Y. 1992)), this Court's long-standing recognition that summary judgment is inappropriate in copyright and other matters where "credibility is a vital factor" has not been vitiated.

24

credibility, issues of fact existed on  both of those issues: (i) "**whether to credit Stallone's declaration that he has never seen Cordoba"**; and (ii) whether Stallone **"wrote The Expendables entirely independent of Cordoba**."  SPA9 (emphasis added).  The district court ignored that Stallone's credibility, or lack thereof, pervaded every argument Defendants presented.

Defendants made three main arguments in support of their motion for summary judgment: (i) "Barrow, defendants' admitted source for The Expendables, was written before Cordoba, thus showing creation independent of Webb's work;" (ii) "Webb cannot show that Stallone had access to Cordoba when Stallone drafting The Expendables;" and (iii) "there are no similarities between Cordoba and Expendables that are probative of copying."  SPA7.  The district court flatly rejected Defendants' independent creation argument based on Defendants' frequent and consistent denials that *Barrow* was the source of *Expendables*:

> The fact that Stallone now admits Barrow was a source for The Expendables is not by itself sufficient to warrant summary judgment on the ground of independent creation.  **Indeed, the admission smacks more than a little of hypocrisy.**  Stallone previously asserted in a signed letter submitted in his Writer's Guild of America arbitration with defendant Callaham, Barrow's author, that although he read Barrow, he "set it aside," and that Expendables was "an . . . original . . . and doesn't use one word, one comma, one iota from [Barrow]."  The arbitration panel rejected Stallone's argument, and awarded Callaham "story by" credit and shared

25

"screenplay by" credit.  **It is only now, when it is in his self interest, that Stallone admits to copying Barrow. In the face of such inconsistency, the question of whether to credit Stallone's declaration that he has never seen Cordoba and wrote The Expendables entirely independent of Cordoba is for the factfinder to decide.**

[SPA8-9 (citations omitted)(emphasis added).]

Thus the district court correctly found issues of fact as to **both** access ("the question of whether to credit Stallone's declaration that he has never seen Cordoba") and copying ("the question of whether to credit Stallone's declaration that that he … wrote The Expendables entirely independent of Cordoba).  *Id.*  The district court's express recognition that issues of fact exist as to the entire second prong of the infringement analysis (the first prong having been conceded) should have alone warranted a denial of Defendants' summary judgment motion.

### A.     The District Court Found Issues Of Fact As To Access, Yet Still Granted Summary Judgment.

This Court has long recognized that access and copying can rarely be proven directly and that defendants rarely confess.  *See*, *e.g.*, *Gaste*, 863 F.2d at 1066 ("Because copiers are rarely caught red-handed, copying has traditionally been proven circumstantially by proof of access and substantial similarity.")  Access may be inferred, however, even without striking similarity, where "a party had a **reasonable possibility** of viewing the prior work."  *Boisson*, 273 F.3d at 270 (emphasis added).  As Professor Nimmer explains:

26

> **Just as it is virtually impossible to offer direct proof of copying, so it is often impossible for a plaintiff to offer direct evidence that defendant (or the person who composed defendant's work) actually viewed or had knowledge of plaintiff's work**. Such viewing will ordinarily have occurred, if at all, in a private office or home outside of the presence of any witnesses available to the plaintiff. For this reason, it is clear that, even if evidence is unavailable to demonstrate actual viewing, proof that the defendant had the opportunity to view (when combined with probative similarity) is sufficient to permit the trier to conclude that copying as a factual matter has occurred – **in other words, the factfinder has the discretion to reject even the uncontradicted testimony of the writer of defendant's work that he had never in fact viewed plaintiff's work. But this result is often reached through the courts' reasoning that the opportunity to view creates an inference of access, which in turn creates an inference of copying**.
>
> [Nimmer on Copyright, § 13.02[A](2011) (emphasis added).]

Here, the district court correctly recognized that access was a disputed factual issue for the jury, holding "the question of whether to credit Stallone's declaration that **he has never seen Cordoba** … is for the factfinder to decide." SPA9 (emphasis added). This determination was based predominantly on Defendants' unyielding pre-lawsuit denial of *Barrow* as a source for *Expendables*, contrasting with Defendants' later decision to reverse their position when it was in their "self-interest" to do so. *Id.*

For example, according to Stallone, he "read and considered 'Barrow' but ultimately set it aside" and "started writing [his] own screenplay for 'The

27

Expendables' in the Spring of 2008[.]"    A827.    Stallone further claimed that

*Expendables* "doesn't use one word, one comma, one iota from [*Barrow*]" and is

"radically different" from *Barrow*.  A957, 739.  As set forth in greater detail above,

Stallone's attorney, writing on Stallone's behalf in connection with a WGA

arbitration in which Stallone sought "sole 'Story by' and sole 'Screenplay by'

credit" for *Expendables*, similarly stated: "[A] comparative analysis between "The

Expendables" and "Barrow" reveals there are **<u>absolutely no similarities between</u>**

**<u>the two scripts</u>**, save one log line – a corrupt dictator on an island nation who must

be removed from power.  Aside from that one unoriginal idea or theme, there are

no similarities between the two scripts."  A832-34, 838 (emphasis added).

As quoted above, other Defendants (including Callaham) likewise denied

any similarities between *Barrow* and *Expendables* before this litigation began.  For

example, Callaham wrote that *Expendables* is "nothing like" *Barrow* other than

perhaps "the idea and very loose structure" of the two works.  A825, 885.  Trevor

Short of Nu Image agreed, stating that *Expendables* "bears no resemblance to or

similarity with the project entitled 'Barrow'[.]"  A820.  Avi Lerner of Nu Image

similarly argued that "[Barrow] is [a] different script then Expendables."  A867.

Lonnie Ramati of Millennium concurred, emphatically stating that the "film and

our script and our story, '[t]he Expendables' are definitely <u>not</u> 'Barrow.'"  A823.

These statements are consistent with Nu Image's insurance application for

28

*Expendables*, where they responded "N/A" to an inquiry concerning any "underlying works" for the film and did not check the box indicating *Expendables* was "[b]ased on another work."  A858, 860.

Adding additional ambiguity as to the source material for *Expendables*, Stallone admitted "that he gets screenplays from his agents, **but does not know where his agents obtain those screenplays**" and that "[b]efore writing The Expendables, Stallone reviewed fifteen screenplays from **unknown sources**." SPA11 (emphasis added).  Similarly, Trevor Short of Nu Image admitted that the writing of *Expendables* was "chaotic, at the best of times," with **"contributions," from "thousands of people**."  *Id.* (emphasis added).

Given the above denials and resulting credibility questions as to the actual source material for *Expendables*, the district court properly rejected Defendants' independent creation argument, but failed to appreciate the implications of same in regard to Defendants' access argument and the inherent issues of fact therein. Instead, Webb's indirect evidence of access (including his submission of *Cordoba* to eight well-known screenwriting competitions), coupled with Stallone's (and the other Defendants') utter lack of credibility, Stallone's admission that he has no idea where the screenplays came from, and the striking similarities between the

29

works (discussed below), was sufficient to permit a reasonable juror to infer that

Stallone had access to *Cordoba* when writing *Expendables*.[8]

### B.  **The District Court Found Issues Of Fact As To Copying, Yet Still Granted Summary Judgment.**

In addition to finding issues of fact on the question of access, the district

court also recognized that copying was a disputed factual issue for the jury,

holding "the question of whether to credit Stallone's declaration that **he … wrote**

**Expendables entirely independent of Cordoba** is for the factfinder to decide."

SPA9 (emphasis added).   Although in its analysis, the district court did not

delineate the test for copying into its subparts – access and probative similarity –

the striking (and therefore, *a fortiori,* probative) similarities between *Cordoba* and

*Expendables* are manifestly sufficient to justify an inference of access or, at a

minimum, establish that "reasonable minds could differ" as to whether Stallone

copied *Cordoba*.  *Vargas v. Transeau*, 514 F.Supp.2d at 443 (citations omitted).

---

[8] The district court's very choice of language underscores that it usurped the jury's fact- and credibility-finding roles.  For example, the district court stressed that Webb "is **not a professional screenwriter**" SPA10 (emphasis added).  The fact that Webb is not a "professional screenwriter," but only a professional writer, has no bearing on whether Webb's work was protectable or whether Defendants had access to and copied *Cordoba*.  Moreover, the district court inexplicably belittled the eight prominent screenwriting competitions to which Webb submitted his work, putting quotation marks around "well-known" and editorializing that they "purportedly" are set up to discover new material.  SPA10-11.  It was for the jury, not the district court, to weigh the prominence and function of these competitions.

Examples of some, but not all, of the similarities between the works from which copying can be inferred – none of which exist in *Barrow* – include: (1) the identical name of the dictator, General Garza (*Cordoba Screenplay*, *passim*; *Expendables* DVD); (2) a local female freedom fighter closely related to General Garza who assists the mercenaries in overthrowing him (*Id.*);[9] (3) the existence and adverse role of General Garza's accomplice, who ultimately kills him (rather than the hero killing General Garza)(*Cordoba Screenplay*, 170-178, *passim*; *Expendables* DVD);[10] (4) an opening scene involving a hostage rescue at sea (*Cordoba Screenplay* at A67-69; *Expendables* DVD);[11] (5) the existence of two separate security forces for General Garza and his accomplice, with distinctly colored uniforms (*Cordoba Screenplay*, *passim*; *Expendables* DVD); (6) the accomplice rummaging through the heroine's apartment, the heroine's arrest to General Garza's dismay and outrage, and the ensuing torture scene (in the same sequence) (*Cordoba Screenplay* at A154-167, *passim*; *Expendables* DVD); (7) the

---

[9] Stallone asserted at his deposition that "the idea of Sandra being related to Garza" was original to *Expendables*, thus admitting it was not from *Barrow*. A744.

[10] Stallone asserted at his deposition that the "idea of Monroe killing the general" was original to *Expendables*, thus admitting it was not from *Barrow*. A748.

[11] Stallone asserted at his deposition that "the idea to add the hostage rescue with the pirates to the script" was "original" to *The Expendables*, thus admitting is was not from *Barrow*. A743. Callaham similarly denied the existence of "the opening scene" in *Barrow*. A872.

hero's initial reluctance to take the mission, and his later decision to do so because a woman's life is at stake (*Cordoba Screenplay*, *passim*; *Expendables* DVD); (8) cocaine as a source of the Garza regime's wealth and General Garza's persecution of peasants to further cocaine production (*Cordoba Screenplay* at A71, 76, *passim*; *Expendables* DVD); (9) the description of the presidential palace, including a statue of General Garza in the courtyard, a balcony overlooking an outdoor central staircase, an outdoor swimming pool, neoclassical architecture, and a series of interconnected tunnels, cells and torture chambers, all of which play identical roles in the two stories (*Cordoba Screenplay* at A70, 133, 145-46, 157, 182, *passim*; *Expendables* DVD); (10) General Garza's speech to his countrymen moments before he is shot and killed by his accomplice (*Cordoba Screenplay* at A155-64, 170-78, *passim*; *Expendables* DVD); (11) the attempted use, and destruction of, the accomplice's escape helicopter (*Cordoba Screenplay* at A174; *Expendables* DVD); (12) the use of the heroine as a human shield in the accomplice's escape (*Cordoba Screenplay* at A176; *Expendables* DVD);[12] (13) a one-on-one standoff where the hero kills the accomplice in a surprise shooting tactic after the accomplice puts a gun to the heroine's head (*Cordoba Screenplay* at A176-77; *Expendables* DVD); and (14) a suggestion of a future relationship between the hero and heroine

---

[12] Stallone asserted at his deposition that the idea of Monroe taking Sandra hostage while escaping was original to *Expendables*, thus admitting it was not from *Barrow*.  A767-68.

(*Cordoba Screenplay* at A181; *Expendables* DVD).    The only reasonable explanation for these, and other, striking similarities is that *Expendables* was copied from *Cordoba*.  Even more striking, and as discussed further below, **all of these unique similarities collectively appear in both works and unfold in the same sequence**.  *See Cordoba Screenplay*, *passim*; *Expendables* DVD.

### C.    The Striking Similarities Between *Cordoba* and *Expendables* Should Have Precluded Summary Judgment.

This Court has held that "where there are striking similarities probative of copying, proof of access may be inferred: 'If the two works are so strikingly similar as to **preclude the possibility of independent creation**, copying may be proved without a showing of access.'"  *Repp*, 132 F.3d at 889, quoting *Lipton*, 71 F.3d at 471 (emphasis added).  In *Repp*, this Court, reversing the lower court's grant of summary judgment, held: "[W]hile there was little, if any, evidence demonstrating access, there was considerable evidence that [the infringing work was] so strikingly similar to [the original work] as to **preclude the possibility of independent creation and to allow access to be inferred without direct proof**."

*Id.* at 890.  Similarly, in *Gaste*, this Court explained:

> In this Circuit, the test for proof of access in cases of striking similarity is less rigorous.  In *Arnstein v. Porter*, Judge Frank said, 'In some cases, the similarities between the plaintiff's and defendant's work are so extensive and striking as, *without more*, both to justify an

33

inference of copying and to prove improper appropriation.'"

[*Gaste*, 863 F.2d at 1067-68 (internal citations omitted), quoting *Arnstein*, 154 F.2d at 468-69.]

It is also acknowledged that "**striking similarity is a question of fact to be left to the jury where reasonable minds could differ**." *Vargas*, 514 F.Supp.2d at 443 (citations omitted).

Here, the district court held that independent creation had not been established as a matter of law, yet dismissed the possibility that a reasonable juror could infer access to *Cordoba* based on the "striking similarities" between the works. Even viewed in the light most favorable to Defendants (which, of course, is not the applicable standard), based on the numerous striking similarities between the works, it is clear that "reasonable minds could differ" as to whether Stallone had access to and copied *Cordoba*. *Vargas*, 514 F.Supp.2d at 443, citing *Repp*, 132 F.3d at 890-91 and *Gaste*, 863 F.2d at 1068-69.

In fact, one need no look further than Callaham, who, upon learning of this action and reviewing an article discussing only a few of the similarities between the *Cordoba* and *Expendables*, concluded:

> **[W]hat's interesting is that while I clearly didn't steal [Webb's] script, I guess it's not entirely out of the realm of possibility that Stallone did. The specifics mentioned in the article as similarities are things that Stallone added... I didn't have that opening scene and my general wasn't named Garza. And at this**

34

**point would it be shocking to discover that [Stallone] stole the script from not one but two people?**

[A872 (emphasis added).]

If Callaham, a professional screenwriter and the author of *Barrow*, could conclude that even a few basic similarities between *Cordoba* and *Expendables* were indicative of access/copying (particularly in light of the fact that the noted similarities were admitedly not in *Barrow*), a reasonable jury, with **all** the alleged similarities before it, could come to the same conclusion. *Id.* Webb should have been allowed to have a jury make that determination.

Furthermore, it is well-settled in this Circuit that "[s]triking similarity can be shown through expert testimony." *Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429, 439 (S.D.N.Y. 2011), *aff'd*, 2012 WL 5439910 (2d Cir. Nov. 8, 2012)(permitting expert testimony on issue of striking similarity between a screenplay and film), citing *Gaste*, 863 F.2d at 1068; *see also* Repp, 132 F.3d at 891. In *Repp*, for example, this Court held that "the district court fell into error in rejecting the evidence presented by the plaintiffs," which included the "unequivocal opinions" of their experts. *Repp*, 132 F.3d at 890-91. Similarly, in *Gaste*, this Court held there to be "sufficient evidence to permit the jury to infer access based on striking similarity" based on "aural renditions of the songs **and expert testimony**." *Gaste*, 863 F.2d at 1068.

35

As in *Repp*, here, the district court erred in rejecting the parties' experts, stating:

> The Court doubts that these expert reports are admissible under Fed. R. Evid. 702; indeed, they involve no true expertise whatsoever. But neither party moved to strike. Assuming, <u>arguendo</u>, that the reports were admissible, they would not change the Court's conclusion. They simply assert conclusions on similarity based on reading the screenplays, which the Court was more than able to do without the benefit of the reports.

[SPA18-19.]

It was error for the district court to grant summary judgment in the face of expert opinions with which the court simply disagreed. It was for a jury to weigh such expert testimony, along with the other evidence.

The district court's assertion that both sides' expert opinions in this case "involve no true expertise whatsoever" – even though neither side moved to strike – was without foundation. *Id.* As mentioned, Webb retained Michael Elias ("Elias"), a 40-plus-year screenwriting veteran and long-time WGA credits arbiter and consultant, to analyze the striking similarities and differences between the subject works. A959-61. Elias' opinion, which was memorialized in an declaration filed in connection with this motion, confirmed that "there is no reasonable possibility that Stallone authored the screenplay for *Expendables* without access to and copying [*Cordoba*]." A961. Elias analyzed the two works in detail and wrote:

36

There are at least 35 strikingly similar elements in Webb's screenplay that also appear in Stallone's screenplay. **That is a compelling and significant number that can only lead me to conclude that these similarities are not coincidental and that Stallone had access to Webb's screenplay and wrongfully copied critical plot, character, and other elements from it**. These similar elements are **not boilerplate** elements of mercenary or action films but are **unique and deliberate creative choices** that are combined in a strikingly similar way into an **original and compelling storyline**. *Expendables* is driven by a series of characters and plot elements, many of which can be traced directly to *Cordoba*. **There is no reasonable explanation for these unique similarities in plot structure and development other than the fact that one was copied from the other**.

[A961 (emphasis added).]

In addition to these conclusions, Elias makes several salient points that may not be immediately evident to the lay juror and should have been considered by the district court. For example, in regard to General Garza's accomplice/adversary/assassin, Elias wrote,

What Webb has done in [*Cordoba*] is to bifurcate the villain, or split him in two. This unique and creative device provides tension and conflict within the world of General Garza to the point that the 'other half' eventually kills him. The same technique of bifurcation is used in [*Expendables*], and to the same effect[.] This device . . . is not commonplace, necessary, or stock material in mercenary films, where the logical progression would be for the hero to overcome and/or kill General Garza.

[A964.]

As for the similarities between the works' heroines, Elias wrote:

37

> Among the most significant examples of unique and original elements that could not reasonably be attributed to coincidence or prior works is the relationship of the heroine to Garza.
>
>                    ***
>
> The women in both works turn out to be related to Garza; Salvadora/Renata in *Cordoba* is Garza's niece, while Sandra in *Expendables* is Garza's daughter. They both have a relationship with the hero and oppose their relative's regime. It is true that Renata in *Cordoba* is the leader of the rebels while Sandra in *Expendables,* while opposed to Garza's regime, is not explicitly unveiled as the leader of the resistance (although described in the press materials as a "freedom fighter"). However, the idea of having the leader of a country whose female blood relative is playing a significant role in the opposition is what is critical to the development of the story, unique to Webb's screenplay, and copied by Stallone. These elements do not appear in *Barrow*.

[A964-65.]

With respect to the similarities between the settings of the works' opening sequences, Elias noted:

> [T]his scene could have taken place on land, on a battlefield, on a train, on a plane, in a car, or in a two-story textile office in Iraq, as was the case in *Barrow*. But instead, in both [*Cordoba*] and [*Expendables*], the hostage rescue takes place at sea.

[A971.]

As for the accomplice shooting and killing General Garza, Elias wrote:

> In *Cordoba*, following the speech, Torres turns on Garza, shoots and kills him. In *Expendables*, following the speech, Munroe turns on Garza, shoots and kills him. As

38

noted earlier, what is unique and original is the fact that the main villain, Garza, is killed not by the hero, as would be commonplace in the genre, but by his accomplice, and the fact that the accomplice was in a position to do so. This element does not appear in *Barrow*.

[A969.]

As for the similarities between the two presidential palaces, Elias wrote:

In *Cordoba,* Garza's presidential palace is "neoclassical"; is dominated by a statue of Garza in the courtyard; has a prominent balcony overlooking an outdoor central staircase; has an outdoor swimming pool; and has underground-connected tunnels and holding cells for prisoners. In *Expendables*, Garza's presidential palace is also neoclassical in its architecture; is dominated by a statue of Garza in the courtyard; has a balcony overlooking an outdoor central staircase; has an outdoor swimming pool; and has underground tunnels, cells and torture chambers. These similarities are made even more significant in that they are used in a specific way in the action of the movie. Although it may be argued that a presidential palace is common to the genre and necessary to the story, it is significant that Stallone has used a dominant statue of the dictator, a large outdoor swimming pool, a balcony overlooking a central outdoor staircase, underground tunnels and cells, all as first described in Webb's screenplay. Aside from the mention of a tower behind the palace and the existence of a front courtyard and a large roof, there is no description of the palace in *Barrow*.

[A966.]

Under the law of this Circuit, these observations, made by an individual with more than forty years of screenwriting experience and a career as a WGA arbiter and consultant, could not be ignored, particularly in the context of a striking

39

similarity analysis.  Rather, Webb was entitled to have the jury hear and weigh the opinion of his expert, who has a sophisticated and elevated understanding of how screenplays are conceived and written, how themes, plots, and characters are developed, and, ultimately, whether, as here, two works are so similar as to preclude the possibility of independent creation.

In this case, Defendants also proffered an expert opinion on the summary judgment motion – and the jury could have read his opinion to *support* a finding of striking similarity between the works at issue.  Defendants' Expert, David McKenna opined an "obvious and **'striking' similarity** between EXPENDABLES and BARROW."  A1005 (emphasis added).  The jury could have found that *Expendables* was much more similar to *Cordoba* than it was to *Barrow* – and, therefore, that *Expendables* was strikingly similar to *Cordoba*.  Defendants should not be permitted, in turn, to argue that there is no possibility a reasonable juror could find striking similarities between *Expendables* and *Cordoba* (particularly given the number of similarities not otherwise present in *Barrow*).  Although Webb disagrees with McKenna's overall analysis and conclusion, McKenna's argument undermines one of Defendants' main arguments, namely that there are no protectable similarities between *Expendables* and *Cordoba* that could warrant a finding of striking similarity and an inference of access by the trier of fact.

There are additional flaws in the district court's striking similarity analysis. The district court relied heavily and, at times, exclusively, on: (i) statements and explanations by Stallone (whose credibility was undermined); and (ii) hearsay information from outside the summary judgment record.  SPA14-17.  In its analysis of the "Antagonists," for example, the district court states: "**Stallone states** that 'Miramonte' [the name of the antagonist in *Barrow*] was too long a name, and in changing various names in Callaham's script, he chose famous boxers for his hero (Barney Ross), and his antagonist (Jaime Garza)."  SPA14-15 (emphasis added).  Whether to accept Stallone's explanation that he independently and coincidentally conceived of the name General Garza (**the identical name used in *Cordoba***) for use in a screenplay **containing numerous overlaps with *Cordoba***, particularly in light of his recognized lack of credibility, is unquestionably an issue of fact for the jury on which "reasonable minds could differ."  *Vargas v. Transeau*, 514 F.Supp.2d at 443 (citations omitted).

Later, in its analysis of the "Heroine," the district court, again citing Stallone, states: "Indeed, after reviewing the scripts, the Court finds that Sandra **appears to** have more in common with Sophie, the female guide character from Barrow (who was originally a minor character) than with Renata."  SPA16 (emphasis added).  It was for the jury, not the court on summary judgment, to

41

make the subjective judgment call whether "Sandra **appears** to have more in common with Sophie" than with Webb's character.  *Id.* (emphasis added).

The district court even relied on hearsay information from outside the summary judgment record, including unauthenticated information obtained from the Internet Movie Database ("IMDB" or "IMDB.com") and an article posted on Grantland.com.  SPA14, 17.  For example, in discussing the use of the name General Garza, the district court cites to IMDB, an unauthenticated user-generated Internet website, to explain that in 2010, the name "Garza" was used in connection with a "short-lived television show called 'Outlaw,' staring Jimmy Smits as a former U.S. Supreme Court justice named 'Garza.'"  SPA14. This television show had nothing to do with mercenaries overthrowing a third-world dictator named General Garza (or anything close to it).  The district court's reliance on hearsay evidence from IMDB and Grantland.com was wholly improper, particularly where Defendants failed to present (and authenticate) any such evidence.[13]  In reviewing a motion for summary judgment, the district court is limited to admissible information in the summary judgment record and may not rely on unauthenticated

---

[13] Instead, Defendants presented the Declaration of their expert, David McKenna, who noted that "Garza is the 34th most common Hispanic nickname in the United States."  *See* SPA14.  Even if Defendants could argue that "Garza" was within the top ten most common Hispanic nicknames in the United States, a reasonable jury could find that Stallone's use of the name General Garza was not a coincidence, particularly given Stallone's use of the name in the context of a screenplay with numerous overlapping elements with *Cordoba*.

42

hearsay not even presented by the parties. *See* Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, but it may consider other materials **in the record**" (emphasis added).)

Finally, the district court improperly invoked its own non-precedential analogy to Robin Hood's Maid Marion in regard to the originality of Webb's (and later Stallone's) use of "a heroine allied with the protagonist who is related to the antagonist and captured by the antagonist's minions …." SPA15-16. The district court invoked this high-level analogy *sua sponte*: Defendants never mentioned it, and Stallone claimed he thought of Sandra on his own. A744; *see also* A837 ("[T]here is no overlap between any of the characters found in The Expendables from those found in Barrow. In fact, all of the characters in The Expendables are wholly original.") A reasonable jury, moreover, could conclude that there are protectable details of Sandra that were much more like Renata in *Cordoba* than Maid Marion. In sum, a reasonable juror would not be compelled to believe Sandra derived from Maid Marion – particularly when none of the Defendants, including Stallone, so claimed.

For all these reasons, the district court erred in granting summary judgment to Defendants on copying. The matter should be remanded for trial so Webb can have a jury, not the district court, weigh the evidence and the parties' credibility and decide his case.

## II.    THE DISTRICT COURT ERRED IN SUGGESTING THAT THE EVIDENCE SUBMITTED "APPEARED" INSUFFICIENT TO SHOW ACTIONABLE SIMILARITIES BETWEEN THE WORKS.

Although it provided no substantive discussion on the question of protectable/actionable similarity between the works, the district court, in a passing footnote, stated:

> Although the Court therefore does not reach the issue of whether defendants infringed elements of plaintiff's work that are legally protectable, the evidence put forth by plaintiff likewise **appears insufficient** to show any infringement by <u>The Expendables</u> of protected elements in <u>Cordoba</u>.

> [SPA19 (emphasis added).]

Webb can only assume that the district court misunderstood or misapplied the well-settled Second Circuit precedent governing originality and protectability in copyright.    Moreover, the district court again stated that Webb's evidence "**appears insufficient**," an imprecise and subjective judgment call that belongs before a jury.  *Id.* (emphasis added).

"The *sine qua non* of copyright is originality."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991).  As the Supreme Court explains:

> Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least **some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.  The**

44

**vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it may be.** Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

[*Id.* at 345-46 (emphasis added).]

It is well-settled that summary judgment on similarity is appropriate **only** if "the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work'" or if "no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros. Inc. v. Am. Broadcasting Co., Inc.*, 720 F.2d 231, 240 (2d Cir. 1983).

"The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Peter F. Gaito Architecture v. Simone*, 602 F.3d 57, 66 (2d Cir. 2010), quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001). In applying the "ordinary observer" test, the courts of the Second Circuit "ask whether 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Id.*, quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995). Where a work contains both protectable and unprotectable elements, courts are to apply a "more discerning" test wherein they attempt "to extract [any] unprotectable elements from … consideration and ask whether the

protectable elements, standing alone, are substantially similar." *Id.*, quoting *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) and *Knitwaves, Inc.*, 71 F.3d at 1002.

Regardless of the test applied, however, this Court has "**disavowed any notion that [the court is] required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable**." *Id.* (emphasis added). Instead, this Court is "principally guided 'by comparing the contested [work's] "**total concept and overall feel**" with that of the allegedly infringed work,' as instructed by our '**good eyes and common sense**." *Id.* (emphasis added), quoting *Tufenkian Import/Expert Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir. 2003) and *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 102 (2d Cir. 1999). As this Court has explained, the "total concept and feel" approach is necessary because "the defendant may infringe on the plaintiff's work … by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art – **the excerpting, modifying, and arranging of [unprotectable components] ... – are considered in relation to one another**." *Id.* (emphasis added), quoting *Tufenkian Import/Expert Ventures, Inc.*, 338 F.3d at 134. "Thus, in the end, [the] inquiry necessarily focuses on whether the alleged infringer has misappropriated 'the original way in which the author has "**selected, coordinated, and arranged**" the

46

elements of his or her work.'" *Id.* (emphasis added), quoting *Knitwaves, Inc.*, 71 F.3d at 1004 and *Feist Publ'ns, Inc.*, 499 U.S. at 358.

In applying the above test, courts must "analyze 'the similarities in such aspects as . . . theme, characters, plot, sequence, pace, and setting' of the [two works]." *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 140 (2d Cir. 1998); *see also Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976)("[I]t has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterizations.")  This Court has also embraced the "comprehensive non-literal similarity" test, which looks to whether the "defendant has . . . appropriated the '**fundamental essence or structure**' of plaintiff's work." *Arica Inst. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992)(emphasis added), quoting Nimmer on Copyright, § 13.03[A][1].

Other than the basic idea of mercenaries overthrowing a third-world dictator, there is no question that the numerous strikingly similar elements discussed above, which unfold in the same manner in both works, are unique and original expressions that easily meet the above standard for originality.  Moreover, the "theme, characters, plot, sequence, pace, and setting" of *Expendables* are objectively similar and, in many regards, near-identical to *Cordoba*.  In sum, and as illustrated further below, the "total look and feel" and "fundamental essence or

structure" of *Cordoba* and *Expendables* could easily permit a jury, applying "good eyes and common sense," to find substantial similarity between the two works.

Both works open with six mercenaries, led by a grizzled, wisecracking American hero, rescuing a hostage from a boat in an exotic foreign port. *Cordoba Screenplay* at A67-69, *passim*; *Expendables* DVD. Both works have two villains who are allied, yet antagonists: the first, a Latin American dictator named General Garza, who, with his own power center and distinctly-dressed security personnel, persecutes peasants to further cocaine production; the second, General Garza's accomplice who, with his own power center and distinctly-dressed security personnel, maintains a personal interest in the cocaine production and manipulates General Garza accordingly. *Cordoba Screenplay*, *passim*; *Expendables* DVD. The men are mutually dependent on each other, yet there is an obvious antagonism between them. *Id.* In both works, it is that accomplice, rather than the hero, who ends up killing General Garza, following General Garza's speech to his countrymen. *Cordoba Screenplay* at 170-78, *passim*; *Expendables* DVD.

In both works, the hero is hired to overthrow General Garza by a client whose motives initially appear to be about protecting certain financial interests in General Garza's country. *Cordoba Screenplay*, *passim*; *Expendables* DVD. In both works, the hero initially refuses the job but changes his mind because a woman he cares about is in danger. *Id.* Once in country, the hero meets a local

48

female member of the resistance movement who aids the hero in surveying the territory and joins the mercenaries' efforts to overthrow General Garza.  *Id.*  This woman turns out to be a close female relative of General Garza.  *Id.*  In both works, a lengthy and specific sequence of events unfolds in identical order, from the accomplice rummaging through the heroine's apartment (midway through the film), to her capture and ensuing torture scene, to a climactic battle with sequenced explosions including the detonation of a fuel repository, to a one-on-one standoff between the hero and the accomplice (who uses the heroine as a "human shield") wherein the accomplice is killed, to a closing scene strongly suggesting a future romantic relationship between the hero and the heroine.  *Id.*  Many of the above similarities are protectable standing alone, while all are unquestionably protectable given the manner in which they were "selected, coordinated, and arranged" in the overall work.

As for the characters, courts "must consider the 'totality of [their] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of [characters] in the [prior work]."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986), *cert. denied*, 476 U.S. 1159 (1986). What a character "thinks, feels, says, and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fills out a viewer's understanding of the character."  *Warner Bros. Inc. v. Am.*

49

*Broadcasting Co., Inc.*, 720 F.2d 231, 241 (2d Cir. 1983). "[T]he visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted." *Id.*

Applying this standard, it is clear that a reasonable jury could conclude that the characters in *Expendables* are original, protectable, and copied from *Cordoba*.

***General Garza and General Garza***.  Putting aside for the moment the identical name of the two Latin American dictators, which is even more striking in the context of the myriad of other striking similarities between the works, General Garza's role in the overall plot, as discussed above, is indistinguishable in the two films.  Had General Garza been the name of a character in a children's cartoon having nothing to do with mercenaries overthrowing a third-world dictator, the district court could have understandably found that there was no **actionable** similarity between the characters.  Here, however, Stallone used the **identical name**, General Garza, in a **near-identical story**, based on a **near-identical theme**. In sum, the "total concept and feel" of General Garza, individually and in the context of both works, is more than sufficient to allow a reasonable juror to conclude that General Garza was the product of copying.

***Renata and Sandra***.  There is no character with a more significant function in the "total concept and feel" of the two works than Renata/Sandra.  As opposed

to *Barrow's* Sophie, who appears in only three scenes in the entire screenplay,[14] Renata/Sandra are prominent and central characters in *Cordoba* and *Expendables*. In both works, she is a local freedom fighter who also happens to be a direct female relative of General Garza and assists the mercenaries in overthrowing him.[15]  In both works, an **identical pattern** of events unfolds where the accomplice rummages through Renata/Sandra's apartment, she is arrested by General Garza's accomplice, there is an ensuing torture scene where the accomplice attempts to elicit critical information from the heroine, she is taken to General Garza's office, she is used as a human shield in the accomplice's escape, and then saved by the hero.  There is an emotional bond between Renata/Sandra and the hero, and a continuation of the relationship is indicated.  These elements, none of which appear in *Barrow*, taken both individually and collectively, leave no question that a reasonable jury could find the Renata/Sandra characters serve a near-identical purpose in the story are substantially similar.

  ***Torres and Monroe***.   The Torres/Monroe characters share fundamental similarities in their relationship to the other characters and basic plot function,

---

[14] Sophie's role in *Barrow* was so minor that Callaham said that he "didn't write any female characters" in his screenplay.  A875.

[15] While it is acknowledged that Sandra is never explicitly identified in the film as the leader of the resistance, Defendants advertised Sandra as a "local freedom fighter" so clearly understood her as such.  A876.

similarities that are far more critical in the "overall concept and feel" of the works than any superficial differences. Both characters maintain their own power center and have an antagonistic relationship with General Garza. In both works, the story culminates with Torres/Monroe arresting Renata/Sandra. Both works involve a torture scene of Renata/Sandra. In both works, Torres/Monroe, rather than the hero, shoots and kills General Garza following General Garza's speech to his countrymen. In both works, Torres/Monroe attempts to escape via helicopter (which is destroyed by the mercenaries), using Renata/Sandra as a human shield, and is killed by the hero.

***St. John and Ross***. The similarities between St. John and Ross go beyond the fact that they are middle-aged American mercenaries hired to overthrow a Latin American dictator named General Garza. Both characters: (1) display working-class traits; (2) display a wry and sardonic sense of humor; (3) have access to unusual weaponry, including aircraft that spray liquid as a weapon; (4) are moved, emotionally, by a female relative of General Garza who supports her people's struggle against General Garza; and (6) ultimately rescue the heroine and hint they will return to continue their relationship.

Each character discussed above, among others, serves a critical role in the "total concept and feel" of *Cordoba* and *Expendables*. Each character creates a unique and original creative impression that should be evident even to the

untrained eye.  Finally, a jury could easily find the **ensemble** of these unique characters to be original to *Cordoba*.  Based on the foregoing, a reasonable jury should be permitted to determine the extent to which the attributes and traits of the *Cordoba* characters are captured in the "total concept and feel" of the same characters in *Expendables*.

## CONCLUSION

The district court recognized that it was for the "factfinder to decide" both whether to "credit Stallone's declaration that he has never seen Cordoba" (*i.e.*, whether Stallone had access to *Cordoba*) and whether Stallone "wrote The Expendables entirely independent of Cordoba" (*i.e.*, whether Stallone copied *Cordoba*).  SPA9.  The district court nonetheless granted Defendants summary judgment on access and copying, despite Stallone's complete lack of credibility on these issues; despite Defendants' inability to say which screenplays Stallone reviewed or where he sourced them; despite Webb's distribution of his work in the industry; despite the admissible opinion of Webb's highly experienced expert; and despite the numerous striking similarities (individually and collectively) between *Cordoba* and *Expendables*, beginning with the very name of the Latin American dictator, General Garza.  It was for the jury, not the district court, to weigh these facts.  For the foregoing reasons, Plaintiff-Appellant Marcus Webb respectfully

requests that the Court reverse the district court's decision granting summary

judgment and remand for trial.

Respectfully Submitted,

DATED:  New York, New York            COLE, SCHOTZ, MEISEL,
    May 10, 2013            FORMAN & LEONARD, P.A.

                 By: /s/ David M. Kohane
                 David M. Kohane
                 David S. Gold
                 900 Third Avenue, 16th Floor
                 New York, New York 10022
                 (212) 752-8000

54

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).  Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), the brief contains 12,423 words.

The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ David M. Kohane
David M. Kohane, Esq.

49441/0001-9526339v1

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on this 10th day of May 2013, I caused a .pdf version of the foregoing brief to be filed electronically using the *CM/ECF* system.  Prior to transmittal, the .pdf was scanned for viruses and no viruses were detected.

/s/ David M. Kohane
David M. Kohane, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of May 2013, I caused the foregoing brief to be filed electronically using the *CM/ECF* system, which will send notification of such filing to counsel of record.

/s/ David M. Kohane
David M. Kohane, Esq.

49441/0001-9526339v1

# SPECIAL APPENDIX

## TABLE OF CONTENTS

**Page(s)**

Order of the Honorable Jed S. Rakoff, dated June 22, 2012 (Docket No. 61) ........................ SPA1

Memorandum Order of the Honorable Jed S. Rakoff,
dated December 26, 2012 (Docket No. 64) ........................................................................... SPA2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------ x
MARCUS WEBB,                         :
                                     :
            Plaintiff,               :
                                     :
            -v-                      :        11 Civ. 7517 (JSR)
                                     :
SYLVESTER STALLONE et al.,           :            ORDER
                                     :
            Defendants.              :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        On March 15, 2012, the defendants in this action moved for

summary judgment on plaintiff Webb's claim of copyright infringement

and for dismissal of Webb's Second Amended Complaint in its entirety.

The parties extensively briefed the relevant issues, and the Court

heard oral argument on April 26, 2012.  Having now fully considered

the matter, the Court hereby grants defendants' motion in all

respects.  A written opinion stating the reasons for this ruling will

issue in due course, and final judgment will not be entered until that

opinion issues.  In the interim, all further proceedings in this case

are stayed.  The Clerk of the Court is hereby directed to close

document number twenty-nine on the docket of this case.

        SO ORDERED.

                                    _____
                                        JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        June 22, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MARCUS WEBB,                        :
                                    :
              Plaintiff,            :
                                    :
         -v-                        :        11 Civ. 7517 (JSR)
                                    :
SYLVESTER STALLONE, et al.,         :        MEMORANDUM ORDER
                                    :
              Defendants.           :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Plaintiff Marcus Webb accuses defendant Sylvester

Stallone of copying Webb's screenplay The Cordoba Caper for

Stallone's 2010 action movie The Expendables. On this basis, Webb

brought the instant copyright infringement action against

Stallone, his co-writer David Callaham,[1] and the various

Hollywood entities that produced and distributed The Expendables

-- Alta Vista Productions, Double Life Productions, Lions Gate

Films, Lions Gate Home Entertainment, Millennium Films, and Nu

Image Films. On March 15, 2012, defendants moved for summary

judgment on plaintiff's claim. By "bottom line" Order dated June

22, 2012, the Court granted defendants' motion for summary

judgment in its entirety. This Memorandum Order sets forth the

reasons for that ruling and directs the entry of final judgment.

-----------------------------

[1] On April 26, 2012, defendant Callaham was dismissed from the
case pursuant to a stipulation entered into between the parties
and so-ordered by the Court.

The relevant factual background, drawn from the parties' Local Civil Rule 56.1 statements,[2] is as follows:

Defendant David Callaham had a "blind commitment" to write a script for Warner Bros. studios. Defendants' Statement Pursuant to Local Rule 56.1 dated Mar. 15, 2012 ("Def. 56.1") ¶ 1. In late 2003/early 2004, after watching news reports about Blackwater and mercenaries, he suggested to Warner Bros. that he might write a script about a group of American mercenaries taking on a foreign dictator. Id. ¶ 2. Callaham sent Warner Bros. the first draft of this script, tentatively titled Barrow, on June 8, 2005. Id. ¶ 3. Callaham revised this draft two more times. He sent Warner Bros. the third draft on January 24, 2006, which was the last draft of Barrow and the last work Callaham did pertaining to the Expendables. Id. ¶¶ 4-6; see also Answer to Second Amended Complaint ("Answer"), Ex. C (Barrow "3rd Studio Draft").

Plaintiff Marcus Webb is an employee of Walker Digital, LLC, where he write speeches for the company's executives, scripts promotional videos, and works on marketing materials. Id. ¶ 16. He also writes for trade magazines. Id. ¶ 17; Response to Defendants' Statement Pursuant to Local Rule 56.1 and Plaintiff's Statement of Additional Material Facts dated Apr. 6, 2012 ("Pl.

_____

[2] Where the Court cites only defendants' Local Civil Rule 56.1 statements, plaintiff has admitted the factual assertion.

2

56.1 Resp.") ¶ 17 (noting plaintiff continues to write for trade
magazines). He has never worked in television or movies, and
although he has written a number of screenplays, none of them has
been produced. Def. 56.1 ¶ 18.

In 2006, Webb wrote a screenplay featuring a team of
American mercenaries, who are hired by a billionaire to stop a
genocide, and end up rescuing a young woman. Id. ¶ 20. He titled
the screenplay, The Cordoba Caper. Id. ¶ 20; see Answer Ex. A
(screenplay for The Cordoba Caper). The story had two villains:
General Garza, a Latin-American fascist dictator; and Colonel
Torres, his Marxist second-in-command, who was the minister of
state security. Id. ¶ 22. Webb stated that he wanted to use a
"triple-cross" plot structure, where the protagonist poses as
someone else (a CIA agent) posing as someone else (an oil
executive). Id. ¶ 23 (analogizing to films like The Sting, Where
Eagles Dare, and The Thomas Crowne Affair). Webb also wanted to
include an ideological struggle between Garza and Torres, based
on "Night of the Long Knives," and an underground resistance
movement, whose leader, a woman, fell in love the main character,
but was secretly related to General Garza. Id. ¶¶ 24-26. Webb
wrote a screenplay and short story version of Cordoba in March
and April 2006, which he then registered with the U.S. Copyright
Office on June 8 and June 9, 2006. Id. ¶¶ 28-30. Webb's script

3

was written entirely after Callaham finished his last draft of
<u>Barrow</u>. <u>Id.</u> ¶ 29.

In 2008, defendant Sylvester Stallone told his agents
that he was interested in doing an action-oriented ensemble film.
<u>Id.</u> ¶ 7. His agents obtained scripts for him to review, and he
recalls reviewing Callaham's last draft of <u>Barrow</u>, which he
assumes came through his agency (although he does not know for
sure). <u>Id.</u> ¶ 8; Pl. 56.1 Resp. ¶ 8. Stallone then began writing
his own screenplay. Here, the parties dispute how much of
Stallone's story was sourced from Callaham's script for <u>Barrow</u>,
and how much was sourced from Webb's script for <u>The Cordoba
Caper</u>. As for <u>Barrow</u>, Stallone admits to using it as a "starting
point" for his screenplay, which he states he reworked through
several drafts to simplify the plot and keep the focus on an
action-packed move. Stallone Decl. ¶ 3 (explaining changes made
and elements from <u>Barrow</u> retained); <u>see also</u> Declaration of David
E. Callaham in Support of Defendants' Motion for Summary Judgment
dated Mar. 14, 2012 ("Callaham Decl.") ¶ 6, Ex. B (<u>The
Expendables</u> "First Stallone Draft" dated Sept. 18, 2008).
Stallone denies ever seeing Webb's script for <u>The Cordoba Caper</u>.
<u>Id.</u> ¶ 6.

Stallone's finished screenplay, titled <u>The
Expendables</u>, is about a group of mercenaries led by Barney Ross
(Stallone's character) who are hired by the CIA to bring down a

Latin American dictator named General Garza. The Expendables was
turned into a major motion picture starring Stallone, Jason
Statham, Jet Li, Dolph Lundgren, Bruce Willis, and Arnold
Schwarzenegger and was released on August 13, 2010. Def. 56.1 ¶
15; Answer Ex. B (DVD of The Expendables).

  Against this background, the Court turns to the legal
merits of plaintiff's claim of copyright infringement. To
establish infringement, "two elements must be proven: (1)
ownership of a valid copyright, and (2) copying of constituent
elements of the work that are original." Feist Pubs., Inc. v.
Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). "The second
element, copying, is comprised of two requirements: actual
copying and improper appropriation." Muller v. Twentieth Century
Fox Film Corp., 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011) (citing
Laureyessens v. Idea Group, Inc., 964 F.2d 131, 139–40 (2d Cir.
1992)).

> Copying may be established "either by direct evidence of
> copying or by indirect evidence, including access to the
> copyrighted work, similarities that are probative of copying
> between the works, and expert testimony." Castle Rock
> Entm't, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137
> (2d Cir. 1998). The level of similarity needed to establish
> copying is now commonly referred to as "probative
> similarity." See id. Once copying has been established, a
> plaintiff must next demonstrate that the copying was
> unlawful by showing that there is a substantial similarity
> between the protectable elements in the two works.

Hogan v. DC Comics, 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999)
(citation omitted). Here, defendants concede Webb has a valid

5

copyright in Cordoba that has been registered. Def. 56.1 ¶ 30
(citing Compl. ¶ 18, Exs. A-B). They dispute the second element,
copying of protected elements.

Defendants argue that Webb cannot establish copying of
any kind, for three reasons: (1) because Barrow, defendants'
admitted source for The Expendables, was written before Cordoba,
thus showing creation independent of Webb's work; (2) because
Webb cannot show that Stallone had access to Cordoba when
Stallone drafted The Expendables; and (3) because there are no
similarities between Cordoba and Expendables that are probative
of copying. The Court addresses each of these arguments in turn,
and determines that because no reasonable juror could conclude
that Stallone copied from Cordoba, defendants are entitled to
summary judgment.

Defendants argue that because Barrow was written before
Cordoba, and because Barrow indisputably served as the starting
point for The Expendables, defendants have established that The
Expendables was independently created, not copied. See Dimmie v.
Carey, 88 F. Supp. 2d 142, 150-51 (S.D.N.Y. 2000) (granting
summary judgment on independent creation grounds where there was
evidence of evolution of defendant's work separate and apart from
plaintiff's work). Particularly because plaintiff submits no
evidence of actual copying, defendants argue this is a sufficient
basis for summary judgment. See Muller v. Twentieth Century Fox

6

Film Corp., 794 F. Supp. 2d 429, 443-44 (S.D.N.Y. 2011) (granting summary judgment on independent creation where no evidence of actual copying).

As plaintiff points out, however, independent creation is an affirmative defense, and the burden of proof on defendants is stringent: "strong, convincing, and persuasive evidence" of independent creation is required, in order to avoid relying solely on the affidavits of the parties. Repp v. Webber (Repp I), 892 F. Supp. 552, 558 (S.D.N.Y. 1995), aff'd in part, rev'd in part, Repp v. Webber (Repp II), 132 F.3d 882 (2d Cir. 1997), cert. denied, 525 U.S. 815 (1998). The Second Circuit has held that the strength of such a defense is "a question for the factfinder." Repp II, 132 F.3d at 891.

The fact that Stallone now admits Barrow was a source for The Expendables is not by itself sufficient to warrant summary judgment on the ground of independent creation. Indeed, the admission smacks more than a little of hypocrisy. Stallone previously asserted in a signed letter submitted in his Writer's Guild of America arbitration with defendant Callaham, Barrow's author, that although he read Barrow, he "set it aside," and that Expendables was "an original . . . and doesn't use one word, one comma, one iota from [Barrow]." Declaration of David Gold dated Apr. 6, 2012 ("Gold Decl.") at ¶¶ 3-4, Ex. B ("Stallone Letter") at 2. The arbitration panel rejected Stallone's argument, and

awarded Callaham "story by" credit and shared "screenplay by"
credit. See Defendants' Reply Memorandum of Law in Further
Support of Their Motion for Summary Judgment dated Apr. 18, 2012
("Def. Reply Br.") at 3. It is only now, when it is in his self
interest, that Stallone admits to copying Barrow. In the face of
such inconsistency, the question of whether to credit Stallone's
declaration that he has never seen Cordoba and wrote The
Expendables entirely independent of Cordoba is for the factfinder
to decide. See also Transcript of Oral Argument dated Apr. 26,
2012 ("Tr.") at 17-20 (defense counsel arguing that Stallone
simply signed an "advocacy" letter prepared by his previous
attorney, and never disclaimed starting from Barrow). Moreover,
even if Stallone's declaration here is totally truthful, copying
from one screenplay (Barrow) does not inoculate Stallone from the
claim that he also copied from a second screenplay (Cordoba).
Viewing the facts in the light most favorable to Webb, the non-
moving party, and drawing all reasonable inferences in his favor,
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), the
Court cannot conclude that a mere declaration attributing The
Expendables to one screenplay and disclaiming attribution to the
other is sufficient to carry defendants' burden of "strong,
convincing, and persuasive evidence" of independent creation such
that a reasonable jury could reach no conclusion other than
finding independent creation.

8

Defendants next argue that Webb cannot present any evidence that Stallone ever saw the Cordoba screenplay. To show what is referred to in the case law as "access," plaintiff must show either (1) "a particular chain of events" or a "link" from his work to the creators of the allegedly infringing work, or (2) that plaintiff's work was "widely disseminated." Gal v. Viacom Int'l, Inc., 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007); see also Mowry v. Viacom Int'l Inc., No. 03 Civ. 3090 (AJP), 2005 U.S. Dist. LEXIS 15189, at *12-13 (S.D.N.Y. July 29, 2005). A work is "widely disseminated" when it has had "considerable commercial success" or is "readily available on the market." Silberstein v. Fox Entm't Group, 424 F. Supp. 2d 616, 627 (S.D.N.Y. 2004). Moreover, plaintiff must meet this showing with "significant, affirmative and probative" evidence, not mere "speculation or conjecture." Muller, 794 F. Supp. 2d at 439 (quoting Jorgensen v. EPIC/SONY, 351 F.3d 46, 51 (2d Cir. 2003)). That said, access can be inferred where "a party had a reasonable possibility of viewing the prior work," Boisson v. Banian, Ltd., 273 F.3d 262, 270 (2d Cir. 2001), and less proof of access is required when there is stronger proof of similarity, Jorgensen, 351 F.3d at 56.

Plaintiff's circumstantial affirmative evidence of access is weak, to say the least. Webb, who is not a professional screenwriter, and has no previous screenwriting credits to his name, submitted Cordoba to eight "well-known" screenwriting

9

competitions, which purportedly pride themselves on discovering
new material and employ staff and judges with contacts in the
movie industry. Declaration of David M. Kohane in Opposition to
Defendants' Motion for Summary Judgment dated Apr. 6, 2012
("Kohane Decl.") Ex. B, Deposition of Marcus Webb dated Feb. 9,
2012 ("Webb Dep.") at 241. Stallone testified that he gets
screenplays from his agents, but does not know where his agents
obtain those screenplays. Kohane Decl. Ex. A, Deposition of
Sylvester Stallone dated Feb. 28, 2012 ("Stallone Dep.") at 188.
Before writing The Expendables, Stallone reviewed fifteen
screenplays from unknown sources. Id. at 24-25. Trevor Short, CFO
of Nu Image, stated in his deposition that writing the
Expendables was "chaotic, at the best of times," with
"contributions," from "thousands of people." Kohane Decl. Ex. C,
Deposition of Trevor Short dated Mar. 8, 2012 ("Short Dep.") at
22, 24-25. Short could not, however, identify these "people,"
which plaintiff argues exponentially increases the ways Stallone
might have accessed Cordoba.

        Nevertheless, it would require almost endless
speculation to explain how Webb's submission of Cordoba to
amateur screenplay competitions ended up in front of Stallone.
Indeed, even after full discovery, plaintiff submits no evidence
whether anyone who worked for Stallone -- or even anyone who
worked at the companies who worked for Stallone -- participated

10

in or had connections to any of these screenwriting competitions.
In the absence of this or other evidence presenting a reasonable
possibility that Stallone viewed Cordoba, as opposed to mere
speculation or conjecture, plaintiff has failed to raise a
genuine issue of material fact on access. See Muller, 794 F.
Supp. 2d at 439 ("'A reasonable possibility' is not simply a
'bare possibility' . . . .").

     Plaintiff seeks to overcome this defect by relying
instead on the doctrine of "striking similarity." It is true that
"[w]hen two works are so 'strikingly similar' as to preclude any
possibility that the second work was independently created, no
more evidence [of access] is necessary." Design Tex Group, Inc.
v. U.S. Vinyl Mfg. Corp., No. 04 Civ. 5002 (JSR), 2005 WL
1020436, at *3 (S.D.N.Y. Apr. 28, 2005); accord Gaste v.
Kaiserman, 863 F.2d 1061, 1067-68 & n.3 (2d Cir. 1988). But no
such striking similarity is present here.

     The general standard for similarity that is probative
of copying requires showing "similarities between the two works
that would not be expected to arise if the works had been
independently created." Nicholls v. Tufenkian Import/Export
Ventures, Inc., 367 F. Supp. 2d 514, 522 (S.D.N.Y. 2005). Here,
however, where plaintiff relies on the "striking similarity"
doctrine to avoid proving access, the "threshold required to
establish striking similarity is 'stringent,' and it requires

11

more than a showing of substantial similarity." <u>Vargas v.
Transeau</u>, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007), <u>aff'd</u>, 352 F.
App'x 458 (2d Cir. 2009) (summary order). To show striking
similarity, the works "must be so <u>identical</u> as to preclude any
reasonable possibility of independent creation." <u>Dimmie</u>, 88 F.
Supp. 2d at 150 (emphasis supplied). Mere multiple similarities
are insufficient, and the relevance of a similarity is diminished
if the similarity consists of "stock elements" within a genre or
otherwise non-protectable elements. <u>Gal</u>, 518 F. Supp. 2d at 543.

Having reviewed the scripts for <u>The Expendables</u>,
<u>Barrow</u>, and <u>The Cordoba Caper</u>, the Court concludes that no
reasonable juror could find that <u>The Expendables</u> is so nearly
identical to <u>Cordoba</u> "as to preclude any reasonable possibility
of independent creation," <u>Dimmie</u>, 88 F. Supp. 2d at 150, or even
that there exists "similarities between the two works that would
not be expected to arise if the works had been independently
created." <u>Nicholls</u>, 367 F. Supp. 2d at 522.

Plaintiff lists twenty examples of what he calls
"striking similarities" between <u>The Expendables</u> and <u>Cordoba</u>. <u>See</u>
Plaintiff's Memorandum of Law in Opposition to Defendants' Motion
for Summary Judgment dated Apr. 17, 2012 ("Pl. Opp. Br.") at 7–8.
The Court finds none of these examples sufficient to permit a
reasonable juror to find "striking similarity," whether

12

considered independently or in the aggregate. To give a few
examples:

(1) The Antagonists. Plaintiff points to the identical
name of the Latin American dictator, General Garza, as a striking
similarity. But, as defendants point out, Garza is a common
Hispanic surname.[3] Declaration of David McKenna dated Apr. 16,
2012 ("McKenna Rep.") at 7 & n.2 (noting Garza is the 34th most
common Hispanic nickname in the United States); see CK Co. v.
Burger King Corp., No. 92 Civ. 1488 (CSH), 1994 WL 533253, at *8
(S.D.N.Y. Sept. 30, 1994) ("The fact that characters have
identical names and have similar roles in two works does not
necessitate a finding of substantial similarity." (emphasis
supplied)), aff'd, 122 F.3d 1055 (2d Cir. 1995); Bevan v.
Columbia Broad. System, 329 F. Supp. 601, 605–06 (S.D.N.Y. 1971)
(holding "Hogan's Heroes" did not infringe on copyright of play
"Stalag 17," even though both works featured German World War II
prison camp guards named Sergeant Schultz), abrogated on other
grounds by Jorgenson, 351 F.3d at 53 n.5. The title "General,"
moreover, first appeared in Barrow, where the character was
titled "General Miramonte." Answer Ex. C at 10. Stallone states
that "Miramonte" was too long a name, and in changing various

_____

[3] For example, in 2010, the same year The Expendables was
released, NBC aired a short-lived television show called
"Outlaw," staring Jimmy Smits as a former U.S. Supreme Court
justice named "Garza." See Outlaw, IMDb,
http://www.imdb.com/title/tt1592226/ (last accessed Oct. 23,

names in Callaham's script, he chose famous boxers for his hero
(Barney Ross), and his antagonist (Jaime Garza). Declaration of
Sylvester Stallone dated Mar. 12, 2012 ("Stallone Decl.") ¶ 4.

Plaintiff also points to the fact that in both movies,
Garza and his accomplice (Torres in Cordoba, Monroe in The
Expendables) have their own security forces with different
colored uniforms. This, as defendants point out, overstates the
point by half (at least). In Cordoba, Torres is Garza's right-
hand man and ideological counterpart, who rules with Garza as
minister of state security. In The Expendables, Monroe is a rogue
CIA agent who uses Garza as his puppet, and travels around with
his own bodyguard, Paine. Stallone Decl. ¶ 3(d); see also Def.
Br. at 11 n.7 (both Barrow and Expendables have mysterious
financial backers, "Mr. Monday," and "Mr. Church," where
Cordoba's Scottish billionaire, Sir Reginald, makes no attempt to
hide his identity).

(2) The Heroine. Plaintiff also sees supposed striking
similarities between Renata, the female protagonist in Cordoba,
and Sandra, the female protagonist in The Expendables, in that
both are related to Garza (niece and daughter, respectively),
both help the heroes, and both are tortured by Garza's
accomplice. But, as the Court noted at oral argument, the idea of
a heroine allied with the protagonist who is related to the

2012).

antagonist and captured by the antagonist's minions is hardly
new, as, for example, the familiar story of Robin Hood and Maid
Marian (variously described as the niece of Prince John or the
daughter of Sheriff of Nottingham) well demonstrates. Tr. at 4.
Moreover, the characters of Renata and Sandra are substantially
different. Renata leads a double life as Garza's prized
debutante/student niece by day (the hero, St. John, meets her at
Garza's party), and rebel freedom fighter who leads a violent
revolution by night under a nom de guerre. She actively assists
the heroes in their fight, becomes romantically involved with St.
John, and eventually becomes president of her country. Sandra, on
the other hand, is estranged from Garza, lives in-country, mourns
her country's plight, and acts simply as a guide for the heroes
until they are discovered by Garza and the rogue CIA agent's men.
Indeed, after reviewing the scripts, the Court finds that Sandra
appears to have more in common with Sophie, the female guide
character from Barrow (who was originally a minor character) than
with Renata. See Stallone Decl. ¶ 3(e).

> (3) Action scenes. Plaintiff also cites a litany of
action scenes which he describes as "strikingly similar" to
Cordoba. These include the use of the heroine as a human shield
in the accomplice's escape; strategic planting of explosives by
mercenaries in key strategic positions before the coup begins; an
attempted ambush by regime forces against the mercenaries; a

15

climactic gun battle with sequenced explosions including
detonation of a fuel repository to create a "reverse ambush"; the
attempted use, and destruction of, the accomplice's escape
helicopter; and a one-on-one standoff where the hero kills the
accomplice in a surprise shooting tactic after the accomplice
puts a gun to the heroine's head. Pl. Opp. Br. at 8. None of
these comes anywhere near striking similarity, let alone even
close to substantial similarities that are merely probative of
copying. To the contrary, these are all simple stock devices that
are standard in action movies. They are "scenes a faire" that
follow naturally from the theme of the work rather than from the
author's creativity. MyWebGrocer, LLC v. Hometown Info, Inc., 375
F.3d 190, 194 (2d Cir. 2004); see Walker v. Time Life Films,
Inc., 784 F.2d 44 (2d Cir. 1985) (holding "drunks, prostitutes,
vermin, and derelict cars" are scenes a faire in a work about
NYPD cops in the South Bronx); see also Zach Baron,
Summermetrics: The Death of the Great American Shoot-'em-Up,
Grantland, Aug. 16, 2012,
http://www.grantland.com/story/_/id/8272930/summermetrics-
expendables-2-death-great-american-shoot-em-up (last accessed
Oct. 23, 2012) (evaluating production notes for The Expendables 2
as the Expendables' series attempts to revive and pay homage to
the genre of 80s-era action films).

While the foregoing includes, <u>inter alia</u>, all the "striking similarities" that plaintiff's counsel identified at oral argument as being the most "egregious," <u>Tr.</u> at 2-6, the Court has carefully examined the entire litany of plaintiff's proffered "striking similarities" and finds none of them remotely striking or legally sufficient. Any reasonable factfinder would have to conclude that these are two very different screenplays built on a familiar theme: mercenaries taking on a Latin American dictator. But where the more specific development of <u>The Expendables</u> can be clearly traced to defendant Callaham's script, <u>Barrow</u>, there is no such link apparent to <u>Cordoba</u>. <u>See also</u> <u>Berkic v. Crichton</u>, 761 F.2d 1289, 1293-94 (9th Cir. 1985). Indeed, whereas <u>Cordoba</u> uses deception and subterfuge as its central plot devices, <u>The Expendables</u> is a pure action movie, with CIA involvement (heavily distilled from <u>Barrow</u>). Stallone's hero (Ross) engages in no trickery -- just shooting.

Whether considered at the high-concept levels of plot, theme, pacing, etc., or at the detailed level of specific points, plaintiff has failed to show <u>Cordoba</u> is so "strikingly similar" to <u>The Expendables</u> "as to preclude any reasonable possibility of independent creation." <u>Dimmie</u>, 88 F. Supp. 2d at 150.[4]

_____

[4] In support of their arguments, the parties submitted reports from their respective expert witnesses, Michael Elias and David McKenna, who offer their opinions on the similarity (or lack thereof) between <u>Cordoba</u> and <u>The Expendables</u>. The Court doubts that these expert reports are admissible under Fed. R. Evid. 702;

17

Because plaintiff has failed to provide evidence of access, and failed to show the Cordoba and Expendables are so strikingly similar as to permit a reasonable juror to infer access, the Court finds the plaintiff's claim fails as a matter of law.[5] Accordingly, the Court reaffirms its "bottom line" Order dated June 22, 2012 granting summary judgment in favor of defendants. The Clerk of the Court is hereby directed to enter judgment in favor of defendants dismissing the complaint with prejudice, and to close the case.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          December 26, 2012

---

indeed, they involve no true expertise whatsoever. But neither party moved to strike. Assuming, arguendo, that the reports were admissible, they would not change the Court's conclusion. They simply assert conclusions on similarity based on reading the screenplays, which the Court was more than able to do without the benefit of the reports.

[5] Although the Court therefore does not reach the issue of whether defendants infringed elements of plaintiff's work that are legally protectable, the evidence put forth by plaintiff likewise appears insufficient to show any infringement by The Expendables of protected elements in Cordoba.

18