# 13-324-cv

---

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



MARCUS WEBB,

*Plaintiff-Appellant,*

*v.*

SYLVESTER STALLONE, MILLENNIUM FILMS, NU IMAGE FILMS, LIONS GATE FILMS, INC.,
LIONS GATE HOME ENTERTAINMENT, INC., ALTA VISTA PRODUCTIONS, INC.,
ALTA VISTA PRODUCTIONS, LLC, DOUBLE LIFE PRODUCTIONS, INC.,

*Defendants-Appellees,*

*and*

DAVID E. CALLAHAM, LIONS GATE ENTERTAINMENT CORPORATION,

*Defendants.*

---

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

---

## JOINT APPENDIX
## VOLUME IV OF IV
## Pages A807 to A1078

---

PRYOR CASHMAN LLP
*Attorneys for Defendants-Appellees and
    Defendants*
7 Times Square
New York, New York 10036
212-421-4100

COLE, SCHOTZ, MEISEL, FORMAN
    & LEONARD, P.A.
*Attorneys for Plaintiff-Appellant*
900 Third Avenue, 16th Floor
New York, New York 10022
212-752-8000

## TABLE OF CONTENTS

**Page(s)**

### Volume I

U.S. District Court Docket Entries ....................................................................A1

Order of the Honorable Jed S. Rakoff, dated February 24, 2012 (Docket No. 26) ...................A14

Notice of Motion, dated March 15, 2012 (Docket No. 29)........................................................A15

Declaration of Tom J. Ferber in Support of Defendants' Motion
for Summary Judgment, dated March 15, 2012 (Docket No. 31)................................................A17

    Exhibit A to Ferber Declaration -
    Second Amended Complaint (Docket No. 31-1)...........................................................A19

        Exhibit A to Second Amended Complaint -
        Certificate of Registration (Docket No. 31-1) ..................................................A35

        Exhibit B to Second Amended Complaint -
        Certificate of Registration (Docket No. 31-1) ..................................................A40

    Exhibit B to Ferber Declaration -
    Answer to Second Amended Complaint (Docket No. 31-2) ..........................................A44

        Exhibit A to Answer to Second Amended Complaint -
        *The Cordoba Caper*, a screenplay by Marcus Webb
        (Docket No. 31-2/3).......................................................................A65

        Exhibit B to Answer to Second Amended Complaint -
        DVD of *The Expendables* [Place Holder] (Docket No. 31-3) .........................A183

        Exhibit C to Answer to Second Amended Complaint -
        *Barrow*, a screenplay by Dave Callaham (Docket No. 31-3/4) .......................A184
        ***(Cont'd in Vol. II)***

### Volume II

        Exhibit D to Answer to Second Amended Complaint -
        *The Cordoba Caper*, a short story by Marcus Webb
        (Docket No. 31-4) .............................................................................A311

    Exhibit C to Ferber Declaration-
    Excerpts from Webb Deposition (Docket No. 31-5) ....................................................A339

Exhibit D to Ferber Declaration -
Exhibit "CC" from Webb Deposition (Docket No. 31-6)..............................................A434

Exhibit E to Ferber Declaration -
Exhibit "FF" from Webb Deposition (Docket No. 31-7) ..............................................A442

Exhibit F to Ferber Declaration -
Exhibit "GG" from Webb Deposition (Docket No. 31-8) .............................................A445

Exhibit G to Ferber Declaration -
Webb's Response to Defendants' Interrogatories (Docket No. 31-9) .........................A448

Declaration of Sylvester Stallone in Support of Defendants'
Motion for Summary Judgment, dated March 12, 2012 (Docket No. 32)................................A457

Declaration of Trevor Short in Support of Defendants'
Motion for Summary Judgment, dated March 12, 2012 (Docket No. 33)................................A463

Declaration of David E. Callaham in Support of Defendants'
Motion for Summary Judgment, dated March 14, 2012 (Docket No. 34)................................A465

Exhibit A to Callaham Declaration -
Draft of *Barrow* Screenplay, dated June 8, 2005 (Docket No. 34-1/2) .......................A469
***(Cont'd in Vol. III)***

## Volume III

Exhibit B to Callaham Declaration -
Draft of *The Expendables* Screenplay, dated September 18, 2008
(Docket No. 34-3/4)......................................................................................A598

Defendants' Statement Pursuant to Local Rule 56.1,
dated March 15, 2012 (Docket No. 35) .................................................................A716

Declaration of David M. Kohane in Opposition to Defendants'
Motion for Summary Judgment (Docket No. 54).....................................................A728

Exhibit A to Kohane Declaration -
Excerpts from Stallone Deposition (Docket No. 54-1)...............................................A732

Exhibit B to Kohane Declaration -
Excerpts from Webb Deposition (Docket No. 54-2) ..................................................A770

## Volume IV

Exhibit C to Kohane Declaration -
Excerpts from Short Deposition (Docket No. 54-3) ...................................................A807

Exhibit D to Kohane Declaration -
Excerpts from Thompson Deposition (Docket No. 54-4)............................................A815

Exhibit E to Kohane Declaration -
Letter from Trevor Short to Wayne Smith, dated January 7, 2009
(Docket No. 54-5) ....................................................................................................A819

Exhibit F to Kohane Declaration -
Series of e-mails, including an e-mail from Lonnie Ramati
to an Unknown Recipient, dated February 11, 2009 (Docket No. 54-6) .....................A822

Exhibit G to Kohane Declaration -
E-mail from David Callaham, dated August 17, 2009 (Docket No. 54-7) ..................A824

Exhibit H to Kohane Declaration -
Statement of Sylvester Stallone to the Writers' Guild
of America (West) ("WGA"), dated August 27, 2009 (Docket No. 54-8) ..................A826

Exhibit I to Kohane Declaration -
Submission to the WGA (Docket No. 54-9)................................................................A830

Exhibit J to Kohane Declaration -
Submission to the WGA (Docket No. 54-10)..............................................................A839

Exhibit K to Kohane Declaration -
E-Mail to Lonnie Ramati, dated November 6, 2008 (Docket No. 54-11) ...................A855

Exhibit L to Kohane Declaration -
Travelers Producers' or Distributors' Liability Insurance Application,
dated December 10, 2008 (Docket No. 54-12)............................................................A856

Exhibit M to Kohane Declaration -
Series of e-mails, including an e-mail sent by Avi Lerner on
May 28, 2009 (Docket No. 54-13)..............................................................................A866

Exhibit N to Kohane Declaration -
Series of e-mails, including an e-mail sent by David Callaham on
October 25, 2011 (Docket No. 54-14) ........................................................................A871

Exhibit O to Kohane Declaration -
E-mail from David Callaham, dated December 29, 2008
(Docket No. 54-15) ...................................................................................................A874

Exhibit P to Kohane Declaration -
Pages from *The Expendables* official website, hosted by
Lionsgate Entertainment Corp., last visited on March 16, 2012
(Docket No. 54-16) ...................................................................................................A876

Exhibit Q to Kohane Declaration -
E-mail from David Callaham, dated August 18, 2009
(Docket No. 54-17) ............................................................................A884

Exhibit R to Kohane Declaration -
Statement by WGA "Arbiter #2" (Docket No. 54-18) ................................A886

Exhibit S to Kohane Declaration -
Quitclaim Agreement, dated July 10, 2009 (Docket No. 54-19) ..................A888

Exhibit T to Kohane Declaration -
Cover page to draft screenplay of *The Expendables*,
dated October 8, 2008 (Docket No. 54-20).................................................A894

Exhibit U to Kohane Declaration -
Defendants' Responses to Plaintiff's First Requests
for Admission (Docket No. 54-21) ............................................................A896

Declaration of David S. Gold in Opposition to Defendants'
Motion for Summary Judgment (Docket No. 38) .....................................A951

Exhibit A to Gold Declaration -
E-mail from Bill Donovan, dated February 9, 2012 (Docket No. 38-1).......A953

Exhibit B to Gold Declaration -
Article from July/August 2012 edition of *Creative
Screenwriting Magazine* (Docket No. 38-1) .............................................A955

Declaration of Michael Elias in Opposition to Defendants'
Motion for Summary Judgment (Docket No. 41)(Exhibits Ommitted
From Joint Appendix) ............................................................................A959

Response to Defendants' Statement Pursuant to Local Rule 56.1
and Plaintiff's Statement of Additional Material Facts (Docket No. 58) ................A976

Reply Declaration of David E. Callaham in Support of Defendants'
Motion for Summary Judgment, dated April 17, 2012 (Docket No. 43)..................A992

Declaration of Kevin King Templeton, dated April 2012 (Docket No. 44) ............A997

Declaration of Scott Lambert, dated April 18, 2012 (Docket No. 45)....................A999

Declaration of David McKenna, dated April 16, 2012 (Docket No. 46)...............A1001

Declaration of Martin D. Singer, dated April 16, 2012 (Docket No. 47) .............A1043

Sylvester Stallone Reply Declaration, dated April 2012 (Docket No. 48) ............A1047

Response to Plaintiff's Statement of Additional Material Facts Pursuant
to Local Rule 56.1, dated April 18, 2012 (Docket No. 49)......................................................A1051

Declaration of Robert Mark Kamen, dated April 18, 2012 (Docket No. 50) .........................A1055

Stipulation of Dismissal as to David E. Callaham,
    filed April 27, 2012 (Docket No. 56)...............................................................................A1057

Order of the Honorable Jed S. Rakoff, dated June 22, 2012 (Docket No. 61) .......................A1059

Memorandum Order of the Honorable Jed S. Rakoff,
dated December 26, 2012 (Docket No. 64) ..........................................................................A1060

Notice of Appeal, dated January 25, 2013 (Docket No. 69)...................................................A1078

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4    MARCUS WEBB,                    )
                                      )
 5           PLAINTIFF,               )
                                      )
 6      vs.                           )     No. 1:11-cv-07517 (JSR)
                                      )
 7    SYLVESTER STALLONE, DAVID E.    )
      CALLAHAM, MILLENNIUM FILMS, NU  )
 8    IMAGE FILMS, LIONS GATE FILMS,  )
      INC., AND LIONS GATE HOME       )
 9    ENTERTAINMENT, INC.,            )
                                      )
10           DEFENDANTS.              )
      _____)

11

12

13                C O N F I D E N T I A L

14             SINGLE DEFENDANT RESTRICTED

15

16       (THE FOLLOWING PAGES CONTAIN CONFIDENTIAL MATERIAL

17               39 - 41, 44 - 47, 63 - 64,

18               133 - 178, 185 - 199)

19

20             DEPOSITION OF TREVOR SHORT

21                  MARCH 8, 2012

22

23

24    FILE NO. 5919

25    REPORTED BY:  D'ANNE MOUNGEY, CSR 7872
```

```
1        Q      Anyone else's?

2        A      Everybody's, other than Mr. Weldon and

3    myself.

4        Q      Not your own?

5        A      No.

6        Q      So Mr. Davidson's ego was -- I mean,

7    everybody is not everybody.  My ego is not at stake.

8    Who are you talking about?

9               THE WITNESS:  Do I have to educate them on

10   the whole thing -- the process?

11              MR. JANOWITZ:  You can tell him the process.

12              THE WITNESS:  Let me try and give you some

13   context for this script, amongst many.

14              "The Expendables" was a movie we were going

15   to make and it began with a script and thousands of

16   people had contributions to it and there were all sorts

17   of different ideas floating around between Mr. Stallone

18   and his camp as to what the movie was going to be,

19   within my own company of the various executives there as

20   to what it should be, and the thing was becoming a, in

21   my colloquialism, bun fight.

22   BY MR. KOHANE:

23       Q      A what?

24       A      A bun fight.

25       Q      What does that mean?
```

1          A       It means everybody was throwing everything at

2     everybody and there was no focus, there was no

3     confluence of what this movie was going to be.

4               I had some very distinct ideas about what I

5     thought should and shouldn't be in the movie; Mr. Boaz

6     Davidson had some ideas.  Our ideas kind of overlapped

7     in some measure.

8               And up to this point, certainly the process

9     was that everybody tried to cajole and convince

10    Mr. Sylvester Stallone as to what he would put and

11    wouldn't put into the script.

12              In other words, he was determining what went

13    on to the page and what didn't and inputs were being

14    made to him, some of which he acknowledged, some of

15    which he ignored and others of which he made up on his

16    own.

17              So this particular script, which is of no

18    particular relevance to anything in the process, the

19    notion of -- within the company people having ideas,

20    expressing them to Boaz Davidson, who is the head of

21    development in our company, for him to communicate to

22    Mr. Stallone in the hope that some of those ideas ended

23    up in the screenplay, was not, in my opinion, working

24    particularly well up to that stage.

25              I then recommended to Mr. Davidson that we go

```
 1   and write a full script, that we actually do the things
 2   that we were hoping to have done into the script.  And
 3   rather than presenting a whole lot of unrelated ideas on
 4   this page and that page and in that sequence, that we
 5   produce a coherent complete document, which was a script
 6   that embodied the basic concepts and ideas that we would
 7   like to see in the movie.
 8           The only writer, per se, that we had
 9   immediate access to, because he was working for us in
10   one capacity or another, was Les Weldon in Bulgaria.  So
11   we briefed him on whatever the existing screenplay was
12   at that point, Mr. Stallone's version, and the kinds of
13   changes and things that we would like to see in it and
14   could he now produce a fully fledged script, which could
15   then be presented to be read as a complete exercise
16   rather than this idea of please change the dialogue in
17   this scene and please move this character from this
18   scene to the next scene, which was very unfocused.
19           Does any of that make sense to you so far?
20       Q    Well, I can't answer questions, but we can --
21   but please continue if you have more to say.
22       A    So this was an attempt to consolidate our
23   comments in the hope of presenting them in the form of a
24   fully fleshed out screenplay would be more successful
25   than presenting those ideas in isolation into a writing
```

1    process that was chaotic, at the best of times, as far

2    as I saw it, so we had the script written.

3            In doing that, to answer the question that we

4    started this off on, the last thing in life we would

5    want to do is put Les Weldon's name onto a screenplay

6    and present it to Sylvester Stallone that someone else

7    wrote a screenplay that we think is better than yours.

8            So, you know, this is probably a cover sheet

9    of one of the existing screenplays, "Sly, please read

10   this version."  That was the idea.

11       Q    "Sly" is Stallone; right?

12       A    Yes.

13       Q    Did Stallone know that you had asked Weldon

14   to do a rewrite?

15       A    I have no idea what he did and didn't know.

16       Q    You did not tell Mr. Stallone that Weldon was

17   involved?

18       A    I don't communicate with Mr. Stallone.  As I

19   said, everything was focused through Boaz Davidson, who

20   is our head of development in the company.  So if and to

21   whatever extent this screenplay was presented to him, it

22   would have been done by Boaz, and I'm not clear that was

23   at the time of the day.

24       Q    You don't know whether NI 72 was ever given

25   to Stallone?

```
1    you take my representation that there's testimony he
2    worked on one, did anyone, to your knowledge, produce a
3    rewrite of the script?
4              MR. JANOWITZ:  Objection to the form of the
5    question.
6    BY MR. KOHANE:
7         Q    You can answer.
8              MR. JANOWITZ:  I think that's a very vague
9    question.
10             THE WITNESS:  It doesn't matter.
11             I don't know.  I don't work with the writers.
12   This is about as close as I would have ever got to
13   interfering in the process.
14             Understand, I'm the guy in the company that
15   handles the legal and the financial stuff.  Nobody
16   particularly regards my creative opinion as being a
17   particular way.  Although, given that I'm one of the
18   owners of the company, I do stick my oar in when I feel
19   inclined.
20   BY MR. KOHANE:
21        Q    You stick your oar in, o-a-r?
22        A    Yeah.  I'm English.
23             So I don't have any idea who was doing the
24   writing.  I review the output.  Someone says to me,
25   "Here is a current draft of the script."  I read it, I
```

```
 1    come up with my own ideas and I will typically
 2    communicate those really only to Boaz Davidson.  I'm not
 3    one of the guys in a room full of writers throwing ideas
 4    around.  That isn't the way I operate.  So I don't know
 5    who was involved in writing or not writing or whatever.
 6         Q     Just so the record is clear, you use a term
 7    "band fight"; did I hear you right?
 8         A     Bun fight.  Bun is a --
 9         Q     Bun, b-u-n?
10         A     Yeah.  A bread, a thing that people throw at
11    each other when they're screwballs.
12         Q     It's like a food fight?
13         A     Yes.
14         Q     Do you know what the term of -- on 72 -- the
15    document still in front of you -- do you know what the
16    term "official photo play" means?
17         A     The term means it's the official script
18    that's going to be turned into a movie.
19         Q     Let me direct your attention to Exhibit 71.
20    The top e-mail on the first page appears to be an e-mail
21    from Les Weldon to Joan Mao with copies to Boaz Davidson
22    and you.  Do you see that?
23         A     I do.
24         Q     Do you recall receiving this e-mail?
25         A     No.
```

```
 1   BY MR. KOHANE:
 2        Q     Do you know whether Nu Image believed it
 3   needed to acquire the rights to any other works in
 4   connection with the making of "The Expendables"?
 5        A     When?
 6        Q     Ever.
 7        A     Eventually we did acquire other works, yes.
 8        Q     What other works?
 9        A     We acquired a script called "Barrow" -- or
10   rights to a script called "Barrow" and we acquired
11   rights to a movie called the "Dogs of War."
12        Q     When did Nu Image come to believe it needed
13   to acquire the rights to "Barrow" to make
14   "The Expendables"?
15        A     I don't think we ever came to the conclusion
16   we had to buy the rights to "Barrow."  We decided to do
17   it because we were being threatened with lawsuits out of
18   Warner Bros.
19        Q     And Warner Bros. owned the rights to "Barrow"
20   at the time?
21        A     As far as I know, yes.
22        Q     Was there a lawsuit between Nu Image and
23   Warner Bros. relating to "Barrow"?
24        A     A lawsuit?  No.  They made -- they wrote
25   various claims and asked us to cease and desist and all
```

1                  UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4      MARCUS WEBB,                    )
                                       )
5              PLAINTIFF,              )
                                       )
6        vs.                           )    No. 1:11-cv-07517 (JSR)
                                       )
7      SYLVESTER STALLONE, DAVID E.    )
       CALLAHAM, MILLENNIUM FILMS, NU  )
8      IMAGE FILMS, LIONS GATE FILMS,  )
       INC., AND LIONS GATE HOME       )
9      ENTERTAINMENT, INC.,            )
                                       )
10             DEFENDANTS.             )
       _____)

11

12

13

14

15               DEPOSITION OF JOHN THOMPSON

16                    MARCH 7, 2012

17

18

19

20

21

22

23

24     FILE NO. 5918

25     REPORTED BY:  D'ANNE MOUNGEY, CSR 7872

```
 1   related to the production of "The Expendables."
 2   BY MR. KOHANE:
 3        Q     Were there any other companies that are
 4   affiliated with Nu Image that were also involved in the
 5   production of "The Expendables"?
 6        A     Not in my experience.
 7        Q     Who do you work for?
 8        A     I was -- I work for -- I'm an independent
 9   contractor.  I have a production company and I work
10   primarily for Nu Image/Millennium.
11        Q     What is the name of your company?
12        A     Authentic Picture Corporation.
13        Q     Are you -- that's a corporation?
14        A     (No audible response.)
15        Q     You have to speak.
16        A     It's a corporation, yes.
17        Q     Are you the sole owner?
18        A     That's right.
19        Q     And you, I think, a moment ago used the
20   phrase "Nu Image/Millennium" or you might have said
21   "Millennium/Nu Image."  If I use the term "Nu Image" or
22   "Millennium" in the course of the deposition, will we
23   understand we're talking about the same company?
24        A     Yes.
25        Q     And are you able to tell me what Nu Image
```

```
 1      A     No.

 2      Q     Are you an officer of any of the Nu Image or

 3   Millennium companies?

 4      A     No.

 5      Q     Do you know who the owners of Nu Image and

 6   Millennium companies are?

 7            MR. JANOWITZ:  Objection.  When you say

 8   "Nu Image and Millennium companies," you mean the

 9   defendants in this case that are listed in the second

10   amended complaint?

11            MR. KOHANE:  Yes.

12            MR. JANOWITZ:  You can answer.

13            THE WITNESS:  Avi Lerner and Trevor Short.

14   BY MR. KOHANE:

15      Q     Was Mr. Dimbolt (sic) ever an owner of those

16   companies, to the best of your knowledge?

17      A     Yes.

18      Q     When did he cease being an owner?

19      A     I'm not sure if he has ceased to be an owner,

20   but --

21            MR. JANOWITZ:  Again, I think you're getting

22   into an area where you're speculating.

23            THE WITNESS:  I'm not sure what Mr. Dimbort's

24   role is now.

25   ///
```

```
 1    the cost of the picture.
 2         Q    Do you know a person named John King -- I'm
 3    sorry -- Kevin King or Kevin King Templeton?
 4         A    Yes.
 5         Q    And does he work with Mr. Stallone?
 6         A    Yes.
 7         Q    And did you work with him in connection with
 8    the production of "The Expendables"?
 9         A    Absolutely.
10         Q    What was his -- what was his role with
11    respect to the production of "The Expendables"?
12         A    Kevin King was a producer of the picture.
13         Q    What did he do as a producer?
14         A    He helped cast the picture, he helped with
15    the budget of the picture, he helped keep and maintain
16    the schedule of the picture, he helped us as an
17    intermediary with Mr. Stallone and he did customary
18    producorial services.
19         Q    Do you know a person named Lonnie Ramati?
20         A    I do.
21         Q    He works for Nu Image or Millennium?
22         A    He does.
23         Q    And what is his job?
24         A    He is the head of business affairs.
25         Q    Is he a lawyer?
```

# EXHIBIT

# E



6423 Wilshire Boulevard • Los Angeles, California 90048 USA
Tel: (310) 388-6900 • Fax: (310) 388-6901 • E-mail: info@millenniumfilms.com

January 7, 2009

Wayne M. Smith
Vice President
Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, California 91522

**Re : BARROW**

Dear Sir

I am in receipt of your letter dated January 7, 2009 in connection with the above screenplay.

Millennium Films is indeed proceeding with the development of a motion picture tentatively entitled "The Expendables". This project, however, currently bears no resemblance to or similarity with the project entitled "Barrow", which we understand is owned by Warner Bros.

Upon originally reading and reviewing "Barrow" we noted a striking similarity between that project and a novel by Fredrick Forsyth and motion picture by MGM based thereon, both entitled "The Dogs of War". The similarities were so strong that we formed the opinion that, were we to acquire the rights to "Barrow" and produce a motion picture based thereon, we could possibly face legal action from MGM and/or Fredrick Forsyth. Given this assessment, together with the fact that we had been unable to negotiate an acceptable deal with Warner Bros. and the other related producers for the rights to "Barrow", we approached MGM in order to obtain the rights to undertake a remake of "The Dogs of War". We have finalized terms for the acquisition of the requisite rights to that project and the production we are currently working on under the tentative title "The Expendables" is a remake of that film.

We therefore respectfully decline your invitation to cease and desist our development activities. Further, as the owners of the relevant rights to "The Dogs of War", we will be sensitive to any proposed further development of "Barrow" as, in our opinion, that project bears remarkable similarities to "The Dogs of War".

Whilst we are confident that the project we are currently developing has no relationship to "Barrow" we would, nevertheless, be willing to meet with the responsible decision makers at Warner Bros. in order to see if any reasonable accommodation can be reached between the parties.

Confidential

This letter does not constitute and should not be interpreted as a complete statement of all relevant facts or of our rights and remedies, all of which are hereby reserved.

Sincerely

Trevor Short – CFO

cc.    Avi Lerner
       Lonnie Ramati
       Steve Spira
       Kevin McCormick
       Dan Furie
       Jake Bloom
       Jim Wiatt
       Jeff Rabinov
       Patti Connolly
       Richard Levin

ATTORNEY'S EYES ONLY - CONFIDENTIAL

NI002732

# EXHIBIT
# F

| | |
|---|---|
| **From:** | Phase1234@aol.com |
| **Sent:** | Wednesday, February 11, 2009 4:17 PM |
| **To:** | |
| **Subject:** | "Untitled Mercenary Project" - Quitclaim |

I spoke to Avi who said as follows concerning "Barrow" and the 2 producers:

(a)  We had a deal for US $400,000 with the 2 producers
(b)  We are willing to do that deal <u>which is a favor to the producers</u> since our film and our script and our story, "The Expendables" are definitely <u>not</u> "Barrow"
(c)  Although we were going to settle this with Warner Bros and not go to litigation on the matter (<u>even though we know we will win</u>), we now, because of Carlos Goodman, have no option but to call off the entire deal and we will see WB in court on this matter.
(d)  This is a general warning to all of you not to interfere with the movie and its distribution because this film, "The Expendables" (and the story and script on which it is based) is definitely <u>not</u> "Barrow"

Sincerely,

Lonnie Ramati

cc:Carlos Goodman, Avi Lerner, Jake Bloom, Jim Wiat, Kevin King, Dan Furie

---

| | |
|---|---|
| Subject | RE: FW: INITIAL: "Untitled Mercenary Project" - Quitclaim |
| Date: | 2/11/2009 10:35:38 A.M. Pacific Standard Time |
| From: | ckg@bhdrl.com |
| To: | Phase1234@aol.com, alerner@nuimage.net |
| CC: | pjs@ziffrenlaw.com, dan.furie@warnerbros.com, johanny@bhdrl.com |

*Sent from the Internet (Details)*

Lonnie,
Our understanding is that you guys offered a reduced deal and then withdrew it when you took the position that you didn't need the Barrow rights.  Our view of course is that you do need the Barrow rights and that in any event Thunder Road and Management 360 have a submission position as this project was developed on the basis of our submission to Stallone and then to Avi of a mercenary project in the original form of Barrow.
In any event, as I notified you when you withdrew the prior offer, our position was that if you proceeded with trying to avoid Thunder Road's and Management 360's deal, we would not re-entertain a reduced deal -- in my words, you did not have a free option to see if you could avoid our deal and then come back and try to offer us the reduced deal again.  We never heard from you all again.
Quite honesty, we've all been in the dark about Avi's intentions since the initial discussions that ceased.
Carlos

CONFIDENTIAL

# EXHIBIT G

**From:**      Dave Callaham <Callaham@stingrza.com>
**Sent:**      Monday, August 17, 2009 3:44 PM
**To:**        Dave Kalstein <kalstein@mac.com>; Kyle Harimoto <kharimoto@sbcglobal.net>
**Subject:**   expendables

HOLY SHIT THIS SCRIPT IS FUCKING AWFUL I feel really bad now for sending it to you guys. I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote. Which I suppose at this point is both the good and bad news...

CONFIDENTIAL

DC00483_REV

# EXHIBIT
# H

"THE EXPENDABLES"- WGA CREDIT ARBITRATION STATEMENT

Writer "B"
August 27, 2009

Colleagues —

I appreciate your efforts in this arbitration.

I.    PROPOSED CREDIT

I am entitled to shared "Story By" credit and sole "Screenplay By" credit for "The Expendables". I believe such credit for my work is fully in accord with the WGA Policy on Credits (Section III of the WGA Screen Credits Manual).

The idea of doing an action-oriented theatrical picture featuring a group of mercenaries had been something that my representatives and I had been discussing with the producers for some time. These discussions began back in 2006 when I was working on another action picture with the same producers and accelerated in earnest beginning in early 2008 following the release of that picture.

The producers mentioned to me that they controlled the rights to a picture from the 1980s called "Dogs of War" that dealt with the mercenary theme. I had never seen "Dogs of War," and I actually still have not seen that picture, since we agreed at the outset that we wanted to take a fresh cut at a somewhat familiar theme and possibly launch a franchise.

In about February or so of 2008, the producers sent my then-agent a screenplay that was reportedly based upon "Dogs of War". This was the "Barrow" screenplay. I read and considered "Barrow", but ultimately set it aside. While I liked the idea present in "Barrow" of mercenaries overthrowing a dictator, I thought the plot points involving the dead grandson, an opening sequence in battle-torn Iraq, suspicion over Al Queda, finding a clue in an old photograph and others were things we had seen before and didn't add anything really new to the theme.

I started writing my own screenplay for "The Expendables" in the spring of 2008 and completed numerous drafts, culminating in the "cherry" shooting script that had been submitted to the arbiters. Counting dialogue polishes, I took over one hundred (100) passes at the screenplay.

The WGA Policy on Credits provides that *"arbiters must take into consideration the following elements in determining whether a writer is entitled to screenplay credit: dramatic construction; original and different scenes; characterization or character relationships; and dialogue. "* (Paragraph B.4.a. of the WGA Policy on Credits):

Dramatic construction:

-1-

214417_1

CONFIDENTIAL

SS 010650

You may find that my dramatic construction is similar to Writer A's in the sense that we both tell stories about mercenaries traveling to a foreign land and overthrowing the resident dictator, and, in both stories, the mercenaries are ultimately successful; but that is the extent of the similarities in construction. Key differences in my story include the following:

— Barney and his band of mercenaries are hired by Church for business and economic reasons, so that the resources of the island may be made available and utilized (no dead grandson)

— My opening sequence (more than 20 pages) involves the problem of pirating on the high seas (no Iraq)

— My protagonists are a band of mercenaries and the characters work together as an ensemble, led by the aging Barney (no central leading man as in "Barrow")

— The overthrow of the dictator in my story is a major spectacle (no parallel in Barrow)

— My side-story between Christmas and Lacey increases one's understanding of and emotional access to Christmas (again, no parallel in Barrow).

These and other key differences in structure alone will likely lead you to conclude that I am responsible for more than 50% of the content of the final, though the following elements are also relevant to your analysis and will reinforce this finding.

Original or Different Scenes

These include the following:

— Pirate sequence
— Church's hiring of Barney and his band
— Barney and Christmas pose as ornothologists
— Scenes on Barney's sea plane
— Scenes with Barney's truck
— Scenes in Lacey's apartment
— Christmas' discovery of Lacey's new boyfriend
— Scenes with Tool and in the tattoo parlor
— Motorcycle scenes
— Destruction of the palace

I don't think there can be any serious doubt that more than 50% of the scenes in the final screenplay are my own.

Characterization or Character Relationships

In addition to my mercenaries working together as a team of protagonists, character elements that are unique to my work include:

— Barney is an old-hand, hyper-masculine, bringing up the new

-2-

264475 1

CONFIDENTIAL

SS 010651

— Each of the mercenaries has there own specialty: Barney is into guns, Christmas is an expert with knives. _____ is into martial arts.
— Christmas has a special relationship with Lacey and must move on
— Tool is an "ex"-Expendable, and serves as the hub of the character wheel
— Tattoos are used to reinforce the bond among the men

Other than the use of multiple mercenaries and a local girl who assists men in general situated in the foreign land, you will easily find that the majority of the characters are my own.

<u>Dialogue</u>

You will undoubtedly conclude that, without exaggeration, over 90% (perhaps over 95%) of the final dialogue is my own work.

"It is up to the arbiters to determine which of the elements are most important to the overall values of the final screenplay." (Paragraph B.4.e. of the WGA Policy on Credits.) I believe that, in assessing all of the elements to be considered, you will find that any reasonable assessment of the four elements to be considered shows conclusively that I am responsible for more than 50% of the content of the final screenplay. Accordingly, I respectfully look forward to your decision in support of the Tentative Notice of Writing Credits.

Thank you once again for your service.

-3-

CONFIDENTIAL

SS 010652

# EXHIBIT

# I

WRITER B

APPEAL TO WGA POLICY REVIEW BOARD

Submitted on behalf of Writer B by:

Martin D. Singer
William J. Briggs, II
Lavely & Singer
2049 Century Park East, Ste 2400
Los Angeles, CA 90067-2906
(310) 556-3501
wjbriggs@lavelysinger.com

CONFIDENTIAL                                                    SS 010661

Writer B's Appeal to Policy Review Board

Writer B appeals the determination by the Arbitration Committee that Writer A should be awarded sole "Story by" credit and shared "Screenplay by" credit on "The Expendables." Writer B strongly believes that an indefensible misapplication of Guild policy and rules has led to a result which deprives Writer B of sole "Story by" and sole "Screenplay by" credit on this film.

The grounds for Writer B's appeal is that the Arbitration Committee misinterpreted, misapplied or violated Guild Policy. First, the Automatic Arbitration Provision of Schedule A of the Minimum Basic Agreement was improperly applied in this situation. Second, there was a misapplication or misinterpretation of the Screen Credit Policy.

## AUTOMATIC ARBITRATION

According to the Screen Credits Manual, Schedule A of the Minimum Basic Agreement provides:

"Unless the story and/or screenplay writing is done entirely without any other writer, no designation of tentative story or screenplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with Guild rules for determination of such credit." (Screen Credits Manual, III, Section C, provision 1.)

Nu Image originally submitted its Notice of Tentative Writing Credit to the WGA with only Writer B named and no other writer designated. Although Writer B is a production executive on the film, the story and screenplay was done entirely without any other writer. Based on Nu Image's Notice of Tentative Writing Credit, it was therefore improper for the Guild to have requested an Automatic Arbitration since no other writer had been designated to receive any credit. In apparent violation of its own policies and rules regarding writing credits, the Guild called Nu Image and demanded that it resubmit a Notice of Tentative Writing Credit with the name of Writer A. While the Guild has a right to protest credits proposed by a signatory company, it may not demand that the Company resubmit a Notice of Tentative Writing Credit in order to force Automatic Arbitration. (See, Screen Credits Manual, III, Section F.) In this case, the Guild's demand that Writer A be included on the Notice of Tentative Writing Credit appears especially capricious given the fact that Writer A was neither hired by Nu Image nor did he write the screenplay. Troublesome too was the Guild's demand that Nu Image resubmit its Notice of Tentative Writing Credit with Writer A included in the "Story by" and "Screenplay by" credits. The Guild took it upon itself to set up a scenario that would therefore force an Automatic Arbitration for writing credits on this project even though there is no provision in the Guild's

**CONFIDENTIAL**

**SS 010662**

policies and rules which provides that it can demand a signatory resubmit a Notice of Tentative Writing Credit.

Once it created the artificial need for an Automatic Arbitration, the Guild further ignored its own policies, procedures and rules because it failed to provide Writer B with a copy of the Screen Arbiters List to permit him to challenge peremptorily a reasonable number of the names on the Screen Arbiters List. (Screen Credits Manual, II, Section D, provision 1.) Instead, it appears that the Screen Credits Administrator unilaterally selected the arbiters, who themselves then ignored Guild Credit Policy in awarding writing credit on this project.

## GUILD POLICY ON CREDITS

Guild Policy on Credits defines "story" as a writing that consists of basic narrative, idea, theme or outline indicating character development and action. (SCM, III, Section A, provision 4.) Further, it is appropriate to award a "Story by" credit when, among other reasons, the story was purchased by a signatory company from a professional writer. (SCM, III, Section A, provision 4.)

A "Screenplay" is defined as consisting of individual scenes and full dialogue, together with basic adaptation, continuity, scenario and dialogue as shall be used in, and represent substantial contributions to the final script. (SCM, III, Section A, provision 6.) Importantly, screen credit for screenplay shall be awarded to any writer whose work represents a contribution of more than 33% of a screenplay, except where the screenplay is an original screenplay. (SCM, III, Section B, provision 4 (a).) In the case of an original screenplay, any subsequent writer or writing team must contribute 50% to the final screenplay. *Id.*

Further, "Original screenplays" is defined as "those screenplays which are not based on source material and on which the first writer writes a screenplay without there being any other intervening literary material by another writer pertaining to the project." (SCM, III, Section B, provision 4 (b) (1).) If a writer is furnished or uses research material, the screenplay is still considered an original screenplay. *Id.* Moreover, according to the Guidelines for Arbiters in Determining Screenplay Credit, arbiters must take into consideration the following elements in determining whether a writer is entitled to screenplay credit: (1) dramatic construction; (2) original and different scenes; (3) characterization or character relationships; and (4) dialogue. (SCM, III, Section B, provision 4 (c).)

## STORY BY CREDIT

There is no dispute that Nu Image, the production company and signatory company, acquired "The Expendables" from Writer B, a professional writer. Nu Image did not hire Writer A to provide any writing services on that screenplay. Rather, Writer A wrote a script entitled Barrow which Nu Image acquired from Warner Bros. but did not use. Moreover, a comparative analysis between "The

**CONFIDENTIAL**                                                    **SS 010663**

Expendables" and "Barrow" reveals there are absolutely no similarities between
the two scripts, save one log line – a corrupt dictator on an island nation who
must be removed from power. Aside from that one unoriginal idea or theme,
there are no similarities between the two scripts. Writer B should therefore be
awarded a sole "Story by" credit and sole "Screenplay by" credit because every
idea, every scene, every set piece, every character, every theme, every plot
twist, every story beat is wholly original to Writer B in The Expendables.

### A.    Basic Narrative.

**The Expendables:**  The basic story consists of a group of mercenaries
hired by the CIA to over throw a corrupt dictator of an island nation. The dictator
is controlled by a rogue former CIA operative who runs a drug cultivation and
smuggling operation from the Caribbean. In a key plot twist, the rogue CIA
operative kills the dictator when the dictator no longer wants to take orders. The
mercenaries who are led by Barney blow up the presidential palace.

**Barrow:**      The basic story consists of a quasi government team of
former Navy Seals who are hired to take control of an island rich in oil reserves.
The team is led by Barrows and is hired by the head of a German conglomerate
who wants the oil. Layered within the story is that the U.S. government wants
control of the oil, and the CIA has an agent in place assisting the dictator control
the island. However, the CIA agent in charge is secretly attempting to siphon
profits from the oil to enrich himself. A key plot point is that the corrupt CIA agent
has hired a contractor to kill Barrow. To accomplish that task, the contractor
threatens the family of one of Barrow's teammates to coerce him to betray
Barrows. Meanwhile, another CIA agent who has been chasing Barrow for some
unknown reason for more than a decade is getting close to his quarry. And,
although the corrupt CIA officer attempts to thwart Barrow's assassination of the
dictator, Barrow outwits both the CIA and the German conglomerate.

### B.    Idea and Theme.

A group of former military men are hired to depose a corrupt dictator on an
island nation.

The idea is not original. In 1962, Albert Broccoli produced the first of the James
Bond movies, Dr. No. In Dr. No, James Bond is sent to a West Indies
(Caribbean) island to foil a master criminal who acts as a dictator of the island.

In 1967, Kenneth Hyman produced The Dirty Dozen, a story about twelve
convicts recruited to act as commandos to attack a Nazi stronghold.

In 1980, Norman Jewison produced The Dogs of War, a film about a
group of mercenaries sent to depose a corrupt African dictator.

In 1985, Joel Silver produced Commando, a film in which Arnold
Schwarzenegger portrays a commando in pursuit of a deadly Latin dictator.

**CONFIDENTIAL**

SS 010664

### C.    Character Development and action.

**The Expendables:** (See attached outline for Character comparison.)  The main characters in The Expendables are: Barney, the leader of the Expendables, who has no family; Lee Christmas, a former SAS who is a savant with knifes, and a failed relationship with Lacy; Gunnar Jensen, an Expendable who has a drug problem and betrays Barney; Mr. Church, the CIA Agent who hires the Expendables; General Garza, the corrupt dictator; James Monroe, the rogue CIA agent who controls Garza and runs drugs; and Sandra, the daughter of General Garza, who helps Barney.  There is no real back-story for any of the characters.  And, there is minimal character development.

The story begins with the Expendables rescuing hostages from Somalian Pirates on a cargo ship.  (See attached outline of Major Scenes and Plot Twists Comparisons.)  After that scene, The Expendables are hired by Mr. Church to kill General Garza.  Barney and Christmas visits the island to do recon and meet Sandra.  They are attacked by Garza's troops while Sandra shows them the island.  Barney and Christmas kill the troops and barely escape the island on Barney's seaplane.  Gunnar then tries to kill Barney during a car chase.  On the island, Monroe demands that Garza's daughter be caught and killed for helping Barney.  Garza meekly acquiesces.  Realizing Sandra may be in danger even though she bravely stayed behind on the island rather than leave with Barney and Christmas, Barney decides to go back to the island.  He does so even though he discovers that the real reason the CIA want him to kill Garza is so that they can get rid of the rogue agent, Monroe, and reassert their control over their Caribbean drug pipeline.  Barney returns to the island with his crew, rescue Sandra, blow up the palace and kill Monroe.

**Barrow:** (See attached outline for Character comparison.)  Barrow Miles, former Navy Seal Captain whose wife died of breast cancer and daughter is in college.  Barrow lives alone with his cat.  He is slightly estranged from his daughter.  Ali Al-Batayneh, a member of Barrow's team.  Ali has a wife and young son.  Ali explains the moral compass of the team and their missions, which he explains is not about the money.  Emiro Coca Raya, former Navy Seal, Hispanic, diminutive in stature but has a gargantuan attitude.  Ivy is Navy Seal, who killed UBL and he wants to work with Barrow.  CIA Agent Fruchborn has chased after Barrow for more than 10 years.  Mr. Monday pretends to be an ultra-wealthy individual out for revenge for the death of his grandson and wants General Miramonte dead.  Monday is really the personal steward for Preston Layfield, a billionaire who controls an oil company and wants the island for himself.  General Miramonte is the dictator of Sandrayo and led an ultra-violent junta to overthrow the government.  Dr. Adoti is the only doctor to have survived Miramonte's purges.  Dr. Adoti is ultimately handed the reigns of country after Miramonte is ousted.  Ballcap is an unnamed CIA operative

**CONFIDENTIAL**

**SS 010665**

who helps Miramonte run his country. Murali is the corrupt CIA officer who is trying to siphon oil profits to enrich himself. Hulking Mark is a Navy Seal who helps Barrow. Gary Coe Caine, a mercenary, no honor, no code. He wants to kill Barrow. The Characters and their back story are well developed.

The story begins with Barrow in Iraq torturing an Iraqi to find missing Americans. (See attached outline of Major Scenes and Plot Twists Comparisons.) After Barrow and his team rescue the missing Americans, Barrow is later approached by Mr. Monday to kill General Miramonte and take over the country as revenge for killing Monday's grandson. In conducting recon of the island, Barrow learns that his best opportunity to kill Miramonte will be on his birthday, the one day he makes a public appearance. Yet, Barrow also begins to uncover the tissue of lies told by Mr. Monday. Barrow discovers that CIA is protecting Miramonte, and Barrow subsequently discovers that the kid killed on the island was not the grandson of Mr. Monday. Meanwhile, Fruchbom is squaring off with Murali about going after Barrow. Barrow understands that he is in a cat and mouse game with the CIA so he leaves false clues about his plans. To assemble the arms needed for the take over, Coca goes to a drug dealer in Central America, who naturally tries to steal the money and kill Coca. In the interim, Murali hires Coe Caine to kill Barrow. Coe Caine holds Ali's family hostage to coerce Ali to betray Barrow, but Barrow and his team reverse the trap set for him. And, we learn the mystery woman Barrow has been leaving messages for is his daughter, Shelby, a student at Dartmouth. Barrow visits her on campus, where coincidentally Fruchbom happens to be visiting his own daughter. Fruchbom confronts Barrow, but grudgingly lets him go when Barrow provides information to let Fruchbom know that Murali has lied to him. Murali sets in motion a plan to send the Navy Seals to protect Miramonte from Barrow. However, Barrow and his team arrive on the island disguised as Navy Seals deployed to protect Miramonte. Barrow ultimately takes control of the government and hands the reigns of power to Dr. Adoti.

The above salient factors of story narrative, character development and action all dictate that Writer B should be awarded a sole Story by credit. Absent that award, Writer B is entitled to at a bare minimum a shared Story by credit.

### SCREENPLAY BY CREDIT

There is no dispute that the dialogue in Barrow is completely different from that in The Expendables. No line of dialogue is the same.

There is also no dispute that every single scene in The Expendables differs from that of Barrow. Indeed, the story beats, the plot twists, the key plot points, all differ in The Expendables from those found in Barrow. And, all of the action set pieces differ, something even the

arbiters found. There simply are no cross-over plot points between The Expendables and Barrow.

Notably, there is no overlap between any of the characters found in The Expendables from those in Barrow. In fact, all of the characters in The Expendables are wholly original. This fact is underscored by the different backgrounds of the characters in The Expendables from those found Barrow. While Barrow goes to great length to acquaint the audience with the characters' back-story, the characters in The Expendables are front and center from the start with little attention to background story.

In short, aside from the unoriginal idea of staging a coup against a corrupt dictator on an island nation, everything else in The Expendables has been created by Writer B. Writer B created original scenes. He created original dialogue. He created original characters. He created original plot points and twists. He created original set pieces, e.g., the relationship between Christmas and Lacy, and the daughter who betrays her father the dictator. (See attached Comparative Outline of Major Scenes and Plot Twists.) Thus, Writer B's contribution to The Expendables screenplay is 100%. Certainly, no objective evaluation of The Expendables screenplay can credit Writer B anything less than 90%, assuming the unoriginal idea of a coup against a corrupt dictator is entitled to 10%.

Assuming for the sake of argument that the non-original idea of staging a coup against a corrupt dictator is the source material for The Expendables, the Arbiters were required to give weight to Writer B's original and unique utilization, choice, and arrangement of that idea when he presented it in the final shooting script to determine credits. (SCM, III, Section B, provision 4 (d).) Yet, the Arbiters appeared to ignore this policy when they awarded the credits. Had the Arbiters properly applied this principle with the other above mentioned factors, the Arbiters would have had to conclude that Writer B should have received sole Screenplay by credit.

## CONCLUSION

The decision of the Arbiters should be reversed as it appears they misapplied or misinterpreted Guild Policy. Either a new panel of Arbiters should be appointed in accord with Guild Policy to reconsider the Writing Credits, or the Policy Review Board should award credits as follows: Writer B sole "Story by" credit for The Expendables. In the event the Board believes the underlying idea of overthrowing a corrupt dictator on an island nation originated with Writer A, then Writer B should be given shared "Story by" credit because every other concept, theme, idea, scene, set piece, plot twist, plot point in The Expendables was original to Writer B who should be properly credited for them.

**CONFIDENTIAL**

**SS 010667**

Last, Writer B should be accorded sole Screenplay by credit since it is indisputable that his contribution constitutes 100% of the screenplay.

CONFIDENTIAL

SS 010668

# EXHIBIT
# J

WRITER B

COMPARATIVE ANALYSIS OF CHARACTERS

Submitted by:

Martin D. Singer
William J. Briggs, II
2049 Century Park East, Ste 2400
Los Angeles, CA 90067-2906
310.556.3501
wbriggs@lavelysinger.com

**CONFIDENTIAL**

SS 010669

## The Expendables Characters

**Barney Ross** - Mercenary; group leader and strategist; former Special Forces background, and known to be a record holder for speed and accuracy with combat pistols; pilots a seaplane; no family, except his truck and seaplane and fellow mercenaries who call themselves and are tattooed the Expendables.

**Hale Caesar** - - Mercenary; long barrel weapon specialist, especially custom full-auto shotguns. Friends with Barney for 10 years. Tattooed with Expendables insignia.

**Lee Christmas** - - Mercenary. Former SAS who is a savant with knifes or anything with a blade. Tattooed with Expendables insignia.

**Ying Yang** - - Mercenary who likes to meditate. He always bugs Barney for more money. He is a master at close quarter combat. Tattooed with Expendables insignia.

**Toll Road** - - Mercenary, who despite his imposing size and scarred appearance is a demolition expert. Tattooed with Expendables insignia.

**Gunnar Jensen** - - a big combat veteran who excels in precision sniping, but who has become a drug addict. His drug of choice is Meth. He betrays Barney because Barney refuses to work

## Barrow Characters

**Barrow Miles** - - former Navy Seal Capt.; wife died of breast cancer; lives alone with a cat; daughter attends Dartmouth college, but is slightly estranged from Barrow due to his long unexplained absences from the family.

**Christian Monkey Rensch** (30s) - huge guy with a bald head with a mustache lives in Dessau, Germany. He enjoys gardening and plants tulips. He is covered in large tattoos.

**Ali Al-Batayneh** (40s), married to Amira. They have a seven year old son Ahmed. They live in a modest ranch style home, and he drives a non-descript sedan. He enjoys watching baseball with his son. Underscores the point that with this team of operatives it is not about the money.

**Emiro Coca Raya** - - former Navy Seal; Hispanic and diminutive in stature, but has a gargantuan attitude problem. He was on previous missions with Barrow in Kosovo and Zaire. Coca constantly chews on Coca leaves, which accounts for his nickname.

**Ivy** - - (20s) Current Navy Seal; recently responsible for killing UBL (Usama Bin Laden); he has a clean cut and well appointed look like he was spit out of a Connecticut private school

**CIA Agent David Fruchbom** - middle aged. He knows Barrow. He's been after Barrow for a very long time because its his job and he does not believe Barrow operates on the right

**CONFIDENTIAL**                                    **SS 010670**

with him until he's clean and sober. Tattooed with Expendables insignia.

side of the law, even though he realizes that Barrow fights the good fight. Fruchbom just wants to see and be seen by Barrow. Fruchbom's wife, Rachel, is in her 50s. They have a daughter in college, Dartmouth.

**Lacy** - - sometime girlfriend of Lee Christmas, who leaves him for another man.

**Mr. Monday** - - pretends to be an ultra-wealthy individual out for revenge for the death of his grandson, who allegedly was an activist and died at the hands of the dictator, General Antonio Miramonte - President of Sandrayo. Mr. Monday is, in fact, the steward for Preston Layfield, a billionaire who controls an oil company.

**Mr. Church** - - CIA operative. Hires Barney to stage a coup and kill the dictator of an island (Vilena) in the Gulf. CIA is interested in the island because they can grow cocaine on the island and process it there.

**Preston Layfield, Jr.** - a billionaire who actually hires Barrow to stage a coup to take over the island nation of Sandrayo in the mid-Atlantic. Layfield wants to control oil that has been secretly discovered on Sandrayo.

**General Ruben Garza,** (dictator) President of Vilena, who overthrew the previous government. Garza is controlled by a group of ex-CIA operatives, who are running a drug ring.

**General Antonio Miramonte** - - dictator. President of Sandrayo who led an ultra-violent junta that overthrew the Sandrayan government in 1997. The island is now a human rights graveyard having exterminated 15,000 alleged rebels, a quarter of the country's population.

**James Monroe** - rogue ex-CIA officer in his 40s. Monroe controls General Garza and runs a major drug operation from the island.

**Sophie** - - local woman on Sandrayo who helps show Barrow around the island.

**Paine** - - rogue ex-CIA officer who backs up Monroe.

**Dr. Adoti** (60s) - father of Sophie, the only doctor to survive the purge of intellectuals on the island. He is charged with keeping Miramonte alive. Ultimately, Adoti is handed the reigns of the country after Miramonte is successfully ousted.

**CONFIDENTIAL**

**SS 010671**

**Sandra (20s)** - - very attractive. Daughter of General Garza, who works against her father's corrupt regime.

**Ballcap** - - an unnamed CIA officer who assists Miramonte control his populace. Ballcap reports to another CIA officer in DC (Murali), who knows there is oil on Sandrayo.

**Murali (45)** - uber-confident CIA officer who is secretly working to line his own pockets with oil wealth from Sandrayo.

**Agent Ellickson** - works with Fruchborn to catch Barrows.

**The Hulking Man - Mark** - Navy Seal Commander; friend and comrade of Barrow; Hulking Mark supplies Barrow with Ivy and other operatives. Hulking Mark has key plot point at end of film when he brings Seal team to Sandrayo to protect country's president (the newly installed president).

**Gary Coe Caine** - - Mercenary, who has no honor, no code, and fights for money. He believes he competes with Barrow. Murali wants to prevent Barrow from overthrowing Miramonte so Murali enlists the help of Coe Caine. Coe Caine threatens the lives of Ali's family in an attempt to have Ali betray Barrow.

**CONFIDENTIAL**

WRITER B

COMPARATIVE ANALYSIS OF MAJOR SCENES AND PLOTS

Submitted by:

Martin D. Singer
William J. Briggs, II
2049 Century Park East, Ste 2400
Los Angeles, CA 90067-2906
310.556.3501
wbriggs@lavelysinger.com

CONFIDENTIAL                                           SS 010673

Major Scenes and Plot Twists

| The Expendables | | Barrow | |
|---|---|---|---|
| Opening: | Somalian Pirates take control of 25,000 ton Cargo Ship.  Pirates abuse hostages and are preparing to kill them.  Six mercenaries (The Expendables) raid ship and rescue hostages. One of the mercenaries, Gunner Jensen, is strung out on drugs and told he will no longer work with The Expendables until he gets clean. | Opening: | Iraq, undisclosed location. Interior of clay building with a single chair on which a middle aged Iraqi sits tied to the chair. Barrow and Christian question the Iraqi about missing American engineers.  He refuses to disclose information.  Barrow and Christian pretend to torture another Iraqi prisoner with a 7" electric urithethral probe. That second prisoner is really Ali, a member of Barrow's team.  After the middle aged Iraqi discloses the location of the missing Americans, Barrow and his team rescue them. |
| | Christmas and Lacy's sometime relationship is on the rocks.  He goes to her home only to find another man there. | | The rescue of the missing Americans is captured on video and viewed by the CIA.  Agent Ellickson wants to know who conducted the rescue.  However, Fruchbom says it is unnecessary because he knows who is responsible for the rescue. |
| | Tattoo Parlor – – a quasi-meeting place for The Expendables | | Barrow's apartment, Dallas, Texas.  He lives alone, except for a cat and it no longer likes him. |

1

**CONFIDENTIAL**

SS 010674

Mr. Monday meets with Barrow. Monday's alleged steward hovers in the background. (We later learn that the steward is the actual principal.) Monday tells Barrow about General Miramonte and Sandrayo, a small island.

Non-denominational Church - - Barney meets Mr. Church, a CIA operative. Church tells Barney about Garza's misdeeds on the island of Vilena, but Barney is simply interested in how much money he can make. Church says he wants Garza dead, his government dead, and his soldiers dead.

Vilena - - Garza inspects peasants stack bricks of cocaine on wooden pallets and confronts suspected thief. In this scene, Monroe is introduced and demonstrates his control over Garza.

Mr. Monday tells Barrow that Miramonte has exterminated 15,000 alleged rebels, a quarter of the country's population. Monday claims that his grandson has been killed by Miramonte. Monday says he wants revenge for his grandson's death. Monday also says he wants the entire country delivered to him so that he can rebuild it according to his grandson's dreams.

Barney and Christmas discuss Christmas' sour relationship with Lacy.

Fruchbom's house. Fruchbom's wife, Rachel asks that he not chase after Barrow. He insists that it is his job even though for more than 5 years he has been unable to catch Barrow. Fruchbom states that he simply needs to see Barrow and be seen by him to let Barrow know that he's been made.

Tool's Social Club - Barney and Christmas review file about Vilena. Gunnar unexpectedly shows up. Barney tells Gunnar to leave because he is sick and can't be trusted. Gunnar threatens Barney.

Sandrayo - - Barrow wanders the streets of Sandrayo and takes pictures of everything. Miramonte's Elite Guards harass a middle-aged woman, and Sophie intercedes to help. Barrow strikes up a conversation with her. Sophie takes Barrow to The Churchill, a cylindrical building that formerly housed a radio station.

2

**CONFIDENTIAL**

**SS 010675**

Vilena - Barney and Christmas arrive by seaplane; go through a customs shack where they are secretly videotaped. Barney and Christmas wander streets and photograph various scenes of squalor and abuse by solders. Go to a bar where they meet their contact, Sandra. Meanwhile, Garza is in the palace painting a self-portrait. Sandra takes Barney and Christmas around town in her truck. Later, Garza and

Monroe inspect the coca plant fields. Monroe chastizes Garza about who is really in control. (Garza begins to think he made a mistake by getting into bed with Monroe.)

Sandrayo - major plot point: Sophie tells Barrow that Miramonte lives in hiding and presents himself in public only once a year. On his birthday. He throws an elaborate celebration. Sophie introduces Barrow to her father, Dr. Adoti. Adoti explains why he is still alive unlike the other intellectuals, e.g., doctors, lawyers, tribal leaders. And, Adoti mentions a survey team from Europe, who allegedly found no natural resources on the island.

Sandrayo - Barrow locates grave of Monday's alleged grandson. Barrow is confronted by Elite guards, he kills two and chases other. Scene introduces Emiro Coca Raya, another member of Barrow's team.

Sandrayo - Barrow and Coca dig up Monday's grandson's grave. They inspect body and discover grandson was not robbed of possessions as told by Monday. Monday lied. Barrow cuts off finger of supposed grandson.
  Barrow and Coca discover that Miramonte uses a body double. And, Barrow and Coca learn that Ballcap, one of Miramonte's advisors, and who was riding in car with Miramonte's body double is really a CIA operative because of the type of gun he carries. Ballcap having seen Barrow realizes he may have a problem.
        Barrow flies back home.

3

**CONFIDENTIAL**

**SS 010676**

Vilena - - Barney, Sandra and Christmas in truck. Ten soldiers surround Barney and Sandra. Barney and Christmas kill all of the soldiers and make a run for the seaplane. Barney and Christmas try to convince Sandra to leave with them, but she refuses to leave Vilena. Monroe arrives as Barney and Christmas fly off in seaplane. Monroe shoots at seaplane, which angers Barney who banks around and begins to strafe Monroe and his group of soldiers.

Vilena - - Monroe tells Garza that his daughter, Sandra, has helped the Americans and she must be killed. Monroe meets with Gunnar and pays him to kill Barney.

Tool's place - - Barney discovers that Mr. Church is really George Compton, Counterintel Operations Manager, The CIA. Barney pieces together that

Monroe is a former CIA agent who went rogue and took over the agency's Caribbean drug pipeline after it backed Garza's coup. Barney surmises that the agency wants to use Barney to get rid of Monroe (off the books), and then the agency will try to get rid of Barney and his crew.

Langley CIA headquarters - Murali is on the phone with Ballcap, who tells Murali about Barrow.

Meanwhile, Barrow tells Monday that Miramonte is under the protection of the CIA having surmised that Ballcap is a CIA operative. Barrow questions Monday about what really is going on in Sandrayo given the CIA's interest.

Murali sends out an agency wide alert to try and ID Barrow through a photo of Barrow getting off a plane in Miami.

Coronado, CA – Barrow meets with Hulking Mark, a Navy Seal commander. Barrow asks Hulking Mark for an operative to help with an assignment. Mark tells Barrow that Coe Caine is out to get Barrow because Barrow bad mouthed Coe Caine.

Barrow's team for the mission is assembled. Each team member receives a package in the mail from Barrow, which is a signal that they need to meet.

All is at home with his wife and son when he receives Barrow's package.

Barrow's team assembles in a non-descript motel room. Ivy is introduced to the team. Ivy's claim to fame is that he killed UBL.

4

CONFIDENTIAL

SS 010677

Vilena - soldiers hunt for Sandra. They find her and take her to the palace. There, Monroe instructs the soldiers to torture her. Garza appears too weak to stop Monroe and save Sandra.

Langley - Fruchbom is shown picture of Barrow and ID's him.

Lacy's house - Christmas goes to house. Lacy has been hit by the man she has been seeing. Christmas is enraged and wants revenge. He goes to basketball court and beats the guy to within an inch of his life.

Pennsylvania - plot point: Barrow's suspicions of Mr. Monday leads Barrow to the real grandparents of the boy killed. In Sandrayo, who do not know that he has been killed. Upon meeting the boy's real grandparents, Barrow knows that Monday has lied. Barrow now wants to discover what is really on that island that so many people want.

Barney feels he has to go back to Vilena to save Sandra. He wants to go alone, but his crew won't let him.

Langley - Fruchbom and Murali square off over who has priority interest in Barrow, operations or intelligence.

Gunnar tries to kill Barney during a car chase, but Gunnar is instead killed.

Langley - Murali meets with Coe Caine and tells him to kill Barrow.

Cancun, Mexico - Ali purchases a Beach House to be used in the job.

Managua, Nicaragua - Coca arranges to purchase guns from a drug dealer

Vilena - Garza turns the table on Monroe by reasserting control. Meanwhile, Barney and his crew are wiring the palace with explosives.

Any city USA, Public Storage Unit - major plot point and twist: Barney acquires a storage unit with a credit card he knows has been discovered by the agency. Barney intentionally plants evidence of his upcoming job in the storage unit knowing it will be discovered by the agency. (Agent Ellickson discovers that Barney has used a known aliases to rent a public storage unit.)

5

**CONFIDENTIAL**

**SS 010678**

Any city USA: major plot point: Barney makes cryptic telephone call to unknown female and leaves message. (The female turns out to be Barney's daughter with whom he is slightly estranged.) Also, Barney shows Ivy a photo of the kid in the grave with an European cigarette next to the body.

Fruchbom's house: Fruchbom tells wife he has to pursue Barrow, but she reminds him that their daughter is expecting to see him.

Managua, Nicaragua - Coca goes to pick up guns and drug dealer tries to steal the cash and kill Coca.

Ali's house: major plot point: Coe Caine is holding hostage Ali's wife and son. Ali calls house and discovers that Caine is there with wife and child. Caine demands to meet with Ali, and later tries to get Ali to betray Barrow.

Storage Unit: Fruchbom discovers the files that Barrow has left behind to provide false clues to the CIA.

Garza orders that his daughter be brought to him, which exasperates Monroe and Paine. Barney discovers that Sandra is locked up in a cell and being tortured. Barney kills the two guards who are torturing Sandra. However, as Barney and Sandra leave the cell, Paine intercepts them and grabs Sandra. While Barney is being beaten by the other soldiers, Paine instructs the soldiers to take Sandra away. As Paine and the soldiers prepare to kill Barney, Yang drops threw an overhead grate and saves him.

Langley – Major plot point and twist: Fruchbom confronts Murali with information Fruchbom discovered in Barrow's rental storage unit about Sandrayo. Murali lies to Fruchbom about the reason the CIA is interested in Sandrayo. Murali claims there is an Al-Qaeda operative who is hiding out there. Fruchbom says that he just learned that Barrow wants to assassinate Miramonte and will do so on his birthday. Murali says he will get the Navy Seals to protect Miramonte since he is needed to help the agency with the Al-Queda operative.

6

**CONFIDENTIAL**

SS 010679

Vilena - Garza's chambers. Garza gives Monroe money and tells him to leave the island. Monroe refuses. Monroe ultimately kills Garza in front of Garza's soldiers. Monroe snatches Sandra and runs. After coming under fire from Garz's troops, Barney finally decides to blow the Palace. Monroe tries to escape with Sandra. Barney pursues them. Barney and Monroe confront each other.

Dartmouth Dorm: plot piece (explains characters back-stories): Barrow meets his daughter, Shelby in her dorm room. They go to lunch. While at lunch, Fruchbom, who also happens to be at the school visiting his daughter, Amy, to his complete shock and surprise sees the object of his massive decades long manhunt, Barrow. Fruchbom sits down opposite Barrow and they confront each other, both have guns drawn on the other under the table. A grudging respect grows as both realize neither is there for the other, but simply because of their children. And, importantly, Fruchbom learns that Murali lied about the Al-Queda connection in Sandrayo.

Closing scene - Barney and Sandra say goodbye to each other. Tool's place; the crew plays with Gunnar's knife. The Expendables all roar away on their motorcycles.

Gary Coe Caine: plot point: Caine believes he has convinced Ali to betray Barrow. Ali is supposedly walking Barrow into a trap. The trap is reversed on Caine. Caine still believes he has upper hand and orders Ali's wife and son killed. However, Caine's henchmen have already been dealt with by Barrow's team. When Caine realizes he is out of options, its too late for him. Caine tells Barrow that he was hired by the Agency to kill Barrow. Coe is killed.

Langley - Fruchbom confronts Murali about his lie. Murali taunts Fruchbom with his lack of understanding of geo-politics and the fact that oil is the one thing the U.S. government would do anything for. Murali also tells Fruchbom that the Seal team is going to kill Barrow.

7

**CONFIDENTIAL**

**SS 010680**

Barrow learns that his real employer is a
German conglomerate, of which an
American is the Chairman of the board
and CEO. The conglomerate is
Rosenrot Holdings, LP. The industrialist
is also president of Morgenstern Petrol,
which is owned by Rosenrot. His name
is Preston Layfield, Jr., the so-called
personal steward to Mr. Monday.

Plot point: flashback to Dr. Adoti who
told Barrow that a survey team from
Europe supposedly found no natural
resources on the island.

Plot point: Murali calls Ballcap to tell him
that Murali is sending a Navy Seal Team
to protect Miramonte.

Plot twist: Barrow meets with Mr.
Monday and tells him the plan to take
over the island. Barrow asks to whom
he should turn over leadership of the
island once it is secured. Monday says
he has a candidate already chosen.
Barrow also says he wants full payment
before the operation begins and split
between two accounts.

Plot point and twist: knowing that
Fruchbom is probably tracing his
daughter Shelby's calls, Barrow calls
Shelby while he is in Cancun at the
staging house. Fruchbom is alerted to
the call and he and Agent Ellickson fly
to Cancun.

8

**CONFIDENTIAL**                              **SS 010681**

Plot point and twist: Barrow and his team arrive on Sandrayo disguised as Navy Seals. Barrow and his team are literally escorted to meet the president, who is expecting the Navy Seals to come and protect him from Barrow.

Plot point and twist: while Fruchbom is in the empty house in Cancun, he begins to finally piece together Barrow's plan and how Barrow deceived him by leaving a false trail of clues.

Plot point and twist: Sophie helps members of Barrow's team by rallying the people to overthrow Miramonte. Meanwhile, Ivy has the unused radio station operating and broadcasting news that Miramonte has been overthrown. And, Barrow's team uses one of Miramonte's Towncars to display Miramonte's body (body double) on the hood of the car. The radio announces that Miramonte is dead and crowds gather and cheer. Radio announces that group that overturned the regime will present new leader in morning. Even Miramonte's Elite Guard celebrate his death.

Plot point: Ballcap prevents Barrow from immediately killing Miramonte. Ballcap appears to kill Barrow. Ballcap and Miramonte appear to escape. Fight ensues. Christian sacrifices his life for All. Barrow shoots both Ballcap and Miramonte, neither shot is fatal. Barrow and Ballcap bare knuckle it.

9

**CONFIDENTIAL**

**SS 010682**

Plot point: Real Navy Seals arrive on Sandrayo lead by Hulking Mark. Barrow defeats Ballcap. Barrow tells Dr. Adoti that he is the new head of Sandrayo. Hulking Mark is told to protect Dr. Adoti.

Plot point and twist: Barrow calls Fruchbom. Barrow tells Fruchbom that his Fruchbom's daughter's phone has been monitored, which is how Barrow got Fruchbom's phone number. Fruchbom tells Barrow that Fruchbom is at the beach house in Cancun. Barrow explains to Fruchbom that Ballcap is prepared to spill the beans about Murali's under the table deal with Miramonte to skim profits off the top of an impending oil contract.

Plot point: Preston Layfield, Jr. arrives on Sandrayo to claim his island only to be seized by Dr. Adoti and the soldiers.

Conclusion: Barrow and Fruchbom see each other at Dartmouth. Fruchbom asks Barrow for a job.

10

**CONFIDENTIAL**                                              **SS 010683**

| | |
|---|---|
| **From:** | Phase1234@aol.com |
| **Sent:** | Thursday, November 6, 2008 2:27 PM |
| **To:** | Kkingtemple@aol.com; Avi Lerner <alerner@nuimage.net> |
| **Subject:** | Basil Iwanyk Threat For Lawsuit Over "Barrow" |

Mr. Iwanyk is calling around telling a number of people that the script that we are selling at the IFTA/AFM is based on the same story as "Barrow" and contains the same characters as "Barrow".

He is saying that he and Warner Brothers will be suing Mr. Stallone, us, Mr. Lerner and our companies as result of the fact that the script and project (which he alleges is based on "Barrow") is being shopped and sold at the IFTA/AFM

Per Basil, he is calling Jim Wiatt to let him know this as well.

The status on "Barrow" is that we wanted the acquisition from Warner Bros to involve a deferment of the overhead and interest but Warner Brothers would not agree to this. So we can't close with them as a result of this to date.

Just letting you know the update.

Sincerely,

Lonnie Ramati

NI031974

# EXHIBIT
# L

**≣ TRAVELERS**

## PRODUCERS' OR DISTRIBUTORS' LIABILITY INSURANCE APPLICATION

**NOTICE:**
This is an application for a "specified cause of loss" claims-made policy. Except as provided in the policy, any insurance policy issued will be limited to coverage for only those claims that are first made against the insured during the policy period and reported to the Company during the policy period. Please read and review this application carefully and discuss the coverage with your insurance broker, agent or legal representative.

This application should be completed on behalf of those entities that have significant control over creating and producing the insured production. *If there are multiple applicants who desire "named insured" status, Questions 1 through 4 should be answered separately for each such co-applicant.* Requests for coverage of any "additional insureds" cannot be made in Questions 1 through 4, but should be made through separate attachments or correspondence with your broker. (Additional insureds are protected, subject to Policy limitations, for the acts, errors and omissions of named insureds, but they are not covered for their own acts, errors or omissions).

1. Name of Applicant(s):  Millennium Films (Canada) Ltd.

2. Street & Mailing Address (including postal/zip code):  2200-1055 W. Hastings Street, Vancouver BC, V6E 2E9

3. The Applicant is a:  ☒ Corporation    ☐ Individual    ☐ Partnership    ☐ Joint Venture
   Province/State of Incorporation: _____

4. Names and titles of principal officers, partners or individuals:  Avi Lerner, Trevor Short

5. Name of Producer (individual):  Avi Lerner, Sylvester Stallone, Kevin King, John Thompson
   Executive Producer (individual):  Danny Dimbort, Trevor Short, Boaz Davidson

6. Desired effective date:  ASAP    Desired term of policy:  3    year

7. Title of production to be insured:  "Expendables"

8. Has the Title Report been obtained for any one of the title clearance services?    ☒ Yes  ☐ No
   If "Yes", name the clearance service:  Dennis Angel
   *(Attach copy of report)*

9. Estimated dates for:
   (a) Commencement and completion of principal photography:  @ March 31 to @ June 10, 2009
   (b) First release on air date:  TBD

10. Limits of desired coverage:  ☐ CDN$  ☒ US$    Each Wrongful Act:  $3 million
    Total Limit:  $5 million
    Deductible Amount:  $25,000
    Note:  Costs and expenses of claims handling and defence are inclusive within the Deductible Amount.

11. Will any of the following companion material be distributed in connection with the Production? If "Yes", please complete the attached Supplemental Questionnaire.    ☐ Yes  ☒ No
    (a)  Merchandising; (if "Yes", please describe in detail):    ☐ Yes  ☒ No
    _____
    _____
    If "Yes", Sublimit desired:  $

CONFIDENTIAL

NI SUP 00051

(b)  Loss of advertising or promotional expenses due to an injunction:   ☐ Yes  ☒ No

(c)  Book:  *(If "Yes", please describe in detail):*   ☐ Yes  ☒ No

(d)  Website:  *(If "Yes", please describe in detail):*   ☐ Yes  ☒ No

(e)  "Making of" documentary or other extra materials on DVD:  *(If "Yes", please describe in detail):*   ☒ Yes  ☐ No

(f)  Soundtrack:  *(If "Yes", please describe in detail):*   ☐ Yes  ☒ No

(g)  CD ROM or videogame:  *(If "Yes", please describe in detail):*   ☐ Yes  ☒ No

Is Coverage desired for any of the above companion materials?   ☒ Yes  ☐ No

(h)  New media products (e.g. screensavers, wallpaper, ring and voice tones, mobile TV products, mobisodes):  *(If "Yes", please describe in detail):*   ☐ Yes  ☒ No

12.  Synopsis of production:  __Attached__

13.  Names of authors and writers and their nationality:

(a)  Of underlying works:  __N/A__

(b)  Of screenplays, etc.:  __Sylvester Stallone__

14.  Production is:
☒ Motion picture for initial theatrical release   Running Time: __@ 90-110 minutes__

☐ Motion picture for initial television release   Program Time: _____

☐ T.V. Pilot   ☐ T.V. Special   ☐ Radio Program   Program Time: _____

☐ T.V. Series   Number of Episodes: _____   Program Time: _____ **(Each Episode)**

☐ Radio Series   Number each week: _____   Number of weeks: _____   Program Time: _____ **(Each Episode)**

☒ Videocassette
☐ Theatrical stage presentation
☐ Territory of broadcast or distribution: _____
☒ Other (e.g. Cable, Pay-T.V., Subscription, etc.) Please describe: _____

15.  Name and address of Applicant's attorney:  Individual: __Lonnie Ramati__

Firm: _____

Phone No.: __(310)388-6900__

16.  Has Applicant's attorney read the Clearance Procedures attached to this application?   ☒ Yes  ☐ No
*If "No", please explain:*

**CONFIDENTIAL**

**NI SUP 00052**

PRODUCERS' OR DISTRIBUTORS' LIABILITY (03-06)
©St. Paul Fire and Marine Insurance Company

CONFIDENTIAL

NI SUP 00053

| | | |
|---|---|---|
| 17. | Has Applicant's attorney approved as adequate the Clearance Procedures used by the Applicant in connection with the production? *If "No", please explain:* | ☒ Yes ☐ No |
| 18. | Has a script research report been obtained (to clear character names, etc.)? | ☒ Yes ☐ No |
| | *If "Yes", have suggested changes been made and suggested permissions obtained?* | ☒ Yes ☐ No |
| | *If either question answered "No", please explain:* | |

Please provide name of research company:    **Hollywood Script Research**

| | | |
|---|---|---|
| | Is the script report supervised or reviewed by Applicant's lawyer? | ☒ Yes ☐ No |
| 19. | Is the name or likeness of any living person used or is any living person portrayed (with or without use of name or likeness) in the production? | ☐ Yes ☒ No |
| | *If "Yes", have clearances been obtained in all cases?* | ☐ Yes ☐ No |
| | Is the name or likeness of any deceased person used or is any deceased person portrayed (with or without name or likeness) in the production? | ☐ Yes ☒ No |
| | *If "Yes", have clearances been obtained in all cases from personal representatives, heirs or other owners of such rights?* | ☐ Yes ☐ No |
| 20. | Is there a possible risk that a living person could claim (without regard to the merits) to be identifiable in the production, whether or not the person's name or likeness is used or the production purports to be fictional? | ☐ Yes ☒ No |
| | If so, has a release been obtained from such person? | ☐ Yes ☐ No |
| 21. | Are actual events portrayed in the production? | ☐ Yes ☒ No |
| 22. | Has Applicant or any of its agents bargained for (a) any rights in literary, musical or other material; or (b) releases from any persons in connection with any production, and been unable to obtain or refused an agreement or release? *If "Yes", please explain:* | ☐ Yes ☒ No |

| | | |
|---|---|---|
| 23. | Is the production:    ☒ Entirely fictional    ☐ True portrayal of events or happenings | |
| | ☐ Entirely fictional but inspired by specific events or happenings | |
| | ☐ Portrayal of actual events or happenings, but which includes significant fictionalization | |
| | ☐ Based on another work. *If so, please specify title and author:* | |
| | ☐ Other: | |
| 24. | Is the production:    ☐ Quiz or Panel    ☐ Interview or Forum    ☐ Variety    ☐ Musical | |
| | ☒ Dramatic    ☐ Children's Show    ☐ Documentary    ☐ Mini-Series    ☐ Docudrama | |
| | ☐ Other: | |
| 25. | Have submissions of any similar properties been received by the Applicant or someone closely involved with the Production? *If "Yes", please explain:* | ☐ Yes ☒ No |
| 26. | (a) Does the production use any literary, musical or other material whatsoever that was copyrighted before January 1, 1978? | ☐ Yes ☒ No |

CONFIDENTIAL

26. **(b)** *If "Yes", list separately the title of the material and the date of initial and renewal copyright for each such copyrighted matter:*

| Title of Material Used | Date of Copyright (MM/DD/YYYY) | Date of Renewal (MM/DD/YYYY) |
|---|---|---|
| | | |
| | | |
| | | |

**(c)** Does the licence or assignment for all such material grant renewal rights? ☐ Yes ☐ No

**(d)** Was the copyright for such material renewed during the lifetime of the author? ☐ Yes ☐ No

27. Has a copyright report been obtained? ☒ Yes ☐ No

*If "No", please explain why not:* _____

Are there any ambiguities or gaps in the line of ownership? *If "Yes", please explain:* ☐ Yes ☒ No

_____

28. Will any film clips be used in this production? *If "Yes", please describe:* ☐ Yes ☒ No

_____

*If "Yes", have all licences and consents for the film clips been obtained as follows:*

| | | | |
|---|---|---|---|
| From copyright owners? | ☐ Yes | ☐ No | ☐ N/A |
| From music owners? | ☐ Yes | ☐ No | ☐ N/A |
| From writers and/or others? | ☐ Yes | ☐ No | ☐ N/A |
| Have musical rights been obtained? | ☐ Yes | ☐ No | ☐ N/A |
| Recording & synchronization rights? | ☐ Yes | ☐ No | ☐ N/A |
| Performing rights? | ☐ Yes | ☐ No | ☐ N/A |
| From performers or persons appearing in the film? | ☐ Yes | ☐ No | ☐ N/A |

*If "No" or "Not Applicable" to any of the foregoing, please explain:*

_____

29. Have musical rights been cleared? ☐ Yes ☒ No

(a) Recording and synchronization rights? ☐ Yes ☐ No

(b) Performing rights? ☐ Yes ☐ No

*If "No", will these rights be obtained prior to release?* **Yes**

_____

30. If original music was commissioned, has a Hold Harmless been obtained from the composer? *If "No", please explain:* ☐ Yes ☐ No

_____

31. Will a soundtrack album or tape be produced? ☐ Yes ☒ No

32. Will the production be exhibited on the Internet or other on-line communications systems or distributed to the public on videotapes, videocassettes, videodiscs or other technology? ☒ Yes ☐ No

*If "Yes", has Applicant acquired necessary music and all other licences and consents therefor?* ☐ Yes ☒ No

CONFIDENTIAL

NI SUP 00055

33. Has Applicant had prior copyright, libel, etc. (producers' liability) insurance on the production to be insured? (*If "Yes", attach a copy of prior Policy*)     ☐ Yes  ☒ No

34. Has the Applicant or any Officer(s), Director(s) or Partner(s) ever been refused similar insurance for this production or any other production? *If "Yes", please explain:*     ☐ Yes  ☒ No

_____

_____

35. Applicant represents that neither it, nor any of its Officers, Directors or Partners, or their Counsel, have any knowledge, actual or constructive:

(a) of any claims or legal proceedings made or commenced against the Applicant, or any Officers, Directors, Partners, or subsidiary or affiliated corporations within the last five (5) years for invasion of privacy, infringement of copyright (statutory or common law), defamation, unauthorized use of titles, formats, ideas, characters, plots or other program material embodied in any production, or breach of implied contract arising out of alleged submission of any literary or musical material.

If no exceptions, please initial

☐ Except as follows: (attach a separate sheet if necessary)  _____

(b) of any threatened claims or legal proceedings against the Applicant or any Officers, Directors, subsidiaries or Partners or against any other person, firm or corporation arising out of or based upon any Production including title thereof, or any material upon which any Production is or will be based, that would be covered by the Policy sought to be obtained by the Applicant.

If no exceptions, please initial

☐ Except as follows:  _____

(c) of any facts, circumstances or prior negotiations by reason of which they, or any of them, believe that a claim might reasonably be asserted or legal proceedings instituted against the Applicant that would be covered by the Policy sought to be obtained by the Applicant.

If no exceptions, please initial

☐ Except as follows:  _____

36. Attach separate schedule of all known, suspected or reported claims.

37. Applicant agrees to obtain from third parties from whom it obtains matter, material or services for the Production written warranties, representations and indemnities against claims arising out of the use of such matter, material or services, including advertising agencies, advertisers, independent contractors and others providing copy, music, photographs, artwork and other material to be used in the Insured Productions.

Please initial

38. Applicant agrees that it will use due diligence to determine whether any matter or materials to be used in any Production are protected by law, and, where necessary, to obtain from parties owning rights therein the right to use the same in connection with the Production.

Please initial

39. COVERAGE CONFLICTS, ETC.
Applicant understands that there will be special provisions in the Policy (General Condition F.) covering the respective obligations of the Company and Applicant to provide DEFENCE and INDEMNITY where coverage issues or conflicts of interest are or may be present.

CONFIDENTIAL

NI SUP 00056

39. Applicant acknowledges that claims and lawsuits may be brought which may combine covered and uncovered claims or forms of relief and that conflicts of interest may arise as between one insured and another insured under the Policy, with respect to the Company or otherwise. In all such circumstances, Applicant recognizes that, under the Policy, the Company's obligation is only to provide one (1) counsel for defence of all claims and if any further counsel are desired by Applicant, they may be retained by Applicant, but the costs and expenses of such counsel shall be shared fifty percent (50%) by the Company and fifty percent (50%) by Applicant, fees shall be limited to amounts generally paid by the Company and representation shall be subject to further terms and conditions contained in the Policy. Applicant understands that the premiums set forth herein, the deductible, and the balance of the terms of the Policy have been specifically set and determined with the foregoing provisions in mind and acknowledges that it has agreed to such method of payment for any additional counsel desired to be retained by Applicant.

Please Initial [X]

40. **THIS APPLICATION IS SUBMITTED WITH THE FOLLOWING SPECIFIC UNDERSTANDING:**

(a) Applicant represents that the above answers and statements are in all respects true and material to the issuance of an Insurance Policy and that Applicant has not omitted, suppressed or misstated any facts.

(b) If any claims, threatened claims, or other matters which might affect issuance of a Policy come to the attention of Applicant after execution or filing of this Application with the Insurer but before a Policy issues, Applicant must notify the Insurer immediately.

(c) All exclusions in the Policy apply regardless of any answers or statements in this Application.

(d) Deductible Provision - Please note that the Policy stipulates that any deductible or retention shall apply to investigation expenses and defence costs as well as indemnity.

(e) Applicant understands that the limit of liability, deductible, term of coverage and other terms and conditions in any Policy issued in response hereto may be different than those requested herein and Applicant agrees to such differences.

41. This application shall be attached to and become a part of any Policy, should a policy be issued as a result of this application. The application shall be deemed a schedule to such Policy, but the signing of this application does not bind the Applicant or the Company unless and until a Policy of insurance is issued in response to this application.

Date Signed: _12/10/08_    Applicant's Signature: _Jimm_
                                                    *(Authorized Representative)*
By: _John Thompson_    Title: _Producer_

Account Executive: _____    Broker/Agent: _____

Address: _____    Telephone No.: _____

                          Telex: _____

                          Telefax: _____

Statement by Applicant's lawyer. Neither I nor my firm (if applicable) are principals in this Production nor are we guarantors in relation to it. I have reviewed this application and the Applicant's clearance procedures and am not aware of any deficiencies, inaccuracies or omissions.

Date Signed: _3/03/09_    Signature of Applicant's lawyer _Carolina Lonnie Rapot_

**NOTE: Please be sure to attach five (5) years loss experience in detail of the Applicant or of any Officer, Director or Partner for any production in which they were included.**
*(SEE ATTACHED FOR CLEARANCE PROCEDURES)*

PRODUCERS' OR DISTRIBUTORS' LIABILITY (03-06)    Page 7 of 9
©St. Paul Fire and Marine Insurance Company

**CONFIDENTIAL**

## CLEARANCE PROCEDURES

The Clearance Procedures below should not be construed as exhaustive and they do not cover all situations which may arise in any particular circumstance or any particular production.

1. Applicant and its counsel should continually monitor the production at all states, from inception through final cut, with a view to eliminating material which could give rise to a claim.

2. The script and script research report should be read prior to commencement of production to eliminate matter which is defamatory, invades privacy or is otherwise potentially actionable.

   (i) A script research report should also be prepared *before* filming to alert the Applicant to potential problems. Such problems may include: names of fictional characters that are coincidentally similar to real people; script references to real products, businesses or people if not cleared; or uses of copyrighted or other protected materials, etc. Fictional character names should be checked in relevant telephone directories, professional directories or other sources to minimize the risk of accidental identification of real people. Similar checks should be done for the names of businesses, organizations and products used in the Production. Special care should be taken to check names of persons, businesses, etc. that are negatively portrayed. The Applicant also must be alert to elements that do not appear in the script (such as art works used on the set) but that may need clearances.

   (ii) If the Production is a documentary and there is no script, the Applicant should provide its counsel with a detailed synopsis of the project in advance of production. (If it is a documentary series, the lawyer should receive a detailed synopsis of each episode). If the Production will involve negative statements about people or businesses, the Applicant should provide counsel with full details about the allegations and their merit. Problem statements can then be identified and thus avoided while filming. During filming, the Applicant should be careful to avoid (or consult with counsel about) possible problem areas. (Examples include: filming identifiable copyrighted items or performances, trademarks, persons who have not specifically consented to be filmed, or minors). Relevant laws differ from place to place: some jurisdictions have very restrictive rules about filming persons, signs, buildings, public art, etc. Also, be careful to avoid narration or editing that accidentally implies negative things about pictures, people, products or businesses.

3. Unless work is an unpublished original not based on any other work, a copyright report must be obtained. Both domestic and foreign copyrights and renewal rights should be checked. If a completed film is being acquired, a similar review should be made on copyright and renewals on any copyrighted underlying property.

4. If the script is an unpublished original, the origins of the work should be ascertained - basic idea, sequence of events and characters. It should be ascertained if submissions of any similar properties have been received by the Applicant and, if so, the circumstances as to why the submitting party may not claim theft or infringement should be described in detail.

5. Prior to final title selection, a Title Report should be obtained and reviewed by the Applicant and Applicant's lawyer.

6. Whether production is fictional (and location is identifiable) or factual, it should be made certain that no names, faces or likenesses of any recognizable living persons are used unless written releases have been obtained. Release is unnecessary if person is part of a crowd scene or shown in a fleeting background. Releases can only be dispensed with if the Applicant provides the Company with specific reasons, in writing, as to why such releases are unnecessary and such reasons are accepted by the Company. The term "living persons" includes thinly disguised versions of living persons or living persons who are readily identifiable because of identity of other characters or because of the factual, historical or geographic setting.

7. All releases must give the Applicant the right to edit, modify, add to and/or delete material, juxtapose any part of the film with any other film, change the sequence of events or of any questions posed and/or answers, fictionalize persons or events including the release and to make any other changes in the film that the Applicant deems appropriate. If a minor, consent has to be legally binding.

**CONFIDENTIAL**

## CLEARANCE PROCEDURES (Continued)

8. If music is used, the Applicant must obtain all necessary synchronization and performance licences from composers or copyright proprietors. Licences must also be obtained on pre-recorded music.

9. Written agreements must exist between the Applicant and all creators, authors, writers, performers and any other persons providing material (including quotations from copyrighted works) or on-screen services.

10. If distinctive locations, buildings, businesses, personal property or products are filmed, written releases must be secured. This is not necessary if non-distinctive background use is made of real property.

11. If the production involves actual events, it should be ascertained that the author's sources are independent and primary (contemporaneous newspaper reports, court transcripts, interviews with witnesses, etc.) and not secondary (another author's copyrighted work, autobiographies, copyrighted magazine articles, etc.).

12. Shooting script and rough cuts should be checked, if possible, to assure compliance of all of the above. During photography, persons might be photographed on location, dialogue added or other matter included which was not originally contemplated.

13. If the intent is to use the production to be insured on videotapes, videocassettes, videodiscs or other new technology, rights to manufacture, distribute and release the production must be obtained, including the above rights, from all writers, directors, actors, musicians, composers and others necessary therefore, **including proprietors of underlying materials.**

14. Film clips are dangerous unless licences and authorizations for the second use are obtained from the owner of the clip or party authorized to licence the same, as well as licences from all persons rendering services in or supplying material contained in the film clip; e.g., underlying literary rights, performances of actors or musicians. Special attention should be paid to music rights as publishers are taking the position that new synchronization and performance licenses are required.

15. Aside from living persons, even dead persons (through their personal representatives or heirs) have a "right of publicity", especially where there is considerable fictionalization. Clearances should be obtained where necessary. Where the work is fictional in whole or in part, the names of all characters must be fictional. If for some special reason particular names need not be fictional, full details must be provided to the Company in an attachment to the Application.

16. Consideration should be given to the likelihood of any claim or litigation. Is there a potential claimant portrayed in the production who has sued before or is likely to sue again? Is there a close copyright or other legal issue? Is the subject matter of the production such as to require difficult and extensive discovery in the event of necessity to defend? Are sources reliable? The above factors should be considered in your clearance procedures and recommendations.

CONFIDENTIAL

NI SUP 00059

# EXHIBIT
# M

| From: | Carlos Goodman <ckg@bhdrl.com> |
|---|---|
| Sent: | Thursday, May 28, 2009 5:13 PM |
| To: | Avi Lerner <alerner@nuimage.net>; 'PJS@ZiffrenLaw.com'; Lonnie Ramati AOL <phase1234@aol.com> |
| Cc: | 'basil.iwanyk@warnerbros.com'; 'gcasady@management360.com' |
| Subject: | RE: Revised Deal For Basil And His Producing Partner For "Barrow" |

Avi, when did the budget change? I don't see how that happened after we made the deal.
-----Original Message-----
From: Avi Lerner [mailto:alerner@nuimage.net]
Sent: Thursday, May 28, 2009 10:53 AM
To: Carlos Goodman; 'PJS@ZiffrenLaw.com'; Lonnie Ramati AOL
Cc: 'basil.iwanyk@warnerbros.com'; 'gcasady@management360.com'
Subject: Re: Revised Deal For Basil And His Producing Partner For "Barrow"
Carlos please your
Client did nothing for
This movie and we will prove that borrow is
A different script then
Expendables. We agree to pay in order to save legal cost. The box office change is result of
different budget. Please help as I can't get the box office from Lionsgates thanks
-Avi Lerner
----- Original Message -----
From: Carlos Goodman <ckg@bhdrl.com>
To: 'P.J. Shapiro' <PJS@ZiffrenLaw.com>; Lonnie Ramati AOL; Avi Lerner
Cc: basil.iwanyk@warnerbros.com <basil.iwanyk@warnerbros.com>;
gcasady@management360.com <gcasady@management360.com>
Sent: Thu May 28 10:31:47 2009
Subject: RE: Revised Deal For Basil And His Producing Partner For "Barrow"
You intimated before that the film had gone "over" -- my partners (who rep several of the
principals in the movie) say they are unaware of anything like that. So everything has been
going according to plan and you made the deal for this level of box office bonuses. If the
movie is simply bigger, then maybe we should have gotten 500K or 600K with higher cut-ins
on BO bonuses.
-----Original Message-----
From: P.J. Shapiro [mailto:PJS@ZiffrenLaw.com]
Sent: Thursday, May 28, 2009 10:21 AM
To: Phase1234@aol.com; Carlos Goodman; ALerner@NuImage.net
Cc: basil.iwanyk@warnerbros.com; gcasady@management360.com
Subject: RE: Revised Deal For Basil And His Producing Partner For "Barrow"
The budget changes doesn't give you the right to unilaterally change the deal terms. Our deal
is with you, not Lionsgate.
From: Phase1234@aol.com [mailto:Phase1234@aol.com]
Sent: Thursday, May 28, 2009 10:20 AM
To: ckg@bhdrl.com; ALerner@NuImage.net
Cc: basil.iwanyk@warnerbros.com; gcasady@management360.com; P.J. Shapiro
Subject: Re: Revised Deal For Basil And His Producing Partner For "Barrow"
Please note that the only change to both Amendments from the last drafts sent to you is that
Box Office Bonuses now start at US $100 Million instead of US $60 Million.

CONFIDENTIAL

This revision is made as per my instructions from Avi Lerner.

The reason Avi made this change is that the film, "The Expendables", has had its budget increase by US $20 Million and neither the domestic distributor, Lions Gate, nor us can give you the Box Office Bonuses at the US 60 Million level, so we have to move the Box Office Bonus numbers up.

Customary reservation of rights.

Sincerely,

Lonnie Ramati

In a message dated 5/28/2009 10:17:19 A.M. Pacific Daylight Time, ckg@bhdrl.com writes:

Please stand by the deal you made.

-----Original Message-----

From: Phase1234@aol.com [mailto:Phase1234@aol.com]

Sent: Thursday, May 28, 2009 10:15 AM

To: Carlos Goodman; ALerner@NuImage.net

Cc: basil.iwanyk@warnerbros.com; gcasady@management360.com; pjs@ziffrenlaw.com

Subject: Re: Revised Deal For Basil And His Producing Partner For "Barrow"

Warner Bros can negate the deal is this continues to not close for too long. Please get the Amendments signed and the Acknowledgement and Consent required by WB signed

In a message dated 5/28/2009 10:11:59 A.M. Pacific Daylight Time, ckg@bhdrl.com writes:

We're still doubling over with laughter at your elimination of our box office bonuses.

Avi is going to owe me his floor Laker tickets and I guess I'll give Guymon and Basil at least two games a season each.

-----Original Message-----

From: Phase1234@aol.com [mailto:Phase1234@aol.com]

Sent: Thursday, May 28, 2009 10:05 AM

To: Carlos Goodman; ALerner@NuImage.net

Cc: basil.iwanyk@warnerbros.com; gcasady@management360.com; pjs@ziffrenlaw.com

Subject: Revised Deal For Basil And His Producing Partner For "Barrow"

Status?

Lonnie Ramati

Subject:

Re: Revised Deal For Basil And His Producing Partner For "Barrow"

Date:

5/13/2009 9:12:31 A.M. Pacific Daylight Time

From:

Phase1234 <mailto:Phase1234>

Reply To:

To:

ckg@bhdrl.com, ALerner@NuImage.net

CC:

basil.iwanyk@warnerbros.com, gcasady@management360.com, pjs@ziffrenlaw.com

It did not cover it and there are legal reasons why this occurred

In a message dated 5/13/2009 8:46:04 A.M. Pacific Daylight Time, ckg@bhdrl.com writes:

What about insurance?

----

From: Phase1234@aol.com

To: Carlos Goodman; alerner@nuimage.net

Sent: Tue May 12 19:19:34 2009

Subject: Re: Revised Deal For Basil And His Producing Partner For "Barrow"

CONFIDENTIAL

Avi:
See below.
The reason it went up is because we had a force majeure event that occurred among other things.
Lonnie Ramati
In a message dated 5/12/2009 6:41:22 P.M. Pacific Daylight Time, ckg@bhdrl.com writes:
why did the bugdet go up? and maybe we should have gotten some more cash in that event
-----Original Message-----
From: Phase1234@aol.com [mailto:Phase1234@aol.com]
Sent: Tuesday, May 12, 2009 4:16 PM
Subject: Revised Deal For Basil And His Producing Partner For "Barrow"
Gentle persons:
Attached are the latest drafts of the Amendments to your producing deals for "Barrow".
Please note that the only change to both Amendments from the last drafts sent to you is that Box Office Bonuses now start at US $100 Million instead of US $60 Million.
This revision is made as per my instructions from Avi Lerner.
The reason Avi made this change is that the film, "The Expendables", has had its budget increase by US $20 Million and neither the domestic distributor, Lions Gate, nor us can give you the Box Office Bonuses at the US 60 Million level, so we have to move the Box Office Bonus numbers up.
Customary reservation of rights.
Sincerely,
Lonnie Ramati

Recession-proof vacation ideas. Find free things to do in the U.S. <http://travel.aol.com/travel-ideas/domestic/national-tourism-week?ncid=emlcntustrav00000002>

Recession-proof vacation ideas. Find free things to do in the U.S. <http://travel.aol.com/travel-ideas/domestic/national-tourism-week?ncid=emlcntustrav00000002>

Recession-proof vacation ideas. Find free things to do in the U.S. <http://travel.aol.com/travel-ideas/domestic/national-tourism-week?ncid=emlcntustrav00000002>

We found the real 'Hotel California' and the 'Seinfeld' diner. What will you find? Explore WhereItsAt.com <http://www.whereitsat.com/?ncid=emlwenew00000004> .

We found the real 'Hotel California' and the 'Seinfeld' diner. What will you find? Explore WhereItsAt.com <http://www.whereitsat.com/?ncid=emlwenew00000004> .

We found the real 'Hotel California' and the 'Seinfeld' diner. What will you find? Explore WhereItsAt.com <http://www.whereitsat.com/?ncid=emlwenew00000004> .
******* Internet E-mail Confidentiality Footer ******
ZIFFREN BRITTENHAM LLP
1801 Century Park West
Los Angeles, CA 90067-6406
Tel 310-552-3388
Fax 310-553-7068
This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not

the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

To ensure compliance with requirements imposed by the IRS, we inform you that, unless explicitly provided otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

If you have received this communication in error, please notify us immediately via e-mail at Postmaster@ZiffrenLaw.com or by telephone at 1-310-552-3388. Thank you.

CONFIDENTIAL

# EXHIBIT

# N

| From: | Dave Callaham <callaham@stingrza.com> |
|---|---|
| Sent: | Tuesday, October 25, 2011 9:43 PM |
| To: | Matt Bass <mattbass99@gmail.com> |
| Cc: | Mac Torluccio <mac.torluccio@yahoo.com> |
| Subject: | Re: |

what's interesting is that while I clearly didn't steal this guy's script, I guess it's not entirely out of the realm of possibility that Stallone did. The specifics mentioned in the article as similarities are things that Stallone added... I didn't have that opening scene and my general wasn't named Garza. And at this point would it be shocking to discover that he stole the script from not one but two people?

I haven't been served or anything so for now I'm just gonna keep on keepin on, and I guess if they ever want to talk I will refer them to Warners' records room...

On Oct 25, 2011, at 6:39 PM, Matt Bass wrote:

The only thing funnier than this lawsuit is the one where the guy is trying to sue Poison for stealing songs like talk dirty to me. The statute ran out over two decades ago and no one has any idea why they haven't done anything about it in 25 years

On Tue, Oct 25, 2011 at 6:34 PM, Dave Callaham <callaham@stingrza.com> wrote:
wow, matt was on this one. Precisely right, Matt: I wrote the script in 2005 so, if anything, this idiot stole MY script.

Always nice to hear about something like this though. I was told about it in a meeting today.


On Oct 25, 2011, at 4:34 PM, Matt Bass wrote:

I see Dave's lawyers court reply now - Expendables in no way stole the idea from Mr Webb as it was previously established that Mr Stallone already tried stealing the idea from Mr Callaham, who wrote the original idea back in 2005 with WB. So fuck off so we can keep making sequel money for my client without having done any work (DC to add the last part himself).

On Tue, Oct 25, 2011 at 4:29 PM, Mac Torluccio <mac.torluccio@yahoo.com> wrote:
Talk about a birthday present...kick butt, DC...show em' who's boss:

Stallone sued, accused of stealing screenplay - Yahoo! News 10/25/11 4:28 PM
YAHOO! NEWS
**Login with Facebook**
Discover News based on what your friends are reading and publish your own reading activity. You have full control over what you
publish.
**Stallone sued, accused of stealing screenplay**
By Grant McCool | Reuters – 4 hrs ago
NEW YORK (Reuters) - Action movie star Sylvester Stallone is accused in a lawsuit of copying another writer's screenplay to
make "The Expendables," a movie about mercenaries hired to defeat a military dictator.
The lawsuit was filed in Manhattan federal court on Tuesday by writer Marcus Webb, who said the screenplay for "The
Expendables" is "strikingly similar and in some places identical" to his work entitled "The Cordoba

CONFIDENTIAL

Caper."

Webb seeks unspecified damages for copyright infringement and an order from the court stopping further infringement in

any sequel by Stallone, his credited co-author David Callaham, Millennium Films, its Nu Image Films unit and Lions Gate

Entertainment Corporation.

Stallone's publicist, Michelle Bega, declined to comment. Millennium Films' general counsel, Frank DeMartini, said the company had not been served with the lawsuit, and he

declined further comment. A spokeswoman for Lions Gate was not immediately available for comment.

"The Expendables" -- produced by Millennium and Nu Image and distributed by Lions Gate -- was released worldwide on August 13, 2010. It featured a cameo appearance by Arnold Schwarzenegger after he left his post as California governor,

along with other aging action heroes Stallone and Jet Li.

According to the lawsuit, Webb registered "The Cordoba Caper" screenplay and a short story with the same title and plot with the U.S. Copyright Office in June 2006. Between 2006 and 2009, the lawsuit said, the screenplay was made widely available by Webb for consideration in the movie industry.

"There can be no dispute that Stallone and/or Callaham had access to and copied protectable elements of the screenplay," the lawsuit said.

"The Cordoba Caper" tells the story of a team of elite, highly-trained mercenaries hired to defeat General Garza, a rogue army general of a small Latin American country," the lawsuit said.

The court document provides details of the ways in which Webb sees similarities between his screenplay and the released movie, including the opening "with a hostage rescue at sea, off a foreign coast, which has nothing to do with the main plot."

It said the main villain in both is a General Garza, a military dictator with a notorious human rights record.

Webb said he has been deprived of benefits from the screenplay such as potential earnings from the production, distribution and performance of "The Expendables."

"Expendables 2," a sequel to "The Expendables," is due for release on August 17, 2012. (See http://www.expendablespremiere.com/expendables-2.html).

The case is Marcus Webb v Sylvester Stallone, et al, U.S. District Court for the Southern District of New York, No. 11-7517.

http://news.yahoo.com/stallone-sued-accused-stealing-screenplay-172703105.html Page 1 of 5

Stallone sued, accused of stealing screenplay - Yahoo! News 10/25/11 4:28 PM

(Editing by Steve Orlofsky)

CONFIDENTIAL -  SINGLE DEFENDANT RESTRICTED

# EXHIBIT

# O

| | |
|---|---|
| **From:** | Dave Callaham <callaham@stingrza.com> |
| **Sent:** | Monday, December 29, 2008 1:42 PM |
| **To:** | Dave Kalstein <kalstein@mac.com> |
| **Cc:** | Kyle Harimoto <kharimoto@sbcglobal.net> |
| **Subject:** | Re: ain't it cool |

well, to be honest, I really don't think my script was all that great. I didn't even when I wrote it. So I suspect he added some good setpieces, and also part of that excitement must come from the foreknowledge of the cast. That said, the Warners legal team script review says it's almost exactly my script. So who knows. I can tell you that I didn't write any female characters, so he must have changed SOMETHING to get Sandra Bullock in. Again, to hear that they are cumming all over this script like that sucks so bad for me. Can you imagine the jobs I'd be getting offered in January if my name was on that fucking thing like it should be? I really cannot express how shitty this whole thing is. On Dec 29, 2008, at 10:29 AM, Dave Kalstein wrote: I kind of wish you would read it because I have no idea if the details they are celebrating from the "the best action movie script we've seen in the last 10 years" is yours or the shit that Stallone did to it. On Dec 29, 2008, at 10:23 AM, Dave Callaham wrote: > OK. Well, thanks for letting me know. Needless to say I won't be > reading it. > > Kyle, when are you back? I'm going to the DMV today... > > > On Dec 29, 2008, at 10:18 AM, Dave Kalstein wrote: > > Callaham: They have a "script review" of the Expendables today. I > know you're on media black out, but thought someone should tell you... > >

CONFIDENTIAL

Case: 13-324    Document: 40    Page: 77    05/10/2013    933695    279

A876

Case 1:11-cv-07517-JSR    Document 54-16    Filed 04/25/12    Page 1 of 8







# TERMS OF SERVICE

Last Revised May 10, 2011

PLEASE READ THESE TERMS OF SERVICE AND THE RELATED PRIVACY POLICY LOCATED AT http://www.lionsgate.com/privacy.html CAREFULLY BEFORE USING THIS WEBSITE OR ANY OF THE "FORUMS" (AS DEFINED BELOW).

**Lionsgate**
This "Site" (as defined below) is owned and operated by Lionsgate Entertainment Corp. on its own behalf or in combination with one of its film or television divisions or joint ventures (collectively referred to herein, solely for ease of reference, as "Company, "us" or "we"). These terms of service (the "Terms of Service", "TOS" or "Agreement") set forth the legal terms and conditions governing your use of our website and any other online and mobile websites and interactive applications operated by Company (collectively, the "Site") (unless a different policy is provided on a particular site, application or service, in which case such different policy shall govern and control). Your use of this Site confirms your unconditional agreement to be bound by these Terms of Service and is subject to your continued compliance with these Terms of Service. If you do not agree to be bound by these Terms of Service, you may not access or otherwise use the Site. Before using the Site, please review the related Company Privacy Policy, located at http://www.lionsgate.com/privacy.html (the "Privacy Policy"), which is incorporated herein by this reference.

**Table of Contents**
Eligibility
Registration
License to the Site
Changes to Site and/or Terms of Service
Trademarks, Copyrights and Restrictions
Software
Consent to Electronic Communications
Submissions
Linked Sites
Purchases
Forums and Public Communications
Registration and Acceptance of Community Guidelines
User Disputes
Promotions
No Resale/Exploitation
Non-United States Residents
Jurisdictional Issues
Termination
Disclaimer
Limitation of Liability
Linking Policy
Copyright Notice
Indemnification
Filtering
Miscellaneous

**Eligibility**
The Site is intended solely for users thirteen (13) years of age and older. You represent and warrant either that you are eighteen (18) years of age or older, or if you are under the age of eighteen (18) that you are at least thirteen (13) and are accessing the Site with the knowledge and consent of your parent or legal guardian, who will also be deemed to have agreed to this Agreement. Certain parts of the Site may be subject in whole or in part to heightened age and/or eligibility requirements.

**Registration**
Certain parts or features of the Site may require registration or may otherwise ask you to provide information to participate in certain features or to access certain content. The decision to provide this information is purely voluntary and optional; however, if you elect not to provide such information, you may not be able to access certain content or participate in certain parts or features of the Site. You agree that you will not provide any false personal information to the Site, or create an account for anyone other than yourself without permission. You will also not create more than one personal profile, and if you select a username for your account, we reserve the right to remove or reclaim it if we believe appropriate (such as if a trademark owner complains about a username). If you register with the Site, you are responsible for maintaining the confidentiality of your password, if any, and for restricting access to your computer so that others may not access the password protected portion of the Site. You accept responsibility for all activities that occur under your account, email or password, if any, and agree you will not sell, transfer or assign your membership or any membership rights. Company may, in its sole discretion, and at any time, with or without notice, terminate your password and membership, for any reason or no reason at all. If we disable your account, you agree that you will not create another one without our permission.

**License to the Site**
Company grants you a non-exclusive, non-transferable, limited right and license to access, use and privately display the Site and the materials thereon for your personal use only, provided that you comply fully with this TOS. You shall not interfere (or permit the use of your membership by a third party to interfere) or attempt to interfere with the operation or use of Site by other members in any way through any means or device including, but not limited to, spamming, hacking, uploading computer viruses or time bombs, or any other means expressly prohibited by any provision of this TOS.

**Changes to Site and/or Terms and Conditions of Service**
Company reserves the right, from time to time, in its sole discretion, to change, modify, update, discontinue, remove, revise, delete or otherwise change any portion of the Site or this TOS, in whole or in part, at any time without further notice. For changes to these TOS that we deem material, we will place a notice on the site by revising the link on the homepage to read substantially as "Updated Terms of Use" for up to three (3) weeks or some other amount of time that we determine in our discretion. If you access or use the Site in any way after the TOS have been changed, you will be deemed to have read, understood and unconditionally consented to and agreed to such changes. The most current version of these TOS will be available on the site and will supersede all previous versions of these TOS.

**Trademarks, Copyrights & Restrictions**

The Site and all of the content it contains, or may in the future contain, including but not limited to text, video, pictures, graphics, designs, information, applications, software, music, audio files, articles, directories, guides, photographs as well as the trademarks, service marks, trade names, trade dress, copyrights, logos, domain names, code, patents and/or any other form of intellectual property (collectively, the "Material") that relate to the Site (other than and except for "User Content" as defined herein) are owned by or licensed by Company or other third parties and are protected from any unauthorized use, copying and dissemination by copyright, trademark and other intellectual property and non-intellectual property laws and by international treaties. Except as expressly permitted in writing by site host , you shall not capture, reproduce, perform, transfer, sell, license, create, derivative works from or based upon, republish, reverse engineer, upload, edit, post, transmit, publicly display, frame, link, distribute or exploit, in whole or in part, any of the Material. Nothing contained in this Agreement or on the Site should be construed as granting, by implication, estoppel or otherwise, any license or right to use any Material in any manner without the prior written consent of Company or such third party that may own the Material or intellectual property displayed on the Site. UNAUTHORIZED USE, COPYING, REPRODUCTION, MODIFICATION, PUBLICATION, REPUBLICATION, UPLOADING, FRAMING, DOWNLOADING, POSTING, TRANSMITTING, DISTRIBUTING, DUPLICATING OR ANY OTHER MISUSE OF ANY OF THE MATERIAL IS STRICTLY PROHIBITED. Any use of the Material other than as permitted by this Agreement will violate this Agreement and may infringe upon or the rights of the third party that owns the affected Material. You agree to report any violation of this Agreement by others that you become aware of. You are advised that Company will aggressively enforce its rights to the fullest extent of the law. Company may add, change, discontinue, remove or suspend any of the Material at any time, without notice and without liability.

**Software**

From time to time, and at its sole discretion, Company may make available to users certain software that may be accessible or downloaded from the Site. In the event you access or download software from this Site, the software, including any files, images incorporated in or generated by the software, and data accompanying the software (collectively, the "Software") are licensed to you by Company or a Company-approved third party software provider ("Third Party Provider"). Company does not transfer title to the Software to you. You own the medium on which the Software is recorded, but Company retains full and complete title to the Software, and all intellectual property rights therein. For purposes of these TOS, such Software shall be included in the definition of "Materials". Furthermore, your use of any Software of a Third Party Provider shall be subject to the end user license agreement or any other terms of use set forth by such Third Party Provider for its Software.

**Consent to Electronic Communications**

By registering with the Site, you understand that we may send you communications or data from Company regarding the Site via electronic mail, SMS, MMS, instant messaging, electronic chat, or other electronic delivery, including but not limited to (i) tasks, notices, videos, record keeping, and audio files; (ii) promotional information regarding the Site, (iii) updates; and (iv) notices about your use of the Site. By registering with Site you consent to such communications and understand that standard text and data charges may apply.

**Unsolicited Submissions**

Company is pleased to hear from its customers and welcomes your comments regarding Company products, including Company's online services. Unfortunately, however, Company's long-standing company policy does not allow it to accept or consider creative ideas, suggestions, or materials other than those it has specifically requested (see below). While we value your feedback on our services and products, we request that you be specific in your comments on our services and products, and that you not submit any creative ideas, suggestions or materials, including but not limited to stories or character ideas, screenplays, or original artwork. We hope you will understand that it is the intent of this policy to avoid the possibility of future misunderstandings when projects developed by Company's or its affiliates' professional staff might seem to others to be similar to their own creative work. Accordingly, we ask that you do not send us any original creative materials such as show designs, photographs, drawings, or original artwork that you expect to be compensated for or that you would like to keep private.

If you send or post certain specific submissions at our request (e.g., via message boards or in connection with contests) or if you send us creative suggestions, ideas, notes, photographs, drawings, concepts, or any other information (each, a "Submission" and collectively, the "Submissions") despite our request that you not send us any unsolicited Submissions or other creative materials, the Submission will be treated as non-confidential and non-proprietary in each instance. For purposes of this Paragraph, all User Content shall be deemed included in the definition of Submissions. None of the Submissions shall be subject to any obligation of confidence on the part of Company, and Company shall not be liable for any use or disclosure of any Submissions. Any Submission may be used by Company without restriction for any purpose whatsoever, including, without limitation, reproduction, disclosure, transmission, publication, broadcast or posting, and you hereby irrevocably waive, release and give up any claim that any use of such Submission violates any of your rights, including, without limitation, copyright, trademark, moral rights, privacy rights, proprietary or other property rights, publicity rights, or right to credit for the material or ideas. Company shall have and is hereby irrevocably granted the right, but not the obligation, to reproduce, modify, adapt, publish, broadcast, license, perform, post, sell, translate, incorporate, create derivative works from, exploit, distribute and otherwise use the Submission in any and all media, now known or hereafter devised, throughout the universe, in perpetuity, without according you any compensation or credit. By submitting a Submission to the Site or Company, you represent that such Submission is original with you and does not violate or infringe upon the rights of any third party, including, without limitation, any intellectual property rights and rights of publicity and/or privacy. Submissions to the Site and/or Company will not be acknowledged or returned. You agree and understand that Company is not obligated to use any Submission you make to the Site or Company and you have no right to compel such use. You hereby acknowledge and agree that your relationship with Company is not a confidential, fiduciary, or other special relationship, and that your decision to submit to Company does not place Company in a position that is any different from the position held by members of the general public with regard to your Submission. You understand and acknowledge that Company has wide access to ideas, stories, designs, and other literary materials, and that new ideas are constantly being submitted to it or being developed by Company's own employees. Many ideas or stories may be competitive with, similar or identical to your Submission in structure, purpose, function, theme, idea, plot, format or other respects. You acknowledge and agree that you will not be entitled to any compensation as a result of Company's use of any such similar or identical material. Finally, you acknowledge that, with respect to any claim you may have relating to or arising out of Company's actual or alleged exploitation or use of any material you submit to the Site and/or Company, the damage, if any, thereby caused will not be irreparable or otherwise sufficient to entitle you to injunctive or other equitable relief or to in any way enjoin the exploitation or other use of any Company film, television show, platform, product or service based on or allegedly based on the material, and your rights and remedies in any such event shall be strictly limited to the right to recover damages, if any, in an action at law. Applicable law may restrict or limit the foregoing provisions of this Paragraph. If so, without in any way limiting the foregoing, you agree that in no event shall Company's liability exceed the amount payable to a writer under the Writers Guild of America Basic Agreement for a network prime time story or teleplay.

**Linked Sites**

The Site may contain links to third party websites or resources, which may or may not be obvious ("Third Party Sites") as well as software, text, graphics, articles, photographs, pictures, designs, sound, video, music, information, software applications and other content originating from third parties (collectively, "Third Party Applications, Software or Content"). Our provision of links to Third Party Sites is not an endorsement of any information, product or service that is offered on or reached through such Third Party Site or Third Party Application, Software or Content. Such Third Party Sites and Third Party Applications, Software or Content are not monitored or checked for accuracy, appropriateness, or completeness by us, and we are not responsible for the content or performance of any Third Party Sites accessed through the Site or any Third Party Applications, Software or Content posted on, available through or installed from the Site, including the content, accuracy, offensiveness, opinions, reliability, privacy practices or other policies of or contained in the Third Party Sites or the Third Party Applications, Software or Content. If you decide to leave the Site and access the Third Party Sites or to use or install any Third Party Applications, Software or Content, you do so at your own risk and you should be aware that our terms and policies no longer govern.

YOU AGREE THAT YOUR USE OF THIRD-PARTY SITES OR THIRD PARTY APPLICATIONS, SOFTWARE OR CONTENT, INCLUDING, WITHOUT LIMITATION, YOUR USE OF ANY CONTENT, INFORMATION, DATA, ADVERTISING, PRODUCTS, OR OTHER MATERIALS ON OR AVAILABLE THROUGH SUCH WEBSITES AND RESOURCES, IS AT YOUR OWN RISK AND IS SUBJECT TO THE TERMS AND CONDITIONS OF USE APPLICABLE TO SUCH SITES AND RESOURCES.

**Purchases**

AMAZON.COM WILL BE PROCESSING AND SHIPPING ANY PURCHASE ORDER MADE THROUGH THE SITE. COMPANY IS NOT RESPONSIBLE FOR ANY CONTENT APPEARING ON THE AMAZON.COM WEBSITE. PLEASE NOTE THAT AMAZON.COM'S CONDITIONS OF USE, SHIPPING RATES AND POLICIES AND RETURNS POLICY SHALL APPLY TO YOUR ORDER. AMAZON.COM'S CUSTOMER SERVICE WILL BE RESPONSIBLE FOR HANDLING YOUR CONCERNS AND ISSUES WITH YOUR ORDER. COMPANY EXPRESSLY DISCLAIMS ANY AND ALL RESPONSIBILITY FOR, OR LIABILITY TO ANY PERSON OR ENTITY ARISING OUT OF OR RELATED IN ANY WAY TO AMAZON.COM'S DECISIONS REGARDING SUCH MATTERS OR FOR ANY OTHER MATTERS RELATED TO AMAZON.COM'S WEBSITE. PLEASE NOTE THAT AMAZON.COM GIFT CERTIFICATES OR CREDITS WITH AMAZON.COM CANNOT BE USED IN CONNECTION WITH PURCHASES THROUGH THE SITE.

Case: 13-324    Document: 40    Page: 81    05/10/2013    933695    279

**Forums and Public Communications**
As a convenience to its visitors, Company may provide, from time to time and at its sole discretion, one or more chat areas, message boards, bulletin boards, e-mail functions, instant messaging service, voice-mail, and other interactive areas as part of the Site (collectively, the "Forums"). Forums are provided by Company to you and others subject to this TOS, the "Community Guidelines", (as defined below) the Privacy Policy, and other rules that may be published from time to time by Company in its sole discretion. The individual who posts messages, content or other information in the Forums (collectively, "User Content") is responsible for the reliability, accuracy, and truthfulness of such content, and Company has no control over the same. Additionally, Company has no control over whether any such User Content is of a nature that users will find offensive, distasteful or otherwise unacceptable and expressly disclaims any responsibility for such material.

Company does not endorse the User Content in the Forums and specifically disclaims any responsibility or liability to any person or entity (including, without limitation, persons who may use or rely on such material) for any loss, damage (whether actual, consequential, punitive or otherwise), injury, claim, liability or other cause of any kind or character based upon or resulting from any User Content provided through a Forum.

Company does not and cannot review every message posted by users in the Forums, and is not responsible for the content of these messages or the views or opinions expressed by the users of the Forums. Information disclosed in the Forums is revealed to the public by design. Company reserves the right, but not the obligation, to delete, move or edit User Content, in whole or in part for any reason in Company's sole discretion. In addition, Company may delete, move, edit or disclose User Content when it is required to do so by law or in a good faith belief that such action is necessary to protect and defend the rights and property of Company or to protect the safety of our users or the public. In no event does Company assume any obligation to monitor the Forums or remove any specific material.

You understand that the uploading to and/or posting of any User Content in any Forum shall not be subject to any obligation of confidence on the part of Company, and Company shall not be liable for any use or disclosure of any User Content. In consideration for your use of the Forums and functionality, you agree to comply with the "Community Guidelines" set forth below. Without limiting Company's other rights and remedies, individuals who violate the following Community Guidelines may, at Company's sole discretion, be banned from using the Forums and/or the Site entirely.

**Registration and Acceptance of Community Guidelines**
In consideration for your use of the Forums, you agree to (i) comply with this TOS and the Community Guidelines, (ii) provide Company with (A) accurate, complete and true information about yourself as required on the Forums registration form (your "Registration Information") in order to create your Company Forum Account (your "Account") and (iii) maintain and update, as applicable, your Registration Information with current and complete information. Users who violate this TOS, the Community Guidelines, or provide inaccurate, false, or non-current Registration Information may, at Company's sole discretion, have their Account suspended or terminated, and may be permanently banned from using any Forum or the Site.

ENTERING ANY FORUM WILL CONSTITUTE ACCEPTANCE OF THESE TERMS OF SERVICE AND YOUR COMPLIANCE WITH THE FOLLOWING GUIDELINES (THE "COMMUNITY GUIDELINES") FOR USE OF THE FORUMS. IF YOU DO NOT AGREE TO ABIDE BY THESE TERMS OF SERVICE OR THE COMMUNITY GUIDELINES, PLEASE DO NOT ENTER ANY FORUM.

*Guidelines for Use of the Forums*
You are entirely responsible and liable for all activities conducted by you and any authorized user of your Account in the Forums, including the transmission, posting, or other provision of User Content. Listed below are some, though not all, violations that may result in Company terminating or suspending your access to a Forum. You agree not to do any of the following actions while using any Forum:
Harass, threaten, embarrass or cause distress or discomfort upon another Forum participant, user, or other individual or entity;

1. Transmit any User Content in any Forum that Company considers to be disruptive, unlawful, harmful, threatening, abusive, harassing, defamatory, vulgar, obscene, hateful, racially, ethnically or otherwise objectionable;
2. Cause any chat room screen to any chat room to "scroll" faster than other users are able to type to it or any action of a similar disruptive effect;
3. Misrepresent yourself, your age or your affiliation with any person or entity, impersonate in any Forum any person or entity, including but not limited to, a Company official, chat or message board leader, guide or host, or make false or misleading statements;
4. Disrupt the normal flow of dialogue in a Company chat room or otherwise act in a manner that negatively affects other participants;
5. Post or transmit any unsolicited advertising, promotional materials, or any other forms of solicitation in the Forums;
6. Intentionally or unintentionally violate any applicable local, state, national or international law, including but not limited to any regulations having the force of law while using or accessing any Forum;
7. Invade the privacy or violate any personal or proprietary right of any person or entity;
8. Infringe the intellectual property rights or similar rights, including but not limited to copyrights and trademarks, of any person or entity
9. Use the Site in any manner that could damage, impair, disable, overburden or harm the Site or circumvent the intended functionality of the Site;
10. Collect information identifying users of the Site by electronic or other means without authorization from the person(s) affected;
11. upload, post, transmit, send, share, store, distribute or otherwise make available on the Site any private or sensitive information or content about any third party, including, addresses, phone numbers, e-mail addresses, Social Security numbers and credit card numbers; and
12. upload, post, transmit, send, share, store, distribute, or otherwise make available any viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software, hardware or other electronic or telecommunications equipment.

By posting or uploading Content to the Site, any Forum or submitting any other User Content to Company, you automatically grant (or warrant that the owner of such rights has expressly granted) Company a perpetual, worldwide, royalty-free, irrevocable, non-exclusive right and license to reproduce, modify, adapt, publish, publicly perform, translate, sub-license, create derivative works from, exploit, distribute and otherwise use such materials or incorporate such User Content in or in connection with the Site or by or in any other media or technology now known or later developed throughout the universe in perpetuity. In addition, you represent and warrant that any and all User Content you upload, post, transmit, send, share, store, distribute, or otherwise make available on the Site complies with each of the foregoing Community Guidelines.

**User Disputes**
You are solely responsible for your interactions with other Site users. We reserve the right, but have no obligation, to monitor disputes between you and other users.

**Promotions**
From time to time, the Site may offer sweepstakes, contests or other promotions that require you to send material or information about yourself. Please note that sweepstakes, contests or promotions offered via the Site may be, and often are, governed by a separate set of rules that, in addition to describing such sweepstakes, contest or promotion, may have eligibility requirements, such as certain age or geographic area restrictions, terms and conditions governing the use of material you submit, and supplemental disclosures about how your personal information may be used. It is your responsibility to read such rules to determine whether or not you want to and are eligible to participate, register and/or enter. By entering any such sweepstakes, contest or other promotion, you agree to comply with abide by such rules and the decisions of the sponsor(s) identified therein, which shall be final and binding in all respects.

**No Resale/Exploitation**
You understand and agree that you may not reproduce, copy, resell, manipulate, or exploit any part of the Site for any commercial purpose.

**Non-United States Residents**
Company operates the Site in the United States. Company makes no representation that the Materials, including merchandise offered for sale on the Site and their copyrights, trademarks, patents, and licensing arrangements, are appropriate or available for use in locations other than the United States. If you access the Site from locations outside of the U.S. you do so on your own initiative and at your own risk, and you are solely responsible for compliance with local laws, if and to the extent local laws are applicable.

With respect to shipments of merchandise to consumers, wherever they may reside, title to and risk of loss shall pass to the buyer upon delivery of the merchandise to the common carrier.

**Jurisdictional Issues**

The Site is controlled and operated by Company from its offices within the State of California, United States. Company makes no representation that materials in the Site are appropriate or available for use in other locations. Software from this Site is further subject to United States export controls. No software from this Site may be downloaded or otherwise exported or re-exported (i) into (or to a national or resident of) any countries that are subject to U.S. export restrictions; or (ii) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's Table of Deny Orders. By downloading or using the Software, you represent and warrant that you are not located in, under the control of, or a national or resident of any such country or on any such list.

**Termination**

You understand and agree that Company may, in its sole discretion and at any time, terminate your password, Account or use of any Forum, and discard and remove any User Content posted or submitted by you to any Forum, and/or prohibit you from accessing the Site, in whole or in part, for any reason or no reason at all, at any time in its sole discretion, with or without notice. You understand and agree that Company may take any one or more of these actions without prior notice to you. Should Company take any of these actions, it may, in its sole discretion, immediately deactivate and/or delete any or all information about and concerning your Account, including your Registration Information and submitted User Content. You understand and agree that Company shall not have any liability to you or any other person for any termination of your access to any Forum and/or the removal of information concerning your Account. Company will determine your compliance with this Agreement in its sole discretion and its decision shall be final and binding and not subject to challenge or appeal. Any violation of this Agreement may result in restrictions on your access to all or part of the Site and may be referred to law enforcement authorities. No changes to or waiver of any part of this Agreement shall be of any force or effect unless formally posted or made in writing and signed by a duly authorized officer of Company. Upon termination of your membership or access to the Site, or upon demand by Company, you must destroy all materials obtained from the Site and all related documentation and all copies and installations thereof. You are advised that Company will aggressively enforce its rights to the fullest extent of the law.

**Disclaimer**

The Site may be unavailable from time to time due to maintenance or malfunction of computer equipment or for various other reasons. Company assumes no responsibility for any delays, interruptions, errors, defects, omissions, or deletions, related to the communications line failure, operation or transmission, or alteration of, or theft or destruction or unauthorized access to, user communications. Company is not responsible for any technical or non-technical malfunction or other problems of any hosting services, computer systems, servers or providers, telephone networks or telephone services, computer or mobile phone equipment, software, failure of e-mail or players on account of technical problems or traffic congestion on the Internet or in connection with the Site, including injury or damage to a user's or to any other person's computer, mobile phone, or other hardware or software, related to or resulting from using or downloading materials in connection with the Web and/or in connection with the Site.

THE SITE, THE MATERIALS, AND THE SOFTWARE, IF APPLICABLE, ARE PROVIDED "AS IS" "WITH ALL FAULTS" AND "AS AVAILABLE" AND WITHOUT WARRANTIES OF ANY KIND EITHER EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OR THOSE ARISING BY STATUTE OR OTHERWISE IN LAW FROM A COURSE OF DEALING OR USAGE OF TRADE, TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, COMPANY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. COMPANY DOES NOT WARRANT THAT THE AVAILABILITY OF THE FUNCTIONS CONTAINED IN THE SITE, THE MATERIALS, THE FORUMS OR THE SOFTWARE, WILL BE UNINTERRUPTED OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE SITE OR THE SERVER THAT MAKES IT AVAILABLE OR THE SOFTWARE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS OR THAT THE SITE, MATERIALS SOFTWARE OR SERVER DO NOT VIOLATE ANY PATENT OR OTHER INTELLECTUAL PROPERTY RIGHTS OF ANY PERSON OR ENTITY. COMPANY DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE SITE, THE MATERIALS, THE FORUMS OR THE SOFTWARE, IN TERMS OF THEIR CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE. YOU (AND NOT COMPANY) ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR, OR CORRECTION. APPLICABLE LAW MAY NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT FULLY APPLY TO YOU.

**Limitation of Liability**

YOU AGREE THAT COMPANY AND ITS PARENTS, AFFILIATES, SUBSIDIARIES, LICENSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE EMPLOYEES, OFFICERS AND DIRECTORS (COLLECTIVELY, THE "RELEASED PARTIES") ARE NOT LIABLE TO YOU OR ANY THIRD PERSON FOR DAMAGES OF ANY KIND, WHETHER BASED IN TORT, CONTRACT, STRICT LIABILITY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING FOR ANY LOST PROFITS OR LOST DATA ARISING OUT OF OR RESULTING IN ANY WAY FROM OR IN CONNECTION WITH THE SITE, THE MATERIAL, THE FORUMS, ANY TRANSACTIONS IN THE COMPANY SHOP, ANY LISTING OR ANY ERRORS OR OMISSIONS IN THE TECHNICAL OPERATION OF THE SITE, EVEN IF THE COMPANY IS AWARE OR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER CAUSED IN WHOLE OR IN PART BY NEGLIGENCE, ACTS OF GOD, TELECOMMUNICATIONS FAILURE, THEFT OR DESTRUCTION OF, OR UNAUTHORIZED ACCESS TO THE SITE (COLLECTIVELY, THE "RELEASED MATTERS"). NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, COMPANY'S LIABILITY TO YOU FOR ANY CAUSE WHATSOEVER, AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO $1000. BY ACCESSING THE SITE, YOU UNDERSTAND THAT YOU MAY BE WAIVING RIGHTS WITH RESPECT TO CLAIMS THAT ARE AT THIS TIME UNKNOWN OR UNSUSPECTED, AND IN ACCORDANCE WITH SUCH WAIVER, YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND, AND HEREBY EXPRESSLY WAIVE, THE BENEFITS OF SECTION 1542 OF THE CIVIL CODE OF CALIFORNIA, AND ANY SIMILAR LAW OF ANY STATE OR TERRITORY, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

You hereby waive any and all rights you have or may have under California Civil Code Section 1542, and/or any similar provision of law or successor statute to it, with respect to the Released Matters. In connection with this waiver and release, you acknowledge that you are aware that you may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which you now know or believe to be true. Nevertheless, you intend by this Agreement to release fully, finally and forever all Released Matters under this Agreement. In furtherance of such intention, the releases set forth in this Agreement shall be and shall remain in effect as full and complete releases notwithstanding the discovery or existence of any such additional or different claims or facts relevant hereto.

Company makes no representation or warranty whatsoever regarding the completeness, accuracy, currency or adequacy of any information, facts, views, opinions, statements or recommendations contained on the Site and/or the Material. Reference to any product, process, publication or service of any third party by trade name, domain name, trademark, service mark, logo, manufacturer or otherwise does not constitute or imply its endorsement or recommendation by Company. Views and opinions of users of the Site do not necessarily state or reflect those of Company. Users are responsible for seeking the advice of professionals, as appropriate, regarding the information, opinions, advice or content available as part of the Site.

The Internet may be subject to breaches of security. Company is not responsible for any resulting damage to any user's computer from any such security breach, or from any virus, bugs, tampering, unauthorized intervention, fraud, error, omission, interruption, deletion, defect, delay in operation or transmission, computer line failure or any other technical or other malfunction. You should also be aware that email submissions over the Internet may not be secure, and you should consider this before submitting any information to anyone over the Internet. Company makes no representation or warranty whatsoever regarding the suitability, functionality, availability or operation of the Site.

**Linking Policy**

If you link to the Site, we require that you follow these guidelines. You may link only to the home page, and the link must be in plain text, unless otherwise approved in writing by an authorized representative of Company. The link to this Site must not damage, dilute or tarnish the goodwill associated with any Company names and/or intellectual property, nor may the link create the false appearance that your website and/or organization is sponsored, endorsed by, affiliated and/or associated with Company. You may not "frame" the Site or alter its intellectual property or Material in any other way. You may not link to the Site from a site that is unlawful, abusive, indecent or obscene, that promotes violence or illegal acts, that contains expressions of racism, that is libelous, defamatory, scandalous, or inflammatory or is otherwise deemed inappropriate, as determined by Company in its sole discretion. Company reserves the right, in its sole discretion, to terminate a link with any website for any reason or no reason at all, including without limitation any website that Company deems to be inappropriate or inconsistent with or antithetical to the Site and/or these Terms of Use.

Lions Gate Films - Terms of Service (TOS)                                                                    Page 5 of 6

Company is not responsible for the content or performance of any portion of the Internet including other World Wide Websites to which this Site may be linked or from which this Site may be accessed.

**Copyright Notice**
If you believe that any Content appearing on the Site or in any Forum has been copied in a way that constitutes copyright infringement, please forward the following information to the Copyright Agent named below:

1. Your name, address, telephone number, and email address;
2. A description of the copyrighted work that you claim has been infringed;
3. The exact URL or a description of where the alleged infringing material is located;
4. A statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
5. An electronic or physical signature of the person authorized to act on behalf of the owner of the copyright interest; and
6. A statement by you, made under penalty of perjury, that the above information in your Notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

**Copyright Agent**
Lionsgate
2700 Colorado Ave., Suite 200
Santa Monica, CA 90404
Attn: Business Affairs
E-Mail: general-inquiries@lionsgate.com

By this filing, Company seeks to preserve any and all exemptions from liability that may be available under the copyright law, but does not necessarily stipulate that it is a service provider as defined in 17 U.S.C Section 512(c) or elsewhere in the law.

**Indemnification**
BY USING THE SITE YOU AGREE TO INDEMNIFY, DEFEND AND HOLD THE RELEASED PARTIES HARMLESS FROM AND AGAINST ANY THIRD PARTY CLAIMS, ALLEGED CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, DAMAGES, LOSSES, LIABILITIES, AND ALL COSTS AND EXPENSES OF DEFENSE, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES, ARISING OUT OF OR RELATING TO: YOUR BREACH OF YOUR REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS HEREUNDER; YOUR VIOLATION OF THESE TERMS OF USE OR ANY LAW; YOUR USE OF THIS SITE AND/OR THE MATERIAL IN VIOLATION OF THESE TERMS OF USE; INFORMATION OR MATERIAL POSTED OR TRANSMITTED THROUGH YOUR COMPUTER OR MEMBERSHIP ACCOUNT, EVEN IF NOT SUBMITTED BY YOU, THAT INFRINGES ANY COPYRIGHT, TRADEMARK, TRADE SECRET, TRADE DRESS, PATENT, PUBLICITY, PRIVACY OR OTHER RIGHT OF ANY PERSON OR DEFAMES ANY PERSON; ANY MISREPRESENTATION MADE BY YOU; AND/OR COMPANY'S USE OF YOUR INFORMATION. YOU WILL COOPERATE AS FULLY AND AS REASONABLY REQUIRED IN COMPANY'S DEFENSE OF ANY CLAIM. COMPANY RESERVES THE RIGHT, AT ITS OWN EXPENSE, TO ASSUME THE EXCLUSIVE DEFENSE AND CONTROL OF ANY MATTER OTHERWISE SUBJECT TO INDEMNIFICATION BY YOU, AND YOU SHALL NOT IN ANY EVENT SETTLE ANY SUCH MATTER WITHOUT THE WRITTEN CONSENT OF COMPANY.

**Filtering**
Pursuant to 47 U.S.C. Section 230(d), as amended, Company hereby notifies you that parental control protections (such as computer hardware, software or filtering services) are commercially available that may assist you in limiting access to material that is harmful to minors. Information identifying current providers of such protections is available at:

http://dir.yahoo.com/Business_and_Economy/Shopping_and_Services/...

Please note that Lionsgate does not endorse any of the products or services listed at such site.

**Miscellaneous**
This TOS constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous written or oral agreements between the parties with respect to the subject matter hereof. This TOS may not be amended, nor any obligation waived, without Company's written authorization. Any failure to enforce any provision of this TOS shall not constitute a waiver thereof or of any other provision thereof.

This TOS shall be governed and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed in California (without regard to its conflicts of law principles that would cause the application of any other jurisdiction's laws) With respect to any disputes or claims not subject to arbitration, you agree not to commence or prosecute any action in connection therewith other than in the state and federal courts of California, and you hereby consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to venue and jurisdiction in the state and federal courts of California.

By using the Site in any way, you unconditionally consent and agree that: (1) any claim, dispute, or controversy (whether in contract, tort, or otherwise) you may have against the officers, directors and employees of Company and its parent, subsidiaries, affiliates (all such individuals and entities collectively referred to herein as the "Company Entities") arising out of, relating to, or connected in any way with the website or the determination of the scope or applicability of this agreement to arbitrate, will be resolved exclusively by final and binding arbitration administered by JAMS and conducted before a sole arbitrator in accordance with the rules of JAMS; (2) this arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16; (3) the arbitration shall be held in Los Angeles, California; (4) the arbitrator's decision shall be controlled by the terms and conditions of this Agreement and any of the other agreements referenced herein that the applicable user may have entered into in connection with the website; (5) the arbitrator shall apply California law consistent with the FAA and applicable statutes of limitations, and shall honor claims of privilege recognized at law; (6) there shall be no authority for any claims to be arbitrated on a class or representative basis, arbitration can decide only your and/or the applicable Company Entity's individual claims; the arbitrator may not consolidate or join the claims of other persons or parties who may be similarly situated; (7) the arbitrator shall not have the power to award punitive damages against you or any Company Entity; (8) in the event that the administrative fees and deposits that must be paid to initiate arbitration against any Company Entity exceed $125 USD, and your are unable (or just not required under the rules of JAMS) to pay any fees and deposits that exceed this amount, Company agrees to pay them and/or forward them on your behalf, subject to ultimate allocation by the arbitrator. In addition, if you are able to demonstrate that the costs of arbitration will be prohibitive as compared to the costs of litigation, Company will pay as much of your filing and hearing fees in connection with the arbitration as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive; and (9) with the exception of subpart (6) above, if any part of this arbitration provision is deemed to be invalid, unenforceable or illegal, or otherwise conflicts with the rules of JAMS, then the balance of this arbitration provision shall remain in effect and shall be construed in accordance with its terms as if the invalid, unenforceable, illegal or conflicting provision were not contained herein. If, however, subpart (6) is found to be invalid, unenforceable or illegal, then the entirety of this Arbitration Provision shall be null and void, and neither you nor Company shall be entitled to arbitrate their dispute. For more information on JAMS and/or the rules of JAMS, visit their website at www.jamsadr.com. You may also contact the Complaint Assistance Unit of the Division of Consumer Services of the Department of Consumer Affairs in writing at 400 R Street, Suite 1080, Sacramento, California 95814, or by telephone at (916) 445-1254 or (800) 952-5210 in connection with any potential claim in connection with the Site.

You hereby irrevocably waive any right to seek and/or obtain rescission, equitable and/or injunctive relief related to Company's production, distribution, license, and/or exploitation of any of their motion pictures, television shows, commercials and/or other content; and your exclusive remedy in connection therewith shall be an action for damages.

If any provision of these terms shall be unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from these terms and shall not affect the validity and enforceability of any remaining provisions.

http://www.lionsgatefilms.com/terms.html                                                                    3/16/2012

This Site may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements reflect our current views with respect to future events and are based on assumptions and are subject to risks and uncertainties. Except for our ongoing obligation to disclose material information as required by federal securities laws, we undertake no obligation to update you concerning any future revisions to any forward-looking statements. Factors that could cause actual results to differ materially from those expressed or implied by the forward-looking statements include, but are not limited to, those risk factors contained in our filings with the Securities and Exchange Commission.

For any questions, suggestions, or concerns related to these Terms of Use, please email general-inquiries@lionsgate.com. Alternatively, you may contact Company via postal mail at Terms of Use Questions, c/o Lionsgate, Investor Relations, 2700 Colorado Ave., Suite 200, Santa Monica, CA 90404.

©2011 Lionsgate Entertainment Inc. All rights reserved.

©COPYRIGHT 2006 • LIONS GATE ENTERTAINMENT • NYSE/TSX: LGF
TERMS OF USE  |  PRIVACY POLICY

A884

# EXHIBIT

# Q

| | |
|---|---|
| **From:** | Dave Callaham <callaham@stingrza.com> |
| **Sent:** | Tuesday, August 18, 2009 2:11 PM |
| **To:** | Kyle Harimoto <kharimoto@sbcglobal.net> |
| **Cc:** | Dave Kalstein <kalstein@mac.com> |
| **Subject:** | Re: Expendables |

if i say that in an email I may be incriminating myself Kyle.

Put it this way: the idea and very loose structure is mine.

Everything else...

I plead the fifth.

Or, to put it another way, if I get sole credit like I am asking for...

it would be A MIRACLE.

On Aug 18, 2009, at 11:06 AM, Kyle Harimoto wrote:

I read it last night.  I have to know what in this script is yours and what is new?

CONFIDENTIAL

# EXHIBIT R

PRIVILEGED AND
CONFIDENTIAL

Dear Credits Department,

Having read all of the submitted materials for THE EXPENDABLES it is my opinion that the credit should be:

Story by Writer A

Screenplay by Writer A and Writer B.

I believe that Writer A should get sole story credit. This decision comes after reviewing all of the submitted materials for foundational narrative, character and themes. The idea of a lead mercenary banding together with his team to overthrow an island dictator, even after he finds out they were duped on the mission by the CIA, and returning the country to the people came from Writer A. I did not find Writer B had contributed original concepts to the story, in terms of narrative structure, theme and characters, simply amended and altered Writer A's story.

I also believe that Writer A has contributed more than 33 percent to the final shooting script. Writer A's original ideas were kept throughout the development process, even though dialogue, character details and action sequences may have been altered by Writer B. In terms of dramatic construction, Writer A has the team being introduced on a mission which demonstrates their superior abilities, the lead character meeting a man that hires them to overthrow a South American dictator, the team finding out about the CIA being behind this mission, and consequently taking over the presidential palace and getting vengeance on the CIA operative behind it all. Over the course of these events unfolding, more than 33 percent of Writer A's scenes and characterizations/character relationships remain intact for the final shooting script.

I believe that writer B, as a production executive, has contributed more than 50 percent to the final shooting script. Writer B's contributions come in the form of dialogue throughout the script, the changing and addition of characters, and essential differences in the action sequences. For example, Writer B created a new way to introduce the team (via modern-day pirates in the big opening sequence), a legitimate "reason" why Barney and his mercs go to the island and under what assumptions they are there, and the way that Barney is one of a group (an ensemble) and not a lead character as Barrow is in Writer A's drafts. Another example of Writer B demonstrating his contributions comes in the final set-piece where the overthrow of the dictator is front and center and the palace is taken and destroyed in a different way than in Writer A's drafts. Other character scenes revolving around Lacey, Tool, and Barney were added by Writer B, further demonstrating his contributions amassing to more than 50 percent on the final shooting script. In terms of dialogue, it is evidently clear that Writer B's contributions outweigh Writer A's.

Thank you.

Arbiter 2

CONFIDENTIAL

# EXHIBIT

# S



"UNTITLED MERCENARY PROJECT" aka "BARROW"

<u>QUITCLAIM AGREEMENT</u>

THIS QUITCLAIM AGREEMENT ("Agreement") dated July 10, 2009 between WARNER BROS. PICTURES, a division of WB Studio Enterpises, Inc. ("Assignor") and Double Life Productions, Inc., a California corporation, having its principal place of business at 6423 Wilshire Boulevard, Los Angeles, CA  90048, Attn:  Lonnie Ramati ("Assignee");

W I T N E S S E T H

In consideration of the mutual covenants and agreements herein set forth, the parties hereto agree as follows:

1.    <u>Quitclaim</u>:  Assignor does hereby quitclaim unto Assignee all of Assignor's right, title and interest in and to the literary material and documents enumerated in Exhibit "A" attached hereto and by this reference made a part hereof ("Project"). Assignor will, upon execution of this Agreement, deliver to Assignee a copy of the documents listed in Exhibit "A".

2.    <u>Representations and Warranties</u>:  Assignor hereby represents and warrants that Assignor has not heretofore granted, assigned, hypothecated or otherwise disposed of any of Assignor's right, title or interest heretofore acquired by it in or to said literary materials or said documents; that there has been paid to the party or parties entitled thereto all sums which have heretofore become payable under said documents; and that, to the best of Assignor's knowledge, there is not now outstanding any litigation or threat of litigation or claim or threats of claims which affect or are concerned with or any way touch upon any of the rights, licenses, privileges and property quitclaimed to Assignee pursuant to this Agreement.  Except as expressly provided in this paragraph Assignor makes no representations or warranties of any kind whatsoever.

3.    <u>Assignor Indemnification</u>:  Assignor will indemnify Assignee and save and hold Assignee harmless from and against any and all claims, demands, actions and liabilities of every kind and character whatsoever, including reasonable attorneys' fees, arising out of any breach of the aforesaid representations and warranties by Assignor.

4.    <u>Consideration</u>:  In consideration of this assignment, Assignee shall pay Assignor, concurrently with the execution hereof, the sum of $200,000.  In addition, Assignee shall pay to Assignor the sum of $200,000 provided that said sum shall be deferred, contingent and payable, out of 100% of "Producer Proceeds" (as such term is defined below) in excess of  "Cost of Production" (as such term is defined below).  "Cost

#176258 v7 (v2 new )DC (July 10, 2009)
UNT. MERCENARY PROJECT – Double Life Prod.
Form 203  rev.  1/13/06
Quitclaim Agreement                                    1

CONFIDENTIAL                              WB000497

of Production" shall mean the actual cost of production of the Project excluding any overhead charges and net of any incentives, rebates, subsidies and completion funds. For purposes of calculating payments payable pursuant to this Paragraph, the Cost of Production shall not exceed $64,300,000.

   4.A. Additional Payments:  In addition, Assignee shall pay to Assignor a sum equal to 5% of 100% of Producer Proceeds in excess of the Cost of Production plus $200,000 (i.e., not more than $64,500,000). Producer Proceeds shall be defined as all sums received by Assignee or on Assignee's behalf from the distribution and exploitation of the Project, including without limitation, advances, guarantees, overages and monies derived from any ancillary sources, including without limitation, videogames, soundtrack albums and merchandising but excluding any incentives, rebates, subsidies and completion funds (for the avoidance of doubt, there shall be no double deduction of the same), in no event shall Assignor's participation be subject to any so-called overbudget reduction or cross-collateralization provisions and/or abandonment charges from other projects. In the event a collection account is established in connection with the Project, Assignor shall be a party to such account on terms and conditions to be negotiated in good faith but in no event shall the financial terms and conditions be less favorable to Assignor than the financial terms and conditions set forth herein.

   5.  .   Executory Obligations/Assumption Agreement:  Assignee assumes and agrees to be bound by and to perform all executory obligations of Assignor under and pursuant to the documents referred to in said Exhibit "A" and under any applicable collective bargaining agreements which are binding on Assignor. Assignee agrees to simultaneously herewith execute the Literary Material Assumption Agreement attached hereto.

   6.   Quitclaim Contingency:  If Assignee fails to: (i) finalize and execute this Agreement and the Literary Material Assumption Agreement attached hereto, (ii) pay Assignor the sum of $200,000 and (iii) deliver an original signed Acknowledgment and Consent from Thunder Road Film Productions, Inc. and Management 360, in form acceptable to Warner, on or before July 24, 2009, then this Agreement shall be automatically rescinded and all rights in the Project shall remain with Assignor.

   7.   Assignee Indemnification:  Assignee will indemnify Assignor and save and hold Assignor harmless from and against any and all claims, demands, actions and liabilities of every kind and character whatsoever, including reasonable attorneys' fees, arising out of any breach by Assignee of its obligations contained herein or arising out of or resulting from any use made by Assignee of the Project (other than claims arising out of a breach of Assignor's representations or warranties contained herein).

   8.   Further Documents:  Each party hereto agrees to execute and deliver, or cause to be executed and delivered, all such documents, and do all such things as may be reasonably necessary and proper to carry out and effectuate the intents and purposes of this Agreement, and particularly, without limiting the generality of the foregoing, Assignor will execute and deliver, or cause to be executed and delivered, to

#176258 v7 (v2 new )DC (July 10, 2009)
UNT. MERCENARY PROJECT – Double Life Prod.
Form 203  rev.  1/13/06
Quitclaim Agreement                                     2

CONFIDENTIAL                          WB000498

Assignee such instruments as may be necessary and proper to vest in Assignee the rights herein assigned to Assignee as a matter of record in the United States Copyright Office, all without any further payment by or cost or expense to Assignee other than customary recording charges.

9. **Parties Bound**: This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, trustees, successors and assigns.

10. **Governing Law**: This Agreement shall be construed in accordance with the laws of the State of California applicable to agreements which are executed and fully performed within the State of California.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS. PICTURES, a division of WB Studio Enterprises Inc.

("Assignor")

By: _____

Its: _____

DOUBLE LIFE PRODUCTIONS, INC.
("Assignee")

By: _____

Its: _____

#176258 v7 (v2 new )DC (July 10, 2009)
UNT. MERCENARY PROJECT – Double Life Prod.
Form 203  rev. 1/13/06
Quitclaim Agreement                    3

**CONFIDENTIAL**                    **WB000499**

EXHIBIT "A"


LITERARY MATERIAL:

Screenplay dated June 8, 2005 written by Dave Callaham
Screenplay dated January 24, 2006 written by Dave Callaham


DOCUMENTS:

Blind Commitment Agreement dated as of November 14, 2002, between Warner Bros. and Jittery Dog Productions for the services of David Callaham.

Letter to Tobin Babst designating "Untitled Mercenary Project as the "Untitled David Callaham Blind Commitment Project."

Amendment dated as of May 25, 2004 in connection with the "Untitled Mercenary Project", to the Term Deal dated as of June 19, 2003 between Warner Bros and BCKORS, LLC d/b/a Management 360 for the services of Susan Bymel, Guyman Casady, Eric Kranzler, Evelyn O'Neill, Daniel Rappaport and David Seltzer, as amended.

Amendment dated as of May 25, 2005 in connection with the "Untitled Mercenary Project",  to the First Look Term Producing Agreement dated August 7, 2003, between Warner Bros. and Thunder Road Film Productions, Inc. for the services of Basil Iwanyk, as amended.


#176258 v7 (v2 new )DC (July 10, 2009)
UNT. MERCENARY PROJECT – Double Life Prod.
Form 203  rev.  1/13/06
Quitclaim Agreement                                    4


**CONFIDENTIAL**                                    **WB000500**



# DECLARATION OF CUSTODIAN OF RECORDS

I, Suzy Chang, declare and state as follows:

1. That I am a Litigation Paralegal of WARNER BROS. ENTERTAINMENT INC. ("Warner") and as such am a duly authorized custodian of records of said company and have authority to certify the records attached hereto;

2. The documents hereby produced were prepared by the personnel of this business in the ordinary course of business; and

3. These documents are true copies of the records requested in the Subpoena served on Warner Bros. Entertainment Inc.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on February 3, 2012 at Burbank, California.

_Suzy K. Chang_

Suzy Chang

# EXHIBIT T



# THE EXPENDABLES

## WRITTEN BY SYLVESTER STALLONE

*Ceasir's name Throughout the Script should Be Change to Loud Ceasir*

Based on the screenplay
BARROW by David Callahan

*Smiler*

*Case*

FIRST OFFICIAL DRAFT 10/8/08

CONFIDENTIAL

SS05561

# EXHIBIT
# U

Tom J. Ferber
James A. Janowitz
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

MARCUS WEBB,

                  Plaintiff

    -against-

SYLVESTER STALLONE, et al.,

                  Defendants.

-------------------------------------------------------x

11 CIV 7517 (JSR)

**DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION**

        Pursuant to Rule 36 of the Federal Rules of Civil Procedure, defendants Sylvester Stallone ("Stallone"), David E. Callaham ("Callaham"), Millennium Films, Inc., Nu Image, Inc., Alta Vista Productions Inc., Alta Vista Productions, LLC and Double Life Productions, Inc. (collectively, "Nu Image"), Lions Gate Films, Inc., Lions Gate Home Entertainment (collectively, "Lions Gate" and, together with Stallone, Callaham and Nu Image, "Defendants"), by their attorneys, Pryor Cashman LLP, respond to the Requests for Admission of plaintiff Marcus Webb ("Plaintiff") as follows:

## PRELIMINARY STATEMENTS AND GENERAL OBJECTIONS

    1.    Defendants reserve their right to supplement, revise, correct or clarify any of the responses provided herein.

2.     Defendants provide the responses without waiving or intending to waive:

    (a)    any questions as to competency, relevancy, materiality, privilege, right to a protective order for trade secrets or other reasons or admissibility in evidence of any documents produced or of their respective subject matter in the trial of this action;

    (b)    the right to object to the use of any of the responses herein or their subject matter at the trial of this action; and

    (c)    the right to object on any ground to any further requests or the right to claim a privilege with respect thereto.

3.     Defendants object to the Requests for Admission to the extent that they seek information protected from discovery by the attorney-client privilege or the work product doctrine, or information which is otherwise privileged or protected from discovery.  Any inadvertent production of such information shall not constitute a waiver of those privileges.

4.     Defendants object to each Request for Admission to the extent that:

    (a)    it is unduly broad, burdensome or oppressive;

    (b)    it is confusing and ambiguous, and thus not susceptible to reasoned interpretation or response;

    (c)    it seeks the disclosure of information relating to subjects extraneous to the claims alleged in the above-captioned action on the ground that such discovery is not relevant or calculated to lead to the discovery of admissible evidence;

    (d)    it seeks confidential business information and/or trade secrets;

    (e)    it exceeds the scope of permitted requests for admission pursuant to Rule 36 of the Federal Rules of Civil Procedure and all applicable local civil rules.

Subject to these Preliminary Statements and General Objections, which apply to each Request for Admission as if set forth fully below, Defendants make the following specific objections and responses:

## RESPONSES AND SPECIFIC OBJECTIONS

1.    Admit that LAbugz@aol.com is or was an e-mail address of John Thompson.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 1.

2.    Admit that Phase1234@aol.com is or was an e-mail address of Lonnie Ramati.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 2.

3.    Admit that Kkingtemple@aol.com is or was an e-mail address of Kevin King Templeton.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 3.

4.    Admit that alerner@nuimage.net is or was an e-mail address of Avi Lerner.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 4.

5.    Admit that Trevor@nuimage.net is or was an e-mail address of Trevor Short.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 5.

6.    Admit that document **DC00001** produced by Defendants is a true copy of an e-mail from Callaham to Matt Milam, sent on or about November 7, 2008.

3

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 6.

7.    Admit that document **DC00002** produced by Defendants is a true copy of an e-mail from Callaham to Jason Burns, with a copy to Tobin Babst, Guymon Casady, Barbara Dreyfus, and Darin Friedman, sent on or about November 7, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 7.

8.    Admit that document **DC00003** produced by Defendants is a true copy of an e-mail from Callaham to Matt Milam, sent on or about November 7, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 8.

9.    Admit that document **DC00004** produced by Defendants is a true copy of an e-mail from Callaham to Jake Berry, sent on or about November 7, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 9.

10.    Admit that document **DC00005** produced by Defendants is a true copy of an e-mail from Callaham to Jake Berry, sent on or about November 7, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 10.

11.    Admit that document **DC00005A – DC00009A** is a true copy of a memorandum from Thunder Road Pictures ("Creative") to Callaham, dated May 18, 2005.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 11.

4

12.    Admit that document **DC00014** produced by Defendants is a true copy of an e-mail from Callaham to Scott Whiteleather, sent on or about November 7, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 12.

13.    Admit that document **DC00029** produced by Defendants is a true copy of an e-mail from Callaham to Dave Kalstein, with a copy to Kyle Harimoto, sent on or about December 15, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 13.

14.    Admit that document **DC00044** produced by Defendants is a true copy of an e-mail from Callaham to Dave Kalstein, with a copy to Kyle Harimoto, sent on or about December 29, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 14.

15.    Admit that document **DC00081** produced by Defendants is a true copy of an e-mail from Callaham to Nate Ravitz, sent on or about February 26, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 15.

16.    Admit that document **DC00106** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Callaham to Mac Torluccio, sent on or about April 20, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 16.

17.    Admit that document **DC00168 – DC00169** produced by Defendants is a true copy of an e-mail from Callaham to Dave Fruchbom, sent on or about July 28, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 17.

18.    Admit that document **DC00172** produced by Defendants is a true copy of an e-mail from Callaham to Kyle Harimoto, Dave Kalstein, and Jordan Cahan, sent on or about July 28, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 18.

19.    Admit that document **DC00483** produced by Defendants is a true copy of an e-mail from Callaham to Dave Kalstein and Kyle Harimoto, sent on or about August 17, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 19.

20.    Admit that document **DC00497** produced by Defendants is a true copy of an e-mail from Callaham to Kyle Harimoto, with a copy to Dave Kalstein, sent on or about August 18, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 20.

21.    Admit that document **DC01279** produced by Defendants is a true copy of an e-mail from Callaham to Mary Jerrido, sent on or about October 8, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 21.

6

22.     Admit that document **DC01293** produced by Defendants is a true copy of an e-mail from Callaham to Dave Kalstein, with a copy to Kyle Harimoto and Jordan Cahan, sent on or about October 16, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 22.

23.     Admit that document **DC01316** produced by Defendants is a true copy of an e-mail from Callaham to Chris McCaleb, sent on or about October 21, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 23.

24.     Admit that document **DC02056** produced by Defendants is a true copy of an e-mail from Callaham to Ryan Condal, sent on or about April 27, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 24.

25.     Admit that document **DC02062 – DC02063** produced by Defendants is a true copy of a series of e-mails including an e-mail from Callaham to Matt Bass, with a copy to Mac Torluccio, sent on or about October 25, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 25.

26.     Admit that document **DC02073 – DC02074** produced by Defendants is a true copy of a series of e-mails including an e-mail from Callaham to Ryan Condal, sent on or about October 26, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 26.

27.      Admit that document **DC02080** produced by Defendants is a true copy of an e-mail from Callaham to Mskiena, sent on or about October 26, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 27.

28.      Admit that document **DC02088 – DC02089** produced by Defendants is a true copy of a series of e-mails including an e-mail from Callaham to leehsu@comcast.net, sent on or about October 26, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 28.

29.      Admit that document **DC02090** produced by Defendants is a true copy of a series of e-mails including an e-mail from Callaham to Scott Whiteleather, sent on or about October 26, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 29.

30.      Admit that document **DC02103** produced by Defendants is a true copy of an e-mail from Callaham to persianlilly@me.com, sent on or about November 29, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 30.

31.      Admit that document **DC00509_REV - DC00510_REV** produced by Defendants is a true copy of a letter from the WGA to Stallone, Robert Kamen, and Callaham, dated August 19, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 31.

32.    Admit that document **DC01071_REV - DC01076_REV** produced by Defendants is a true copy of a statement by "Writer A" to the WGA.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 32.

33.    Admit that document **DC01124_REV – DC01249_REV** produced by Defendants is a true copy of a scene from *The Expendables*, with various dates on the cover page.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny that document **DC01124_REV – DC01249_REV** is a true copy of a scene from *The Expendables*, but admit that document **DC01124_REV – DC01249_REV** is a true copy of a draft, version, or portion of a screenplay, in whole or in part, titled *The Expendables*.

34.    Admit that document **DC01269_REV** produced by Defendants is a true copy of a statement by WGA Arbiter #1.

**Response:** Subject to and without waiving the objections set forth above, Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 34 because they have no knowledge pertaining to the creation of document **DC01269_REV**, but Defendants admit that document **DC01269_REV** is a true copy of a document received from the WGA with the header "ARBITER #1" and do not dispute the authenticity of document **DC01269_REV**.

35.    Admit that document **DC01270_REV** produced by Defendants is a true copy of a statement by WGA Arbiter #2.

**Response:** Subject to and without waiving the objections set forth above, Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 35 because they have no knowledge pertaining to the creation of document

DC01270_REV, but Defendants admit that document **DC01270_REV** is a true copy of a document received from the WGA with the header "Dear Credits Department" and do not dispute the authenticity of document **DC01270_REV**.

36.     Admit that document **DC01271_REV - DC01272_REV** produced by Defendants is a true copy of a statement by WGA Arbiter #3.

**Response:** Subject to and without waiving the objections set forth above,  Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 36 because they have no knowledge pertaining to the creation of document **DC01271_REV - DC01272_REV**, but Defendants admit that document **DC01271_REV - DC01272_REV** is a true copy of a document received from the WGA with the header "ARBITER #3" and do not dispute the authenticity of document **DC01271_REV - DC01272_REV**.

37.     Admit that document **DC01282_REV** produced by Defendants is a true copy of an invoice to Rick Eyler, dated September 30, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 37.

38.     Admit that document **DC01349_REV – DC01491_REV** produced by Defendants is a true copy of a scene from *The Expendables*, with various dates on the cover page.

**Response:** Subject to and without waiving the objections set forth above,  Defendants deny that document **DC01349_REV – DC01491_REV** is a true copy of a scene from *The Expendables*, but admit that document **DC01349_REV – DC01491_REV** is a true copy of a draft, version, or portion of a screenplay, in whole or in part, titled *The Expendables*.

10

39.     Admit that document **DC01493_REV** produced by Defendants is a true copy of a letter from Callaham to Expert Reader dated November 12, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 39.

40.     Admit that document **DC01495_REV - DC01499_REV** produced by Defendants is a true copy of a letter from the WGA to Stallone and Callaham, dated October 29, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 40.

41.     Admit that document **DC01529_REV** produced by Defendants is a true copy of a letter from the WGA to Frank T. DeMartini, dated December 3, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 41.

42.     Admit that **LG00744** produced by Defendants is a true copy of a series of e-mails including an e-mail from Jason Constantine to kkingtemple@aol.com, sent on or about May 29, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 42.

43.     Admit that **LG0005650 – LG0005666** produced by Defendants is a true copy of a trial balance prepared by Wes Guarino relating to *The Expendables*.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 43.

44.     Admit that document **LG0005650 – LG0005666** produced by Defendants is a summary of information and documents kept in the course of a regularly conducted business

activity and that it was the regular practice of the entity preparing this statement to create the documents that served as the source material for **LG0005650 – LG0005666.**

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 44.

    45.    Admit that document **LG0005650 – LG0005666** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 45.

    46.    Admit that document **LG0005650 – LG0005666** produced by Defendants reflects the revenues and expenses of Lionsgate relating to *The Expendables* through December 31, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 46.

    47.    Admit that document **LG0005650 – LG0005666** produced by Defendants reflects the revenues and expenses of Lionsgate Gate relating to *The Expendables* as of January 23, 2012.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 47.

    48.    Admit that document **LG05679 – LG05707** produced by Defendants is a true copy of an agreement between Nu Image, Inc. and Lions Gate Films, dated November 13, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 48.

49.    Admit that document **LG0005789 – LG0005801** produced by Defendants is a true copy of an agreement between Lions Gate Films and UBISOFT Entertainment, dated September 22, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 49.

50.    Admit that document **LG0005822 - LG0005823** produced by Defendants is a true copy of an amendment to an agreement between Nu Image, Inc. and Lions Gate Films, dated May 3, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 50.

51.    Admit that document **LG0005825 - LG0005826** produced by Defendants is a true copy of an amendment to an agreement between Nu Image, Inc. and Lions Gate Films, dated May 4, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 51.

52.    Admit that document **LG0005839 – LG0005840** produced by Defendants is a true copy of an agreement between Nu Image, Inc. and Lions Gate Films, dated October 22, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 52.

53.    Admit that document **LG06972 – LG07003** produced by Defendants is a true copy of an agreement between Lions Gate UK Ltd. and Nu Image, Inc., dated November 18, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 53.

54.    Admit that document **LG07004 – LG07005** produced by Defendants is a true copy of a letter of agreement between Nu Image, Inc. and Lions Gate UK Ltd., dated May 13, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 54.

55.    Admit that document **LG07021 – LG07022** produced by Defendants is a true copy of a letter of agreement between Nu Image, Inc. and Lions Gate UK Ltd., dated November 19, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 55.

56.    Admit that document **LG07092** produced by Defendants is a true copy of a certificate of origin signed by Alta Vista LLC, dated May 27, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 56.

57.    Admit that document **NI001328** produced by Defendants is a true copy of an Expendables Profit and Loss Statement as of January 12, 2012.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 57.

58.    Admit that document **NI001328** produced by Defendants is a true copy of an Expendables Profit and Loss Statement as of December 31, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny the allegations contained in Request No. 58.

59.    Admit that document **NI001328** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny the allegations contained in Request No. 59.

60.    Admit that document **NI01328** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 60.

61.    Admit that document **NI001376 – NI001438** produced by Defendants is a true copy of an agreement between Warner Bros. and Jittery Dog Productions, dated November 14, 2002.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 61.

62.    Admit that document **NI001535 – NI0001543** produced by Defendants is a true copy of an agreement between Alta Vista LLC, Rogue Marble, and Stallone, dated March 5, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 62.

63.    Admit that document **NI02731– NI02732** produced by Defendants is a true copy of a letter from Trevor Short to Wayne Smith, dated January 7, 2009.

15

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 63.

64.    Admit that document **NI002741** produced by Defendants is a true copy of an e-mail exchange between LAbugz@aol.com and Avi Lerner, sent on or about October 27, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 64.

65.    Admit that document **NI003073** produced by Defendants is a true copy of a draft letter agreement from Ralph Brescia to Avi Lerner, dated January 29, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 65.

66.    Admit that document **NI004012** produced by Defendants is a true copy of an e-mail from Boaz Davidson to Stallone, with copies to Avi Lerner and Kevin King, sent on or about March 30, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 66.

67.    Admit that document **NI004541** produced by Defendants is a true copy of an e-mail from Jason Constantine to Avi Lerner, with a copy to Eda Kowan and Joe Drake, sent on or about April 20, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 67.

68.    Admit that document **NI004594** produced by Defendants is a true copy of a series of e-mails, including an e-mail from LAbugz to Avi Lerner and Trevor Short, with a copy to IraJayz@aol.com and Rikimatt10@aol.com, sent on or about April 21, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 68.

69.    Admit that document **NI005977 – NI005978** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Don West to Trevor Short, Alan J. Lam, NU J. Thompson Producer, NU Les Weldon, NU Joshua Throne, with a copy to Avi Lerner and doncoinc@hotmail.com, sent on or about June 9, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 69.

70.    Admit that document **NI006153** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Alan J. Lam to Avi Lerner, sent on or about June 23, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 70.

71.    Admit that document **NI006778** (in native form) is a true copy of a Alta Vista productions Cast Analysis, dated July 6, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 71.

72.    Admit that document **NI006778** (in native form) produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit that document **NI006778** is kept in the course of a regularly conducted business activity but deny that it was the regular practice of the entity preparing document **NI006778** to create the document.

17

73.    Admit that document **NI007520 – NI007522** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Trevor Short to Avi Lerner, sent on or about September 13, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 73.

74.    Admit that document **NI006935 – NI06936** produced by Defendants is a true copy of an e-mail from LAbugz@aol.com to Avi Lerner, with a copy to les.weldon@gmail.com, sent on or about July 14, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 74.

75.    Admit that document **NI007550 – NI007553** produced by Defendants is a true copy of a series of e-mails, including an e-mail from LAbugz@aol.com to Alan J. Lam, with a copy to Avi Lerner, sent on or about September 22, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 75.

76.    Admit that document **NI008770** produced by Defendants is a true copy of an e-mail from Trevor Short to Boaz Davidson, with a copy to Avi Lerner and LAbugz@aol.com, sent on or about February 10, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 76.

77.    Admit that document **NI008785 – NI008789** produced by Defendants is a true copy of a version of *The Expendables* production calendar.

18

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 77.

78. Admit that document **NI009224 – NI009236** produced by Defendants is a true copy of a series of e-mails including an e-mail from Ray A. Tamayo to Tina Rosen, sent on or about March 30, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 78.

79. Admit that document **NI011539** (in native form) produced by Defendants is a true copy of a spreadsheet created by Nu Image.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 79.

80. Admit that document **NI011539** (in native form) produced by Defendants is a true copy of a spreadsheet of Expendables Account Totals from inception to May 10, 2010. Admit that document **NI011539** (in native form) produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit that document **NI011539** is a true copy of a spreadsheet of Expendables Account Totals from inception to May 10, 2010 and Defendants admit that document **NI011539** is a summary of voluminous records kept in the regular course of business.

81. Admit that document **NI011539** (in native form) produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

19

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 81.

82.    Admit that document **NI011562 – NI011564** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Rob Van Norden to labugz@aol.com, Julie A. Weisel, and Avi Lerner, sent on or about May 11, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 82.

83.    Admit that document **NI014778 – NI014780** produced by Defendants is a true copy of a series of e-mails, including an e-mail from LAbugz@aol.com to Barbara Butler and Christian Mercuri, sent on or about July 1, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 83.

84.    Admit that document **NI014867 – NI014869** produced by Defendants is a true copy of a licensee list dated June 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 84.

85.    Admit that document **NI014867 – NI014869** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny that document **NI014867 – NI014869** is a document kept in the course of a regularly conducted business activity but admit that it was the regular practice of the entity preparing document **NI014867 – NI014869** to create the document.

86.    Admit that document **NI014867 – NI014869** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above,  Defendants deny that document **NI014867 – NI014869** is a summary of voluminous records but admit that document **NI014867 – NI014869** is a summary of various licensing contracts kept in the regular course of business.

87.    Admit that document **NI019233 – NI019261** produced by Defendants is a true copy of an agreement between Netflix, Inc. and Nu Image, Inc., dated August 6, 2010.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 87.

88.    Admit that document **NI021293** (in native form) is a true copy of a spreadsheet created by Nu Image.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 88.

89.    Admit that document **NI021293** (in native form) produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 89.

90.    Admit that document **NI021293** (in native form) produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 90.

21

91.    Admit that document **NI025168** (in native form) produced by Defendants is a true copy of a tax credit and cost summary.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 91.

92.    Admit that document **NI025168** (in native form) produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 92.

93.    Admit that document **NI025168** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 93.

94.    Admit that document **NI025864 – NI025915** is a cover letter with attachments from Bingham McCutchen LLP to Adam Korn, dated April 6, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 94.

95.    Admit that document **NI027538 – NI027539** produced by Defendants is a earnings statement dated November 30, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 95.

96.    Admit that document **NI027538 – NI027539** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 96.

97.    Admit that document **NI030049 – NI030052** produced by Defendants is a true copy of a Lionsgate Summary for the period ending June 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 97.

98.    Admit that document **NI030049 – NI030052** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 98.

99.    Admit that document **NI030049 – NI030052** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 99.

100.    Admit that document **NI030936** produced by Defendants is a true copy of a check from Travelers/St. Paul Fire and Marine Insurance Company to Millennium Films (Canada) Ltd., dated October 18, 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 100.

23

101.    Admit that document **NI031834 - NI031886** is a true copy of a production cost report spreadsheet.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 101.

102.    Admit that document **NI031834 - NI031886** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 102.

103.    Admit that document **NI031834 - NI031886** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 103.

104.    Admit that document **NI031887** is a true copy of a Director Deal Memorandum signed by Stallone and John Thompson (as producer).

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 104.

105.    Admit that document **NI031888 – NI031889** produced by Defendants is a true copy of an agreement between Rogue Marble and Double Life, dated January 7, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 105.

106.    Admit that document **NI031974** produced by Defendants is a true copy of an e-mail from Phase1234@aol.com to Kkingtemple@aol.com and Avi Lerner, sent on or about November 6, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 106.

107.    Admit that document **NI032290** produced by Defendants is a true copy of an e-mail from Phase1234@aol.com to LAbugz@aol.com, rene@mondrado.com, Rikimatt10@aol.com; and Avi Lerner, sent on or about December 3, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 107.

108.    Admit that document **NI032593 – NI032596** produced by Defendants is a true copy of a draft amendment to an agreement between Stallone and Alta Vista LLC, dated January 8, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 108.

109.    Admit that document **NI032597 – NI032607** produced by Defendants is a true copy of a draft agreement between Stallone and Alta Vista LLC, dated January 8, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 109.

110.    Admit that document **NI032613 – NI032616** produced by Defendants is a true copy of a draft amendment to an agreement between Stallone and Alta Vista LLC, dated January 8, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 110.

      111.    Admit that document **NI032617 – NI032641** produced by Defendants is a true copy of a draft agreement between Stallone and Alta Vista LLC, dated January 8, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 111.

      112.    Admit that document **NI032617 – NI032641** produced by Defendants is a true copy of an agreement between Stallone and Alta Vista LLC, dated January 8, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny the allegations contained in Request No. 112.

      113.    Admit that document **NI032645** produced by Defendants is a true copy of an e-mail from Phase1234@aol.com to Avi Lerner, with copies to jab@bhdrl.com, rpb@bhdrl.com, LAbugz@aol.com, Rikimatt10@aol.com, rene@mondrado.com, sent on or about January 12, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 113.

      114.    Admit that document **NI032787** produced by Defendants is a true copy of an e-mail from Phase1234@aol.com to jab@bhdrl.com and rpb@bhdrl.com, sent on or about January 14, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 114.

115.    Admit that document **NI032795** produced by Defendants is a true copy of an e-mail from Phase1234@aol.com to jab@bhdrl.com and rpb@bhdrl.com, with a copy to Avi Lerner, sent on or about January 21, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 115.

116.    Admit that document **NI032870** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Phase1234@aol.com to Daniel.furie@warnerbros.com and Avi Lerner, sent on or about January 21, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 116.

117.    Admit that document **NI032972 – NI032974** produced by Defendants is a true copy of a draft letter from Avi Lerner to Rogue Marble and Templeton Media, dated January 8, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 117.

118.    Admit that document **NI033344 – NI033345** produced by Defendants is a true copy of an amendment to an agreement between Nu Image, Inc. and Lions Gate Films, dated December 15, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 118.

119.    Admit that document **NI033350 – NI033352** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Phase1234@aol.com to ckg@bhdrl.com

and Avi Lerner, with a copy to pjs@ziffrenlaw.com, dan.furie@warnerbros.com, and johanny@bhdrl.com, sent on or about February 11, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 119.

120.    Admit that document **NI033373** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Phase1234@aol.com to an unknown recipient, sent on or about February 11, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 120.

121.    Admit that document **NI035598** produced by Defendants is a true copy of a series of an e-mail from Phase1234@aol.com to Beverly@dga.org, with a copy to Boaz Davidson, Avi Lerner, Danny Dimbort, Trevor Short, Rick Eyler, and Trina Bailey, sent on or about April 3, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 121.

122.    Admit that document **NI037004 – NI037005** produced by Defendants is a true copy of a letter from Wayne Smith, an agent of Warner Bros. to Lonnie Ramati, dated January 7, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 122.

123.    Admit that document **NI037347 - NI037350** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Avi Lerner to Carlos Goodman and Lonnie

Ramati, with a copy to basil.iwanyk@warnerbros.com and gcasady@management360.com, sent on or about May 28, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 123.

124.    Admit that document **NI038296 - NI038297** produced by Defendants is a true copy of a series of e-mails, including an e-mail from Ralph Brescia to Avi Lerner, jcsalzer@sbcglobal.net, Lonnie Ramati, kkingtmp@lycos.com, and Rick Eyler, with a copy to Christian Thomas and Jacob Bloom, sent on or about September 11, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 124.

125.    Admit that document **NI039516 - NU039517** produced by Defendants is an amendment to an agreement between Nu Image, Inc. and Lions Gate Films Inc., dated May 3, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 125.

126.    Admit that document **NI040409** produced by Defendants is an invoice from Nu Image to Lions Gate USA dated August 3, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 126.

127.    Admit that document **NI040409** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 127.

128.    Admit that document **NI040480** produced by Defendants is an invoice from Nu Image to Lions Gate USA dated June 25, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 128.

129.    Admit that document **NI040480** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 129.

130.    Admit that document **NU040796 - NU040797** produced by Defendants is a series of e-mails including an e-mail from Wendy Jaffe to Wendy Jaffe, Lonnie Ramati, and Rick Eyler, with a copy to Avi Lerner, Jason Constantine, Eda Kowan, and Trish Kuroda, sent on or about August 16, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 130.

131.    Admit that document **NU040895 - NU040899** produced by Defendants is a series of e-mails including an e-mail from Liat Cohen to Lonnie Ramati, with a copy to Avi Lerner, Trevor Short and lcohn@evolution-ent.com, sent on or about September 7, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 131.

132.    Admit that document **NI041440 – NI041441** produced by Defendants is a true copy of a Lionsgate Summary for the period ending December 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 132.

133.    Admit that document **NI041440 – NI041441** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 133.

134.    Admit that document **NI SUP 00016 – NI SUP 00023** produced by Defendants is a true copy of a series of e-mails, including two e-mails from Phase1234 to CMiller@MGM.com, sent on or about January 21, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 134.

135.    Admit that document **NI SUP 00042 – NI SUP 00050** produced by Defendants is a true copy of an agreement between Nu Image, Inc. and Metro-Goldwyn-Mayer Studies Inc., dated February 10, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 135.

136.    Admit that document **NI SUP 00051 – NI SUP 00059** produced by Defendants is a true copy of a Travelers Producers' or Distributors' Liability Insurance Application, signed by John Thompson on or about December 10, 2008.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 136.

137.    Admit that document **NI SUP 00061 – NI SUP 00066** produced by Defendants is a true copy of a letter from The Law Office of Dennis Angel to Lonnie Ramati, Esq., dated January 13, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 137.

138.    Admit that document **SS02440 – SS02445** produced by Defendants is a true copy of a version of *The Expendables* production calendar.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 138.

139.    Admit that document **SS03117 – SS03120** produced by Defendants is a true copy of a version of *The Expendables* production calendar.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 139.

140.    Admit that document **SS0010599 – SS0010600** produced by Defendants is a true copy of a series of e-mails, including an e-mail from John Thompson to Kevin King Templeton and Celeste Salzer, sent on or about October 14, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny the allegations contained in Request No. 140.

141.    Admit that document **SS010623 – SS010624** produced by Defendants is a true copy of a Lionsgate Summary for the period ending March 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 141.

142.    Admit that document **SS010623 – SS010624** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 142.

143.    Admit that document **SS010642 – SS010643** produced by Defendants is a true copy of a notice sent by Avi Lerner to the WGA on or about August 11, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 143.

144.    Admit that document **SS010644** produced by Defendants is a true copy of a letter from Rick Eyler to Jessica Tammariello, dated August 11, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 144.

145.    Admit that document **SS010646 – SS010646** produced by Defendants is a true copy of an e-mail from Jessica Tammariello to Rick Eyler, sent on or about August 10, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 145.

146.    Admit that document **SS010650 – SS010652** produced by Defendants is a true copy of a statement by Stallone sent to the WGA, dated August 27, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 146.

33

147.    Admit that document **SS010661 – SS010668** produced by Defendants is a true copy of a statement submitted to the WGA on behalf of "Writer B" by Martin Singer and William J. Briggs, II of Lavely & Singer.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 147.

148.    Admit that document **SS010669 – SS010683** produced by Defendants is a true copy of a document submitted to the WGA by Martin Singer and William J. Briggs, II on behalf of Stallone relating to *Barrow* and *The Expendables*.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 148.

149.    Admit that document **SS010684 – SS010686** produced by Defendants is a true copy of an agreement between Rogue Marble and Double Life, dated January 29, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 149.

150.    Admit that document **SS010687 – SS010688** produced by Defendants is a true copy of an amendment to an agreement between Rogue Marble and Double Life, dated January 29, 2009.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 150.

151.    Admit that document **SS010689 – SS010690** produced by Defendants is a true copy of a Lionsgate Summary for the period ending September 2011.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 151.

152.    Admit that document **SS010689 – SS010690** produced by Defendants is a document kept in the course of a regularly conducted business activity and that it was the regular practice of the entity preparing this statement to create the document.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 152.

153.    Admit that document **SS010689 – SS010690** produced by Defendants is a summary of voluminous records kept in the regular course of business.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 153.

154.    Admit that the document attached as **EXHIBIT A** is a true copy of an article from *Creative Screenwriting Magazine* titled *Why I Write*, published in or about July/August 2010.

**Response:** Subject to and without waiving the foregoing objections set forth above, Defendants admit that **EXHIBIT A** appears to be a true copy of an article from *Creative Screenwriting Magazine* entitled "Why I Write," published in or about July/August 2010.

155.    Admit that the article attached as **EXHIBIT A** is based on an interview with Stallone by Peter Clines for *Creative Screenwriting Magazine.*

**Response:** Subject to and without waiving the foregoing objections set forth above, Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 155 because they have no knowledge pertaining to the creation of **EXHIBIT A** and cannot know whether **EXHIBIT A** is based on Mr. Clines' interview of Stallone, the occurrence of which Stallone has no recollection.

156.    Admit that the document attached as **EXHIBIT B** is a true copy of a transcript of questions and answers between Peter Clines and Stallone that served as the basis for an article

35

from *Creative Screenwriting Magazine* titled *Why I Write*, published in or about July/August 2010.

**Response:** Subject to and without waiving the foregoing objections set forth above, Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 156 because they have no knowledge pertaining to the creation, storage, and production of **EXHIBIT B** and cannot know whether **EXHIBIT B** is a true copy of a transcript of Mr. Clines' interview of Stallone, the occurrence of which Stallone has no recollection.

     157.    Admit that the audio file produced by Webb to Defendants is a true copy of an interview with Stallone by Peter Clines that served as the basis for an article from *Creative Screenwriting Magazine* titled *Why I Write*, published in or about July/August 2010.

**Response:** Subject to and without waiving the foregoing objections set forth above, Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 157 because they have no knowledge pertaining to the creation, storage, and production of the audio file in question and cannot know whether the audio file is a true copy of Mr. Clines' interview of Stallone, the occurrence of which Stallone has no recollection.

     158.    Admit that the document attached as **EXHIBIT C** is a true copy of an article published on UGO.com entitled *Sylvester Stallone On The Set Of The Expendables*, dated June 24, 2009.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit the allegations contained in Request No. 158.

159.    Admit that Stallone participated in a press conference concerning *The Expendables* on or about August 9, 2010 at The Dorchester Hotel in London, England.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 159.

160.    Admit that http://www.youtube.com/watch?v=TGoEPm-4RrY is a link to a website containing a press conference concerning *The Expendables* on or about August 9, 2010.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 160.

161.    Admit that Mr. Stallone is pictured speaking on the video located at the following website: http://www.youtube.com/watch?v=TGoEPm-4RrY.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 161.

162.    Admit that Stallone participated in an interview concerning screenwriting on or about September 27, 2008 at the Zurich Film Festival.

**Response:** Subject to and without waiving the objections set forth above, Defendants deny that Stallone participated in an interview but admit that Stallone participated in a broad-based question and answer session concerning screenwriting on or about September 27, 2008 at the Zurich Film Festival.

163.    Admit that http://www.youtube.com/watch?v=2j2REDLgbiU is a link to a website containing an interview with Stallone.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 163.

164.    Admit that Mr. Stallone is pictured speaking on the video located at the following website: http://www.youtube.com/watch?v=2j2REDLgbiU.

**Response:** Subject to and without waiving the objections set forth above, Defendants admit the allegations contained in Request No. 164.

165.    For each document on **ADDENDUM 1**, admit that the document is a true copy of a screenplay, in whole or in part, titled *The Expendables*.

**Response:** Defendants object to Request No. 165 on the grounds that it is unduly burdensome. Subject to and without waiving the objections set forth above, Defendants admit that each document on Addendum 1 is a true copy of a draft, version, or portion of a screenplay, in whole or in part, titled *The Expendables*.

166.    For each document on **ADDENDUM 1**, admit that the document is a true copy of a screenplay, in whole or in part, titled *The Expendables*, written by Stallone.

**Response:** Defendants object to Request No. 165 on the grounds that it is unduly burdensome. Subject to and without waiving the objections set forth above, Defendants admit that each document on Addendum 1 is a true copy of a draft, version, or portion of a screenplay, in whole or in part, titled *The Expendables*, written by Stallone.

167.    For each document on **ADDENDUM 1**, admit that the document is a true copy of a screenplay, in whole or in part, titled *The Expendables*, written, in whole or in part, by Robert Kamen.

**Response:** Defendants object to Request No. 165 on the grounds that it is unduly burdensome. Subject to and without waiving the foregoing objections set forth above, Defendants respond that they have made reasonable inquiry and can neither admit nor deny the allegations contained in Request No. 167 because no document on **ADDENDUM 1** bears Robert Kamen's name and

Defendants have no record of which drafts of *The Expendables* screenplay, if any, contain content written by Mr. Kamen.

168.   For each document on **ADDENDUM 1**, admit that the document is a true copy of a screenplay, in whole or in part, titled *The Expendables*, written, in whole or in part, by an employee, agent, and/or representative of Nu Image and/or Millennium.

**Response:** Defendants object to Request No. 165 on the grounds that it is unduly burdensome. Subject to and without waiving the objections set forth above, Defendants deny the allegations contained in Request No. 168.

169.   For each document on **ADDENDUM 2**, admit that the document is a true copy of a screenplay, in whole or in part, titled *Barrow*.

**Response:** Defendants object to Request No. 165 on the grounds that it is unduly burdensome. Subject to and without waiving the objections set forth above,  Defendants admit that each document on Addendum 2 is a true copy of a draft, version, or portion of a screenplay, in whole or in part, titled *Barrow*.

170.   For each document on **ADDENDUM 2**, admit that the document is a true copy of a screenplay, in whole or in part, titled *Barrow*, written by Callaham.

**Response:** Subject to and without waiving the objections set forth above,  Defendants admit that each document on Addendum 2 is a true copy of a draft, version, or portion of a screenplay, in whole or in part, titled *Barrow*, written by Callaham.

Dated: New York, New York.
April 5, 2012

**PRYOR CASHMAN LLP**

By:

Tom J. Ferber
James A. Janowitz
Benjamin S. Akley
7 Times Square
New York, New York  10036
(212) 421-4100
*Attorneys for Defendants*

40

**ADDENDUM 1**

**PRODUCED IN NATIVE**

| Bates Number | Admit / Deny with Explanation |
|---|---|
| SS00446 | |
| SS00447 | |
| SS00448 | |
| SS00449 | |
| SS00450 | |
| SS00451 | |
| SS00452 | |
| SS00453 | |
| SS00454 | |
| SS00455 | |
| SS00456 | |
| SS00457 | |
| SS00458 | |
| SS00459 | |
| SS00460 | |
| SS00462 | |
| SS00463 | |
| SS00464 | |
| SS00465 | |
| SS00466 | |
| SS00467 | |
| SS00468 | |

41

| | |
|---|---|
| SS00469 | |
| SS00470 | |
| SS00471 | |
| SS00599 | |
| SS00600 | |
| SS00727 | |
| SS00854 | |
| SS00855 | |
| SS00856 | |
| SS00857 | |
| SS00858 | |
| SS00859 | |
| SS00860 | |
| SS00861 | |
| SS00979 | |
| SS00980 | |
| SS00981 | |
| SS01112 | |
| SS01113 | |
| SS01114 | |
| SS01115 | |
| SS01256 | |
| SS01257 | |
| SS01258 | |
| SS01259 | |

| | |
|---|---|
| SS01260 | |
| SS01261 | |
| SS01262 | |
| SS01404 | |
| SS02304 | |
| SS02305 | |
| SS02446 | |
| SS02451 | |
| SS02452 | |
| SS02454 | |
| SS02447 | |
| SS02448 | |
| SS02449 | |
| SS02450 | |
| SS02453 | |
| SS02561 | |
| SS02562 | |
| SS02666 | |
| SS02668 | |
| SS02770 | |
| SS02858 | |
| SS02859 | |
| SS02860 | |
| SS02861 | |
| SS02862 | |
| SS02863 | |

| | |
|---|---|
| SS02864 | |
| SS02985 | |
| SS03020 | |
| SS03064 | |
| SS03121 | |
| SS03122 | |
| SS03146 | |
| SS03147 | |
| SS03153 | |
| SS03154 | |
| SS03155 | |
| SS03156 | |
| SS03216 | |
| SS03217 | |
| SS03218 | |
| SS03227 | |
| SS03228 | |
| SS03229 | |
| SS03403 | |
| SS03404 | |
| SS03405 | |
| SS03542 | |
| SS03543 | |
| SS03680 | |
| SS03890 | |
| SS03895 | |

| | |
|---|---|
| SS03908 | |
| SS03922 | |
| SS03923 | |
| SS03924 | |
| SS03929 | |
| SS03934 | |
| SS03949 | |
| SS03950 | |
| SS03951 | |
| SS03952 | |
| SS04069 | |
| SS04070 | |
| SS04088 | |
| SS04112 | |
| SS04137 | |
| SS04157 | |
| SS04170 | |
| SS04303 | |
| SS04304 | |
| SS04305 | |
| SS04311 | |
| SS04312 | |
| SS00446 | |
| SS00461 | |
| SS01262 | |
| SS01548 | |

| | |
|---|---|
| SS01687 | |
| SS01688 | |
| SS01689 | |
| SS01877 | |
| SS01878 | |
| SS01879 | |
| SS01880 | |
| SS01881 | |
| SS01882 | |
| SS01883 | |
| SS01884 | |
| SS02019 | |
| SS02154 | |
| SS02155 | |
| SS02156 | |
| SS02157 | |
| SS02158 | |
| SS02160 | |
| SS02161 | |
| SS02162 | |
| SS02163 | |
| SS02165 | |
| SS02166 | |
| SS02167 | |
| SS02168 | |
| SS02169 | |

| | |
|---|---|
| SS02452 | |
| SS02454 | |
| SS03226 | |
| SS04170 | |
| SS04302 | |
| SS04313 | |

| Bates Number | Admit / Deny with Explanation |
|---|---|
| SS00001 – SS00151 | |
| SS00152 – SS00301 | |
| SS00312 – SS00445 | |
| SS00472 - SS00598 | |
| SS00601 - SS00726 | |
| SS00729 - SS00853 | |
| SS00862 - SS00978 | |
| SS00982 - SS01111 | |
| SS01116 - SS01255 | |
| SS01263 - SS01403 | |
| SS01405 - SS01547 | |
| SS01549 - SS01686 | |
| SS01690 - SS01876 | |
| SS01885 - SS02018 | |
| SS02020 - SS02153 | |
| SS02170 - SS02303 | |
| SS02306 - SS02439 | |

| | |
|---|---|
| SS02455 - SS02560 | |
| SS02563 - SS02665 | |
| SS02669 - SS02768 | |
| SS02771 - SS02857 | |
| SS02866 - SS02984 | |
| SS02986 - SS03019 | |
| SS03021 - SS03063 | |
| SS03065 - SS03116 | |
| SS03123 - SS03144 | |
| SS03148 - SS03152 | |
| SS03157 - SS03215 | |
| SS03219 - SS03225 | |
| SS03230 - SS03402 | |
| SS03406 - SS03541 | |
| SS03544 - SS03679 | |
| SS03681 - SS03772 | |
| SS03773 - SS03889 | |
| SS03891 - SS03921 | |
| SS03925 - SS03928 | |
| SS03930 - SS03933 | |
| SS03935 - SS03948 | |
| SS03953 - SS04068 | |
| SS04071 - SS04075 | |
| SS04076 - SS04087 | |
| SS04089 - SS04113 | |
| SS04114 - SS04136 | |

| | |
|---|---|
| SS04138 - SS04156 | |
| SS04158 - SS04165 | |
| SS04166 - SS04169 | |
| SS04171 - SS04296 | |
| SS04297 - SS04301 | |
| SS04306 - SS04310 | |
| SS04314 - SS04497 | |
| SS04498 - SS04637 | |
| SS04638 – SS04652 | |
| SS04668 – SS04805 | |
| SS04844 – SS04908 | |
| SS04909 – SS05021 | |
| SS05022 – SS05145 | |
| SS05146 – SS05197 | |
| SS05198 – SS05329 | |
| SS05330 – SS05419 | |
| SS10372 - SS10492 | |
| SS10493 - SS10595 | |
| SS10656 - SS10683 | |
| SS05561 – SS05590 | |
| SS05599 – SS05599 | |
| SS05600 – SS05627 | |
| SS05634 – SS05759 | |
| SS05760 – SS05883 | |
| SS05884 – SS06010 | |
| SS06011 – SS06108 | |

| | |
|---|---|
| SS06109 – SS06183 | |
| SS06184 – SS06202 | |
| SS06203 – SS06245 | |
| SS06255 - SS06272 | |
| SS06273 – SS06312 | |
| SS06313 – SS06321 | |
| SS06322 – SS06322 | |
| SS06323 – SS06325 | |
| SS06326 – SS06331 | |
| SS06332 – SS06343 | |
| SS06344 – SS06393 | |
| SS06394 – SS06441 | |
| SS06442 – SS06451 | |
| SS06452 – SS06553 | |
| SS06561 – SS06595 | |
| SS06596 – SS06715 | |
| SS06716 – SS06737 | |
| SS06738 – SS06760 | |
| SS06761 – SS6880 | |
| SS06881 – SS06967 | |
| SS06968 – SS07096 | |
| SS07097 – SS07112 | |
| NI00644 – NI00762 | |
| NI00763 – NI00923 | |
| NI00924 – NI01039 | |
| NI01040 – NI01157 | |

| | |
|---|---|
| NI01159 – NI01284 | |
| DC00267A – DC00382A | |
| DC00383A – DC00508A | |
| DC00509A – DC00642A | |
| DC00643A – DC00689A | |
| DC00690A – DC00699A | |
| SS07123 – SS07141 | |
| SS07142 - SS07152 | |
| SS07153 - SS07504 | |
| SS07505 - SS07510 | |
| SS07511 - SS07856 | |
| SS07857 - SS08191 | |
| SS08192 - SS08201 | |
| SS08202 - SS08235 | |
| SS08236 - SS08249 | |
| SS08250 - SS08404 | |
| SS08405 - SS08560 | |
| SS08561 - SS08715 | |
| SS08716 - SS08757 | |
| SS08758 - SS08792 | |
| SS08793 - SS08849 | |
| SS08850 - SS08859 | |
| SS08860 - SS08937 | |
| SS08938 - SS08947 | |
| SS08948 - SS09071 | |
| SS09074 - SS09115 | |

| | |
|---|---|
| SS09116 - SS09151 | |
| SS09152 - SS09260 | |
| SS09261 - SS09366 | |
| SS09367 - SS09373 | |
| SS09374 - SS09388 | |
| SS09389 - SS09459 | |
| SS09498 - SS09603 | |
| SS09604 - SS09753 | |
| SS09754 - SS09900 | |
| SS09901 – SS10042 | |
| SS10043 - SS10116 | |
| SS10128 - SS10190 | |
| SS10191 – SS10321 | |
| SS10322 - SS10371 | |
| SS10372 - SS10491 | |
| SS10492 - SS10594 | |
| SS10595 - SS10595 | |
| DC00352 – DC00477 | |
| DC00570 – DC00695 | |
| DC00946 – DC01061 | |
| DC01124 - DC01249 | |
| DC01349 - DC01491 | |
| DC01547 - DC01689 | |
| LG01859 - LG01984 | |
| LG01985 - LG01985 | |
| LG03069 - LG03914 | |

| | |
|---|---|
| NI001810 - NI001935 | |
| NI001936 - NI002054 | |
| NI002055 - NI002194 | |
| NI002195 - NI002328 | |
| NI002329 - NI002488 | |
| NI002489 - NI002489 | |
| NI002490 - NI002605 | |
| NI002606 - NI002723 | |
| NI002894 - NI003027 | |
| NI003544 - NI003643 | |
| NI003861 – NI003960 | |
| NI004873 - NI005027 | |
| NI008169 - NI008295 | |

**ADDENDUM 2**

| Bates Number | Admit / Deny with Explanation |
|---|---|
| NI00001 – NI00127 | |
| NI00128 – NI00248 | |
| NI00249 – NI00369 | |
| DC00001A – DC00004A | |
| DC00010A – DC00143A | |
| DC00144A – DC00263A | |
| DC00203 – DC00323 | |
| DC00697 – DC00821 | |
| DC00822 – DC00942 | |
| DC01812 – DC01932 | |
| DC01936 – DC02055 | |
| NI001562 – NI001688 | |
| NI001689 – NI001809 | |

54

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

MARCUS WEBB,

Plaintiff,

-against-

SYLVESTER STALLONE, et al.,

Defendants.

------------------------------------------------

Index No. 1:11-cv-07517 (JSR)

**DECLARATION OF DAVID S.
GOLD IN OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**DAVID S. GOLD** declares as follows:

1.     I am an attorney-at-law in the State of New York and an associate at the firm Cole,

Schotz, Meisel, Forman & Leonard, P.A., co-counsel for plaintiff, Marcus Webb ("Webb"). I am fully

familiar with the facts set forth herein. I respectfully submit this declaration in opposition to

Defendants' Motion for Summary Judgment.

2.     On January 5, 2012, my office served a subpoena *duces tecum* on AAA Screenplay

Contest (the "AAA Subpoena"). The AAA Subpoena requested documents concerning Webb's 2006

submission of *The Cordoba Caper* to the AAA Screenplay Contest and the judging of that screenplay.

After receiving no response on the return date, I made several calls to *Creative Screenwriting Magazine* (the

"Magazine"), the host of the AAA Screenplay Contest, and left several messages seeking information

concerning the AAA Subpoena. I received no return call. I then e-mailed the Magazine and received a

response from Bill Donovan, who advised me that his company had purchased the Magazine, that the

company had no records from the 2006 AAA Screenplay Contest, and therefore the company had no

information concerning Webb's submission. Donovan provided the contact information of two

former Magazine employees who might have information concerning the requested documentation. A

true copy of the e-mail from Bill Donavan is attached as **Exhibit A**. I e-mailed both these individuals

and only received one response, from Anna Siri, former manager of the AAA Screenplay Contest. On

February 10, 2012, I spoke with Ms. Siri, who no longer works for the Magazine, and she advised me that the documents requested likely no longer exist.

3.      On April 5, 2012, I took the deposition of Peter Clines. Clines testified that he interviewed Stallone on or about May 24, 2010 for an article entitled *Why I Write* published in the July/August 2010 edition of *Creative Screenwriting Magazine*. A true copy of the article is attached as **Exhibit B**. The article includes the following quotation:

> In terms of the format, I looked at *The Dirty Dozen* and was inspired by *Dogs of War*. I also realized that my template would be a little similar, so I had to go out and purchase the *Dogs of War* script because I didn't want to be accused of plagiarizing. Then I heard about another script that was uncomfortably similar to *Dogs of War*, written by David Callaham. Well, I knew from the past that we'd be sued if there was anything similar. It always happens. On every *Rocky*, someone always had that idea first. This time, I wanted to see what was out there that was similar, so I purchased that script. <u>Then I wrote what I think is an original, *The Expendables*, which doesn't use one word, one comma, one iota from either screenplay.</u>

> [Emphasis Added.]

4.      Clines testified that he transcribed the interview and wrote the article in the first person voice based almost entirely on the language from the Stallone interview. In response to a subpoena *duces tecum* served by my office, Clines produced what he testified was a true, accurate, and complete recording of his interview with Stallone. I listened to the recording and the above quote is nearly verbatim in the recording, with minor insignificant and immaterial edits. (In the underlined excerpt above, for example, the words "iota" and "comma" are in the reverse order on the recording.)

I declare under penalty of perjury that the foregoing is true and correct.

_____
David S. Gold

Dated: April 6, 2012

2

# EXHIBIT

# A

**Gold, David**

| | |
|---|---|
| **From:** | Bill at CS [bill@creativescreenwriting.com] |
| **Sent:** | Thursday, February 09, 2012 3:28 AM |
| **To:** | Gold, David |
| **Subject:** | Re: Webb v. Stallone, et. al. -- Very sorry, no records available |

Dear Mr. Gold,

I apologize for the delay in responding to your subpoena.

My company, Inside Information Group, Ltd., acquired Creative Screenwriting and the Screenwriting Expo in April 2007.

We do not have any records of the 2006 AAA Screenplay Contest. We do not have any copies of any screenplays from the 2006 AAA contest. As far as I know, no one connected with the company under my management would have any reason to know about The Cordoba Caper, with the possible exception of a woman named Anna Siri.

The contest was managed for the prior owner, Erik Bauer, by Anna Siri. We inherited her from Erik. She managed the Spring 2007 AAA Screenplay Contest for our company for a while, but she resigned before the work on that contest was completed. She also told me that she deleted all the records of the Spring 2007 contest. I have no idea what she or Erik did with records of the 2006 contest, which precede our ownership of the company.

Ms. Siri is herself a talented screenwriter, and it's possible that she is sympathetic to your client's cause as a fellow screenwriter, and/or might know whether the screenplay was distributed by the AAA contest.

The last email address I had for her is: annaplatypus@gmail.com

If you wish to also contact Erik Bauer, his email address is: erikpsc@yahoo.com

According to the web pages cited below, The Cordoba Caper was a 2006 "Consider" but did not become a quarterfinalist. I don't know whether "Considers" were shown to producers by the AAA Screenplay Contest management. ERik or Anna might know.

http://www.creativescreenwriting.com/aaa/untitled_000.htm
http://www.creativescreenwriting.com/aaa/2006_JuneConsiders.html

Bill Donovan
Publisher, Creative Screenwriting

4/4/2012

# EXHIBIT

# B



# FILM SCHOOL ROUNDUP — PAGE 36

# creativescreenwriting

Wright, Bacall & O'Malley vs.
*Scott Pilgrim vs. the World*

McKay & Henchy file
paperwork on *The Other Guys*

Stallone knocks out
*The Expendables*

## The Architect of Dreams:
### Invading Christopher Nolan's
### mind to steal the secrets of
### INCEPTION

July/
2010
Number 4

08

0  09128 48766  3

6.95

# ›WHY I WRITE EDITED BY PETER CLINES

# Sylvester Stallone believes the pen is mightier than the sword.

**DRAMA WAS MY** major in school and I wasn't getting any parts. There was this group putting on these shows — plays like Eugene Ionesco's "Rhinoceros" or "Rats" by Israel Horovitz — and I thought, "You know, I'd like to try one of these one-act plays." So I started writing and performing them. They were one- or two-man shows. And that was the beginning of my love for the written word.

Believe it or not, after four years of college I got a job as an usher. I would watch a film like *M*A*S*H* six times a day for two months. I would break it down and see what worked, and I got a sense of the timing and the pace. Or I'd see a movie that wasn't very well received. There was a Martin Sheen movie called *No Drums, No Bugles* that no one ever saw. I was like, "Why is this place empty?" I would go home and try to rewrite scenes in the movie, just as an exercise. Then one thing led to another and I started writing about my experiences in school. It wasn't until I went to the New York Library and checked out a book on Edgar Allan Poe that I finally wrote a screenplay that wasn't solely about my experiences.

There were many feature screenplays before *Rocky* — probably 20 or 25. I look at them now and they seem quaint. They were using the old-fashioned format, with the character names on the left margin and the dialogue down the right side. It was pretty archaic.

Now *Poe* is finally in the works. I'm really worried about doing it, though, because I've been talking about it since 1976. Every five years I'd look at it say, "Boy, it's sort of dated." Even though it's a period piece, the writing styles have changed so much and the audience's way of perceiving films is not the way it used to be. *The Lion in Winter* is one of my favorite films, but it's all dialogue — incredible dialogue, but that school of acting has fallen by the wayside. Now you have to think visually, too, and that diminishes the amount of dialogue.

I try to write a little bit each day, even if it's not very consequential. It's like painting: If I put a brush on the canvas a little bit every day, I'm still in the game. I always look at writing like an athlete who hasn't participated in an event in five or six years. Now he has to get back in the ring and he's rusty and insecure. But if he had been going to the gym all this time he would have been somewhat prepared.



About a year and a half ago, I wanted to do a men-being-men journey film. It would have been escapism, but there would be some profound thought going on — asking questions about our mortality and our morality. And then insert that into the action of the film so it wasn't just about men blowing things up.

In terms of the format, I looked at *The Dirty Dozen* and was inspired by *Dogs of War*. I also realized that my template would be a little similar, so I had to go out and purchase the *Dogs of War* script because I didn't want to be accused of plagiarizing. Then I heard about another script that was uncomfortably similar to *Dogs of War*, written by David Callaham. Well, I knew from the past that we'd be sued if there was anything similar. It always happens. On every *Rocky*, someone always had that idea first. This time, I wanted to see what was out there that was similar, so I purchased that script. Then I wrote what I think is an original, *The Expendables*, which doesn't use one word, one comma, one iota from either screenplay.

I pretty much start on page one. I've never been able to write a treatment. I'll sit down and try to find the first 10 scenes. And there'll just be one or two words — truck, airplane, meets girl, goes home, abandoned apartment. I just write those first scenes, knowing that 90% or 95% of it will be unusable. But the process has started and then, unconsciously, if I'm being honest with myself and I've got a story that holds up, it starts to take a life of its own. My first draft takes maybe two weeks. But I know going in that it's far from perfect. Some writers will labor an extraordinary amount of time on each scene to get it right before they

move on. I assume that it's not going to be perfect but I'll get it the third or fourth time. It's like cutting a diamond. You're not going to cut it perfectly the first time. You have to keep going back and polishing.

It took a good 25 drafts before we had what I thought was a workable film. Then the elements of budget came into play. I have to take a situation, a locale, that maybe had 400 people and cut it down to two. In *Rocky*, the ice-skating scene where Rocky takes Adrian on their first date was meant to be in Rockefeller Plaza in New York. They're ice skating and there are 300 people on the ice and Christmas trees and caroling going on in the background. In *The Expendables*, they're supposed to take on Somali pirates in the first scene. I had it written where they climb on board, go across the deck, the camera's dollying in and so forth. That would take about five or six days to get that proper. And then I thought, "Alright, why don't we just establish the boat and then cut inside to the boiler room where you can see the pirates and the hostages?" So we never see the Expendables arrive or exit. They just appear.



Then major rewrites happened because of cast changes. After spending a little time with the actors, everyone had a rhythm to his or her voice and a way of feeling comfortable with dialogue. It's almost a mathematical cadence to their speech patterns. If you can capture that, the actor feels comfortable and you learn how to make a sentence more clever using his speech pattern. For example, Jason Statham came in and he talks a certain way. Then Jet Li was brought in and I had to create a character for him. Then I thought, "You know, it'd be great to have Mickey Rourke in it, too." Every time you bring in a major character, it would create these concentric circles that just keep going out. What starts out as a little idea affects all 120 pages.

I have to keep a balance so one doesn't overwhelm the other character and the script becomes lopsided. The hardest part in *The Expendables* was that everyone has his moment. It has nothing to do with the action; it's just an insight into what makes them tick. Then when I combined that with the action, I un-

derstood what this guy was all about. I know his motive and what really dwells in his heart. It's all motivation. If you know why a guy is going to war, then you're with him on the journey. It isn't just random. Why are you here? Why here and why now?

*Rocky* getting the Academy Award nomination for Best Screenplay was pretty intimidating. How do you follow that up? The idea of *Rocky* was pretty simple, but it touched people a lot more that I thought it was going to. I didn't know if I could do that kind of simplicity and rhythm again. I believe your first instincts, when you write with passion, are usually the best. Quite often in multiple rewrites you can become a little too slick, a bit too polished and predictable. When I was writing *Rocky* I just let go. The speech in *Rocky* with his son, I wrote that while riding around in the backseat of a car. I was just writing from the heart rather than trying to manipulate the audience into being on my side. What I learned over the years is to try to get back to writing purely with my gut more than my brain. There was a point when I forgot that. ⊞



PitchQ.com
where screenplays come true.

Comedy

Pitch it your way!

Save 40%

CS99B

Enter this promo code

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

MARCUS WEBB,

Plaintiff,

-against-

SYLVESTER STALLONE, et al.

Defendants.

------------------------------------------------

Index No. 1:11-cv-07517 (JSR)

DECLARATION OF MICHAEL
ELIAS IN OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

**MICHAEL ELIAS** declares as follows:

1.      I have worked in the motion picture and film industry in Los Angeles, California as a screenwriter, television writer, producer and director since 1969.  Among my publications, I have written or co-written seven produced screenplays and hundreds of hours of episodic and variety television.  My screenplay credits include: *The Frisco Kid* (Warner Bros., 1979), *The Jerk* (Universal, 1979), *Young Doctors in Love* (Fox, 1982), *Serial* (Paramount, 1980), *Envoyez les Violins* (Canal+, 1988), *Lush Life* (Showtime; also directed, 1993), and *No Laughing Matter* (USA; also directed, 1998).  My television credits include *All In the Family* (1972), *The Odd Couple* (1973), *The New Dick Van Dyke Show* (1973-1974), *The Bill Cosby Show* (1969-1971), *Eye to Eye* (ABC, 1985), *Head of the Class* (ABC; 115 episodes, 1986-1991), *Billy* (ABC, 1992), and *Tall Hopes* (CBS, 1993).

2.      I am a member of the Writers' Guild of America, West ("WGA"), the Directors' Guild of America, the Academy of Motion Picture Arts and Sciences, the Screen Actors Guild, and the PEN American Center.  I have served as a guest lecturer on screenwriting at the University of California Los Angeles (2009), the University of Southern California (2004), San Francisco State University (1989), and the Screenwriting Expo (2004 and 2005).  I have taught television writing and production at The Maine School of Photography (1997).  I have also served since 1971 as a screen

credits arbiter for the WGA, and for the last ten years as a consultant to various WGA arbitration committees. In 2008, I was awarded a Certificate of Merit for my service to the WGA.

3.      I was retained as an expert in this matter by counsel for plaintiff Marcus Webb to opine as to whether one could reasonably conclude that Stallone independently created the screenplay and film *The Expendables* ("*Expendables*"). As discussed more fully below, in my opinion, there is no reasonable possibility that Stallone authored the screenplay for *Expendables* without access to and copying *The Cordoba Caper* ("*Cordoba*").

4.      In conducting my analysis, I reviewed the following materials: (1) *Cordoba* Screenplay, dated 2006; (2) *Barrow* Screenplay, dated January 24, 2006; (3) *Expendables* Screenplay, dated September 16, 2008; (4) *Expendables* Screenplay, dated September 18, 2008; (5) *Expendables* Screenplay, dated October 29, 2008; (6) *Expendables* Screenplay, dated January 23, 2009; (7) *Expendables* Screenplay, dated February 20, 2009; (8) *Expendables* Screenplay, dated March 11, 2009; (9) *Expendables* Screenplay, dated March 24, 2009; (10) *Expendables* Screenplay, dated June 12, 2009; (11) The domestic version of *Expendables* film; (12) Defendants' Answer to Plaintiff's Second Amended Complaint; (13) Transcript of the deposition testimony of Sylvester Stallone ("Stallone"); (14) Transcript of the deposition testimony of David Callaham ("Callaham"); (15) Declaration of Callaham, dated March 14, 2012; (16) Declaration of Stallone, dated March 12, 2012; (17) Defendants' Memorandum of Law In Support of Their Motion for Summary Judgment; and (18) Lionsgate's website for *Expendables*.

5.      Based on my review of the screenplays, the film, and other materials provided, and given the myriad similarities between *Cordoba* and *Expendables*, taken both individually and collectively in the overall context of the works, it is my professional opinion that Stallone misappropriated numerous elements from *Cordoba* and used them to create *Expendables*. Said

1

differently, there is no reasonable possibility that Stallone independently authored the screenplay for *Expendables* without having access to, and copying, Webb's screenplay.

6.      I am aware that the defendants in this case have taken the position that Stallone had a copy of David Callaham's screenplay entitled *Barrow* when he initially began writing *Expendables*, and that *Expendables* is based at least in part on *Barrow*.  Regardless of this fact, I am nonetheless of the opinion that elements of *Cordoba*, rather than *Barrow*, make up the majority of the critical plot points that drive the storyline in *Expendables*.  This conclusion is illustrated by the fact that the elements discussed below do not exist in *Barrow*.

7.      There are at least 35 strikingly similar elements in Webb's screenplay that also appear in Stallone's screenplay.  That is a compelling and significant number that can only lead me to conclude that these similarities are not coincidental and that Stallone had access to Webb's screenplay and wrongfully copied critical plot, character, and other elements from it.  These similar elements are not boilerplate elements of mercenary or action films but are unique and deliberate creative choices that are combined in a strikingly similar way into an original and compelling storyline.  *Expendables* is driven by a series of characters and plot elements, many of which can be traced directly to *Cordoba*.  There is no reasonable explanation for these unique similarities in plot structure and development other than the fact that one was copied from the other.

8.      Additionally, there are at least eight what I would term "secondary" similarities. When viewed separately, they do not suggest strong proof of access and copying but, when taken in context of the entire work, they further support a pattern of misappropriation that cannot be coincidental.  These additional elements will also be addressed below.

**Basic Plots of *Cordoba* and *Expendables***

9.      The basic plot of *Cordoba* can be summarized as follows: a group of mercenaries led by Anselm St. John is offered a job by a wealthy businessman to bring down a brutal Latin American

2

dictator named General Garza. Although initially declining the mission, the mercenaries take the assignment. They go to the small country and meet a woman, Renata, a freedom fighter who is opposed to the regime and is related to Garza. Garza and his cohort, Colonel Torres, are terrorizing peasants and want to increase cocaine production. After the heroine is captured, and after Torres kills Garza, the hero, St. John, and his team kill Torres and leave the country in good hands. At the conclusion of the film, there is a strong hint that St. John and Renata will have a further relationship.

10.  The basic plot of *Expendables* can be summarized as follows: a group of mercenaries led by Barney Ross is offered a job by a wealthy businessman to bring down a brutal Latin American dictator named General Garza. Although initially declining the mission, the mercenaries take the assignment. They go to the small country and meet a woman, Sandra, a freedom fighter who is opposed to the regime and is related to Garza. Garza and his cohort, Munroe, are terrorizing peasants and want to increase cocaine production. After the heroine is captured, and after Munroe kills Garza, the hero, Ross, and his team kill Munroe and leave the island in good hands. At the conclusion of the film, there is a strong hint that Ross and Sandra will have a further relationship.

11.  The WGA, in its guide to arbiters, states: "For example, there have been instances in which every line of dialogue has been changed and still the arbiters have found no significant change in the screenplay as a whole." Actors may change lines or improvise, directors may cut lines as they shoot for many reasons, and in the editing process speeches may be cut and added. A comparison of the final draft of the screenplay of *Expendables* with the dialogue in the film will show that, as expected, there are sections of dialogue that have been excised, changed, or added during the editing process. What is important, however, is the intent and purpose of each scene, the arrangement of those scenes, the relationships between the characters, the role of the characters in the overall plot structure, the purpose of the characters in creating and resolving the critical issues in the story – what I would term 'the architecture' of the film. For example, in Webb's screenplay, Garza makes a

speech to his people promising better days as his regime is crumbling, as does Garza in Stallone's screenplay. The words are different but the intent and purpose of the scene is the same. The 'villain,' Garza, seeks redemption from his people after exploiting them only to be killed by his more evil cohort.

12.    Naturally, within the genre of the Hollywood action adventure movie certain 'rules' or conventions must be followed. The hero should be successful in the mission, the hero should have certain skills and weaponry, the hero should not die at the end (one hopes for a sequel), and there should be a climactic fight between the hero and villain. However, these events often have origins, expressions and elements that are unique and original. As a basic example, in most action adventure movies, the villain will attempt to escape. The writer may chose to have him escape in a boat, a plane, on a horse, in a helicopter, or another means. What the writer chooses for a vehicle is a deliberate artistic choice. What follows that choice – the villain's plan is thwarted, he is trapped, there is a one on one fight with the hero, and the hero prevails -- that is a natural and necessary progression. But the choice of the escape vehicle and the events leading up to that escape are deliberate and original creative decisions of writer, and should be recognized as such. As further discussed below, there are numerous instances in the two screenplays that further illustrate this idea and lead inexorably to the conclusion that Stallone had access to and copied Webb's screenplay.

**Striking Similarities Between the Works**

13.    In this section, I set forth the many striking similarities between *Cordoba* and *Expendables* on which I base my conclusions of access and copying.

14.    ***Element 1: The Name Of The Dictator – General Garza***. In *Cordoba*, the antagonist is a military dictator named General Garza. In *Expendables*, the antagonist is a military dictator named General Garza. This element is not in *Barrow*.

4

15.    *Element 2: The Dictators' Accomplices Who Are Also Adversaries.*  In *Cordoba*, Garza has an accomplice named Colonel Torres, who is nominally second-in-command to Garza but in reality has his own security forces and power base.  They have a mutually dependent but simmering antagonistic relationship rooted in their different ideologies: Garza is a fascist and Torres is a Stalinist communist.  Similarly, in *Expendables*, Garza has an accomplice named Munroe, a rogue former CIA operative, who is likewise nominally inferior to Garza but who also has his own security personnel and power base.  They have a mutually dependent but antagonistic relationship.  What Webb has done in *Cordoba* is to bifurcate the villain, or split him in two.  This unique and creative device provides tension and conflict within the world of Garza to the point that his "other half" eventually kills him.  The same technique of bifurcation is used in *Expendables*, and to the same effect; Garza is killed by his "other half" Munroe.  This device, I will add, is not commonplace, necessary, or stock material in mercenary films, where the logical progression would be for the hero to overcome and/or kill Garza.  This element does not appear in *Barrow*.

16.    *Elements 3 and 4: Accomplices Have Their Own Security Personnel; Distinctive Uniforms.*  In each screenplay, the accomplice has his own security personnel loyal to himself.  They even dress in distinctly similar uniforms.  In *Cordoba*, Garza has his Palace Guards who wear black SS-like uniforms while Torres has his Red Brigades dressed in Soviet-style olive with red trim.  In *Expendables*, Garza has his own troops dressed in olive with red trim while Munroe's security personnel wear civilian clothes, mostly black.  These elements do not appear in *Barrow*.

17.    *Elements 5 and 6: Heroine Is Local Freedom Fighter, Related To Garza.*  Among the most significant examples of unique and original elements that could not reasonably be attributed to coincidence or prior works is the relationship of the heroine to Garza.  In *Cordoba*, the hero is looking for Salvadora, an opponent of Garza's regime.  In *Expendables*, the hero meets Sandra who is also an opponent of Garza's regime.  The Lionsgate website for *Expendables* describes Sandra

5

as "a local freedom fighter with a dark secret." Indeed, in the March 11, 2009 draft of *Expendables*, Munroe notes that Sandra is "short for Alexandra, which is Greek for 'defender of mankind,'" and, continues, "here you are."

18.    The women in both works turn out to be related to Garza; Salvadora/Renata in *Cordoba* is Garza's niece, while Sandra in *Expendables* is Garza's daughter. They both have a relationship with the hero and oppose their relative's regime. It is true that Renata in *Cordoba* is the leader of the rebels while Sandra in *Expendables,* while opposed to Garza's regime, is not explicitly unveiled as the leader of the resistance (although described in the press materials as a "freedom fighter"). However, the idea of having the leader of a country whose female blood relative is playing a significant role in the opposition is what is critical to the development of the story, unique to Webb's screenplay, and copied by Stallone. These elements do not appear in *Barrow.*

19.    ***Element 7: Cocaine As Source Of Wealth.*** In *Cordoba*, the country is running out of oil and other sources of income must found for the corrupt leaders. The solution is cocaine production. In *Expendables*, the source of wealth is also cocaine production. This element does not appear in *Barrow.*

20.    ***Element 8: Abuse Of Peasants To Further Cocaine Production.*** In both screenplays, workers and peasants are terrorized, killed and exploited to further the cocaine production. In the *Cordoba*, the aim is to drive the peasants off their land so that it can be used to grow coca, while in *Expendables*, the peasants are brutalized into working harder to increase production. These similarities, although differing slightly in form, are identical in their purpose in the story. This element does not appear in *Barrow.*

21.    As a brief aside, I have noted that Defendants' summary judgment brief describes *Cordoba*'s Garza as having a "distinctly comical side" and a "buffoonish persona," as suggested by a "*bandito*-style mustache [that] is strictly Pancho Villa." (Defs. Mem. of Law in Supp. of Their Mot.

6

for Summ. J. at 21.)  Defendants' provide further support of his "comical aspects" by stating that "he repeatedly calls Renata *'You bitch!'"* (*Id.*)  Although I believe it to be obvious, a dictator-general who persecutes and kills his people and calls his niece a "bitch" is hardly a comical character, but a deadly serious character.  If the only other evidence for this position is that Garza is described as having a certain type of mustache made famous by a Mexican revolutionary, it must be said that the best way to describe a particular style of mustache is to mention for the reader a famous person who donned such a mustache, whether it be Pancho Villa, Tom Selleck, Salvador Dali, Charlie Chaplin, Albert Einstein, or Adolph Hitler.  It is certainly not necessary, as a consequence of that descriptor, for the character to then assume the characteristics of that particular person.

     22.     *Elements 9-13: Description Of Presidential Palace.*  In *Cordoba,* Garza's presidential palace is "neoclassical"; is dominated by a statue of Garza in the courtyard; has a prominent balcony overlooking an outdoor central staircase; has an outdoor swimming pool; and has underground-connected tunnels and holding cells for prisoners.  In *Expendables,* Garza's presidential palace is also neoclassical in its architecture; is dominated by a statue of Garza in the courtyard; has a balcony overlooking an outdoor central staircase; has an outdoor swimming pool; and has underground tunnels, cells and torture chambers.  These similarities are made even more significant in that they are used in a specific way in the action of the movie.  Although it may be argued that a presidential palace is common to the genre and necessary to the story, it is significant that Stallone has used a dominant statue of the dictator, a large outdoor swimming pool, a balcony overlooking a central outdoor staircase, underground tunnels and cells, all as first described in Webb's screenplay.  Aside from the mention of a tower behind the palace and the existence of a front courtyard and a large roof, there is no description of the palace in *Barrow.*

     23.     *Elements 14 and 15: Hero's Initial Refusal of Job; Motivated by Woman to Accept.*  Another unique similarity in the plots of the two works is that the hero in both initially

refuses the job and accepts it only after the threat to a woman's life. I recognize that the woman in *Cordoba* is St. John's daughter, while the woman in *Expendables* is a native Vilenan, and their lives are in danger for different reasons. However, the hero's motivation to take the job not for money but for an altruistic reason is the same, serves the same purpose in the film, and was first written by Webb and later used by Stallone. Altruism and moral obligation to a woman is, again, one of a myriad of deliberate creative choices that can be made by the writer when determining the hero's justification for accepting the job (other obvious options being that he accepts the mission for the money, for pride, to avenge his fallen comrades, or for a number of other reasons). These elements do not appear in *Barrow*.

24.     ***Elements 16-17: Arrest Of Heroine And Response To The Arrest.*** In *Cordoba*, Colonel Torres, Garza's Minister of State, and his Red Brigade soldiers, arrest Renata, the woman opposed to the regime and assisting the mercenaries. In *Expendables*, Sandra, the woman opposed to the regime, is arrested on orders from Munroe. In both screenplays, both the hero and, later, Garza, are distraught at the arrest of the woman. These elements do not appear in *Barrow*.

25.     ***Element 18: Distinctive Aircraft.*** Both *Cordoba* and *Expendables* employ a specially equipped aircraft with an unusual capability – to spray a liquid to thwart or punish the enemy. That again, is a conscious artistic choice by the creative mind behind the screenplay. In *Cordoba*, the aircraft is a Whispercopter that launches a missile, which deploys ink and blackens the windshield of a speedboat – causing it to crash. In *Expendables*, Ross's plane has a device that sprays gasoline that is ignited and causes the destruction of a pier. This element does not appear in *Barrow*.

26.     ***Elements 19 and 20: Heroine's Apartment Ransacked; Heroine Is Arrested.*** There are further events in the lives of the two heroines that are similar. In *Cordoba*, Red Brigade soldiers ransack Renata's apartment and arrest her. In *Expendables*, Red Guard soldiers ransack Sandra's apartment and arrest her. These elements do not appear in *Barrow*.

27.    *Element 21: Heroine Tortured For Information.*  In *Cordoba*, Renata is shackled to a box spring and tortured by Garza's accomplice, Torres, in order to get information about the mercenaries.  In *Expendables*, Sandra is tied to a table and tortured by Garza's accomplice, Munroe, in order to get information about the mercenaries.  This element does not appear in *Barrow*.

28.    *Elements 22 and 23: Heroine Taken To Garza's Office And Revealed.*  In *Cordoba*, following the torture scenes in the underground tunnels of the government buildings, Renata is brought to Garza's office by Torres, where he reveals to Garza that she is a rebel fighter. Garza is furious at Torres for arresting Renata and wants her freed.  Similarly, in *Expendables*, after Sandra is tortured, she is brought to Garza's office where he says to her (in Spanish) "You are everything I should have been."  I take this to be an acknowledgement that he now knows that she is a rebel and right to be on the side of the mercenaries seeking to depose him.  These elements do not appear in *Barrow*.

29.    *Element 24: Team Sympathetic Hero's Personal Motives.*  In *Cordoba*, the members of St. John's team are sympathetic to his predicament (his daughter's life in danger) and support his mission to Cordoba to complete the assignment.  In *Expendables*, Barney's team show up and join him in his return to Vilena to save Sandra.  The heroes' personal problems are the same, the reactions of their teams are also the same, and the purpose of both in the screenplays is identical; support and motivate the hero to action by the threat to a woman.  This element does not appear in *Barrow*.

30.    *Element 25: Garza Makes Speech.*  Following Renata's arrest in *Cordoba*, and just before Torres brings Renata to Garza, Garza makes a speech to his countrymen and promises to nationalize the oil industry.  In *Expendables*, following Sandra's arrest, and just after Munroe brings Sandra to Garza, Garza makes a speech to his forces in which he apologizes for his misdeeds.  This element does not appear in *Barrow*.

9

31.    *Element 26: Accomplice Turns On, And Kills, Garza.*  In *Cordoba*, following the speech, Torres turns on Garza, shoots and kills him.  In *Expendables*, following the speech, Munroe turns on Garza, shoots and kills him.  As noted earlier, what is unique and original is the fact that the main villain, Garza, is killed not by the hero, as would be commonplace in the genre, but by his accomplice, and the fact that the accomplice was in a position to do so.  This element does not appear in *Barrow*.

32.    *Element 27: Security Personnel Turn On Each Other.*  In both screenplays, Garza's forces and the forces loyal to his accomplice turn on each other in a bloody shootout.  This element does not appear in *Barrow*.

33.    *Element 28: Accomplice Abducts Heroine.*  In *Cordoba*, Torres forcibly abducts Renata and takes her hostage as he attempts to escape.  In *Expendables*, Munroe forcibly abducts Sandra and takes her hostage as he attempts to escape.  The specific sequence of events leading up to this element, starting with searching of the heroine's apartment, her arrest, torture, being taken to Garza's office where he is killed by his accomplice, and now the abduction of the heroine in an attempt to escape, none of which is in *Barrow*, is too similar to be coincidental.

34.    *Element 29: Climactic Gun Battle With Sequenced Explosions.*  In both screenplays there is a climactic gun battle in which the government forces are decimated.  The deciding moment in the battle occurs in *Cordoba* when explosive charges previously planted blow up an oil refinery in a deliberate, well planned, and uniquely particular sequence.  In *Expendables*, the mercenaries' previously planted explosives blow up the presidential palace and a fuel tank in a deliberate, well planned, and uniquely particular sequence.  In both sequences, the explosions cause havoc among the government troops and serve as a source of "cover" for the escaping mercenaries.  This element does not appear in *Barrow*.

10

35.    ***Element 30: Hero Chases Accomplice***.  Later, as the mercenaries in *Expendables* fight the remnants of Garza's forces,  Ross chases Munroe and Paine in order to prevent their escape and rescue Sandra.   In *Cordoba*, St. John chases Torres with the intent of preventing his escape and rescuing Renata.  This element does not appear in *Barrow*.

36.    ***Element 31: Preventing Helicopter Escape***.  In *Cordoba*, St. John kills the helicopter pilot so there is no escape.  In *Expendables*, Ross and Hale Caesar blow up the helicopter so there is no escape.  While *Barrow* includes a scene where the mercenaries blow up a helicopter belonging to the enemy at the airport, this scene is not near the presidential palace and is not related to the escape of Garza's accomplice.

37.    ***Element 32: The Final Confrontation***.  In both instances, the escape and chase leads to the hero's final confrontation with the heroine's captor, Garza's accomplice.  In *Cordoba*, Torres holds a gun to Renata's head.  In a surprise move, St. John shoots through her killing Torres.  In *Expendables*, Munroe holds a gun to Sandra's head, which forces Barney to lower his gun.  Munroe shoots and wounds Barney but Sandra distracts him and Barney draws his gun and kills Munroe.  Again, there is a steady and consistent line of action with insignificant variables in both screenplays that are simply too similar to be coincidental.  This element does not appear in *Barrow*.

38.    ***Element 33: Hero Leaves Heroine With Money***.  In both *Cordoba* and *Expendables*, the heroes leave the heroine with a large sum of money for their country's benefit.  This element does not appear in *Barrow*.

39.    ***Element 34: Hero Hints He Will Return***.  In *Cordoba*, St. John and Renata are clearly in love and a furthering of their relationship is strongly indicated.  In *Expendables*, Barney and Sandra seem attracted to each other and when he leaves he promises to "always be around."  This element does not appear in *Barrow*.

40.    *Element 35: Rap Performance Closing.*  In *Cordoba*, the hero celebrates the victory with a comical 'rap' type speech/poem in the company of his fellow mercenaries.  In *Expendables*, one of the mercenaries also delivers a comical 'rap' style speech/poem in the company of his fellow mercenaries.  This element does not appear in *Barrow*.

## Secondary Similarities

41.    As stated earlier, there are several additional elements throughout *Expendables* that further support Stallone's access to and copying of *Cordoba*.  While I would not necessarily consider these elements, in isolation, as strongly indicative of Stallone's access to and copying of *Cordoba*, I nonetheless view them as direct supporting evidence of copying when viewed as part of the collective whole.  None of these elements appear in *Barrow*.

42.    *Secondary Similarity 1: Opening Hostage Rescue At Sea.*  Both screenplays begin with a hostage rescue at sea.  It is not necessary to start the film this way, but a deliberate and creative choice of the screenwriter.  While I recognize the purpose of the scene, and the importance of introducing the mercenary team and any conflict among them, this scene could have taken place on land, on a battlefield, on a train, on a plane, in a car, or in a two-story textile office building in Iraq, as was the case in *Barrow*.  But instead, in both *Cordoba* and *Expendables*, the opening hostage rescue takes place at sea.  Furthermore, the mercenaries could have been introduced in the second, third, or fourth scene, rather than in the opening scene.  The mercenaries could have been introduced in a warzone, on the mainland, or in any number of battle sequences rather than in a hostage rescue scenario.  Again, all deliberate creative decisions that are nearly identical in the two works.

43.    *Secondary Similarity 2: The Name "O'Toole" Or "Tool."*  *Cordoba* features a team member named O'Toole; *Expendables* features a team member named Tool.

44.    *Secondary Similarity 3: "To Hell And Back."*  In *Cordoba,* St. John is described as a man who's been to "hell and back."  In *Expendables,* Tool tells Ross: "I got three pieces of work. Two a walk in the park, one to hell and back."

45.    *Secondary Similarity 4: "Zorro" Reference.*  In *Cordoba,* Renata says: "Tell them I'm a combination of Joan of Arc, Abraham Lincoln, and Zorro."  In *Expendables,* Ross asks Christmas, "Who are you, Zorro?"

46.    *Secondary Similarity 5: "Got Guts."*  Impressed by Renata's courage in *Cordoba,* St. John says: "That gal has more guts."  Impressed by Sandra's courage in refusing to leave her country in *Expendables,* Tool says, "She had some guts."

47.    *Secondary Similarity 6: "Death Squads."*  In *Cordoba,* Garza's special troops are referred to as "Death Squads."  In previous versions of *Expendables,*[1] Garza's troops are also described as "Death Squads."  This language did not make it to the final film.

48.    *Secondary Similarity 7: Garza In A Bathrobe.*  In *Cordoba,* Garza appears with his guards by his pool in a bathrobe.  In previous versions of *Expendables,*[2] Garza appears with his guards by his pool in a bathrobe.  This scene did not make it to the final film (in the final screenplay, Garza is wearing his military uniform).

49.    *Secondary Similarity 8: "Dead Already."*  In *Cordoba,* the hero alludes to Garza's accomplice, while still alive, as being "dead already."  Similar language in similar context is used in earlier drafts of *Expendables.*[3]

---

[1] For example, see *Expendables* Screenplay, dated February 20, 2009, at p. 24.  A true copy of this screenplay is attached as **Exhibit A.**

[2] For example, see *id.* at p. 25.

[3] For example, see *Expendables* Screenplay, dated March 24, 2009, at p. 96.  A true copy of this screenplay is attached as **Exhibit B.**

13

50.     As I stated above, any one of these elements standing alone in *Expendables* and also occurring in *Cordoba* would likely not merit much attention.  However, in my opinion, eight is a significant number and, in the context of the striking similarities already discussed, suggests more than coincidence or accident.

**Plot Structure of the Two Works**

51.     In addition to the striking similarities and secondary similarities discussed above, the manner in which these original elements unfold in the two works also, in my professional judgment, uncontrovertibly points to access and copying.  Although I recognize that some of the *Cordoba* plot elements and twists were eliminated by Stallone, the similarities already discussed, and the manner and order in which these elements unfold (the "architecture" of the film), leaves no question in my mind that Stallone improperly used *Cordoba* as source material for *Expendables*.

52.     For example, the latter part of both *Cordoba* and *Expendables* unfolds as follows:

(a)     Torres/Munroe ransacks the niece/daughter-heroine's home, then arrests her;

(b)     Torres/Munroe takes the niece/daughter-heroine to an underground cell in Garza's government compound, where he tortures her for information about the mercenary heroes and their plans to stage a coup;

(c)     from his palace, Garza makes a speech about how he is going to save his country even while a coup is underway against him;

(d)     Torres/Munroe brings the niece/daughter-heroine to Garza's office where her opposition to his regime is confirmed;

(e)     the mercenaries confront a would-be ambush;

(f)     the mercenaries use their strategically preset explosives in a surprise counterattack to defeat the ambush and wipe out Garza's Red Brigade/Red Guard;

14

(g)     Garza goes to his balcony;

(h)     Torres/Munroe, rather than the hero or a member of his team, shoots and kills Garza;

(i)     the mercenary heroes participate in a massive shootout with pro-regime forces in the front courtyard of the presidential palace;

(j)     Torres/Munroe takes the niece/daughter-heroine hostage and attempts to escape, using her as a shield;

(k)     Torres/Munroe heads for a helicopter that he has standing by for his escape, but the hero cuts off this escape route;

(l)     the mercenary hero chases Torres/Munroe and the niece/daughter-heroine on foot;

(m)     Torres/Munroe is trapped in a one-on-one confrontation with the hero, puts a gun to the niece/daughter-heroine's head and demands the hero disarm himself;

(n)     the hero and Torres/Munroe talk about the villain being "dead";

(o)     the hero puts himself into a vulnerable position, Torres/Munroe shoots at him;

(p)     the hero uses a surprise tactic to kill Torres/Munroe and thereby rescue the niece/daughter-heroine;

(q)     the hero helps the heroine obtain access to millions of dollars that she can use to help rebuild or restore her country; and

(r)     the story ends with the heroes celebrating their victory with a comical poem or rap-type speech.

## Conclusion

53.    Based on the numerous, striking similarities between *Cordoba* and *Expendables* described above, none of which exist in the *Barrow* screenplay, and the striking parallels in how the stories unfold using these elements, it is my opinion that the only reasonable conclusion is that Stallone had access to *Cordoba* and copied from that screenplay.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2012

Michael Elias

16

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARCUS WEBB,

                 Plaintiff,

    -against-

SYLVESTER STALLONE, et al.,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Index No. 1:11-cv-07517 (JSR)

**RESPONSE TO DEFENDANTS'**
**STATEMENT PURSUANT TO**
**LOCAL RULE 56.1 AND**
**PLAINTIFF'S STATEMENT OF**
**ADDITIONAL MATERIAL FACTS**
(Local Civil Rule 56.1 Statement)

       Pursuant to Local Civil Rule 56.1, Plaintiff Marcus Webb ("Webb") submits the below response

to Defendants', Sylvester Stallone ("Stallone"), David E. Callaham ("Callaham"), Millennium Films,

Inc. ("Millennium"), Nu Image, Inc. ("Nu Image"), Lions Gate Films, Inc. ("Lions Gate Films"), Lions

Gate Home Entertainment, Inc. ("Lions Gate Home"), Alta Vista Productions, Inc. ("Alta Vista Inc."),

Alta Vista Productions, LLC ("Alta Vista LLC") and Double Life Productions, Inc. ("Double Life")

(collectively, "Defendants"), Statement Pursuant to Local Rule 56.1.  Webb also submits Plaintiff's

Statement Of Additional Material Facts in opposition to Defendants' Motion for Summary Judgment.

## RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

    1.      Not disputed for purposes of the present motion.

    2.      Plaintiff does not dispute that Callaham asserts the facts contained in Paragraph 2.

Plaintiff is not in the position to dispute or admit the facts in Paragraph 2 because these facts pertain to

Callaham's state of mind and the state of mind of individuals at Warner Bros., as supported only by

Callaham's Declaration.

    3.      Not disputed for purposes of the present motion.

    4.      Not disputed for purposes of the present motion.

    5.      Not disputed for purposes of the present motion.

    6.      Plaintiff does not dispute that Callaham asserts the facts contained in Paragraph 6 and

Plaintiff has no additional facts to dispute them.

**FILED UNDER SEAL**

7.      Plaintiff does not dispute that Stallone asserts the facts contained in Paragraph 7.

8.      Plaintiff disputes that the draft was submitted to Stallone through Stallone's agents at the William Morris Agency.  In his deposition, Stallone stated: "I would assume [the scripts] always come through William Morris.  I don't know.  I never asked where they came from, other than the agency, they would usually have William Morris's imprint on it or ICM or one of the main agencies." (Deposition of Stallone dated February 28, 2012 ("Stallone Dep.") at 25.)

9.      Plaintiff disputes that Stallone "liked Callaham's screenplay" because Stallone stated that he "read and considered 'Barrow' but ultimately set it aside." (Declaration of David Kohane ("Kohane Dec.") at Ex. H, p. 1.)  Plaintiff does not dispute the remainder of Paragraph 9 for purposes of the present motion.

10.      Plaintiff disputes that "Stallone did a number of rewrites of Callaham's screenplay" because the documents produced indicate that Stallone never considered *The Expendables* a "rewrite" of the Callaham screenplay.  For example, Stallone states that he "read and considered 'Barrow' but ultimately set it aside" and "started writing [his] own screenplay for 'The Expendables' in the Spring of 2008[.]"  (*Id.*)  Stallone has also stated that he "wrote what is an original, *The Expendables*, which doesn't use one word, one comma, one iota from [Callaham's screenplay]." (Declaration of David Gold ("Gold Dec.") at ¶¶ 3-4; Ex. B, p. 2.)  Finally, in response to a cease and desist letter from Warner Bros. concerning the use of *Barrow* in connection with *The Expendables*, Trevor Short, the Chief Financial Officer of Nu Image, asserted: "We have finalized the terms for the acquisition of the requisite rights to [*The Dogs of War*] and the production we are currently working on under the tentative title "The Expendables" is a remake of that film."  (Kohane Dec. at Ex. E, p. 1.)

11.      Not disputed for purposes of the present motion.

12.      Plaintiff disputes Paragraph 12 for the reasons set forth in response to Paragraph 10, *supra* and Paragraph 13, *infra*.

2

FILED UNDER SEAL

13.     Plaintiff disputes the introductory sentence of Paragraph 13 because there is no evidence that Stallone ever saw more than one version of the Callaham screenplay.  Plaintiff further disputes the introductory sentence of Paragraph 13 because Stallone and the other defendants have consistently denied any similarities between *The Expendables* and the Callaham screenplay.  For example, in his deposition testimony, Stallone stated that *The Expendables* screenplay was "radically different" than *Barrow*.  (Stallone Dep. at 70.)  Stallone also wrote that he "read and considered 'Barrow' but ultimately set it aside" and "started writing [his] own screenplay for 'The Expendables' in the Spring of 2008[.]"  (Kohane Dec. at Ex. H, p. 1.)  Stallone's attorney, writing on Stallone's behalf, stated:

> Moreover, a comparative analysis between "The Expendables" and "Barrow" reveals there are absolutely no similarities between the two scripts, save one log line – a corrupt dictator on an island nation who must be removed from power. Aside from that one unoriginal idea or theme, there are no similarities between the two scripts.
>
>              \*\*\*
>
> There is no dispute that the dialogue in Barrow is completely different from that in The Expendables. No line of dialogue is the same.
>
> There is also no dispute that every single scene in The Expendables differs from that of Barrow. Indeed, the story beats, the plot twists, the key plot points, all differ in The Expendables from those found in Barrow. And, all of the action set pieces differ, something even the arbiters found. There simply are no cross-over plot points between The Expendables and Barrow.
>
> Notably, there is no overlap between any of the characters found in The Expendables from those in Barrow. In fact, all of the characters in The Expendables are wholly original. This fact is underscored by the different backgrounds of the characters in The Expendables from those found in Barrow.
>
>              \*\*\*
>
> In short, aside from the unoriginal idea of staging a coup against a corrupt dictator on an island nation, everything else in The Expendables has been created by [Stallone]. [Stallone] created original scenes. [Stallone] created original dialogue. [Stallone] created original characters. [Stallone] created original plots and twists. . . . Thus, [Stallone's] contribution to The Expendables screenplay is 100%. Certainly, no objective evaluation of The Expendables can credit [Stallone] anything

3

FILED UNDER SEAL

less than 90% assuming the unoriginal idea of a coup against a corrupt dictator is entitled to 10%.

***

In the event the Board believes the underlying idea of overthrowing a corrupt dictator on an island nation originated with [Callaham], then [Stallone] should be given shared "Story by" credit because every other concept, theme, idea, scene, set piece, plot twist, plot point in The Expendables was original to [Stallone] who should be properly credited for them.

[Kohane Dec. at Ex. I, pp. SS010663-64, SS010666-67.]

Additional statements made by Stallone and the other defendants that contradict the introductory sentence in Paragraph 13 include:

[Stallone:] This time I wanted to see what was out there that was similar, so I purchased [the *Barrow*] script. Then I wrote what is an original, *The Expendables*, which doesn't use one word, one comma, one iota from either screenplay.

[Gold Dec. at ¶¶ 3-4; Ex. B, p. 2.]

[Callaham:] HOLY S--- [*The Expendables*] SCRIPT IS AWFUL . . . I want you to know that it's nothing like what I wrote.

[Kohane Dec. at Ex. G.]

[Callaham:] Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for, it would be a miracle.

[Kohane Dec. at Ex. Q.]

[Trevor Short, Chief Financial Officer of Nu Image:] [*The Expendables*] project, however, currently bears no resemblance to or similarity with the project entitled "Barrow", which we understand is owned by Warner Bros.

[Kohane Dec. at Ex. E.]

[Avi Lerner, Owner of Nu Image:] . . . we will prove that barrow is A different script then Expendables. [sic]

[Kohane Dec. at Ex. M.]

4

**FILED UNDER SEAL**

[Lonnie Ramati, Vice President of Business and Legal Affairs at Millennium:] We are willing to do that deal <u>which is a favor to the producers</u> since our film and our script and our story, "The Expendables" are definitely <u>not</u> "Barrow."

[Kohane Dec. at Ex. F.]

Finally, in its insurance application for *The Expendables*, Nu Image responded "N/A" to an inquiry concerning any "underlying works" for the film and did not check the box indicating *Expendables* was "[b]ased on another work." [Kohane Dec. at Ex. L, pp. 2, 4.]

As to the subparts of Paragraph 13, Plaintiff disputes all of Defendants' creative interpretations because these analyses are inaccurate, inherently subjective, and therefore improper for a Rule 56.1 statement. As to the specific elements in the subparts, Plaintiff responds:

(a)    Plaintiff disputes that the opening scene of *The Expendables* was "retained" from the Callaham screenplay because both Stallone and Callaham have stated the scene was not from *Barrow*. For example, in his deposition testimony, Stallone affirmatively responded when asked whether it was his "idea to add the hostage rescue with the pirates to the script?" (Stallone Dep. at 163.) When Callaham first heard about this lawsuit, he wrote: "What's interesting is that while I clearly didn't steal [Webb's] script, I guess it's not out of the realm of possibility that Stallone did. The specifics mentioned in the article as similarities are things that Stallone added . . . I didn't have that opening scene and my general wasn't named Garza." (Kohane Dec. at Ex. N.) In connection with a Writers' Guild of America ("WGA") arbitration concerning whether Callaham, as author of *Barrow*, was entitled to authorship credit for *The Expendables*, Stallone asserted that the "Pirate sequence" was an "Original or Different Scene." (Kohane Dec. at Ex. H, p. SS010651.) In a second statement, and the Comparative Analysis of Major Scenes and Plots included with that statement, Stallone's attorney denied that the opening hostage scene was from *Barrow*. (Kohane Dec. at Ex. I, p. SS010665; Ex. J, p. SS010674.) At least one WGA arbiter (who, of course, did not have a copy of *The Cordoba Caper*) recognized that Stallone did not take the opening hostage rescue from *Barrow*. "[Stallone] created a new

5

FILED UNDER SEAL

way to introduce the team (via modern-day pirates in the big opening sequence)[.]" (Kohane Dec. at Ex. R.)

       (b)    Plaintiff disputes that the leader of the mercenaries, and his characteristics, were taken from Callaham's screenplay. Stallone's attorney wrote: "Notably, there is no overlap between any of the characters found in The Expendables from those in Barrow. In fact, all of the characters in The Expendables are wholly original." (Kohane Dec. at Ex. I, p. SS010667.) Similar efforts to distinguish the leader of the mercenaries in *The Expendables* from the Callaham screenplay are also seen in the statement of Stallone's attorney and the Comparative Analysis of Characters included with Stallone's WGA arbitration statement. (Kohane Dec. at Ex. K, p. SS010665; Ex. J, p. SS010670.)

       (c)    Plaintiff disputes that offering of a substantial sum of money to overthrow the military dictator was taken from Callaham's screenplay. In his WGA statement, Stallone cites "Church's hiring of Barney and his band" as an "Original or Different Scene." (Kohane Dec. at Ex. H, p. 2.)

       (d)    Plaintiff does not dispute that there are characters named "Ballcap" and "Murali" in the Callaham screenplay or that there are characters named "Paine" and "Monroe" in *The Expendables* screenplay/film. However, Plaintiff disputes that Paine and Monroe are based on, or are in any way similar to, Ballcap and Murali. Both Ballcap and Murali are CIA agents in good standing who protect the dictator (*Barrow* "3rd Studio Draft," Ex. C to Answer [hereinafter "*Barrow* 3rd Studio Draft"] at 28-32), and Defendants concede that Murali, unlike Monroe, was never in country with the dictator (*see* Stallone Dec. at 3, ¶3(d); Callaham Dec. at 3, ¶ 7(d)). In fact, Murali has no parallel in *The Expendables*, and Monroe is much more like Torres than he is like Ballcap (*see Barrow* 3rd Studio Draft at 28-29; *Cordoba Caper* 2006 Screenplay ["*Cordoba Screenplay*"], Ex. A to Answer at 4-5, 14; "*Expendables – First Stallone Draft*" ["*Expendables First Draft*"], Callaham Ex. B at 32, 34). As noted, Stallone's attorney wrote: "Notably, there is no overlap between any of the characters found in The Expendables from

6

those in Barrow. In fact, all of the characters in The Expendables are wholly original." (Kohane Dec.
at Ex. I, p. SS010667.) He further emphasizes the obvious differences between these characters in the
statement and the Comparative Analysis of Characters submitted with that statement. (Kohane Dec. at
Ex. I, pp. SS010665-66; Ex. J., pp. SS010671-72.)

        (e)    Plaintiff does not dispute that there is a character named "Sophie" in the
Callaham screenplay and a character named "Sandra" in *The Expendables*. However, Plaintiff disputes
that "Sandra" is based on, or is in any way similar to, "Sophie." Sophie is a minor character who
appears in only three scenes *Barrow* (*see Barrow* 3rd Studio Draft at 18-23, 114-115), as opposed to Sandra
and Renata who play a prominent and central character in both *The Cordoba Caper* and *The Expendables*.
Both Sandra in *The Expendables* and Renata in *The Cordoba Caper* are "local freedom fighters" who also
happen to be a direct female relative of General Garza and assist the mercenaries in overthrowing him.
(*See Cordoba Screenplay* at 42; *Expendables First Draft* at 30; *"The Expendables"* motion picture ["*Expendables*
motion picture"], Ex. B to Answer; Kohane Dec. at Ex. P.) Callaham clearly viewed Sophie as a minor
character; in an e-mail, Callaham states: "I can tell you that I didn't write any female characters . . . ."
(Kohane Dec. at Ex. O.) Stallone's statements to the WGA and the Comparative Analysis of
Characters similarly distinguishes these two characters. (Kohane Dec. at Ex. I, pp. SS010665-66 (no
reference to "Sophie" in *Barrow*); Ex. J, pp. SS010671-72.)

        (f)    Plaintiff disputes that "the idea of the leader of the mercenaries wanting to
topple the regime because he thought it was a just cause" was taken from Callaham's screenplay.
Stallone's attorney wrote: "There is also no dispute that every single scene in The Expendables differs
from that of Barrow. . . . There simply are no cross-over plot points between The Expendables and
Barrow." (Kohane Dec. at Ex. I, pp. SS010666-67.) The rest of subparagraph (f) points to differences
between *The Expendables* and *Barrow* and actually highlights developments in the hero's character similar
to those in *The Cordoba Caper*. Moreover, Plaintiff disputes whether it is "clear from the beginning that

7

**FILED UNDER SEAL**

the protagonist [in *The Expendables*] only pursues righteous causes[.]" Whether such a depiction is "clear" is a question of artistic interpretation and therefore improper for purposes of a Rule 56.1 Statement (*see Cordoba Screenplay* at 7; *Expendables* First Draft at 10; *Expendables* motion picture).

       (g)     Plaintiff disputes whether having the mercenary leader leave a sum of money in the hands of the sympathetic female character was taken from Callaham's screenplay or Webb's screenplay. In *Barrow*, the hero leaves a sum of money with Dr. Adoti rather than the heroine (*see Barrow* 3rd Studio Draft at 115), as is the case in *The Expendables* and *The Cordoba Caper* (*see Cordoba Screenplay* at 108-111; *Expendables First Draft* at 112 and *Expendables* motion picture). Stallone's attorney wrote: "There is also no dispute that every single scene in The Expendables differs from that of Barrow. . . . There simply are no cross-over plot points between The Expendables and Barrow." (Kohane Dec. at Ex. I, pp. SS010666-67.)

       (h)     Plaintiff disputes that any of the unnamed elements included in Paragraph 13(h) were taken from Callaham's screenplay. Stallone's attorney wrote: "And, all of the action set pieces differ, something even the arbiters found. There simply are no cross-over plot points between The Expendables and Barrow." (Kohane Dec. at Ex. I, p. SS010667.)

    14.     Plaintiff disputes Stallone's bald assertions about how he arrived at the names of characters and that Stallone "changed" any names of characters because "changed" would suggest that the characters were based on characters in *Barrow*. As already discussed, Stallone's attorney wrote: "Notably, there is no overlap between any of the characters found in The Expendables from those in Barrow. In fact, all of the characters in The Expendables are wholly original." (Kohane Dec. at Ex. I, p. SS010667.) Stallone further distinguishes each character in the Comparative Analysis of Characters. (Kohane Dec. at Ex. J, pp. SS010669-72.)

    15.     Not disputed for purposes of the present motion.

    16.     Not disputed for purposes of the present motion.

8

A984

**FILED UNDER SEAL**

17.     Plaintiff disputes that Webb "previously" worked with a variety of trade magazines because Webb continues to write for trade magazines.  (Deposition of Marcus Webb, dated February 9, 2012 ("Webb Dep.") [Kohane Dec. at Ex. B] at 19-20.)

18.     Not disputed for purposes of the present motion.

19.     Plaintiff disputes whether Webb wrote anything about mercenaries prior to 2006.  In his deposition testimony, Webb only stated that he did not "recall" writing anything about mercenaries prior to 2006.  (Webb Dep. at 125.)

20.     Not disputed for purposes of the present motion.

21.     Not disputed for purposes of the present motion.

22.     Not disputed for purposes of the present motion.

23.     Not disputed for purposes of the present motion.

24.     Not disputed for purposes of the present motion.

25.     Not disputed for purposes of the present motion.

26.     Not disputed for purposes of the present motion.

27.     Not disputed for purposes of the present motion.

28.     Not disputed for purposes of the present motion.

29.     Not disputed for purposes of the present motion.

30.     Not disputed for purposes of the present motion.

31.     Not disputed for purposes of the present motion.

32.     Not disputed for purposes of the present motion.

33.     Plaintiff disputes that Webb "claims" to have submitted his screenplay to eight screenplay competitions because Plaintiff did submit his screenplay to eight screenplay competitions.  (Webb Dep. at 241.)  To the extent Defendants dispute this "claim," it is a disputed material fact that should defeat summary judgment.

FILED UNDER SEAL

34.      Plaintiff does not dispute that he lacks personal knowledge that his screenplay was sent by anyone associated with those competitions to anyone outside them, but asserts that the numerous striking similarities between his screenplay and *The Expendables*, and other facts in the record, support an inference that the screenplay was, in fact, transferred outside at least one of those competitions.  (*See* Paragraph 55, *infra*.)

35.      Plaintiff disputes the characterization of Webb's testimony which was:

> Q. Do you have any knowledge of your screenplay being made openly available to anyone in the motion picture industry?
>
> A. No.  By openly available, I assume you mean something like posted on the internet the way Mr. Stallone's script was, and I have no knowledge of that.
>
> Q. How about widely available, widely disseminated?  Do you have any knowledge of it being widely available or widely disseminated in the entertainment industry?
>
> A. To the extent one considers these contests part of the entertainment industry, entry in these contests constitutes widely disseminated, and to the extent that anyone who sees that it was an entry in one of these quarter-final or semi-final or considers is able to request a copy, if they want, then it is widely available to the entertainment industry.
>
> [Webb Dep. at 265-66.]

36.      Plaintiff does not dispute the specific information set forth in Paragraph 36, but notes that the cited facts do not preclude the possibility that someone involved with the contest did disseminate the screenplay outside of the competition.

37.      Plaintiff disputes the information in Paragraph 37 because the information is based on evidence that has not been authenticated.  Plaintiff also disputes the information contained in the second sentence of Paragraph 37 because this information is immaterial to the present motion.

38.      Plaintiff does not dispute that Webb entered *The Cordoba Caper* screenplay in the PAGE International Screenwriting Awards Competition.  Plaintiff disputes the second sentence in Paragraph 38 because the information is based on evidence that has not been authenticated.  Plaintiff does not

10

FILED UNDER SEAL

dispute the third sentence of Paragraph 38. Plaintiff does not dispute that he lacks personal knowledge that his screenplay was sent by anyone associated with those competitions to anyone outside them, but asserts that the numerous striking similarities between his screenplay and *The Expendables*, and other facts in the record, support an inference that the screenplay was, in fact, transferred outside at least one of those competitions. (*See* ¶¶ 53-56, *infra*.)

39.    Plaintiff does not dispute that Webb submitted *The Cordoba Caper* to the ASA Screenwriting Competition. Plaintiff disputes the second sentence in Paragraph 39 because the information is based on inadmissible hearsay evidence that has not been authenticated. Plaintiff does not dispute the third sentence of Paragraph 39.

40.    Plaintiff does not dispute that Webb submitted *The Cordoba Caper* to the Big Break Competition or that the screenplay was eliminated in the first round. Plaintiff disputes the remaining information in Paragraph 40 because the information is based on inadmissible hearsay evidence that has not been authenticated. Plaintiff further disputes the remaining information contained in Paragraph 40 because this information is immaterial to the present motion.

41.    Plaintiff disputes the characterization of Webb's testimony. Webb's interest was "piqued" not only from "press about Stallone appearing in a film about mercenaries in a South American County," but because those media reports also included references to "a general named Garza" and "a female character who was related to Garza," both of which are in *The Cordoba Caper*. (Webb Dep. at 174-75.)

42.    Not disputed for purposes of the present motion.

43.    Although Plaintiff does not dispute that Stallone and Callaham have denied hearing of *The Cordoba Caper* before this case, Plaintiffs disputes that assertion based on the evidence in the record that *The Expendables* was based on *The Cordoba Caper*. (*See* Paragraph ¶¶ 53, 55, *infra*.)

FILED UNDER SEAL

44.     Plaintiff disputes the information in Paragraph 44 because Webb's decision to sue David Callaham was a decision made after certain discussions with counsel that are protected under the attorney-client privilege.  This objection was placed on the record at Webb's deposition.  (Webb Dep. at 202-04.)

45.     Plaintiff does not dispute that Callaham asserts the facts contained in Paragraph 45 and Plaintiff has no additional facts to dispute them.

46.     Plaintiff disputes Paragraph 46 because access to *The Cordoba Caper* can be inferred.  (*See* Paragraph ¶¶ 53-56, *infra*.)

47.     Not disputed for purposes of the present motion.

48.     Not disputed for purposes of the present motion.

49.     Not disputed for purposes of the present motion.

50.     Not disputed for purposes of the present motion.

51.     Not disputed for purposes of the present motion.

52.     Not disputed for purposes of the present motion.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

53.     There exists a genuine issue as to whether Stallone had access to and copied elements of *The Cordoba Caper*.  Access and copying may be inferred from the large number of strikingly similar elements in *The Cordoba Caper* and *The Expendables* that do not exist in *Barrow*, coupled with the manner in which these similarities are collectively presented in the two works. (*See* Declaration of Michael Elias, *passim*; *Cordoba Screenplay*, *passim*; *The Expendables* motion picture, *passim*; *Barrow* 3rd Studio Draft, *passim*.)

54.     There exists a genuine issue as to whether elements of *The Expendables* were copied from *The Cordoba Caper* or *Barrow*.  (*See* Declaration of Michael Elias, *passim*; *Cordoba Screenplay*, *passim*; *The Expendables* motion picture, *passim*; *Barrow* 3rd Studio Draft, *passim*.)

(a)     Plaintiff refers to Paragraphs 10, 13, 14, *supra*.

12

FILED UNDER SEAL

(b)      Stallone claimed that the "idea of Sandra being tortured by Monroe" was original to *The Expendables*, thus admitting it was not from *Barrow*. (Stallone Dep. at 168)  Moreover, Stallone's statement is disputed because the Renata/Sandra character was tortured by Torres in *The Cordoba Caper*. (*See Cordoba Screenplay* at 88; *Expendables* motion picture.)  The torturing of the Renata/Sandra character was not present in *Barrow*.

(c)      Stallone claimed that the "idea of Monroe killing the general" was original to *The Expendables*, thus admitting it was not from *Barrow*. (Stallone Dep. at 172-73.)  Moreover, Stallone's claim is disputed because this element originated in *The Cordoba Caper*. (*See Cordoba Screenplay* at 102, 109; *Expendables* motion picture).  It is not in *Barrow*.

(d)      Stallone claimed that "the idea to add the hostage rescue with the pirates to the script" was "original" to *The Expendables*, thus admitting is was not from *Barrow*. (Stallone Dep. at 163.)  Moreover, a hostage rescue at sea is present in *The Cordoba Caper* and in *The Expendables*. (*See Cordoba Screenplay* at 1-3; *Expendables* motion picture).  It is not in *Barrow*.

(e)      Stallone claimed that "the idea of Sandra being related to Garza" was "original" to *The Expendables*, thus admitting it was not from *Barrow*. (Stallone Dep. at 166.)  Moreover, Stallone's claim is disputed because this element originated in *The Cordoba Caper*. (*See Cordoba Screenplay* at 15; *Expendables* motion picture.)  It was not in *Barrow*.

(f)      Stallone claimed  that the idea of "Monroe tak[ing] Sandra hostage while he's trying to escape" was "original" to *The Expendables*, thus admitting it was not from *Barrow*. (Stallone Dep. at 275-76.)  Moreover, Stallone's claim is disputed because this element originated in *The Cordoba Caper*. (*See Cordoba Screenplay* at 105-108; *Expendables* motion picture).  It was not in *Barrow*.

(g)      Stallone claimed that the idea to have "the helicopter that was waiting to fly Monroe away" was "original" to *The Expendables,* thus admitting it was not in *Barrow*. (Stallone Dep. at

13

FILED UNDER SEAL

276-77.) Moreover, Stallone's claim is disputed because this element was original to *The Cordoba Caper*. (*See Cordoba Screenplay* at 105; *Expendables* motion picture). It was not in *Barrow*.

      (h)     In addition to the statements already discussed, in his statement to the WGA, Stallone stated:

> You may find that my dramatic construction is similar to [Callaham] in the sense that we both tell stories about mercenaries travelling to a foreign land and overthrowing the resident dictator, and, in both stories, the mercenaries are ultimately successful; but that is the extent of the similarities in construction.
>
> [Kohane Dec. at Ex. H, p. SS010651.]

     55.     There exists a genuine issue as to whether Stallone regularly copies creative elements from other screenplays without permission of the author.

      (a)     Stallone testified that he has been a party to at least ten WGA credit arbitrations. (Stallone Dep. at 182-191.) Stallone testified that he always takes the position that he should receive sole credit for a film and consistently lost those arbitrations. (*Id.* at 188-91.)

      (b)     Stallone admits he initially copied *Barrow* before he had any rights to that screenplay. Stallone was in possession of the Callaham screenplay for almost a year before the screenplay was purchased by Double Life. Stallone began writing *The Expendables* after receiving a copy of the Callaham screenplay. (Stallone Dep. at 66.) The earliest draft screenplay produced in this case is dated September 3, 2008. (Kohane Dec. at ¶ 22.) Double Life did not obtain the rights to *Barrow* until July, 10, 2009. (Kohane Dec. at Ex. S.)

      (c)     Nu Image only purchased *Barrow* because of a threatened lawsuit by Warner Bros. over the improper use of *Barrow*, a screenplay to which Warner Bros. owned the rights. (Dep. of Trevor Short at 65; Kohane Dec. at Ex. K.)

      (d)     In a public interview, Stallone stated:

> Someone else's screenplay, it can be horrible. In Hollywood there's thousands and thousands and thousands of screenplays they've spent

FILED UNDER SEAL

hundreds of millions of dollars on that will never be done. They're in these vaults. You just go through it and go, hmm. I'm doing that right now. You go, not bad. It's pretty bad the whole story, but interesting idea, interesting character, and that's all you need.

[Kohane Dec. at ¶ 21.]

56.    There exists a genuine issue as to whether Stallone had access to Webb's screenplay.

(a)    From 2006 through 2009, Webb submitted *The Cordoba Caper* to eight screenwriting competitions: (1) the AAA Screenplay Contest (hosted by *Creative Screenwriting Magazine*); (2) the Austin Film Festival; (3) the Big Break International Screenwriting Contest (hosted by Final Draft, Inc.); (4) the American Zoetrope Screenplay Contest; (5) the PAGE International Screenwriting Awards Competition; (6) the ASA Screenplay Competition (hosted by Gotham Writers' Workshop). (Webb Dep. at 241.)

(b)    The AAA Screenplay Contest did not respond to Plaintiff's subpoena *duces tecum*. Plaintiff's counsel was notified by *Creative Screenwriting Magazine* that the magazine was going through financial troubles and would be unable to respond to the subpoena *duces tecum*. In a follow-up telephone call with a former manager of the AAA Screenplay Contest, Plaintiff's counsel was advised that, to their knowledge, no documents concerning the submission or judging of *The Cordoba Caper* were available. (Gold Dec. at ¶ 2.)

(c)    Stallone testified that he gets his screenplays from his agents. (Stallone Dep. 24.) Stallone testified that he "assumes" the screenplays come from the William Morris Agency, although he noted that he never asks were the screenplays come from. (*Id.* at 25.) Stallone further testified that he does not know where his agents get the screenplays. (*Id.* at 188.)

(d)    Trevor Short of Nu Image testified that the process of writing *The Expendables* was "chaotic, at the best of times." (Short Dep. at 24-25.) Short further testified:

"The Expendables" was a movie we were going to make and it began with a script and ***thousands of people had contributions to it*** and there were ***all sorts of different ideas floating around*** between Mr.

15

**FILED UNDER SEAL**

Stallone and his camp as to what the movie was going to be, within my own company of the various executives there as to what it should be, and the thing was becoming a, in my colloquialism, bun fight.

\*\*\*

And up to this point, certainly the process was that everybody tried to cajole and convince Mr. Sylvester Stallone as to what he would put and wouldn't put into the script.

In other words, he was determining what went on to the page and what didn't and inputs were being made to him, some of which he acknowledged, some of which he ignored and others of which he made up on his own.

[Short Dep. at 22-23 (emphasis added).]

DATED:  New York, New York
        April 6, 2012

By: _____
Jeffrey A. Sunshine
Jeffrey A. Sunshine, P.C.
3000 Marcus Avenue – Suite 2E5
Lake Success, NY  11042
(516) 352-2100

-and-

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: _____
David M. Kohane
Steven R. Klein
David S. Gold
900 Third Avenue, 16th Floor
New York, New York 10022
(212) 752-8000

16

Tom J. Ferber
James A. Janowitz
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x,

MARCUS WEBB,

                         Plaintiff,

      - against -

SYLVESTER STALLONE, ET AL,

                         Defendants.
-----------------------------------------------------------x

11 CIV 7517 (JSR)

**REPLY DECLARATION OF
DAVID E. CALLAHAM IN
SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

DAVID E. CALLAHAM declares as follows:

1.      I am a defendant in the above-captioned action.  I submit this reply declaration in further support of the defendants' motion for summary judgment.  I am personally familiar with the matters hereinafter set forth, except as may be otherwise indicated.

2.      I understand that, in his opposition to Defendants' motion, Plaintiff has made numerous references to the Writers Guild of America ("WGA") credit determination arbitration regarding the writing credits for "The Expendables" (the "Film"), and has implied that there is something unusual about either Sylvester Stallone's seeking sole "Screenplay By" credit in such an arbitration or the occurrence of the proceeding at all.

3.      In order to prepare my submission for the WGA credit proceeding regarding the Film, I engaged the help of a professional consultant who was extremely experienced with such arbitrations.  During that process, I learned that WGA credit arbitrations are extremely common

whenever more than one writer (other than a writing team) has worked on the screenplay for a film. Moreover, in cases like the Film, when a production executive, like Mr. Stallone, is one of the writers, an arbitration is automatic. I was also told that writers usually ask for the best possible credit that could be awarded to them under the WGA Screen Credits Manual (the manual can be seen at http://wga.org/uploadedFiles/writers_resources/credits/screencredits_manual10.pdf), even though the arbiters may determine, after weighing the relative contribution of all of the writers, that a credit should be shared.

   4.  With the help of my consultant, I submitted a written statement[1] for the arbiters to review in conjunction with the draft screenplays. I knew, from having read some of Mr. Stallone's drafts, that he had substantially rewritten the dialogue from my script, entitled "Barrow," and that he had cut out subplots, scenes and characters and added action sequences. I nevertheless requested that the arbiters grant me a sole "Written By" credit, which would reflect authorship of both the story and the screenplay. I gave a detailed analysis setting forth how the Film's final shooting script had retained not just my story about American mercenaries being hired by a mysterious figure to topple the dictator of a Latin American island, but also my characterizations (with different names and certain traits) – such as Barrow Miles/Barney Ross, Gary "Coe" Caine/Gunnar Jensen, Sophie/Sandra, Gen. Miramonte/Gen. Garza, "Mr. Monday/Mr. Church" and others – and dramatic construction.

   5.  The arbiters' decision was that I should receive sole "Story By" credit and the first position in a "Screenplay By" credit that I would share with Mr. Stallone. I was subsequently sent the memoranda attached to this declaration as Exhibit "A," which I understand to be the decisions of the three arbiters, in which each of them explains how she or he reached his/her conclusion.

---

[1] The written statement is in the form of a letter. It is not a sworn affidavit or declaration, like this one.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2012.

David E. Callaham

# EXHIBIT A

# Exhibit A is filed under seal.

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

MARCUS WEBB,                                    11 CIV 7517 (JSR)

              Plaintiff

                                            **DECLARATION OF**
     -against-                             **KEVIN KING TEMPLETON**

SYLVESTER STALLONE, et al.,

              Defendants.

-------------------------------------------------------------x

      KEVIN KING TEMPLETON declares as follows:

      1.    I have been Sylvester Stallone's producer for 15 years, and I was a producer on "The

Expendables" (the "Film"). I have personal knowledge of the matters hereinafter set forth, except

as may be otherwise indicated.

      2.    I work closely with Mr. Stallone on all of his projects. In 2008, after the release of

"Rambo," Mr. Stallone told me that he was interested in doing a film in the style of "The Dirty

Dozen" or "The Wild Bunch." As part of my responsibilities as his producer, I conveyed this to Mr.

Stallone's agents at the William Morris Agency ("WMA"), in particular, Scott Lambert.

      3.    Some time later, Mr. Lambert forwarded several scripts, one of which was "Barrow" by

David Callaham. Both Mr. Stallone and I liked this script, and we so advised Mr. Lambert before

Mr. Stallone began working on rewrites.

1158803 v1
16178.00009

4.    Mr. Stallone and I have a strict policy of not looking at any script that has not been filtered through his agents at WMA (or his previous agents). All scripts that we receive from WMA contained indicia indicating that WMA had sent it. We would not look at a script lacking such indicia, and the safeguards that come with them.

5.    I am quite certain that I saw every script that was sent to Mr. Stallone. Neither in 2008 nor at any other time did I ever hear of Marcus Webb or a screenplay or short story entitled "The Cordoba Caper." Moreover, I was with Mr. Stallone constantly while he was working his way through scores of revisions to Mr. Callaham's script, so I watched the gradual evolution from "Barrow" – which had various subplots and characters which detracted from Mr. Stallone's objective of a pure action film – to the shooting script for the Film. There was no mention of Mr. Webb or his script.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __, 2012.

Kevin King Templeton

2

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

MARCUS WEBB,                              11 CIV 7517 (JSR)

               Plaintiff

                                    **DECLARATION OF**
     -against-                    **SCOTT LAMBERT**

SYLVESTER STALLONE, et al.,

               Defendants.

-----------------------------------------------------------x

     SCOTT LAMBERT declares as follows:

     1.       In 2008, I was an Executive Vice President at the William Morris Agency ("WMA").

Together with my colleague Jim Wiatt, I was principally responsible for WMA's client Sylvester

Stallone. I am personally familiar with the matters stated below, except as may be otherwise

indicated.

     2.       In the first part of 2008, I was advised that Mr. Stallone was looking for a script for a

film featuring an ensemble cast. I began making calls and inquiries in search of an interesting script

that might be appealing to Mr. Stallone. I conducted this search for scripts in accordance with

WMA's strict practice (which is standard in the industry) of accepting no unsolicited scripts; *i.e.,*

neither the agency nor I would not accept, let alone pass on to a client, a script that had been sent by

a writer who was not represented by a known talent agent.

3.      Among the people with whom I spoke in the course of my search for a project for Mr. Stallone was Basil Iwanyk of Thunder Road Pictures, who told me about a mercenary-themed action film project to which he was attached as a producer.  Thunder Road then sent that script, entitled "Barrow," by David Callaham, to me and/or Aaron Hart, a younger colleague who was assisting me.  I read and liked Mr. Callaham's script, and thought that it might be the basis for the ensemble film that Mr. Stallone wanted to make.

4.      Shortly thereafter, I sent Mr. Callaham's draft screenplay and a number of other scripts that I had accumulated to Kevin King, Mr. Stallone's producer.[1]  As I had hoped, I received a positive response regarding Mr. Callaham's draft screenplay, and was told that Mr. Stallone was working on revisions to the script, which would not have been considered unusual (i.e., to make revisions to a script, especially one that had been previously passed over for further development, before any decisions is made to produce it or acquire rights to it from the studio that had passed on it).  It is my understanding that Mr. Stallone revised Mr. Callaham's script as the basis for the motion picture "The Expendables," and that both of them were credited as screenwriters and that Mr. Iwanyk, who had been attached to Mr. Callaham's script as a producer, was credited as an executive producer on the film.

5.      While I do not recall the names of the other scripts which I forwarded for Mr. Stallone's review, I can definitely state that they did not include "The Cordoba Caper" by Marcus Webb.  I have never before heard of Mr. Webb.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 6, 2012.

_____
                        Scott Lambert

---

[1] It is possible that I simultaneously sent these scripts to Mr. Stallone.

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MARCUS WEBB,                                    11 CIV 7517 (JSR)

               Plaintiff

                             **DECLARATION OF**
      -against-                    **DAVID MCKENNA**

SYLVESTER STALLONE, et al.,

               Defendants.

------------------------------------------------------------x

     DAVID McKENNA declares as follows:

     1.       As indicated in the attached report, I have been reading and evaluating screenplays, story treatments and other written material for various motion picture studios for 30 years, averaging 300 to 500 such reports a year.  I have also taught film courses, including screenwriting, at the university level for over 20 years, including at Columbia University, Barnard College, New York University and other institutions.  Last year I co-authored a book on story structure entitled *MEMO FROM THE STORY DEPARTMENT.*

     2.       I was retained by counsel for the defendants in this action to review and respond to the report of Michael Elias, dated March 19, 2012, in which Mr. Elias opines about so-called "striking similarities" between a screenplay by Marcus Webb entitled "The Cordoba Caper" ("*Caper*") and the motion picture entitled "The Expendables" (the "Film").  For the reasons set forth in the attached

report, it is my opinion that the similarities described by Mr. Elias are not "striking" (i.e., similarities so great that there is no reasonable possibility of independent creation) and, in several noteworthy instances, do not even exist. The two stories have some abstract similarities, but the evidence presented to allege "striking similarity" (as rebutted point-by-point in the attached report) is often the product of misstatement, dubious interpretation and exaggeration.   The attached report is an accurate statement of my opinion.[1]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2012.

David McKenna

---

[1] I have also attached a curriculum vitae, which accurately reflects my experience.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK


MARCUS WEBB,                                    Index No. 1:11-cv-07517 (JSR)

        Plaintiff,


  -against-

SYLVESTER STALLONE, DAVID E.
CALLAHAM, MILLENNIUM FILMS,
NU IMAGE FILMS, LIONS GATE FILMS, INC.,
LIONS GATE HOME ENTERTAINMENT, INC.,
ALTA VISTA PRODUCTIONS, INC., ALTA VISTA
PRODUCTIONS, LLC, and
DOUBLE LIFE PRODUCTIONS, INC.,

       Defendants.




## EXPERT REPORT OF DAVID McKENNA

**April 11, 2012**

## I.    __INTRODUCTION__

I am David McKenna. I have been reading submissions and writing coverage reports (plot synopsis, critical comment and recommendation about whether to invest in a submitted written material) for film studios (among others, 20th Century Fox, HBO, Focus Features) since the early 1980s. I have averaged 300-500 such reports a year for the past 30 years. I have sometimes been called upon to do "comparison coverage" in which I analyze and cite the similarities and differences between two or more scripts. I am currently retained by Focus Features, GK Films (which produced "Hugo") and Indian Paintbrush.

I have taught film courses at the university level since 1991. My employers in this regard have included NYU (the film school), SUNY Buffalo, Columbia University and the NY Film Academy. Starting in the mid-'90s, I have taught screenwriting and script analysis courses at Columbia and later, Barnard College and the ESRA French film academy (a university level institution in New York).

In 2011, I co-authored a book, MEMO FROM THE STORY DEPARTMENT (published by Michael Weise Productions), on story structure with former Hollywood studio executive and script consultant Christopher Vogler.

I have not served as an expert witness in the last ten years.

In this case, I am being compensated at the rate of $225 per hour. My compensation is not contingent upon my findings or the outcome of this matter.

In preparing this report I have had access to the following materials:

THE CORDOBA CAPER, screenplay, dated 2006 US Copyright Office,

THE CORDOBA CAPER, short story version

BARROW, screenplay, dated 6.08.05,

BARROW, screenplay, dated 1.24.06,

THE EXPENDABLES, screenplay, 9.18.08,

THE EXPENDABLES, screenplay, 2.20.09,

THE EXPENDABLES, screenplay, "cherry revisions" 6.12.09,

THE EXPENDABLES, screenplay, "tan revisions", 10.19.09,

2

THE EXPENDABLES, DVD

THE DOGS OF WAR, DVD,

Declaration of Sylvester Stallone...for Summary Judgment,

Second Amended Complaint to US District Court, stamped 2.15.12, and

Michael Elias's expert report,

In this matter, I have been asked to provide my professional opinion regarding assertions made by the plaintiff and his expert that "there is no reasonable possibility that Stallone authored the screenplay for THE EXPENDABLES without access to and copying THE CORDOBA CAPER."

It is my opinion that THE EXPENDABLES appears to be an independent creation, arising from Mr. Stallone's adaptation of David Callaham's script BARROW. I find no indication of "striking similarities" (i.e., similarities regarding which there is no reasonable possibility of independent creation) between THE EXPENDABLES ("Expendables") and the plaintiff's script THE CORDOBA CAPER ("Caper"). I find that much of what Mr. Elias describes as "striking similarity" is the product of misstatement and exaggeration.

I understand that it is undisputed that Mr. Callaham's script for BARROW preceded Mr. Webb's script for THE CORDOBA CAPER. This report will initially focus on EXPENDABLES and CAPER, which I find to be fundamentally dissimilar works in both their general concepts and in their details.

Mr. Elias's report discusses 35 elements and eight so-called "secondary similarities" which he claims constitute "striking similarity" between CAPER and EXPENDABLES. As a result, what Mr. Elias does not thoroughly address in his expert report is that the main story, sense of genre and basic characterizations of EXPENDABLES appear to be derived from Callaham's BARROW and not from Webb's CAPER.

In the following report, I will respond to Mr. Elias's claims in the order in which he presents them. I will conclude the report with a brief analysis that describes obvious and overwhelming similarities between THE EXPENDABLES and BARROW and note the fundamental differences between both of those projects and THE CORDOBA CAPER. This brief closing analysis will indicate that claims of "striking similarity" between CAPER and EXPENDABLES are often the product of overstatement, misstatement and exaggeration. Those claims concentrate on dozens of minor details which would have no impact on the commercial appeal of EXPENDABLES. More importantly, the claims ignore the obvious and "striking" similarity between EXPENDABLES and BARROW.

3

## II. ALLEGATIONS OF STRIKING SIMILARITIES BETWEEN THE WORKS

A.                **General Comments**

Based on my review of the CORDOBA CAPER screenplay, the EXPENDABLES film, and other materials provided, I conclude that THE EXPENDABLES appears to have been an independent creation that required no access to or copying of Mr. Webb's screenplay. I find no indication that THE EXPENDABLES was anything other than an outgrowth of Mr. Callaham's screenplay for BARROW, combined with conventions from decades of men-at-war films, from information that has been in the news and in the public consciousness for years and from characteristics of Mr. Stallone's long-standing screen persona and the screen personas of the various actors who co-star with Mr. Stallone in THE EXPENDABLES.

I further conclude that the commercial success of THE EXPENDABLES was not the product of the alleged plot similarities between THE EXPENDABLES and THE CORDOBA CAPER as enumerated in Mr. Elias's report. Instead, that success is directly connected to audience nostalgia for the macho action picture hits Mr. Stallone made in the 1980s and '90s (and reflected in the more recent and similar hits of co-star Jason Statham) and the promise (conveyed in trailers and promotional posters) that THE EXPENDABLES would be an all-star homage of those previous commercial hits.

I dispute the conclusion that there are myriad striking similarities between Mr. Webb's screenplay and Mr. Stallone's film, as Mr. Elias claims in his expert report.[1]

B.     **Basic Plots of *The Cordoba Caper* and *The Expendables***

The basic plot of THE CORDOBA CAPER can be summarized as follows: oil baron SIR REGGIE (for personal reasons he does not initially reveal) hires mercenary St JOHN to bring down brutal Latin American dictator General GARZA. Garza and his cohort TORRES face a decline in oil production and are planning a brutal campaign of genocide to facilitate a shift to cocaine production. Disguised as an oilman, St John (backed by his teammates) convinces Garza and Torres that he can increase and secure oil production. St John forms an alliance with Garza's niece RENATA (who secretly leads a small band of armed rebels). St John and Renata become lovers and execute a series of tricks and deceptions which undermines the Garza-Torres alliance. As a result of these tricks, both Garza and Torres ultimately die, and Renata assumes the presidency. The country is left in good hands. It is suggested that St John and Renata will have a further relationship.

The basic plot of THE EXPENDABLES can be summarized as follows: shadowy figure

---

[1] Mr. Elias states that a character in Expendables is referred to as both "Monroe and "Munroe," and refers to him a "Munroe." I will adopt this spelling.

CHURCH (later be to exposed as a middle-man for US intelligence) hires BARNEY ROSS and his team of mercenaries to bring down a brutal Latin American dictator General GARZA. While doing reconnaissance for the mission, Ross and mercenary teammate LEE CHRISTMAS meet Garza's daughter SANDRA who guides them around the island. The reconnaissance mission reveals that Garza is a puppet of ex-CIA agent MUNROE, that Munroe is using Garza to monopolize the island's cocaine production for personal gain and that Church is actually targeting Munroe (not Garza) so the CIA can seize control of the Island's cocaine output. Ross deduces that the CIA will kill Ross and his team once the mission is accomplished, so he plans to reject the mission. But Ross reconsiders because of Sandra's faith in morality and justice. To save his own soul, Ross will take the mission on his own. His teammates join him on the basis of brotherhood. Ross and his teammates infiltrate the island, rescue the captured Sandra, physically battle their way through Munroe's henchmen and Garza's troops, kill Munroe (who has already killed Garza) and purge the country of its evil. At the end, it is suggested that Sandra and Ross have forged a spiritual bond.

Both projects deal with a mercenary effort to oust a Latin American dictator. But the techniques used in the two projects are grossly dissimilar. The tone and plot details are also dissimilar.

THE EXPENDABLES and THE CORDOBA CAPER are fundamentally different for the following reasons:

The **"sub-genres" are different.** (By "sub-genre", I am referring to distinctions within a genre. For instance, DR STRANGELOVE and BRIDESMAIDS are both comedies by genre, but they are different enough in tone, sensibility and intention so be classified in different "sub-genres". Along the same lines, THE WILD BUNCH and SUPPORT YOUR LOCAL SHERIFF can both be placed in the Western genre, but their "sub-genres" are different.) THE EXPENDABLES is a men-at-war action film, evidently conceived and executed at all points to capitalize on nostalgia for the macho action hits from the '80s and '90s (e.g., the RAMBO series, the DIE HARD series, COMMANDO, PREDATOR, RED SCORPION, MEN OF WAR, even the ONCE UPON A TIME IN CHINA series). Those hits featured Mr. Stallone, Bruce Willis, Schwarzenegger, Lundgren, Jet Li, etc (all of whom appear in EXPENDABLES) and to capitalize on co-star Statham's continuing that tradition with his TRANSPORTER hits. Having been present when that sub-genre was previously popular, Stallone and these other people are very familiar with the story elements that make the sub-genre work. By its very title, CORDOBA CAPER is a "caper" film, not a macho, men-at-war action picture. Caper films are very popular, but they are a different sub-genre, play by different rules and have different intentions. Perhaps the clearest precedent for CAPER is the then-innovative '60s TV series MISSION: IMPOSSIBLE in which a team of secret agents uses flimflam, disguise and dupery to outwit (rather than to out-fight) the enemy. THE STING and David Mamet's HOUSE OF GAMES, to name just two, use many of the same story telling rules and conventions. Frequently, the MISSION IMPOSSIBLE team targets dictators for this sort of deception. It is a fundamental distinction and the core of EXPENDABLES that its heroes confront and battle the villains directly, using explosives and firearms as their primary weapons, while the hero of CAPER uses

5

trickery, disguise, psychological sabotage and indirect confrontation rather that firearms (he very rarely uses a firearm) as his weapons of choice.

The **lead characters and their relationship to their mercenary teammates are different**. St John in CAPER is a trickster (e.g., "Only thing I love more'n a good double-cross is a good triple-cross!" Webb, p 115) who uses deception, disguise and double-dealing to foil his enemies. He uses fighting skills only as ploys in a larger game of misdirection. To execute his deceptions and confidence games, he relies upon back-up support from a team of functionary characters who are not developed with interior lives or with independent story threads in the script. In contrast, Ross and his men in EXPENDABLES are men of action who confront their enemies physically (e.g., emphasis throughout on knives, guns, and explosive weapons). They battle their enemies face-to-face without disguise and depend on sheer grit and firepower to decide the outcome. The team's success relies on physical prowess, and the secondary members of the team are individually developed with story threads or dialogue scenes of various length.

The **power structure in the Latin American country is different**. In CAPER the villains are a "junta" (a term used by Mr. Webb in his short story, page 2 and defined by dictionary.com as "a small group ruling a country, especially immediately after a coup d'état") that consists of local dictator Garza and his local military-political cohort Torres. They share power (each has a cadre of armed supporters) in a hospitable relationship (i.e., despite their titular political difference, their mutual name-calling is "a ritualized exchange they both enjoy." Webb, p 5) based on a greedy desire for wealth. In contrast, the EXPENDABLES villain is rogue CIA agent Munroe who uses local dictator Garza as his puppet. This is clear from the fact that Munroe dominates his puppet Garza ("I am your lifeline."), orders him at will ("Snuff those two.") and feels free to humiliate Garza in front of Garza's men. "Church" initially claims that Garza is the target, but Ross deduces that it's really Munroe that "Church" wants to undermine: Garza is a mere sideshow. In short, Torres and Garza are harmonious near-equals in CORDOBA, while EXPENDABLES dictator Garza hates and resents Munroe, the man who holds his leash.

Perhaps most importantly, the projects are based in entirely **different themes**. CAPER focuses on values of cleverness, trickery and pragmatism. St John takes the job because it's his only way to prevent employer Sir Reggie from unleashing a vendetta against him and his college-age daughter. In contrast, EXPENDABLES focuses on values of chivalry, spiritual redemption and honor. Ross is aware that the mission is foolhardy and suicidal. But if he allows Sandra to die, he will cost himself a chance for spiritual redemption.

In short, EXPENDABLES and CAPER are fundamentally different, and Mr. Elias's descriptions of so-called "striking similarity" are not supported by the elements of "sub-genre", character or plot/situation.

6

### C.    Mr. Elias's List of Supposed "Striking Similarities" Between the Works

In this section, this report responds to Mr. Elias's assertion of "striking similarities" between *The Cordoba Caper* and *The Expendables* on a point-by-point basis in the order in which Mr. Elias presents his "elements".

### *Elias Element 1: "The Name Of The Dictator — General Garza"*

Elias states: "*In The Cordoba Caper, the antagonist is a military dictator named General Garza. In The Expendables, the antagonist is a military dictator named General Garza. This element is not in Barrow.*"

Undeniably, the **name of the dictator** in both stories is "Garza". However, "Garza" is the 34th most common Hispanic surname in the US, as well a common name among all surnames.[2] With nearly 115,000 occurrences, it leads such common surnames as Castro, Vargas, Pena and Rios. "Garcia" (clearly related to "Garza") is the most common Hispanic surname in the US, with nearly 780,000 occurrences. Mr. Stallone stated that he was inspired to name his lead character (Barney Ross) and his villain (Garza) after historically famous prizefighters (incidentally, Statham's character Lee Christmas is named after a real-life mercenary). Mr. Elias seems to be challenging Mr. Stallone's credibility, but I see no reason to disbelieve Mr. Stallone, particularly since his stardom began with his role as the prizefighter Rocky Balboa, and he has lately participated in a prizefighting reality TV series, THE CONTENDER.

### *Elias Element 2: "The Dictators' Accomplices Who Are Also Adversaries"*

Elias states: "*In The Cordoba Caper, General Garza has an accomplice named Colonel Torres, who is nominally second-in-command to General Garza but in reality has his own security forces and power base. They have a mutually dependent but simmering antagonistic relationship rooted in their different ideologies: General Garza is a fascist and Torres is a Stalinist communist. Similarly, in The Expendables, General Garza has an accomplice named Munroe, a rogue former CIA operative, who is likewise nominally inferior to General Garza but who also has his own security personnel and power base. They have a mutually dependent but antagonistic relationship. What Webb has done in The Cordoba Caper is to bifurcate the villain, or split him in two. This unique and creative device provides tension and*

---

[2] See names.mongabay.com/data/hispanic.html, and
**http://www.census.gov/genealogy/www/data/2000surnames/index.html]** (click "File A: Top 1000 Names."
"Garza" is at No. 222 – that is among ALL names, irrespective of ethnicity.  It is ahead of names like Greene, Morrison, Jacobs and O'Brien, all of which are extremely common.

7

*conflict within the world of General Garza to the point that his "other half" eventually kills him. The same technique of bifurcation is used in The Expendables, and to the same effect; General Garza is killed by his "other half" Munroe. This device, I will add, is not commonplace, necessary, or stock material in mercenary films, where the logical progression would be for <u>the hero</u> to overcome and/or kill General Garza. This element does not appear in Barrow.*

In CAPER, junta partners Garza and Torres are both native to the country. Key junta members, each controls an independent military force (Garza's Palace Guard, Torres' Red Brigade). They are not adversaries. They share an "inside joke" that they are ideologically different, but in every behavioral way, they are agreeable partners in greedy crime. They harmoniously team up to exploit their country's natural resources for personal gain. They are in functional harmony. Mr. Elias's statement that "there is a simmering antagonistic relationship rooted in their different ideologies: General Garza is a fascist and Torres is a Stalinist communist" is a mischaracterization that is at odds with Webb's own description of their exchanges (e.g., "an inside joke", "a ritualized exchange they both enjoy" and that Garza speaks "almost fond[ly]", Webb script p 5, Webb short story p 3). Garza and Torres turn on each other during the story only because of business mistrust exacerbated solely by St John's trickery, not because of ideological differences.

In EXPENDABLES, native-born Garza seems to run the country, but outsider Munroe clearly runs Garza (e.g., Munroe demands of Garza in an unplanted coca field: "Where is **my** grove? Where is **your** manpower?" – [my emphasis]). Garza is not a brute by nature (e.g., he is slow to pull the trigger on three suspected thieves and fires only when Munroe kills one of the three and orders Garza to finish the job) and is morally conflicted about his alliance with Munroe ("Sometimes things are just not worth the money."). Garza's daughter Sandra suggests in conversation with Ross that Garza was once a decent soldier and a good father. But he's sold his soul and country out to ex-CIA operative Munroe. Moreover, Munroe does <u>not</u> have an independent military force (just two civilian-clad Caucasian body guards). Unlike St. John and his use of trickery to turn Garza and Torres against each other, hero Ross and his men don't need to create tension between Garza to make their mission succeed. Such tensions already exist, but are irrelevant to THE EXPENDABLES.

This is fundamentally different.

### *Elias Elements 3 & 4: "Accomplices Have Their Own Security*
### *Personnel; Distinctive Uniforms"*

Elias states: *"In each screenplay, the accomplice has his own security personnel loyal to himself. They even dress in distinctly similar uniforms. In The Cordoba Caper, General Garza has his Palace Guards who wear black SS-like uniforms while Torres has his Red Brigades dressed in Sovietstyle olive with red trim. In The Expendables, General Garza has his own troops dressed in olive with red trim while Munroe's security personnel wear civilian clothes, mostly black."*

Mr. Elias claims that the security personnel of the bad guy accomplices wear distinctive uniforms. It's true that in CAPER each " accomplice" has a personal army and that each army

wears a distinctive uniform. But in EXPENDABLES, Mr. Elias overstates the matter because the so-called "accomplice" Munroe has no personal army. His personal team consists only of two Caucasian henchmen (Paine and "The Brit") who wear civilian clothing. They are not dressed in "mostly black", as Mr. Elias asserts. One of the two wears black; the other does not. ("The Brit" wears a blue shirt and light colored pants.)

***Elias Elements 5 & 6: "Heroine Is Local Freedom Fighter, Related To General Garza"***

Elias states: *"Among the most significant examples of unique and original elements that could not reasonably be attributed to coincidence or prior works is the relationship of the heroine to General Garza. In The Cordoba Caper, the hero is looking for Salvadora, an opponent of General Garza's regime. In The Expendables, the hero meets Sandra who is also an opponent of General Garza's regime. The Lionsgate website for The Expendables describes Sandra as "a local freedom fighter with a dark secret." Indeed, in the March 11, 2009 draft of The Expendables, Munroe notes that Sandra is "short for Alexandra, which is Greek for 'defender of mankind,'" and, continues, "here you are."*
*The women in both works turn out to be related to General Garza; Salvadora/Renata in The Cordoba Caper is General Garza's niece, while Sandra in The Expendables is General Garza's daughter. They both have a relationship with the hero and oppose their relative's regime. It is true that Renata in The Cordoba Caper is the leader of the rebels while Sandra in The Expendables, while opposed to General Garza's regime, is not explicitly unveiled as the leader of the resistance (although described in the press materials as a "freedom fighter"). However, the idea of having the leader of a country whose female blood relative is playing a significant role in the opposition is what is critical to the development of the story, unique to Webb's screenplay, and copied by Stallone."*

Mr. Elias's claim regarding freedom fighters is inaccurate and misleading. Renata in CAPER is a masked armed rebel (using the nom de guerre "Salvadora") and leads a band of rebels in the field. But in EXPENDABLES, Sandra is not a fighter in any physical sense. There is neither a faction of freedom fighters in the field, nor does Sandra fight, masked or otherwise. Mr. Elias cites to a Lionsgate website as the source for his characterization of Sandra as "a local freedom fighter", but this characterization does not exist in the film.

It is true that both Renata and Sandra are relatives of the dictator in their respective works. But the former is a niece with an apparently warm relationship with her uncle (who has no idea that her secret alter ego is the rebel "Salvadora"), while the latter is a daughter who is openly hostile to and disapproving of her father.  These are different relationships.[3]

---

[3] Stallone states that Sandra was derived from "Sophie", daughter to a BARROW character, and remained a daughter to a different character when the initial BARROW father character was cut in subsequent EXPENDABLES drafts. This makes sense because BARROW's Sophie and EXPENDABLES' Sandra are daughters of (different) local leaders, express regret about the moral decay of their country, guide the lead mercenary on a reconnaissance mission, yearn for the day of freedom and motivate the hero to return.

Further, in CAPER Renata has a double identity which allows her to appear loyal to Garza at the palace while taking action against him in the field. In EXPENDABLES, Sandra openly opposes her father. Renata's double identity plays into Webb's story of caper trickery. Sandra's undisguised contempt for Garza's immoral choices and her function as a damsel-in-distress play into Stallone's chivalric men-at-war framework. These are fundamental differences.

It must be noted that the CAPER hero has a sexual relationship with Renata and enlists her to facilitate his flimflam sabotage tactics against Garza and Torres. EXPENDABLES hero Ross is not having a romantic relationship with Sandra, nor does he use her to facilitate his attacks on Munroe and Garza. Sandra becomes a captured damsel-in-distress, and Ross risks his life to rescue her because he concludes that failing to do so would cost him his soul. This is fundamentally different.

### Elias Element 7: "Cocaine As Source Of Wealth"

Elias states: *"In The Cordoba Caper, the country is running out of oil and other sources of income must found for the corrupt leaders. The solution is cocaine production. In The Expendables, the source of wealth is also cocaine production. This element does not appear in Barrow."*

This claim is inaccurate and misleading. In CAPER, the economy being run by the dictator is based on oil. Cocaine production is mentioned very briefly in Act One, but the subsequent action centers on oil. St John disguises himself as an oilman, wins favor from the villains by promising to boost and secure their oil production and demands that the oil pipelines be protected. Cocaine plays no role in the rest of the hero's mission. Protecting oil supplies, pipelines, etc, is what the dictator and his allies do. Even the climactic battle scene uses an oil tanker truck as a "Trojan Horse" and an oil refinery as a key location.

In EXPENDABLES, the economy being run by the dictator is based on cocaine and nothing else at all points.

### Elias Element 8: "Abuse Of Peasants To Further Cocaine Production"

Elias states: *"In both screenplays, workers and peasants are terrorized, killed and exploited to further the cocaine production. In the Cordoba Caper, the aim is to drive the peasants off their land so that it can be used to grow coca, while in The Expendables, the peasants are brutalized into working harder to increase production. These similarities, although differing slightly in form, are identical in their purpose in the story. This element does not appear in Barrow."*

Mr. Elias claims that there is a striking similarity in that both projects feature abuse of peasants to further cocaine production. But cocaine production (aside from a single brief verbal reference and as noted in the Element 7 paragraph) plays no part in the interaction between hero St John and the villains in CAPER. They are dealing with potential wealth from oil, not cocaine. Hero St

John's sabotage tricks (e.g., his oilman disguise, his use of the pipeline defense as a feint, his use of the oil truck as a Trojan horse) are all based in oil production, not in cocaine.

### Elias Elements 9-13: "Description Of Presidential Palace"

Mr. Elias states: *"In The Cordoba Caper, General Garza's presidential palace is "neoclassical"; is dominated by a statue of General Garza in the courtyard; has a prominent balcony overlooking an outdoor central staircase; has an outdoor swimming pool; and has underground-connected tunnels and holding cells for prisoners.*
*In The Expendables, General Garza's presidential palace is also neoclassical in its architecture; is dominated by a statue of General Garza in the courtyard; has a balcony overlooking an outdoor central staircase; has an outdoor swimming pool; and has underground tunnels, cells and torture chambers.*
*These similarities are made even more significant in that they are used in a specific way in the action of the movie. Although it may be argued that a presidential palace is common to the genre and necessary to the story, it is significant that Stallone has used a dominant statue of the dictator, a large outdoor swimming pool, a balcony overlooking a central outdoor staircase, underground tunnels and cells, all as first described in Webb's screenplay.*
*Aside from the mention of a tower behind the palace and the existence of a front courtyard and a large roof, there is no description of the presidential palace in Barrow."*

Mr. Elias claims striking similarities regarding the presidential palace in both stories (i.e., balconies, swimming pools, statues, tunnels and underground chambers). Mr. Elias devotes 5 of his 35 points to these elements. It should be noted that both presidential palaces feature physical qualities that viewers of American television news have known since the fall of Saddam Hussein provided an inside look at his palaces. As such, the details specified in this claim have been in the public consciousness before EXPENDABLES, CAPER and even BARROW were written. This report will address the supposed similarities one-by-one.

**Dictator makes speech from a balcony:**    This is a very common image. To name two examples, it occurs in Paul Mazursky's MOON OVER PARADOR (1988) and in Ivan Reitman's DAVE (1993). The image is so common that Seth McFarlane spoofs it in a FAMILY GUY episode ("Untitled Griffin Family History" season 4, episode 27, 5.14.06) when Peter's ancestor upstages uncle Adolf Hitler during a balcony speech Hitler makes to a crowd. A comedian like McFarlane doesn't spoof an image unless the audience is familiar with it.

**Presidential Palace features a dominating statue of General Garza:**  Iconic statues of this sort seem to be common in countries ruled by dictators. Tearing down Saddam's statue in Iraq was one of the best-known images from 2003's "Operation Iraqi Freedom". When the Iron Curtain fell in the late 1980s and early 1990s, images of falling Communist statues were also common. Further, the EXPENDABLES film features no close-up shot of the statue, so it's unclear that it's General Garza who is being depicted.

11

**Presidential Palace features an outdoor swimming pool:** Luxurious pools of this sort are commonplace in films to depict fabulous wealth and decadence. In Brian DePalma's SCARFACE (1983), anti-hero Tony's dope lord boss Frank has one, and Tony later bathes in a pool-sized bathtub. In Jack Smight's HARPER (1966) a world-weary private eye hero is summoned to a mansion where the decadent employer has one. In Francis Coppola's THE GODFATHER (1972), Hollywood mogul Jack Woltz shows off the huge pool on his estate when negotiating with Mafia lawyer Tom. Further, the pool is never used in THE EXPENDABLES and plays no discernible role in the action.

**Presidential Palace features underground tunnels and cells:**    These are pretty common features. The architectural idea of underground dungeon cells and torture chambers under castles dates back at least to the 14th century throughout Europe.

In movies, such dungeons, torture chambers and corridors are familiar and appear in James McTeigue's V FOR VENDETTA (2005), Bud Yorkin's START THE REVOLUTION WITHOUT ME (1970) and Richard Lester's THE THREE MUSKETEERS (1973).

It's a critical difference that the torture in EXPENDABLES is genuine and based on "waterboarding", a controversial tactic much in the public mind during the American invasion of Iraq in 2003 and after. The torture in CAPER does not involve "waterboarding". (Far more importantly for our discussion, the CAPER torture is faked and controlled by the hero. See my response to Elias Element 21.) This is fundamentally different.

In EXPENDABLES, the underground corridors are the setting for a major combat scene. But the most striking detail of the setting is that it is littered with hundreds of packages of cocaine (the implication being that there's so much cocaine, it floods into the hallways). Since CAPER deals with oil instead of cocaine, there is no similar element.

### Elias Elements 14 & 15: "Hero's Initial Refusal of Job; Motivated by Woman to Accept"

Mr. Elias states: *"Another unique similarity in the plots of the two works is that the hero in both initially refuses the job and accepts it only after the threat to a woman's life. I recognize that the woman in The Cordoba Caper is St. John's daughter, while the woman in The Expendables is a native Vilenan, and their lives are in danger for different reasons. However, the hero's motivation to take the job not for money but for an altruistic reason is the same, serves the same purpose in the film, and was first written by Webb and later used by Stallone. Altruism and moral obligation to a woman is, again, one of a myriad of deliberate creative choices that can be made by the writer when determining the hero's justification for accepting the job (other obvious options being that he accepts the mission for the money, for pride, to avenge his fallen comrades, or for a number of other reasons)."*

12

Mr. Elias rebuts his own allegation while he is making it. He claims in his second sentence to "recognize that the woman in THE CORDOBA CAPER is St. John's daughter, while the woman in THE EXPENDABLES is a native Vilenan, and their lives are in danger for different reasons." but Mr. Elias then disregards all the dissimilar points he's recognized to claim "striking similarity" between details that he's just admitted are different.

To be clear, St. John only refuses the job momentarily until would-be employer Sir Reggie threatens him. St. John accepts the job in the next moment when he recognizes that Sir Reggie is effectively threatening St. John's life, St. John's home and St. John's college-age daughter. The threat is explicit, personal and immediate.

Unlike St. John, EXPENDABLES' Ross actively seeks the job. He considers rejecting (but does not reject) the mission only 37+ pages later, after going on the reconnaissance mission and only after deducing that his employer "Church" will later kill him and his men (hence, the EXPENDABLES title). "Church's" threat (unlike Sir Reggie's) is implicit, impersonal and delayed.

Ross meets Sandra for the first time while on the reconnaissance mission. Unlike St. John and his daughter, Ross and Sandra are not related. Unlike St. John who acts to save himself and his family, Ross takes the mission only because of a conscience-driven feeling for Sandra and a belief that he must save his own soul.

Mr. Elias is correct when he recognizes the fundamental differences and is way off base when he back tracks to claim similarities in what he's just claimed to be different.

### Elias Elements 16-17: "Arrest Of Heroine And Response To The Arrest"

Mr. Elias states: *"In The Cordoba Caper, Colonel Torres, General Garza's Minister of State, and his Red Brigade soldiers, arrest Renata, the woman opposed to the regime and assisting the mercenaries. In The Expendables, Sandra, the woman opposed to the regime, is arrested on orders from Munroe. In both screenplays, both the hero and, later, General Garza, are distraught at the arrest of the woman."*

This allegation disregards the all-important point that Renata's arrest in CAPER is part of St John's intricate plan to deceive and sabotage Torres and Garza, while Munroe's seizure of Sandra in EXPENDABLES is genuine and out of the heroes' control. In CAPER, unwitting Torres arrests Renata because of clues given him by A MAN IN SILHOUETTE (Torres: "What do you mean, the angles don't match?", Webb script, p 86-7). This "Man" is a St John accomplice who is intentionally tricking Torres ("Torres never figured out ...that his 'CIA' tip-offs came from us?" Webb. p 113). This trick and the subsequent arrest are intended to further St John's overall con game caper. St John wants Renata arrested as part of his caper plan. The arrest is a trick, and both St John and Renata are in on it.

In EXPENDABLES, Munroe captures Sandra because she's been helping Ross. It is noteworthy

13

that Munroe has no legal standing to "arrest" Sandra. He seizes her, and that seizure is violent, genuine (unlike CAPER) and fraught with peril.

The situations are fundamentally different because St. John and Renata have set up of the CAPER arrest, while Ross has no control over the seizure of Sandra in EXPENDABLES.

### *Elias Element 18: "Distinctive Aircraft"*

Mr. Elias states: *"Both The Cordoba Caper and The Expendables employ a specially equipped aircraft with an unusual capability — to spray a liquid to thwart or punish the enemy. That again, is a conscious artistic choice by the creative mind behind the screenplay. In The Cordoba Caper, the aircraft is a Whispercopter that launches a missile, which deploys ink and blackens the windshield of a speedboat - causing it to crash. In The Expendables, Ross's plane has a device that sprays gasoline that is ignited and causes the destruction of a pier."*

Mr. Elias claims a "striking similarity" in that both films feature **distinctive aircraft**. This is an obvious overstatement. In CAPER, the aircraft is a helicopter. In EXPENDABLES, the aircraft is a seaplane. That is obviously different. In CAPER, the "Whispercopter" fires a weapon specifically designed to spray blinding ink. (Webb script, p.2.) In EXPENDABLES, pilot Ross dumps his plane's excess fuel (**not** a specifically designed weapon) to ignite an explosion. Another obvious difference. The abstract similarity is that both machines can fly and can drop liquids. The striking differences are the nature of the machines (a plane vs. a helicopter), the nature of the weapons (one is a premeditated, high-tech design to execute a trick while the other is an improvised low-tech form of deadly napalm) and the placement of the machine sequences in the two stories (CAPER occurs in the opening "teaser" segment while EXPENDABLES occurs in the body of the story). These "distinctive aircraft" are fundamentally different.

### *Elias Elements 19 and 20: "Heroine's Apartment Ransacked; Heroine Is Arrested"*

Mr. Elias states: *"There are further events in the lives of the two heroines that are similar. In The Cordoba Caper, Red Brigade soldiers ransack Renata's apartment and arrest her. In The Expendables, Red Guard soldiers ransack Sandra's apartment and arrest her. These elements do not appear in Barrow."*

This is substantially a restatement of allegations made and rebutted in Elements 16-17 (i.e., "arrest of heroine"). The rebuttal remains the same. In CAPER, St John is working behind the scenes to manipulate the villains, while in EXPENDABLES, Ross and his team are nowhere in sight and have no control over Sandra's immediate fate.

14

***Elias Element 21: "Heroine Tortured For Information"***

Mr. Elias states: *"In The Cordoba Caper, Renata is shackled to a box spring and tortured by General Garza's accomplice, Torres, in order to get information about the mercenaries. In The Expendables, Sandra is tied to a table and tortured by General Garza's accomplice, Munroe, in order to get information about the mercenaries. This element does not appear in Barrow."*

Mr. Elias refers to striking similarities in the torture of the various heroines. But the suggestion once again ignores the far more significant difference. In EXPENDABLES, the torture is genuine and is intended to conjure images of controversial torture techniques (i.e., waterboarding) known from the well-publicized War on Terror. In CAPER, hero St John and Renata manipulate the torture sequence. It is a fake being staged to trick the villains, and the hero and heroine know it (Webb script, p 113, Webb story, p 24: "Torres never figured out we switched 'em, huh?" [i.e. the phony cattle prod from the supposed torture scene]). Unlike the good guy characters in EXPENDABLES, the good guys in CAPER never face physical harm because of this bogus "torture". Further, CAPER features a similar fake torture sequence featuring secondary character Domingo. There is nothing like that in EXPENDABLES.

***Elias Elements 22 and 23: "Heroine Taken To Garza's Office And Revealed"***

Mr. Elias states: *"In The Cordoba Caper, following the torture scenes in the underground tunnels of the government buildings, Renata is brought to General Garza's office by Torres, where he reveals to General Garza that she is a rebel fighter. General Garza is furious at Torres for arresting Renata and wants her freed. Similarly, in The Expet-tdables, after Sandra is tortured, she is brought to General Garza's office where he says to her (in Spanish) "You are everything I should have been." I take this to be an acknowledgement that he now knows that she is a rebel and right to be on the side of the mercenaries seeking to depose him. These elements do not appear in Barrow."*

It's a big narrative point in CAPER when niece Renata is exposed to be the masked rebel leader, "Salvadora". This is so because Salvadora's identity is a mystery the villains have long hoped to solve. There is no similar point in EXPENDABLES, since even lowly troops know all along that daughter Sandra is not friendly to the Munroe-Garza cause (e.g., they openly attack her when they see her showing the presidential palace to Ross). When CAPER's Torres discovers Renata's double identity, he is pleased because he's solved a political mystery. When EXPENDABLES Garza is physically confronted by his disapproving daughter, he is reacting only as a parent who has failed his responsibility and as a man who has sold his soul. Further, the revelation of "Salvadora" in CAPER is part of St John's overall deception plan, and he controls it from a distance. The EXPENDABLES moment is genuine, and the heroes have no control over it. The two moments are fundamentally different.

15

***Elias Element 24: " Team Sympathetic Hero's Personal Motives"***

> Mr. Elias states: *"In The Cordoba Caper, the members of St. John's team are sympathetic to his predicament (his daughter's life in danger) and support his mission to Cordoba to complete the assignment. In The Expendables, Barney's team show up and join him in his return to Vilena to save Sandra. The heroes' personal problems are the same, the reactions of their teams are also the same, and the purpose of both in the screenplays is identical; support and motivate the hero to action by the threat to a woman."*

Mr. Elias claims that in both stories the supporting teammates are sympathetic to the hero's personal motives for continuing the mission. That is clearly true in EXPENDABLES. When Ross tells his teammates that he's returning to Vilena on "personal business", he plans to go in alone. It's a series of telling thematic moments when each teammate subsequently finds a personal reason to join him. There is no comparable moment in CAPER. There is no scene in which St John consults with his teammates about a change in mission or in which his teammates make individual choices to stick with him. It is a significant difference between the two stories is that the secondary characters in EXPENDABLES are developed in individual story threads of varying length while there is no such development in the secondary characters of CAPER. The characters in CAPER perform functions, but their back-stories and interior lives are not dramatized. This is fundamentally different.

***Elias Element 25: "General Garza Makes Speech"***

> Mr. Elias states: *"Following Renata's arrest in The Cordoba Caper, and just before Torres brings Renata to General Garza, General Garza makes a speech to his countrymen and promises to nationalize the oil industry. In The Expendables, following Sandra's arrest, and just after Munroe brings Sandra to General Garza, General Garza makes a speech to his forces in which he apologizes for his misdeeds."*

Mr. Elias claims that the dictator in both stories makes a "speech". That claim of similarity ignores the significant fact that in CAPER it's a pre-written, schedule, televised propaganda speech delivered to the multitude and designed to maintain the dictator's hold on the country (i.e., to explain that his junta is taking over the oilfields). In EXPENDABLES, it's a spur of the moment impulse in which the dictator is confessing his sins and purging his soul merely to the several dozen soldiers who happen to be within earshot. In CAPER, the dictator uses the speech to maintain the embattled status quo. In EXPENDABLES, it is not so much a "speech" as words the dictator speaks to change sides in the ongoing moral battle (e.g., he tells his idealistic daughter "You are who I should have been."). The storytelling purpose and the nature, content and context of the so-called speeches are fundamentally different.

***Elias Element 26: "Accomplice Turns On, And Kills, General Garza"***

> Mr. Elias states: *"In The Cordoba Caper, following the speech, Torres turns on General*

16

*Garza, shoots and kills him. In The Expendables, following the speech, Munroe turns on General Garza, shoots and kills him. As noted earlier, what is unique and original is the fact that the main villain, General Garza, is killed not by the hero, as would be commonplace in the genre, but by his accomplice, and the fact that the accomplice was in a position to do so."*

Mr. Elias claims that in CAPER, Torres turns on Garza and kills him. Mr. Elias has misread the script. Here is what happens at this moment in CAPER (Webb script, p 103-105):

At the moment when St John's sabotage plan peaks (i.e., his people, teamed with Renata's rebels, blow up the oil refinery), Torres and Garza race to Garza's office. Garza (he and Torres have been deceived by St John's trickery into mistrusting each other) reaches for his handgun to kill Torres. At that moment, St John's people confuse Torres and Garza by plunging the office into darkness. Three gunshots are fired in the dark, heard (but importantly not seen) by both Torres' troops, and Garza's troops, who are standing nearby. St John (disguised as a Garza guard) comes forward to proclaim to Garza's troops that Torres has assassinated Garza with the unseen shots (even though we know that Garza is not dead at this point because he dies seven pages later. See Webb script p104 and 111) is attempting a coup (we have seen no indication of this from Torres) and must be stopped. In the next moment, Renata's rebel associate Ignacio (disguised as a Torres guard) comes forward to proclaim to Torres' troops that Garza has arrested Torres (which we know has not happened) and must be stopped. St John's people restore the light, and the two armies (fooled by the fiery announcements from disguised St John and Ignacio) battle each other to the death.

Clearly this sequence is a St John trick and the climax of his grand deception plan. He creates and then exploits the blackout and the staged shots in the dark to baffle Torres and Garza and to incite combat between the Torres and Garza armies. We never see Torres shoot Garza, and it's likely (and consistent with what we've seen of St John) that it was a St John henchman (not Torres) who fired the shots in the dark to instigate the ensuing chaos. Mr. Elias ignores all this (i.e., the momentum of all St John's actions to this point) and incorrectly concludes that Torres has killed Garza. Like Garza's troops, Mr. Elias has fallen prey to St John's deception.

There is nothing like this in EXPENDABLES. The trickery involved in this moment is the heart of CAPER (that's why it's called a "caper") and the sub-genre of film Mr. Webb is promoting. The sensibility of this moment runs completely counter to the basis of the macho action movies Callaham in BARROW and Stallone in EXPENDABLES are evoking. In these movies, climactic showdowns are traditionally face-to-face duels.

In the EXPENDABLES moment that Mr. Elias claims is similar, puppet-master Munroe pulls out a pistol and guns Garza to death because (at a peak moment) Garza wants to betray Munroe and to end the corruption industry Munroe has developed. There is no trickery. There is only straightforward violent reaction. Munroe's "puppet" is malfunctioning, so he destroys it as he might destroy a toy that is throwing sparks.

17

The relationship between the two villains in each story is fundamentally different. The climax of that relationship (as seen here) is fundamentally different. Mr. Elias is misrepresenting what is on the page.

**Elias Element 27: "Security Personnel Turn On Each Other"**

Mr. Elias states: *"In both screenplays, General Garza's forces and the forces loyal to his accomplice turn on each other in a bloody shootout. This element does not appear in Barrow."*

Mr. Elias claims that, in both stories, forces loyal to the dictator turn against forces loyal to the dictator's accomplice. Aside from evidence offered in the "Element 26" response that the CAPER forces are being tricked into turning on each other, "Element 27" is inaccurate because no such event happens in EXPENDABLES. As noted in the response to "Elements" 3 & 4, in EXPENDABLES, Munroe's security team consists of only two Caucasian men. These two do not turn against Garza's troops. They fight side-by-side with them against the mercenary heroes. Mr. Elias is referring to something that does not exist in EXPENDABLES.

**Elias Element 28: "Accomplice Abducts Heroine"**

Mr. Elias states: *"In The Cordoba Caper, Torres forcibly abducts Renata and takes her hostage as he attempts to escape. In The Expendables, Munroe forcibly abducts Sandra and takes her hostage as he attempts to escape. The specific sequence of events leading up to this element, starting with searching of the heroine's apartment, her arrest, torture, being taken to General Garza's office where he is killed by his accomplice, and now the abduction of the heroine in an attempt to escape, none of which is in Barrow, is too similar to be coincidental."*

Mr. Elias claims in both this "Element" and in "Element 32" that the so-called "accomplice" in both stories captures the heroine and uses her as a human shield. This is a stock storytelling convention, obviously familiar to both Mr. Webb and Mr. Stallone. Well-known examples of the capture of damsels in distress, the use of that damsel as a human shield and the hero's final ploy to rescue the damsel and foil the villain include DIE HARD (director John McTiernan, 1988), HIGH NOON (dir, Fred Zinnemann, 1952) and ROBIN HOOD (dir, Kevin Reynolds, 1991). The convention is so well known that writer-director Walter Hill tweaks it in 48 HRS (1982) by having Eddie Murphy get climactically stuck in the captured damsel-in-distress role. Fans of the classic SUPERMAN comic books know that Lois Lane frequently faces this fate, leaving Superman with the challenge of rescuing her from the villain's clutches. Mr. Webb did not invent this convention, so there is no reason to conclude that it must have been copied from CAPER.

18

***Elias Element 29: "Climactic Gun Battle With Sequenced Explosions"***

Mr. Elias states: *"In both screenplays there is a climactic gun battle in which the government forces are decimated. The deciding moment in the battle occurs in The Cordoba Caper when explosive charges previously planted blow up an oil refinery in a deliberate, well planned, and uniquely particular sequence. In The Expendables, the mercenaries' previously planted explosives blow up the Presidential Palace and a fuel tank in a deliberate, well planned, and uniquely particular sequence. In both sequences, the explosions cause havoc among the government troops and serve as a source of "cover" for the escaping mercenaries. This element does not appear in Barrow."*

Mr. Elias claims "striking similarity" in that both stories feature sequenced explosions as a tactic used by the mercenaries. This is a stock convention made familiar (to name only a few examples) from David Lean's THE BRIDGE ON THE RIVER KWAI (1957), Sam Peckinpah's THE WILD BUNCH (1969), Brian Hutton's WHERE EAGLES DARE (1968), Robert Aldrich's THE DIRTY DOZEN (1967) and even Andy Tennant's ANNA & THE KING (1999). Mr. Webb certainly did not invent this convention, so there is no reason to conclude that it must have been copied from CAPER.

***Elias Element 30: "Hero Chases Accomplice"***

Mr. Elias states: *"Later, as the mercenaries in The Expendables fight the remnants of General Garza's forces, Ross chases Munroe and Paine in order to prevent their escape and rescue Sandra. In The Cordoba Caper, St. John chases Torres with the intent of preventing his escape and rescuing Renata. This element does not appear in Barrow."*

Mr. Elias claims in this "Element" and in "Element 31" that both CAPER and EXPENDABLES feature sequences in which the hero chases the accomplice and prevents his escape. Such chases are a stock convention (hence the familiar idiom "let's cut to the chase") since the audience for this sort of thing demands a climactic showdown and final reckoning. The Clint Eastwood characters in DIRTY HARRY (1971), THE OUTLAW JOSEY WALES (1976) and TIGHTROPE (1984) execute such chases. The chase scenes in BULLITT (director, Peter Yates, 1968) and THE FRENCH CONNECTION (dir, William Friedkin, 1971) both involved heroes pursuing henchmen. James Bond chases DR NO (1962), THUNDERBALL villain Largo (1965) and archenemy Ernst Stavro Blofeld (without success) in YOU ONLY LIVE TWICE (1967). In each example, the villain is seeking escape and the hero runs him down. Mr. Webb did not invent this convention, so there is no reason to conclude that it must have been copied from CAPER.

***Elias Element 31: "Preventing Helicopter Escape"***

Mr. Elias states: *"In The Cordoba Caper, St. John kills the helicopter pilot so there is no escape. In The Expendables, Ross and Hale Caesar blow up the helicopter so there is no escape. While*

19

*Barrow includes a scene where the mercenaries blow up a helicopter belonging to the enemy at the airport, this scene is not near the Presidential Palace and is not related to the escape of General Garza's accomplice."*

Mr. Elias claims "striking similarity" in the hero's prevention of a villain's helicopter escape. But in CAPER, St John and his teammates gun down a helicopter pilot and physically block the villain's access to the helicopter. St John is a trickster who relies on flimflam instead of firepower, and this shooting appears to be St John's first lethal use of firearms in the climactic sequence. In short, St John uses new tactics (for him) to prevent the villain's escape. In EXPENDABLES, Ross and his teammates are in the process of blowing up and gunning down the presidential palace, the military and its equipment. It is typical of Ross that he blows up the would-be escape helicopter by hurling a huge artillery shell at the copter and igniting that shell with a barrage of handgun bullets. This recalls the machismo of similar scenes from RIO BRAVO (1959) and JAWS (1975).

Obviously, the simple killing of a pilot is different from the spectacularly explosive destruction of a helicopter. Further, the CAPER hero uses unusual tactics (for him) to prevent this would-be escape while the EXPENDABLES hero does what he always does in this matter. The details are fundamentally different.

### Elias Element 32: "The Final Confrontation"

Mr. Elias states: *"In both instances, the escape and chase leads to the hero's final confrontation with the heroine's captor, General Garza's accomplice. In The Cordoba Caper, Torres holds a gun to Renata's head. In a surprise move, St. John shoots through her killing Torres. In The Expendables, Munroe holds a gun to Sandra's head, which forces Barney to lower his gun. Munroe shoots and wounds Barney but Sandra distracts him and Barney draws his gun and kills Munroe. Again, there is a steady and consistent line of action with insignificant variables in both screenplays that are simply too similar to be coincidental. This element does not appear in Barrow."*

Mr. Elias redundantly claims in both this "Element" and in "Element 28" that the accomplice in both stories captures the heroine and uses her as a human shield. As noted in the response to Mr. Elias's "Element 28", this is a stock storytelling convention, obviously familiar to both Mr. Webb and Mr. Stallone. Well-known examples of the capture of damsels in distress, the use of that damsel as a human shield and the hero's final ploy to rescue the damsel and foil the villain include DIE HARD (director John McTiernan, 1988), HIGH NOON (dir, Fred Zinnemann, 1952) and ROBIN HOOD (dir, Kevin Reynolds, 1991). The convention is so well known that writer-director Walter Hill tweaks it in 48 HRS by having Eddie Murphy get stuck in the captured damsel-in-distress role. Fans of the classic SUPERMAN comic books know that Lois Lane frequently faces this fate, leaving Superman with the challenge of rescuing her.

### *Elias Element 33: "Hero Leaves Heroine With Money"*

Mr. Elias states: *"In both The Cordoba Caper and The Expendables, the heroes leave the heroine with a large sum of money for their country's benefit. This element does not appear in Barrow."*

Mr. Elias is inaccurate in this claim. On p 115 of the 1.24.06 draft of BARROW, the hero says: "This is the number of an account at the Bank of Sandrayo. I set it up on my first visit. Recently, a healthy sum has found its way into the account. It will be more than enough to repair the city, the palace, the airfield. To buy food for the people. To start anew." The detail of leaving money behind existed before Webb wrote CAPER.

### *Elias Element 34: "Hero Hints He Will Return"*

Mr. Elias states: *"In The Cordoba Caper, St. John and Renata are clearly in love and a furthering of their relationship is strongly indicated. In The Expendables, Barney and Sandra seem attracted to each other and when he leaves he promises to "always be around." This element does not appear in Barrow."*

Mr. Elias misinterprets this moment in EXPENDABLES to make his claim. It is true that CAPER's St John has taken Renata as his lover and plans some kind of future with her (e.g., he tells her he wants her to meet his college-age daughter, Webb script, p 114). But the leave-taking between EXPENDABLES' Ross and Sandra is entirely different. They are not lovers. Ross has been motivated by Sandra's spirit, not her physicality. He responds to her question about coming back by saying "I promise I'll always be around." Given the specifics of the Ross-Sandra relationship, it is more logical to infer that he means "If you need me, call me." than to infer that he intends to physically visit Sandra on the island. This interpretation is immediately substantiated by the fact that Ross and Sandra subsequently embrace like comrades and **do not** kiss like lovers and by the fact that Lee buttons the scene with the running punch line: "Truthfully. I never really thought she was your type." The CAPER hero may return. The EXPENDABLES hero has no such intention. The moments are fundamentally different.

### *Elias Element 35: "Rap Performance Closing"*

Mr. Elias states: *"In The Cordoba Caper, the hero celebrates their victory with a comical 'rap' type speech/poem in the company of his fellow mercenaries. In The Expendables, one of the mercenaries also delivers a comical 'rap' style speech/poem in the company of his fellow mercenaries. This element does not appear in Barrow."*

Mr. Elias inaccurately claims that both stories end in a rap performance. Actually, neither story does. Mr. Webb specifies that St John "soliloquizes" (p 115, Webb) at the end of CAPER. He is "rhapsodizing" (p 115, Webb). He is not "rapping". The allegation misstates what Mr. Webb has

21

explicitly written in his script.  Further, the poem that Lee performs at the end of EXPENDABLES is not a rap either: it's an out-of-rhythm variation of a limerick.  The claim is incorrect.

### *End Note on "Striking Similarities" Section*

The 35 "Elements" Mr. Elias enumerates in his report include numerous redundancies and inaccurate statements. For instance:

"Elements" 3 & 4 seem to be one element that is offered as two.

"Elements" 9-13 seem to be one element that is offered as five.

"Elements" 16 and 20 seem to reiterate the same point.

Statements made in "Elements" 3, 4, 14, 15, 18, 23, 24, 26, 27, 32 and 35 contain inaccuracies which contradict the claims.

Mr. Elias's claim regarding "Element" 26 completely misreads the climactic moment of Mr. Webb's story. He presents as fact things that do not exist.


### D.        Secondary Similarities

In this section, Mr. Elias proposes so-called "secondary similarities" between CAPER and EXPENDABLES as evidence that Mr. Stallone could not have created the EXPENDABLES details independently and, therefore, must have copied Mr. Webb.  This report will address Mr. Elias's points individually and in the order in which he presents them.


### *Elias Secondary Similarity 1: "Opening Hostage Rescue At Sea"*

Mr. Elias states: *"Both screenplays begin with a hostage rescue at sea. It is not necessary to start the film this way, but a deliberate and creative choice of the screenwriter. While I recognize the purpose of the scene, and the importance of introducing the mercenary team and any conflict among them, this scene could have taken place on land, on a battlefield, on a train, on a plane, in a car, or in a two-story textile office building in Iraq, as was the case in Barrow. But instead, in both The Cordoba Caper and The Expendables, the opening hostage rescue takes place at sea.*
*Furthermore, the mercenaries could have been introduced in the second, third, or fourth scene, rather than in the opening scene. The mercenaries could have been introduced in a warzone, on the mainland, or in any number of battle sequences rather than in a hostage rescue scenario. Again, all deliberate creative decisions that are nearly identical in the two works."*

CAPER opens with a "teaser sequence" which features a climactic showdown between a

22

kidnapper and a team of mercenaries who use trickery to foil the kidnapper's escape plan. The key elements in the sequence are a speedboat chase and a trick weapon which blinds the kidnapper.

EXPENDABLES opens with a "teaser sequence" which features a climactic showdown between a band of Somali pirates holding hostages and a team of heavily armed mercenaries who've come to the rescue. The key element in the sequence is a long gunfight concentrating on the mercenaries' explosive combat skills and overpowering physical force. The sequence occurs at sea only in the sense that it is staged in the hold of a ship. Unlike the CAPER scene, it involves no trickery, does not feature a chase on the water and does not happen in the open air.

Teaser sequences (often placed before a film's opening credits) are common in action-adventure pictures. Notably, the James Bond series has used them as a trademark for fifty years. Two Bond "teasers" (i.e., FROM RUSSIA WITH LOVE and YOU ONLY LIVE TWICE) present tricks in which the hero's supposed death is staged. The teaser in the Bond film THE WORLD IS NOT ENOUGH features an extended speedboat chase that somewhat resembles the opening of CAPER. In using a teaser opening, CAPER and EXPENDABLES are simply following a familiar film convention. Mr. Elias's allegation of similarity in this regard addresses a very minor detail and ignores all of the wide and obvious distinctions between these two sequences.

### Elias Secondary Similarity 2: "The Name 'O'Toole' Or 'Tool'"

Mr. Elias states: *"The Cordoba Caper features a team member named O'Toole; The Expendables features a team member named Tool."*

In CAPER, there is a character named "Terrible Terri" O'Toole. EXPENDABLES has a character named Tool. The CAPER character is a "cute but lethal" (Webb script, p 1) "20-something" female and a pilot. O'Toole is her family name. Aside from piloting aircraft, this character serves no thematic function in CAPER and has very little screen time. The EXPENDABLES character is non-cute, battle-scarred, middle-aged male tattoo artist who lives in a garage-type space loaded with tools and machinery. Presumably Tool is a nickname, not a family name. Unlike the CAPER character, he is thematically developed throughout the story. His garage-type space seems to be the headquarters of Ross' team, he has considerable screen time, and he becomes the sounding board and voice of experience that shapes the hero's decision to take the climactic action of the story. There is no fundamental similarity between these characters, and the claim seems fanciful at best and outrageous at worst.

### Elias Secondary Similarity 3: "To Hell And Back"

Mr. Elias states: *"In The Cordoba Caper, St. John is described as a man who's been to "hell and back." In The Expendables, Tool tells Ross: 'I got three pieces of work. Two a walk in the park,*

23

*one to hell and back.'"*

Both stories use the term "to hell and back". This term was the title of the best selling 1949 autobiography of Audie Murphy, one of the most decorated and most famous US soldiers of World War II. It was also the title of a subsequent film, causing the term to filter into common speech. It is unsurprising that people involved in professional warfare would be familiar with the term. The assertion is trivial, not "striking." The reference is common, and there is no reason to conclude that it must have been copied from CAPER.

### Elias Secondary Similarity 4: "'Zorro' Reference"

Mr. Elias states: *"In The Cordoba Caper, Renata says: 'Tell them I'm a combination of Joan of Arc, Abraham Lincoln, and Zorro.' In The Expendables, Ross asks Christmas, 'Who are you, Zorro?'"*

In both stories, the fictional character "Zorro" is mentioned. Zorro is a Hispanic figure from Old California made widely popular in fiction, movies and television shows throughout the 20th century. Zorro is a notorious idealist who opposes a repressive Hispanic ruler. In CAPER, the Hispanic heroine refers to herself with this term (as well as with the terms "Abraham Lincoln" and "Joan of Arc") to describe genuinely to the newcomers the ideals she represents. In EXPENDABLES, Lee teasingly and briefly mocks Ross' misuse of Spanish language grammar. Ross briefly wisecracks back: "Who are you, Zorro?" The contexts, sensibilities and functions of these two references could hardly be more different. The claim is trivial. The term "Zorro" is widely known, and there is no reason to conclude that it must have been copied from CAPER.

### Elias Secondary Similarity 5: "Got Guts"

Mr. Elias states: *"Impressed by Renata's courage in The Cordoba Caper, St. John says: "That gal has more guts." Impressed by Sandra's courage in refusing to leave her country in The Expendables, Tool says, "'She had some guts.'"*

Both stories use the term "guts" to refer to a courageous heroine. The term has been in American slang parlance since at least the 1930s (http://www.alphadictionary.com), and is frequently used to characterize heroic warriors. For instance, General George Patton's nickname was "Old Blood and Guts". The term is not limited to men of war. In 1588, facing the invasion of the Spanish Armada, Queen Elizabeth I of England famously responded to fears that she was too weak as a female leader by saying "I know I have the body but of a weak and feeble woman; but I have the heart and stomach (i.e., guts) of a king…" (http://www.britannia.com). The claim is trivial. The term is not unique to Mr. Webb, and there is no reason to conclude that it must have been copied from CAPER.

24

***Elias Secondary Similarity 6: "Death Squads"***

*Mr. Elias states: "Impressed by Renata's courage in The Cordoba Caper, St. John says: "That gal has more guts." Impressed by Sandra's courage in refusing to leave her country in The Expendables, Tool says, "She had some guts."*

Mr. Elias cites as a "secondary similarity" that both CAPER and a previous draft (not the film) of EXPENDABLES (but not the film) uses the term "Death Squad". This is a common term used (among other places) in Brazil ("Esquadrão da Morte") in the 1960s and during the 1980s civil war in El Salvador ("Escuadrón de la Muerte"). Use of the term has been further promoted by the writings of investigative journalist Allan Nairn (e.g., "Behind the Death Squads: An exclusive report on the U.S. role in El Salvador's official terror"), Jeffrey A. Sluka in his book DEATH SQUAD: THE ANTHROPOLOGY OF STATE TERROR (University of Pennsylvania Press, 2000) and Bruce B. Campbell and Arthur D. Brenner in their book DEATH SQUADS IN GLOBAL PERSPECTIVE: MURDER WITH DENIABILITY (Palgrave MacMillan, 2002). The reference is common. The term is not unique to Mr. Webb, and there is no reason to conclude that it must have been copied from CAPER.

***Elias Secondary Similarity 7: "Garza In A Bathrobe"***

*Mr. Elias states: "In The Cordoba Caper, General Garza appears with his guards by his pool in a bathrobe. In previous versions of The Expendables, General Garza appears with his guards by his pool in a bathrobe. This scene did not make it to the final film (in the final screenplay, General Garza is wearing his military uniform)."*

Mr. Elias finds "secondary similarity" in the fact that the dictator in CAPER and in an early draft of EXPENDABLES is seen by a swimming pool wearing a bathrobe. Such attire is common to a swimming pool setting and is an image of such insignificance that it does not appear in the EXPENDABLES film. Mr. Webb did not invent the idea of wearing a bathrobe by a swimming pool, and there is no reason to conclude that it must have been copied from CAPER.

***Elias Secondary Similarity 8: "Dead Already"***

*Mr. Elias states: "In The Cordoba Caper, the hero alludes to General Garza's accomplice, while still alive, as being "dead already." Similar language in similar context is used in earlier drafts of The Expendables"*

Mr. Elias claims "secondary similarity" in the fact CAPER uses the phrase "dead already" and that early drafts of EXPENDABLES uses unspecified "similar language". In CAPER, hero St. John tells villain Torres that further attempts to escape are futile ("Why bother? You're dead already.", Webb script, p.110). In EXPENDABLES, Munroe equates his soul-less existence with the spiritual lives of hero Ross and his men. ("We're both mercenaries,

25

both dirty, <u>dead</u> inside…")[4] The former is an active threat, spoken by the triumphant hero. The latter is philosophical musing, spoken by the doomed villain. They are fundamentally different.

***End Note on "Secondary Similarities" Section***

Mr. Elias claims that the existence of eight alleged "secondary similarities" between CAPER and EXPENDABLES suggests "more than coincidence or accident". But most of the alleged secondary similarities are either not similar (e.g., the opening rescue at sea) or are so common (e.g. the use of the term "guts" to characterize courage) that any similarity is meaningless and does not refute the possibility of independent creation by Mr. Stallone. It is my opinion that, lacking clear evidence of access and copying by Mr. Stallone, Mr. Elias is misstating or overemphasizing alleged similarities that either do not exist or exist only on the most abstract level.

**E.        Plot Structure of the Two Works**

This section of Mr. Elias's report seems to be a reiteration of points already alleged and already rebutted in sections C and D. Allegations made in this section imply that Mr. Stallone, an Academy Award nominated screenwriter and the creative writing force behind some of the most popular and commercially successful films of the past 35 years, is incapable of structuring the "architecture" of a film in a sub-genre he knows well without illicitly copying the work of someone else. An accusation this bold, in my opinion, requires proof more compelling and conclusive than what Mr. Elias offers in this section.

Yes, Torres ransacks Renata's home and then arrests her in CAPER, <u>but the arrest has been set up by hero St John as a trick</u> – a key point which Mr. Elias disregards. There is no such trickery in EXPENDABLES. As noted in Element 16, Munroe seizes, and does not arrest, EXPENDABLE's Sandra. It is fundamentally different.

Yes, Torres imprisons Renata in a cell and seems to subject her to torture, but the <u>torture is another trick set up by St John</u> (e.g., he's provided unwitting Torres with a fake cattle prod, Webb, p 113) and Renata knows it. Renata is never in genuine danger in CAPER. St. John and Renata <u>want</u> Torres to think Renata is giving up the details of an attack on the oil refinery, in response to being "tortured" with (what we later learn is) a fake cattle prod. (Webb script at 92.) There is no trickery in EXPENDABLES. Sandra is in genuine danger, is waterboarded and tortured. It is fundamentally different.

---

[4] Mr. Elias cites to p. 96 of the March 24, 2009 draft Expendables script.

Regarding Mr. Elias's assertions about presidential speeches and balconies: in CAPER there is a pre-written, televised propaganda speech delivered by the dictator to the multitude and designed to maintain the dictator's hold on the country (i.e., to announce the nationalization of the oil fields). This speech is very unlike the moment in EXPENDABLES when the dictator follows an impromptu impulse to confess his sins and purge his soul to several dozen soldiers who happen to be within earshot. In CAPER, the dictator uses the speech to maintain the embattled status quo. In EXPENDABLES, the dictator uses the speech to change sides in the ongoing moral battle (e.g., he tells his idealistic daughter "You are who I should have been."). It is fundamentally different.

Mr. Elias sees the balcony setting in EXPENDABLES but disregards Mr. Webb's clear stage direction that the CAPER speech is delivered not from a balcony, but from Garza's office. (Webb script p 95, 103-4.)

Yes, the daughter or niece character is brought to the General's office in both stories. But in CAPER it is a triumph for the villains that the niece's secret identity is exposed, while in EXPENDABLES Garza has ordered that Sandra be brought to him, she has no secret identity and her opposition to his regime has been known all along. It is fundamentally different.

It is not clear what the would-be ambush Mr. Elias cites in CAPER is. The ambush in EXPENDABLES is a realistic, face-to-face, extended battle set piece between the mercenaries and the troops of the villains. It is the climax of the story. In CAPER, con man St John uses disguise and trickery to incite the two villains' rival military factions to annihilate each other. Unlike the EXPENDABLES heroes who launch forward and attack, CAPER's St John and his team stand back and let the consequence of their deception do their work for them. It is fundamentally different.

The use of pre-set explosives to foil a counter-attack and to defeat the enemy is a convention seen in many other action films. Such devices are well known from Brian Hutton's WHERE EAGLES DARE and Robert Aldrich's THE DIRTY DOZEN, to name just two famous previous examples. One need not copy Mr. Webb to exploit this familiar storytelling device. (see this report, Section C, Element 29)

Despite Mr. Elias's statement to the contrary, it is clear from Mr. Webb's script that Torres has not actually killed Garza; indeed, the script suggests that he was shot (and wounded, not killed) by St. John and his accomplices. This report (see Section C, Element 26) describes in detail how this climactic sequence works in CAPER and conclusively proves that Mr. Elias has misunderstood what Mr. Webb has written. Claims of "similarity" made in the light of Mr. Elias's misunderstanding have no basis in reality.

Climactic shootouts between the good guys and bad guys are standard Act Three sequences in action films. Heroes customarily cut off the escape routes of villains, and villains frequently use hostages to get their way. A villain's use of a damsel-in-distress as a shield is also a familiar convention. Villains often get the upper hand in face-to-face showdowns only to be outwitted at the last moment by resourceful heroes. Mr. Elias is a long-time industry veteran. It is hard to imagine how Mr. Elias can believe that these storytelling conventions originated with Mr. Webb and that it is there is no reasonable possibility that Mr. Stallone created his EXPENDABLES sequences independently.

Finally, Mr. Elias claims that both stories end in a "rap performance." As noted in this report (see Section C, Element 35), this is incorrect. Mr. Webb specifies that St John "soliloquizes" (p 115, Webb) at the end of CAPER. He is "rhapsodizing" (p 115, Webb). He is not "rapping". Mr. Elias's claim ignores what Mr. Webb has explicitly written in his script. Further, the poem that Lee Christmas performs at the end of EXPENDABLES is not a rap either: it's an out-of-rhythm variation of a limerick.  There is no basis for this claim of similarity.

### *End Note on "Plot Structure" Section*

Mr. Elias's opinion ignores the obvious fact that Mr. Callaham's script BARROW and EXPENDABLES dramatize a mercenary team's explosive commando raid against a far greater military force while Mr. Webb's script THE CORDOBA CAPER dramatizes a series of tricks played by a flimflam artist to turn rival factions within a country against each other in order to topple a junta. Callaham and Stallone are writing a men-at-war commando raid story. Webb is writing a self-described "caper" picture. CAPER and EXPENDABLES are fundamentally different.

Further, it is significant that Mr. Elias's begins his Section E comparison of the supposedly similar plot structures of CAPER and EXPENDABLES at the mid-point of both stories rather than at the beginning. Traditionally in storytelling, it's at the beginning that a storyteller selects what elements, from all the possibilities in the universe, will constitute the dramatic "knot" of his/her particular story. Once this dramatic "knot" has been tied by the mid-point, there are limited ways in which the storyteller can untie it. By beginning at the mid-point, Mr. Elias ignores the difference in details and sensibilities that constitute the specifics of the tying of each story's "knot" and overemphasizes the more limited possibilities available to any storyteller in the untying process.

28

F.    **Striking Similarity Conclusion**

The similarities Mr. Elias claims between THE CORDOBA CAPER and THE EXPENDABLES are not "striking" (i.e., similarities so great that there is no reasonable possibility of independent creation) and, in several noteworthy instances, do not even exist. The two stories have some abstract similarities, but the evidence presented to allege "striking similarity" (as rebutted point-by-point in this report) is often the product of misstatement, dubious interpretation and exaggeration.

Neither THE EXPENDABLES nor THE CORDOBA CAPER is greatly original. Mr. Stallone created an homage to hit action films from the '80s and '90s, so he is intentionally revisiting conventions and replicating ideas that he knows well. I find no indication that he used anything from the unproduced CAPER screenplay to accomplish this task when his own background is so steeped in this sub-genre.


**III. CONTRIBUTION OF *THE CORDOBA CAPER* TO THE COMMERCIAL SUCCESS OF *THE EXPENDABLES***

Having found little substance to Mr. Elias's conclusion that Mr. Stallone must have copied Mr. Webb's screenplay, I see no reason why Mr. Webb should financially participate in the financial success of THE EXPENDABLES.

It is evident that the main story threads and overall sensibility that Mr. Stallone kept from Mr. Callaham's BARROW script played a great role in making THE EXPENDABLES a commercial hit. The BARROW script that Mr. Stallone transformed into THE EXPENDABLES is effectively expressed in the film's poster which promises a phalanx of instantly recognizable action stars and sports heroes in a high voltage adventure story loaded with explosives, physical combat and intimidating weaponry. It promises a return to the macho action films of the '80s and '90s which featured Mr. Stallone and many of his co-stars. The target audience bought into those promises.

The primary question is whether any of the minor details cited by Mr. Elias would have any impact on those promises. My answer is "absolutely not."


**IV. *BARROW* (NOT *THE CORDOBA CAPER*) AS THE SOURCE FOR *THE EXPENDABLES***


Until now and with few exceptions, this report has focused exclusively on Mr. Elias's claims of similarity between Mr. Webb's script and Mr. Stallone's film. These claims have used misstatements (e.g., Torres does not kill Garza, as Mr. Elias claims), trivial details (e.g., the wearing of a bathrobe by a swimming pool), absurd comparisons (e.g., staged and bogus torture scenes equated with genuine waterboarding), vague references

29

to "Zorro" and people with "guts" and stock elements (e.g., heroes who prevent a villain's escape) as proof of copying. This report has been addressed each of these claims point-by-point.

Since Mr. Elias's report ignores the overwhelming and obvious similarities between Mr. Callaham's script BARROW and Mr. Stallone's film THE EXPENDABLES, this report would not be complete without citing similarities to underline that THE EXPENDABLES is a clear and obvious outgrowth of BARROW .

BARROW pre-dates Mr. Webb's CORDOBA CAPER and is the basis for Stallone's THE EXPENDABLES. BARROW's basic plot (stripped of subplots which Stallone jettisoned in the making of THE EXPENDABLES) can be summarized as follows: a shadowy figure (MONDAY) hires BARROW to bring down brutal dictator General MIRAMONTE of a Latin American island nation. With help from mercenary colleague COCA, Barrow first does recon on the island. Barrow is guided by local woman, SOPHIE, daughter of quiet dissident / spiritual leader Dr ADOTI, and she hopes that her country will one day be freed from wicked rulers. She urges Barrow to be that liberator. Rogue CIA agents BALLCAP (on the island) and MURALI (at CIA headquarters) are using Miramonte as their puppet to control the island's hidden oil supply. Against long odds, Barrow assembles a team of mercenaries, infiltrates the island, kills Ballcap and Miramonte and (in a display of explosive derring-do), secures the island's future peace and honor by destroying the dictator's army and transferring money and presidential power to Sophie's father Adoti before wicked Murali can send in his reinforcements to maintain his puppet dictatorship.

In showing the linkage between BARROW and EXPENDABLES and the dissimilarities between both of these and THE CORDORBA CAPER, the following points are important and must be considered:

BARROW and THE EXPENDABLES portray men-at-war heroes who use personal combat and explosive weaponry to execute a commando raid against a Latin dictator's regime. THE CORDOBA CAPER does not.

In BARROW and EXPENDABLES there is little use of disguise and trickery. CAPER's action is based in disguise and trickery. The former are action films; the latter is a self-described "caper" about a "flim-flam" or "swindle."

A major selling point in BARROW and EXPENDABLES is that the heroes in both use firearms and fighting skill weapons in personal combat. CAPER has no such selling point.

BARROW and EXPENDABLES are both set on an island. CAPER is not.

30

BARROW and EXPENDABLES deal with efforts by US intelligence agents (rogue or otherwise) to use a dictatorial puppet they control to exploit and steal the natural resources of an island. The villainous leaders in CAPER are genuine leaders and not the puppets of hidden American controllers.

In BARROW and EXPENDABLES, the hero considers taking the mission because his prospective employer offers money. In CAPER, the hero considers taking the mission because his college-age daughter will be harmed if he refuses.

In BARROW and EXPENDABLES, the heroes (explicitly or otherwise) endanger the daughter of a local leader when they use her as a guide around the island. This daughter is not an armed rebel. In CAPER, the local female is an armed rebel, leading fighters in the field. She is not in genuine danger as a result of her interaction with the heroes.

In BARROW and EXPENDABLES, the lead mercenary does not have a romantic/sexual relationship with the local girl. In CAPER, the romantic/sexual relationship between the hero and local girl is a matter of importance.

Mr. Stallone streamlined Mr. Callaham's story and its details, but there are obvious connections between the characters in BARROW and those in EXPENDABLES.

EXPENDABLES lead mercenary Ross is a revision of BARROW's lead mercenary Barrow.

EXPENDABLES primary sidekick Lee Christmas, who, like Coca, is good with knives, is a revision of BARROW's primary sidekick Coca.

EXPENDABLES shadowy "Mr. Church" mirrors BARROW's shadowy "Mr. Monday."

BARROW's rogue US intelligent agents Murali and Ballcap presage EXPENDABLES' Munroe and Paine.

BARROW's Sophie is the daughter of a local leader. EXPENDABLES Sandra is the daughter of a different local leader.

These similarities between BARROW and EXPENDABLES clearly highlight the connection between the two projects. They propose a very different film experience from what Mr. Webb's CAPER script offers.

*    *    *    *    *

Analyses and opinions contained in this report are based solely upon information available to date and listed at the beginning of this document. I reserve the right to review documents, deposition

31

transcripts or other information that may become available and to supplement my opinions based upon that review.

David McKenna

# DAVID MC KENNA

200 West 108th Street #8D
NYC    10025
(212) 564-7993
d1mck1@earthlink.net

## EDUCATION:

**Carnegie-Mellon University**       1976, MFA, Theatre Directing
                                     2-year fellowship

**University of Texas at Austin**    1971, BA cum laude, Drama (acting) major
                                     2-year scholarship

---

## TEACHING EXPERIENCE:

**Columbia University (1997-present)        Summer Session**

**Screenwriting: From**       an intensive workshop in which students present a
**Pitch to Outline**          series of story ideas as verbal pitches, as written
                              screen stories and then as screenplay outlines.

**Topics in American**        a survey course which analyzes the history of the
**Cinema: The Horror**        horror genre from 1920's German Expressionism
**Film**                      through the 1980s and beyond.

**Topics in American**        a survey course which compares and contrasts the
**Cinema: Westerns &**        reality of American Manifest Destiny with films which
**The West**                  dramatize that mythology.

**Topics in American**        a survey course which analyzes the shifting images
**Cinema: At War On**         of the American military and foreign policy as applied
**Film**                      by Hollywood filmmakers.

**Script Analysis**           a lecture-demonstration designed to orient film
                              students in the craft of cinematic storytelling.

**Columbia University (1997-present)        Undergraduate Film**

**Senior Seminar**            a writing workshop in which undergrad film majors
**In Screenwriting**          develop dramatic ideas into screen stories and
                              full screenplays.

**Narrative Strategies**        a continuation of the Senior Seminar in Screenwriting.
**In Screenwriting**

**Script Analysis**            a 13-week lecture course designed to teach film
                               designed to teach film students fundamentals of            r
                               reciprocal action, three-act structure, polarities, etc.

**Columbia University (1992-98)**        **Graduate Film Division, School of the Arts**

**Being an Actor**             introduces graduate filmmakers to basic principles of
                               communicating with actors.

**Directing Actors**           applies the principles of Being an Actor to practical
                               situations.

**Barnard College (2003-present)**        **English Department**

**Screenwriting**              dramatic ideas are developed into screen stories and
                               scripts.

**Topics in American**    See above
**Cinema: The Horror Film**

**Auteur Studies:**            a survey of the works and career of the
**Clint Eastwood**             actor/director/producer

**The New York Film Academy (1993- present)**

**Story Structure**            a lecture/workshop which extracts the story-telling
                               principles from Joseph Campbell's HERO WITH A
                               A THOUSAND FACES and applies them to
                               screenwriting and directing.

**Intro to Acting**            a workshop designed for beginning actors to explore
                               the demands of on-camera and on-stage performance.

**ESRA (2007- present)**

**Screenwriting**              an interactive workshop designed to introduce 50+
                               visiting French students to the craft of screenwriting.

Case: 13-324    Document: 40    Page: 228    05/10/2013    933695    279

**SUNY Buffalo (2003)**                     **Film Department**

    **Script Analysis &**         a two-week workshop introducing students to the
    **Directing**                concept of screenplay construction and scene
                                    directing.

**The American Academy of Dramatic Art (1992-4)**

    **Guest Artist**          ran workshops and directed plays for and with the acting
                             students.

**New York University (2005)**               **Film Department**

    **Directing Actors**      introduces filmmakers to techniques of
                             communicating with actors.

**New York University (2012)**               **Music Department**

    **Guest Speaker**       lecture: the history of American musical comedy

**Alliance Francaise  (2005)**

    **Guest Speaker**       lecture: a personal history of French cinema.

**Glimmerglass Opera**        **(2003-4)**

    **Guest Speaker**       lecture: elements of BLUEBEARD on screen.

                            lecture: women in the Western.

**Greenwich (CT) Film Festival (2002-present)**

    **Guest Speaker**       lectures on films, including CITIZEN KANE, HUD,
                             LIFEBOAT, THE DAY THE EARTH STOOD STILL

**National Arts Club, NYC (2008-present)**

Guest Speaker    lecture on film and architecture as seen in THE
FOUNTAINHEAD

lecture on IN THE HEAT OF THE NIGHT and director
Norman Jewison.

**Rubin Museum of Art, NYC (2005)**

Guest Speaker    lecture on THE SHINING and director Stanley Kubrick.

**LaRoche College (1975)**

Guest Director    staged HEAR THE SOUND OF MY FEET WALKING…
that initiated the school's theatre program

**American College Theatre Festival (1986 & '87)**

Adjudicator    Texas Regionals, Immaculate Heart College,
San Antonio

---

**SCRIPT DOCTOR / PERFORMANCE COACH** ·    **(1985-present)**

Group Leader (1979-81)    N.A.T.A.S. Actors' Workshop

Founder (1988-92)    NY Actors' Gymnasium

Guest Artist / Director    Lee Strasberg Institute (1978)
University of South Dakota (1979)
Yale Dramat, New Haven (1984)
American College Theatre Festival (1986-7)
The Directors' Company, NYC (1991)

Writing Coach    (clients include:)
Lavinia Currier
Susan Dansby (AS THE WORLD TURNS)
Mark Harris (Desperate Comfort Films)
Cy Coleman & AE Hotchner (JUDGE & JURY)
Charlie Peters (JEKYLL & HYDE, "R")
James Yaffe (CLIFFHANGER)
Don Rifkin (A BRIEF PERIOD OF TIME)

---

## SCRIPT ANALYST   (1981-present)

Development notes for:

| | |
|---|---|
| Focus Features | (James Schamus, David Linde) |
| Indian Paintbrush | (Kara Van Abeele, Adam Draves, Jill Morris) |
| GK Films | (Denis O'Sullivan, Kahli Small, Abby Ex) |
| United Artists | (Bingham Ray) |
| Home Box Office | (Robt Conte, Colin Callender) |
| 20th Century Fox | (Marcia Nasatir, Tricia Burke, Henry Guettel) |
| Cinecom, X-roads | (Leon Falk) |
| CBS-Fox Video | (Nancy Tenenbaum, Stephen Poe) |
| Nederlander Film/TV | (Gladys Rackmil Nederlander) |

---

## THEATRE DIRECTING   (1971-present)

Representative work, 100+ plays (some dates approximate)

| | | |
|---|---|---|
| Broadway | CLIFFHANGER (1985)<br>also co-produced | The Lamb's Theatre |
| Off-B'way | JEKYLL & HYDE  (1976)<br>transfer of MFA directing project from Carnegie-Mellon University | LaMama ETC |
| | OF BLESSED MEMORY (1990) | The Directors' Company |
| New York | RICHARD II  (1986)<br>also edited the script | Ensemble Studio Theatre |
| | L-305 (1990)<br>premiere production | Soupstone Productions |
| | A BRIEF PERIOD OF TIME  (1987) | Soupstone Productions |
| | LIFE IS NOT LIKE THE MOVIES<br>(1995) musical | Players Club |
| | "R"  (1978)<br>premiere production | Westbeth Theatre Center |
| | THE COMEBACK OF A<br>ONE-EYED LION   (1980) | Walden Theatre |
| | METESKY (1987) | St Mark's Church |

Case: 13-324   Document: 40   Page: 241   05/10/2013   933695   279
**A1040**

|  |  |
|---|---|
| CASH FLOW  (1988) | Westbeth Theatre Center |
| VERONICA'S ROOM (1978) | NYU/Stella Adler Studio |
| WHAT THE BUTLER SAW (1977) four-month run & ensuing tour | Nat Horne Theatre |
| Gayle Humphries (1994) created & directed a cabaret act | Don't Tell Mama |
| MILLER'S TALE  (1984) premiere production | No Smoking Playhouse |
| ANDROCLES & THE LION (1986) musical, ensuing nat'l tour | Nat'l Shakespeare Company |
| PLASTIC  (1991) | Alice's Fourth Floor |
| THE BEST OF SEX & VIOLENCE (1990), premiere production | Ensemble Studio Theater |
| FAIR GAME (1989) premiere production | Ensemble Studio Theatre |
| BEHIND THE COUNTER WITH MUSSOLINI  (1997) | Westbeth Theatre Center |
| MISALLIANCE  (1994) | American Academy |
| Tunnel Vision edited & directed a sketch comedy writing/performing ensemble | Caoline's Comedy Club, etc |

| Regional | | |
|---|---|---|
| | THE FOREIGNER (1986-96 & 2004) ongoing nat'l tour | |
| | TUNA XMAS (1996) | Barter Theatre, Virginia |
| | THE FANTASTICKS (1983) | Lake Erie Rep |
| | CABARET house sales record | Yale Dramat |
| | IMMORALITY PLAY  (1983) | Alliance Theatre, Atlanta] |

| | |
|---|---|
| DESIRE UNDER THE ELMS (1972) | First Repertory, San Antonio |
| WHO'S AFRAID OF VIRGINIA WOOLF? (1979) | University of South Dakota |
| ARSENIC & OLD LACE (1994) | Casa Manana, Fort Worth |
| SLEUTH  (1980) house sales record | South Jersey Regional |
| AESOP'S FALABLES (1972) children's musical | Texas tour |
| THE BOYS IN THE BAND (1974) also produced | Championship Prdctns, Texas |
| KING LEAR (1992) | LA Workshop |
| DICK & JANE (1970) | Pacific Conservatory |

**VOICE-OVER / NARRATION / Television / Radio**

Representative work (1990- present)

| | |
|---|---|
| WITNESS 9/11 (2002) | MSNBC |
| STAGE MOMS (2003) | VH-1 |
| SCARFACE (2002) Expert commentary | The History Channel |
| THE SIXTH SENSE (2001) | Touchstone Pictures DVD |
| VOICES FROM GROUND ZERO (2001) | BNN Productions |
| DOCTORS' DIARIES  (2002) | Web MD/TV |
| FIG PUDDING (2000) | Scholastic (audio) Books |
| FROZEN MAN (2000) | Scholastic (audio) Books |
| GRAVEYARDS OF THE DINOSAURS  (2000) | Scholastic (audio) Books |

THE GREAT AMERICAN
ROAD RACE  (1999)                The History Channel

THE STAR-SPANGLED BANNER
CONSERVATION  (1999)        Smithsonian Institute

Wingspan Bank  (1999)          Coppos Films

CRIME STORIES
"Maximum Security" (1998)      Court TV

SCIENCE TIMES (1996)          The Discovery Channel

WHATEVER HAPPENED TO THE
DINOSAURS? (1994)          Blackwatch Productions

Matchbox Toys (1992-present)    industrials

In-Touch Network (1980-3)        closed circuit radio

The American Health Care Forum
('80s)                          industrials/BNN

The Public Agenda Forum  ('80s) industrials/BNN

---

**WRITER**

Radio scripts for Rabbit Ears Radio & Rabbit Ears TV ('90s)
        Performed by Mel Gibson, Danny Glover, etc.

LEARYCORP (1992)  Theatre script performed for four months off-off-B'way.

Co-write and co-edit films with Mark Harris and Desperate Comfort Films,
2001-present        Titles include:
BOTTOMS UP
IF YOU WERE THE LAST MAN ON EARTH…
MAGIC JUAN
MANHOLE series #1-4
BLOODY MARY
KATRINA

Book:        MEMO FROM THE STORY DEPARTMENT (co-written with
Christopher Vogler, published 2011 by Michael Weise Productions)

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MARCUS WEBB,                                                    11 CIV 7517 (JSR)

             Plaintiff

              -against-                               **DECLARATION OF**
                                           **MARTIN D. SINGER**

SYLVESTER STALLONE, et al.,

             Defendants.

------------------------------------------------------------x

        MARTIN D. SINGER declares as follows:

        1.        I am an attorney admitted to practice in the State of California and a member of

Lavely & Singer, P.C.  I am personally familiar with the matters set forth below, except as may be

otherwise indicated.

        2.        I have been practicing law in California since 1977.  I served as counsel to the

Writers Guild of America, West ("WGA") for a number of years and I have also represented

numerous clients in credit determination proceedings before the WGA.  As a result, I am intimately

familiar with WGA credit determination proceedings and the rules which govern them.  Sylvester

Stallone, a defendant in this action, is one of my clients, and my firm has represented him in such

proceedings, including one concerning the credits to be afforded him and writer David Callaham in

connection with the motion picture "The Expendables" (the "Film").

Case: 13-324    Document: 40    Page: 245    05/10/2013    933695    279

3.       While WGA credit determination proceedings are referred to as "arbitrations" and the panelists who participate in such proceedings are called "arbiters," the WGA has emphasized that they are not like the formal arbitrations conducted in other forums, in which one party asserts a grievance or claim of wrongdoing against another.  These proceedings are commonplace when more than one writer has participated in the preparation of a story, a screenplay, or has contributed dialogue or other material to a revised screenplay.  Indeed, they are automatic when there are multiple writers (unless two writers worked as a team) or where, as with the Film, one of the writers was also a production executive.  These proceedings are concerned only with what credits should be given to, or shared among, *acknowledged* writers; they have nothing to do with copyright infringement. A submission is made to the panel of arbiters on behalf of each writer (either by the writer himself, or his representatives), in which an argument is presented as to why that writer should be given a certain credit, and whether or not such credit should be shared with another writer.  It is common practice for the writers to advocate for the best possible credit. These submissions are not like legal pleadings or testimony –there is no hearing or testimony given; they are just written argument.

4.       The WGA has detailed rules and terminology regarding the types of credits that can be given in these proceedings.  The possible credits include, *inter alia*, "Story By," "Screen Story By," "Screenplay By," "Written By," "Based on Characters Created By" and others.  The arbiters read (at least) the final shooting script and the written work prepared by writers who may have worked on the project before it was final, in order to determine the relative contribution of each writer.  The writers' relative contributions are determined in the context of the material that was actually used in the final shooting script.  The arbiters may also decide the order in which the writers' names will appear in a shared credit; generally, the writer who is found to have made the greatest contribution is entitled to be listed first.  When a shooting script is the product of the last writer's rewrites of an earlier writer's draft, it is common for the last writer to seek sole credit for the screenplay, with the

earlier writer being entitled to receive at least a shared "story by" credit. Screenplay credit is determined by each writer's contribution to the dramatic construction, dialogue, characterization/character relationships and original and different scenes contributed by each writer.

5.    Because WGA credit arbitration proceedings are commonplace when there are multiple writers (and are automatic where one of the writers is a production executive or director), it is not at all unusual that Mr. Stallone – who has acted in, written, directed and/or produced scores of films – has been involved in a number of them over his 40 year career, including one concerning the Film[1], in which he wrote, *inter alia*, virtually all of the dialogue in the final shooting script. The submission prepared by Mr. Stallone's representatives[2] for the three arbiter panel in that proceeding asked that he and David Callaham, whose draft screenplay Mr. Stallone had rewritten, share "Story By" credit and that Mr. Stallone be given "Screenplay By" credit.[3] The panelists concluded that Mr. Callaham should get sole "Story By" credit and that the two writers should share the screenplay credit.

6.    I understand that in his opposition to the defendants' motion for summary judgment in this action, the plaintiff has attempted to attack the character of Mr. Stallone, an Academy Award-nominated screenwriter, by referring to the WGA credit determination proceedings in which Mr. Stallone has been involved (most of which were decades ago) and trying to equate these proceedings with copyright infringement. As set forth above, WGA credit proceedings – which concern only

---

[1] To the best of my knowledge Mr. Stallone was involved in only one other such proceeding in the last decade.

[2] Mr. Stallone's submission to the three arbiters panel regarding the Film was not prepared by my firm.

[3] See the first paragraph of the "Writer B" letter dated Aug. 27, 2009 (attached as Ex. H to the Declaration of David M. Kohane In Opposition To Defendants' Motion For Summary Judgment). Following the arbiters' decision to give Mr. Callaham sole "Story By" and shared screenplay credit, my firm submitted papers on Mr. Stallone's behalf to a WGA Policy Review Board, seeking review of the procedures surrounding that finding. That submission, which Mr. Stallone did not see, included a request for sole "story by" credit for Mr. Stallone, but this was an error since Mr. Stallone had already acknowledged that Mr. Callaham was entitled to at least shared "Story By" credit.

how credits shall be apportioned among writers whose participation in connection with a film project has been acknowledged – have absolutely nothing to do with copyright infringement. With respect to the latter, in the over 25 years in which I have represented Mr. Stallone, I am not aware of a single successful claim of copyright infringement having been asserted against him.[4]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2012.

_____

Martin D. Singer

_____

[4] The only copyright claim against Mr. Stallone during that period that I know of concerned "Rocky IV," in which the court not only granted summary judgment dismissing the plaintiff's claim, it found that the plaintiff had unlawfully written an unauthorized derivative work based on Mr. Stallone's first three "Rocky" films.  See *Anderson v. Stallone*, 11 U.S.P.Q.2d 1161 (C.D.Cal. 1989).

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MARCUS WEBB,                                    11 CIV 7517 (JSR)

               Plaintiff

                                  **SYLVESTER STALLONE**
      -against-                           **REPLY DECLARATION**

SYLVESTER STALLONE, et al.,

               Defendants.

------------------------------------------------------------x

        SYLVESTER STALLONE declares as follows:

        1.     I am a defendant in this action.  I submit this reply declaration in further support of

defendants' motion for summary judgment.  I am personally familiar with the matters hereinafter set

forth, except as may be otherwise indicated.

        2.     As I stated in my previous declaration, David Callaham's draft screenplay entitled

"Barrow" was provided to me in mid-2008 by my producer Kevin King, who had received it from

my agents at the William Morris Agency after I expressed an interest in a screenplay for an action-

oriented ensemble film.  I told my agent that I thought I could work with Mr. Callaham's draft

screenplay, and I then prepared numerous rewrites of it, making the changes I described in my

earlier declaration.  As I also stated, I have never seen or heard of Plaintiff Marcus Webb or his

screenplay or short story "The Cordoba Caper" prior to this lawsuit, and have never to this day read

his work.  My shooting script for the Film was the final product of my rewrites of Mr. Callaham's script, with some editorial assistance from Robert Kamen, who helped me pare down the script late in the process.  Even though these facts are beyond dispute, and Plaintiff has no evidence to the contrary, I understand Plaintiff attempts to cast aspersions on my professionalism and integrity by implying, among other things, that I somehow saw Mr. Webb's work through some unspecified means.[1]

3.    The very reason for my practice of looking at scripts <u>only</u> if they come through my agents (I have a strict policy of <u>never</u> accepting materials from other people) is precisely so that someone I have never heard of, like Mr. Webb, will <u>not</u> be able to speculate that I might have gotten a copy of a script by some unknown means.  The policy of refusing any unsolicited scripts is common among screenwriters, actors, producers and film studios, and I think an important and prudent one.

4.    I understand that plaintiff also cites out-of-context statements from and references to a Writers Guild of America ("WGA") credit arbitration regarding the Film.  Such arbitrations are automatic where a production executive or director was one of the writers on a project or where there were multiple writers (except where they worked as a team in writing a script).  Film credits are based on a detailed set of WGA rules, and these rules can bestow different types of credits based on the nature of a writer's contribution.  Like most of my colleagues who author or rewrite screenplays, I have been involved in numerous WGA credit proceedings in which the various writers who

---

[1] Among other statements, plaintiff misleadingly says: "[r]ather than writing an original work, Stallone had his agent search for screenplays that would provide a basis for *Expendables*."  There was, of course, nothing illicit about asking my agent to solicit potentially interesting properties from producers or other agencies, or in my revising Mr. Callaham's draft, since it was understood when it was submitted to my agent (apparently by a producer who was attached to Callaham's "Barrow") that I would probably revise it if I thought it had promise.  (There had been no interest in producing it in its present form.)

2

worked on a film make their pitch as to why they and the other contributors should be given greater or lesser credits.

5.    Contrary to plaintiff's baseless suggestions of some sort of impropriety, I personally put Mr. Callaham's name on drafts of "The Expendables" which I circulated. The cover page of those drafts said "Written by David Callahan and Sylvester Stallone," thereby acknowledging my source.[2] In the submission for the mandatory WGA credit determination which my attorneys submitted on my behalf, the panel was asked to give Mr. Callaham and me a shared "Story By" credit, but to give me "Screenplay By" credit because of the changes I had made to Mr. Callaham's draft, including dropping various subplots and scenes which I thought took away from the pure action motif I wanted.

6.    The decision of the three WGA arbitrators was that Mr. Callaham should receive sole "Story By" credit and that the screenplay credit would read "Screenplay By David Callaham and Sylvester Stallone," and these are the credits that appear in the Film.

7.    Plaintiff also cites to an article by Peter Clines which was supposedly based on an interview with me. As I testified at my deposition, I do not recall this interview, but even if the facts in it were based on my statements, they are simply incorrect: I had read and was revising Mr. Callaham's script well before anyone at Nu Image made any reference to a perceived similarity to "The Dogs of War" (which I had not seen at the time) or before Nu Image acquired rights to that property. Despite plaintiff's attempts to muddy the waters, I have never testified otherwise.

---

[2] The cover page of a later draft said "Written By Sylvester Stallone, Based on the screenplay BARROW by David Callahan." After still further revisions, I dropped Mr. Callaham's name from the cover page for two reasons: First, I knew that he would be entitled to a minimum of a shared "Story By" credit under WGA rules, and I felt that I had made sufficient changes to get the "Screenplay By" credit. Second, I felt that the prominent use of my name would help generate interest in the property among potential distributors whose investments would be needed to help finance the production.

3

Case: 13-324    Document: 40    Page: 251    05/10/2013    933695    279

**A1050**

8.    The Film is the product of the written work of Mr. Callaham and myself (with Mr. Kamen's editorial assistance), and had nothing to do with plaintiff's work, which I know nothing about.  Accordingly, I respectfully request that the Court grant defendants' motion, and dismiss plantiff's claim of infringement, which is utterly baseless.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __, 2012.

Sylvester Stallone

4

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

MARCUS WEBB,

                    Plaintiff

     -against-

SYLVESTER STALLONE, et al.,

                  Defendants.

---------------------------------------------------x

11 CIV 7517 (JSR)

**RESPONSE TO PLAINTIFF'S
STATEMENT OF ADDITIONAL
MATERIAL FACTS PURSUANT TO
<u>LOCAL RULE 56.1</u>**

Defendants Sylvester Stallone ("Stallone"), David E. Callaham ("Callaham"), Millennium Films, Inc., Nu Image, Inc., Lions Gate Films, Inc., Lions Gate Home Entertainment, Alta Vista Productions Inc., Alta Vista Productions, LLC and Double Life Productions, Inc. (collectively, "Defendants") respectfully submit this response to plaintiff Marcus Webb's ("Plaintiff") Statement of Additional Material Facts dated April 6, 2012.

<u>**RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

53.     There is no genuine issue as to whether Stallone had access to and copied elements of *The Cordoba Caper* because Plaintiff has submitted no evidence to contradict the facts asserted in the Declaration of Sylvester Stallone in Support of Defendants' Motion for Summary Judgment dated March 12, 2012 (the "Stallone Moving Decl.") and cannot contradict the facts asserted in the Sylvester Stallone Reply Declaration (the "Stallone Reply Decl."), the Declaration of Scott Lambert

dated April 15, 2012 (the "Lambert Decl."), and the Declaration of Kevin King Templeton (the "King Decl.") submitted herewith. All four declarations were made by people intimately familiar with Stallone's writing process -- Mr. Lambert in his capacity as Stallone's agent in 2008 (Lambert Decl. ¶ 1) and Mr. King in his capacity as Stallone's producer (King Decl. ¶¶ 1-2) -- and the four declarations establish that Stallone never heard of, received, saw, or otherwise came into contact with *The Cordoba Caper* before or during his drafting of *The Expendables*. (Stallone Moving Decl. ¶ 6; Stallone Reply Decl. ¶¶ 2, 8; Lambert Decl. ¶ 5; King Decl. ¶ 5). All four declarations further assert that neither Stallone nor his agent (Mr. Lambert) would look at any script that did not come from a known talent agent and would not otherwise accept unsolicited scripts. (Stallone Moving Decl. ¶ 6; Stallone Reply Decl. ¶ 3; Lambert Decl. ¶ 2; King Decl. ¶ 4). In response to that uncontroverted evidence, Plaintiff argues only that "access and copying may be inferred," and bases that inference solely on the Declaration of Michael Elias. However, an expert's "conclusory assertions [relating to striking similarity] are insufficient to defeat a motion for summary judgment." *Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 n.9 (2d Cir. 2003)); *see also Tisi v. Patrick*, 97 F. Supp. 2d 539, 549 (S.D.N.Y. 2000) ("Although plaintiff's expert opines that the songs are strikingly similar, an issue of fact cannot be created by merely reciting the magic words 'strikingly similar' and 'no possibility of independent creation.'" (quoting *McRae v. Smith*, 968 F. Supp. 559, 566 (D. Colo. 1997)). Moreover, as stated in the expert report attached to the Declaration of David McKenna dated April 16, 2012 (the "McKenna Report"), the comparisons drawn by Mr. Elias are based on exaggerations, distortions and misreadings. (McKenna Report pp. 7-26).

54.    There is no genuine issue as to whether elements of *The Expendables* were derived from co-screenwriter Callaham's draft screenplay *Barrow* (the "Callaham Draft") because Plaintiff has submitted no evidence to controvert the facts asserted in the Stallone Moving Decl., the Declaration

of David E. Callaham in Support of Defendants' Motion for Summary Judgment dated March 14, 2012 (the "Callaham Moving Decl."), and cannot contradict the facts asserted in the Stallone Reply Decl., the King Decl. and the Lambert Decl. All five declarations were made by people with personal knowledge of the manner in which Stallone received and revised the Callaham Draft and all five declarations establish that Stallone started with the Callaham Draft to produce what eventually became *The Expendables*. (Stallone Moving Decl. ¶ 3; Callaham Moving Decl. ¶ 6; Stallone Reply Decl. ¶ 2; King Decl. ¶¶ 3, 5; Lambert Decl. ¶ 4). The evidence showing how Stallone revised certain elements of the Callaham Draft for *The Expendables* is uncontroverted. (Stallone Moving Decl. ¶¶ 3-5). In response to the above-referenced uncontroverted testimony from people with personal knowledge, Plaintiff again relies solely on the conclusory analysis of Michael Elias to infer that certain elements of *The Expendables* must have come from *The Cordoba Caper*.

55.     Plaintiff's baseless assault on Stallone's character is neither material nor relevant. It is also inadmissible. Even evidence of prior copyright infringement -- which Plaintiff does not and cannot offer -- is neither relevant nor admissible in determining liability for copyright infringement. *See Loussier v. Universal Music Group, Inc.*, 02-CV-2447 (KMW), 2005 U.S. Dist. LEXIS 45431, at *12-13 (S.D.N.Y. 2005) (finding evidence of eight prior copyright infringement claims against a defendant to be irrelevant "character evidence" pursuant to FRCP 404(b) and 402 and to be inadmissible as evidence of "habit" pursuant to FRCP 406). Moreover, the WGA arbitrations to which Plaintiff refers in Paragraph 55(a) are not comparable to legal proceedings, do not concern copyright law, are commonplace where there are multiple writers of a screenplay and are automatic where a writer is also a production executive -- as Stallone often is (and was on *The Expendables*). (*See* the Declaration of Martin D. Singer dated April 16, 2012 (the "Singer Decl.") ¶ 3; the Reply Declaration of David E. Callaham in Support of Defendants Motion for Summary Judgment dated April 17, 2012 (the "Callaham Reply Decl.") ¶ 3; Stallone Reply Decl. ¶ 4). Indeed, participating

3

writers regularly submit letters to the arbiters requesting the best possible credit.  (Singer Decl. ¶ 3; Callaham Reply Decl. ¶ 3).  For these reasons, even assuming *arguendo* that evidence of past WGA arbitrations were admissible, that evidence has no bearing on the issue of copyright infringement, and Plaintiff's allegations related thereto do not and cannot present a genuine issue of material fact precluding summary judgment.

     **56.**    There is no genuine issue as to whether Stallone had access to Plaintiff's screenplay because Plaintiff has admitted that he has no information that any of the eight screenwriting competitions to which Plaintiff supposedly submitted *The Cordoba Caper* forwarded that screenplay on to anyone, nor is there is any evidence of a connection between those screenwriting competitions and Stallone (or any Defendant).  Moreover, Plaintiff's attempt to use his <u>inability</u> to obtain records of his submission from the AAA Screenplay Contest as evidence that the AAA Screenplay Contest may have been a link between *The Cordoba Caper* and Stallone is patently absurd.  Plaintiff's "evidence" of access is wholly speculative and cannot serve to present a genuine issue of material fact precluding summary judgment.  See *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000). Finally, as demonstrated in Paragraph 53 *supra*, there is uncontroverted evidence that Stallone obtained his scripts solely from his agent.

Dated: New York, New York
      April 18, 2012

                             PRYOR CASHMAN LLP

                    By:_____

                      Tom J. Ferber
                      James A. Janowitz
                      Benjamin S. Akley
                      Attorneys for Defendants
                      7 Times Square
                      New York, New York  10036-6569
                      (212) 421-4100

James A. Janowitz
Tom J. Ferber
Benjamin S. Akley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
tferber@pryorcashman.com
(212) 421-4100

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

MARCUS WEBB,                                     11 CIV 7517 (JSR)

          Plaintiff

                                              **DECLARATION OF**
     -against-                            **ROBERT MARK KAMEN**

SYLVESTER STALLONE, et al.,

                Defendants.

---------------------------------------------------------------x

    ROBERT MARK KAMEN declares as follows:

    1.      I have been a professional screenwriter for over 30 years. I have written or co-written the screenplays for the following films, among others: *Taps* (1981); *The Karate Kid* (1984) and sequels of it; *Lethal Weapon 3* (1992); *The Power of One* (1992); *A Walk in the Clouds* (1995); *The Transporter* (2002) and its sequels; and *Taken* (2008). I am also frequently hired to work with other screenwriters in polishing their scripts. I am personally familiar with the matters set forth in this declaration.

    2.      In February 2009, I was hired by Nu Image/Millennium Films to work with Sylvester Stallone on a polish of his screenplay for *The Expendables* (the "Film"), and to help him shorten his then-current draft. Mr. Stallone and I spent nearly three weeks together, reviewing his drafts and discussing how he might both make it as purely action-oriented as possible and streamline

**A1056**

the story. When we started working together the script was approximately 135 pages long. When we finished, it was approximately 108 pages. During that time, Mr. Stallone deleted numerous scenes which took place on the U.S. mainland, including at CIA headquarters, and dropped whole subplots and characters relating to those scenes.

3.    When we started working together, Mr. Stallone had told me that he had rewritten a script called "*Barrow.*" He never mentioned either a screenplay entitled "*The Cordoba Caper*" or anyone named Marcus Webb, and I have never heard of either from anyone else. I personally have a strict policy of not accepting or reviewing unsolicited scripts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2012.

_____
Robert Mark Kamen

1159293 v2
16178.00009

2

Case 1:11-cv-07517-JSR   Document 55   Filed 04/25/12   Page 1 of 2

Rakoff, J

04/25/2012  17:20  5163544731          LAW OFFICE          PAGE  02/03

4/27/12

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

MARCUS WEBB,                                              Index No. 1:11-cv-07517 (JSR)

                        Plaintiff,

        -against-
                                                         STIPULATION OF DISMISSAL AS
SYLVESTER STALLONE, DAVID E.                             TO DAVID E. CALLAHAM
CALLAHAM, MILLENNIUM FILMS, NU IMAGE
FILMS, LIONS GATE FILMS, INC., LIONS GATE
HOME ENTERTAINMENT, INC., ALTA VISTA
PRODUCTIONS, INC., ALTA VISTA
PRODUCTIONS, LLC, and DOUBLE LIFE
PRODUCTIONS, INC.,

                        Defendants.

------------------------------------------

        It is stipulated and agreed, between counsel for all parties, that this matter be dismissed.

with prejudice and without costs and fees, as to defendant David E. Callaham only.

Date: April 25, 2012

COLE, SCHOTZ, MEISEL, FORMAN &               PRYOR CASHMAN LLP
LEONARD, P.A.                                Attorneys for Defendants
Attorneys for Plaintiff, Marcus Webb

By: _____                 By: _____
    David M. Kohane                              Tom J. Ferber
    900 Third Avenue – 16th Floor                7 Times Square
    New York, New York 10022                     New York, N.Y. 10036-6569
    Tel: (212) 752-8000                          (Tel): 212-326-0194

49441/0001-8490757v1

Case 1:11-cv-07517-JSR   Document 55   Filed 04/25/12   Page 2 of 2

JEFFREY A. SUNSHINE P.C.
Attorney for Plaintiff, Marcus Webb

By: _____
Jeffrey A. Sunshine
3000 Marcus Avenue – Suite: 2E5
Lake Success, New York 11042
Tel: (516) 352-2100

SO ORDERED:

_____
U.S.D.J.

4-26-12

4944/0001-8490757v1

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
MARCUS WEBB,                         :
                                     :
                Plaintiff,           :
                                     :
            -v-                      :          11 Civ. 7517 (JSR)
                                     :
SYLVESTER STALLONE et al.,           :              ORDER
                                     :
                Defendants.          :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        On March 15, 2012, the defendants in this action moved for

summary judgment on plaintiff Webb's claim of copyright infringement

and for dismissal of Webb's Second Amended Complaint in its entirety.

The parties extensively briefed the relevant issues, and the Court

heard oral argument on April 26, 2012.  Having now fully considered

the matter, the Court hereby grants defendants' motion in all

respects.  A written opinion stating the reasons for this ruling will

issue in due course, and final judgment will not be entered until that

opinion issues.  In the interim, all further proceedings in this case

are stayed.  The Clerk of the Court is hereby directed to close

document number twenty-nine on the docket of this case.

        SO ORDERED.

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        June 22, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MARCUS WEBB,                        :
                                    :
              Plaintiff,            :
                                    :
        -v-                         :        11 Civ. 7517 (JSR)
                                    :
SYLVESTER STALLONE, et al.,         :        MEMORANDUM ORDER
                                    :
              Defendants.           :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

        Plaintiff Marcus Webb accuses defendant Sylvester
Stallone of copying Webb's screenplay The Cordoba Caper for
Stallone's 2010 action movie The Expendables. On this basis, Webb
brought the instant copyright infringement action against
Stallone, his co-writer David Callaham,[1] and the various
Hollywood entities that produced and distributed The Expendables
-- Alta Vista Productions, Double Life Productions, Lions Gate
Films, Lions Gate Home Entertainment, Millennium Films, and Nu
Image Films. On March 15, 2012, defendants moved for summary
judgment on plaintiff's claim. By "bottom line" Order dated June
22, 2012, the Court granted defendants' motion for summary
judgment in its entirety. This Memorandum Order sets forth the
reasons for that ruling and directs the entry of final judgment.

---

[1] On April 26, 2012, defendant Callaham was dismissed from the
case pursuant to a stipulation entered into between the parties
and so-ordered by the Court.

The relevant factual background, drawn from the parties' Local Civil Rule 56.1 statements,[2] is as follows:

Defendant David Callaham had a "blind commitment" to write a script for Warner Bros. studios. Defendants' Statement Pursuant to Local Rule 56.1 dated Mar. 15, 2012 ("Def. 56.1") ¶ 1. In late 2003/early 2004, after watching news reports about Blackwater and mercenaries, he suggested to Warner Bros. that he might write a script about a group of American mercenaries taking on a foreign dictator. Id. ¶ 2. Callaham sent Warner Bros. the first draft of this script, tentatively titled Barrow, on June 8, 2005. Id. ¶ 3. Callaham revised this draft two more times. He sent Warner Bros. the third draft on January 24, 2006, which was the last draft of Barrow and the last work Callaham did pertaining to the Expendables. Id. ¶¶ 4-6; see also Answer to Second Amended Complaint ("Answer"), Ex. C (Barrow "3rd Studio Draft").

Plaintiff Marcus Webb is an employee of Walker Digital, LLC, where he write speeches for the company's executives, scripts promotional videos, and works on marketing materials. Id. ¶ 16. He also writes for trade magazines. Id. ¶ 17; Response to Defendants' Statement Pursuant to Local Rule 56.1 and Plaintiff's Statement of Additional Material Facts dated Apr. 6, 2012 ("Pl.

---

[2] Where the Court cites only defendants' Local Civil Rule 56.1 statements, plaintiff has admitted the factual assertion.

2

56.1 Resp.") ¶ 17 (noting plaintiff continues to write for trade magazines). He has never worked in television or movies, and although he has written a number of screenplays, none of them has been produced. Def. 56.1 ¶ 18.

In 2006, Webb wrote a screenplay featuring a team of American mercenaries, who are hired by a billionaire to stop a genocide, and end up rescuing a young woman. Id. ¶ 20. He titled the screenplay, The Cordoba Caper. Id. ¶ 20; see Answer Ex. A (screenplay for The Cordoba Caper). The story had two villains: General Garza, a Latin-American fascist dictator; and Colonel Torres, his Marxist second-in-command, who was the minister of state security. Id. ¶ 22. Webb stated that he wanted to use a "triple-cross" plot structure, where the protagonist poses as someone else (a CIA agent) posing as someone else (an oil executive). Id. ¶ 23 (analogizing to films like The Sting, Where Eagles Dare, and The Thomas Crowne Affair). Webb also wanted to include an ideological struggle between Garza and Torres, based on "Night of the Long Knives," and an underground resistance movement, whose leader, a woman, fell in love the main character, but was secretly related to General Garza. Id. ¶¶ 24-26. Webb wrote a screenplay and short story version of Cordoba in March and April 2006, which he then registered with the U.S. Copyright Office on June 8 and June 9, 2006. Id. ¶¶ 28-30. Webb's script

3

was written entirely after Callaham finished his last draft of _Barrow_. <u>Id.</u> ¶ 29.

In 2008, defendant Sylvester Stallone told his agents that he was interested in doing an action-oriented ensemble film. <u>Id.</u> ¶ 7. His agents obtained scripts for him to review, and he recalls reviewing Callaham's last draft of _Barrow_, which he assumes came through his agency (although he does not know for sure). <u>Id.</u> ¶ 8; Pl. 56.1 Resp. ¶ 8. Stallone then began writing his own screenplay. Here, the parties dispute how much of Stallone's story was sourced from Callaham's script for _Barrow_, and how much was sourced from Webb's script for The Cordoba Caper. As for _Barrow_, Stallone admits to using it as a "starting point" for his screenplay, which he states he reworked through several drafts to simplify the plot and keep the focus on an action-packed move. Stallone Decl. ¶ 3 (explaining changes made and elements from _Barrow_ retained); <u>see also</u> Declaration of David E. Callaham in Support of Defendants' Motion for Summary Judgment dated Mar. 14, 2012 ("Callaham Decl.") ¶ 6, Ex. B (The Expendables "First Stallone Draft" dated Sept. 18, 2008). Stallone denies ever seeing Webb's script for The Cordoba Caper. <u>Id.</u> ¶ 6.

Stallone's finished screenplay, titled The Expendables, is about a group of mercenaries led by Barney Ross (Stallone's character) who are hired by the CIA to bring down a

4

Latin American dictator named General Garza. The Expendables was
turned into a major motion picture starring Stallone, Jason
Statham, Jet Li, Dolph Lundgren, Bruce Willis, and Arnold
Schwarzenegger and was released on August 13, 2010. Def. 56.1 ¶
15; Answer Ex. B (DVD of The Expendables).

    Against this background, the Court turns to the legal
merits of plaintiff's claim of copyright infringement. To
establish infringement, "two elements must be proven: (1)
ownership of a valid copyright, and (2) copying of constituent
elements of the work that are original." Feist Pubs., Inc. v.
Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). "The second
element, copying, is comprised of two requirements: actual
copying and improper appropriation." Muller v. Twentieth Century
Fox Film Corp., 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011) (citing
Laureyessens v. Idea Group, Inc., 964 F.2d 131, 139-40 (2d Cir.
1992)).

> Copying may be established "either by direct evidence of
> copying or by indirect evidence, including access to the
> copyrighted work, similarities that are probative of copying
> between the works, and expert testimony." Castle Rock
> Entm't, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137
> (2d Cir. 1998). The level of similarity needed to establish
> copying is now commonly referred to as "probative
> similarity." See id. Once copying has been established, a
> plaintiff must next demonstrate that the copying was
> unlawful by showing that there is a substantial similarity
> between the protectable elements in the two works.

Hogan v. DC Comics, 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999)
(citation omitted). Here, defendants concede Webb has a valid

copyright in Cordoba that has been registered. Def. 56.1 ¶ 30 (citing Compl. ¶ 18, Exs. A-B). They dispute the second element, copying of protected elements.

Defendants argue that Webb cannot establish copying of any kind, for three reasons: (1) because Barrow, defendants' admitted source for The Expendables, was written before Cordoba, thus showing creation independent of Webb's work; (2) because Webb cannot show that Stallone had access to Cordoba when Stallone drafted The Expendables; and (3) because there are no similarities between Cordoba and Expendables that are probative of copying. The Court addresses each of these arguments in turn, and determines that because no reasonable juror could conclude that Stallone copied from Cordoba, defendants are entitled to summary judgment.

Defendants argue that because Barrow was written before Cordoba, and because Barrow indisputably served as the starting point for The Expendables, defendants have established that The Expendables was independently created, not copied. See Dimmie v. Carey, 88 F. Supp. 2d 142, 150-51 (S.D.N.Y. 2000) (granting summary judgment on independent creation grounds where there was evidence of evolution of defendant's work separate and apart from plaintiff's work). Particularly because plaintiff submits no evidence of actual copying, defendants argue this is a sufficient basis for summary judgment. See Muller v. Twentieth Century Fox

6

Film Corp., 794 F. Supp. 2d 429, 443-44 (S.D.N.Y. 2011) (granting summary judgment on independent creation where no evidence of actual copying).

As plaintiff points out, however, independent creation is an affirmative defense, and the burden of proof on defendants is stringent: "strong, convincing, and persuasive evidence" of independent creation is required, in order to avoid relying solely on the affidavits of the parties. Repp v. Webber (Repp I), 892 F. Supp. 552, 558 (S.D.N.Y. 1995), aff'd in part, rev'd in part, Repp v. Webber (Repp II), 132 F.3d 882 (2d Cir. 1997), cert. denied, 525 U.S. 815 (1998). The Second Circuit has held that the strength of such a defense is "a question for the factfinder." Repp II, 132 F.3d at 891.

The fact that Stallone now admits Barrow was a source for The Expendables is not by itself sufficient to warrant summary judgment on the ground of independent creation. Indeed, the admission smacks more than a little of hypocrisy. Stallone previously asserted in a signed letter submitted in his Writer's Guild of America arbitration with defendant Callaham, Barrow's author, that although he read Barrow, he "set it aside," and that Expendables was "an original . . . and doesn't use one word, one comma, one iota from [Barrow]." Declaration of David Gold dated Apr. 6, 2012 ("Gold Decl.") at ¶¶ 3-4, Ex. B ("Stallone Letter") at 2. The arbitration panel rejected Stallone's argument, and

7

awarded Callaham "story by" credit and shared "screenplay by"
credit. See Defendants' Reply Memorandum of Law in Further
Support of Their Motion for Summary Judgment dated Apr. 18, 2012
("Def. Reply Br.") at 3. It is only now, when it is in his self
interest, that Stallone admits to copying Barrow. In the face of
such inconsistency, the question of whether to credit Stallone's
declaration that he has never seen Cordoba and wrote The
Expendables entirely independent of Cordoba is for the factfinder
to decide. See also Transcript of Oral Argument dated Apr. 26,
2012 ("Tr.") at 17-20 (defense counsel arguing that Stallone
simply signed an "advocacy" letter prepared by his previous
attorney, and never disclaimed starting from Barrow). Moreover,
even if Stallone's declaration here is totally truthful, copying
from one screenplay (Barrow) does not inoculate Stallone from the
claim that he also copied from a second screenplay (Cordoba).
Viewing the facts in the light most favorable to Webb, the non-
moving party, and drawing all reasonable inferences in his favor,
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), the
Court cannot conclude that a mere declaration attributing The
Expendables to one screenplay and disclaiming attribution to the
other is sufficient to carry defendants' burden of "strong,
convincing, and persuasive evidence" of independent creation such
that a reasonable jury could reach no conclusion other than
finding independent creation.

8

Defendants next argue that Webb cannot present any
evidence that Stallone ever saw the Cordoba screenplay. To show
what is referred to in the case law as "access," plaintiff must
show either (1) "a particular chain of events" or a "link" from
his work to the creators of the allegedly infringing work, or (2)
that plaintiff's work was "widely disseminated." Gal v. Viacom
Int'l, Inc., 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007); see also
Mowry v. Viacom Int'l Inc., No. 03 Civ. 3090 (AJP), 2005 U.S.
Dist. LEXIS 15189, at *12-13 (S.D.N.Y. July 29, 2005). A work is
"widely disseminated" when it has had "considerable commercial
success" or is "readily available on the market." Silberstein v.
Fox Entm't Group, 424 F. Supp. 2d 616, 627 (S.D.N.Y. 2004).
Moreover, plaintiff must meet this showing with "significant,
affirmative and probative" evidence, not mere "speculation or
conjecture." Muller, 794 F. Supp. 2d at 439 (quoting Jorgensen v.
EPIC/SONY, 351 F.3d 46, 51 (2d Cir. 2003)). That said, access can
be inferred where "a party had a reasonable possibility of
viewing the prior work," Boisson v. Banian, Ltd., 273 F.3d 262,
270 (2d Cir. 2001), and less proof of access is required when
there is stronger proof of similarity, Jorgensen, 351 F.3d at 56.

Plaintiff's circumstantial affirmative evidence of
access is weak, to say the least. Webb, who is not a professional
screenwriter, and has no previous screenwriting credits to his
name, submitted Cordoba to eight "well-known" screenwriting

competitions, which purportedly pride themselves on discovering new material and employ staff and judges with contacts in the movie industry. Declaration of David M. Kohane in Opposition to Defendants' Motion for Summary Judgment dated Apr. 6, 2012 ("Kohane Decl.") Ex. B, Deposition of Marcus Webb dated Feb. 9, 2012 ("Webb Dep.") at 241. Stallone testified that he gets screenplays from his agents, but does not know where his agents obtain those screenplays. Kohane Decl. Ex. A, Deposition of Sylvester Stallone dated Feb. 28, 2012 ("Stallone Dep.") at 188. Before writing The Expendables, Stallone reviewed fifteen screenplays from unknown sources. Id. at 24-25. Trevor Short, CFO of Nu Image, stated in his deposition that writing the Expendables was "chaotic, at the best of times," with "contributions," from "thousands of people." Kohane Decl. Ex. C, Deposition of Trevor Short dated Mar. 8, 2012 ("Short Dep.") at 22, 24-25. Short could not, however, identify these "people," which plaintiff argues exponentially increases the ways Stallone might have accessed Cordoba.

Nevertheless, it would require almost endless speculation to explain how Webb's submission of Cordoba to amateur screenplay competitions ended up in front of Stallone. Indeed, even after full discovery, plaintiff submits no evidence whether anyone who worked for Stallone -- or even anyone who worked at the companies who worked for Stallone -- participated

10

in or had connections to any of these screenwriting competitions. In the absence of this or other evidence presenting a reasonable possibility that Stallone viewed Cordoba, as opposed to mere speculation or conjecture, plaintiff has failed to raise a genuine issue of material fact on access. See Muller, 794 F. Supp. 2d at 439 ("'A reasonable possibility' is not simply a 'bare possibility' . . . .").

Plaintiff seeks to overcome this defect by relying instead on the doctrine of "striking similarity." It is true that "[w]hen two works are so 'strikingly similar' as to preclude any possibility that the second work was independently created, no more evidence [of access] is necessary." Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp., No. 04 Civ. 5002 (JSR), 2005 WL 1020436, at *3 (S.D.N.Y. Apr. 28, 2005); accord Gaste v. Kaiserman, 863 F.2d 1061, 1067-68 & n.3 (2d Cir. 1988). But no such striking similarity is present here.

The general standard for similarity that is probative of copying requires showing "similarities between the two works that would not be expected to arise if the works had been independently created." Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F. Supp. 2d 514, 522 (S.D.N.Y. 2005). Here, however, where plaintiff relies on the "striking similarity" doctrine to avoid proving access, the "threshold required to establish striking similarity is 'stringent,' and it requires

11

more than a showing of substantial similarity." <u>Vargas v.
Transeau</u>, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007), <u>aff'd</u>, 352 F.
App'x 458 (2d Cir. 2009) (summary order). To show striking
similarity, the works "must be so <u>identical</u> as to preclude any
reasonable possibility of independent creation." <u>Dimmie</u>, 88 F.
Supp. 2d at 150 (emphasis supplied). Mere multiple similarities
are insufficient, and the relevance of a similarity is diminished
if the similarity consists of "stock elements" within a genre or
otherwise non-protectable elements. <u>Gal</u>, 518 F. Supp. 2d at 543.

Having reviewed the scripts for <u>The Expendables</u>,
<u>Barrow</u>, and <u>The Cordoba Caper</u>, the Court concludes that no
reasonable juror could find that <u>The Expendables</u> is so nearly
identical to <u>Cordoba</u> "as to preclude any reasonable possibility
of independent creation," <u>Dimmie</u>, 88 F. Supp. 2d at 150, or even
that there exists "similarities between the two works that would
not be expected to arise if the works had been independently
created." <u>Nicholls</u>, 367 F. Supp. 2d at 522.

Plaintiff lists twenty examples of what he calls
"striking similarities" between <u>The Expendables</u> and <u>Cordoba</u>. <u>See</u>
Plaintiff's Memorandum of Law in Opposition to Defendants' Motion
for Summary Judgment dated Apr. 17, 2012 ("Pl. Opp. Br.") at 7-8.
The Court finds none of these examples sufficient to permit a
reasonable juror to find "striking similarity," whether

12

considered independently or in the aggregate. To give a few examples:

(1) <u>The Antagonists.</u> Plaintiff points to the identical name of the Latin American dictator, General Garza, as a striking similarity. But, as defendants point out, Garza is a common Hispanic surname.[3] Declaration of David McKenna dated Apr. 16, 2012 ("McKenna Rep.") at 7 & n.2 (noting Garza is the 34th most common Hispanic nickname in the United States); <u>see</u> <u>CK Co. v. Burger King Corp.</u>, No. 92 Civ. 1488 (CSH), 1994 WL 533253, at *8 (S.D.N.Y. Sept. 30, 1994) ("The fact that characters have identical names and have similar roles in two works does not necessitate a finding of <u>substantial</u> similarity." (emphasis supplied)), <u>aff'd</u>, 122 F.3d 1055 (2d Cir. 1995); <u>Bevan v. Columbia Broad. System</u>, 329 F. Supp. 601, 605-06 (S.D.N.Y. 1971) (holding "Hogan's Heroes" did not infringe on copyright of play "Stalag 17," even though both works featured German World War II prison camp guards named Sergeant Schultz), <u>abrogated on other grounds by</u> <u>Jorgenson</u>, 351 F.3d at 53 n.5. The title "General," moreover, first appeared in <u>Barrow</u>, where the character was titled "General Miramonte." Answer Ex. C at 10. Stallone states that "Miramonte" was too long a name, and in changing various

---

[3] For example, in 2010, the same year <u>The Expendables</u> was released, NBC aired a short-lived television show called "Outlaw," staring Jimmy Smits as a former U.S. Supreme Court justice named "Garza." <u>See</u> <u>Outlaw</u>, IMDb, http://www.imdb.com/title/tt1592226/ (last accessed Oct. 23,

13

names in Callaham's script, he chose famous boxers for his hero
(Barney Ross), and his antagonist (Jaime Garza). Declaration of
Sylvester Stallone dated Mar. 12, 2012 ("Stallone Decl.") ¶ 4.

Plaintiff also points to the fact that in both movies,
Garza and his accomplice (Torres in Cordoba, Monroe in The
Expendables) have their own security forces with different
colored uniforms. This, as defendants point out, overstates the
point by half (at least). In Cordoba, Torres is Garza's right-
hand man and ideological counterpart, who rules with Garza as
minister of state security. In The Expendables, Monroe is a rogue
CIA agent who uses Garza as his puppet, and travels around with
his own bodyguard, Paine. Stallone Decl. ¶ 3(d); see also Def.
Br. at 11 n.7 (both Barrow and Expendables have mysterious
financial backers, "Mr. Monday," and "Mr. Church," where
Cordoba's Scottish billionaire, Sir Reginald, makes no attempt to
hide his identity).

(2) The Heroine. Plaintiff also sees supposed striking
similarities between Renata, the female protagonist in Cordoba,
and Sandra, the female protagonist in The Expendables, in that
both are related to Garza (niece and daughter, respectively),
both help the heroes, and both are tortured by Garza's
accomplice. But, as the Court noted at oral argument, the idea of
a heroine allied with the protagonist who is related to the

_____

2012).

antagonist and captured by the antagonist's minions is hardly
new, as, for example, the familiar story of Robin Hood and Maid
Marian (variously described as the niece of Prince John or the
daughter of Sheriff of Nottingham) well demonstrates. Tr. at 4.
Moreover, the characters of Renata and Sandra are substantially
different. Renata leads a double life as Garza's prized
debutante/student niece by day (the hero, St. John, meets her at
Garza's party), and rebel freedom fighter who leads a violent
revolution by night under a nom de guerre. She actively assists
the heroes in their fight, becomes romantically involved with St.
John, and eventually becomes president of her country. Sandra, on
the other hand, is estranged from Garza, lives in-country, mourns
her country's plight, and acts simply as a guide for the heroes
until they are discovered by Garza and the rogue CIA agent's men.
Indeed, after reviewing the scripts, the Court finds that Sandra
appears to have more in common with Sophie, the female guide
character from Barrow (who was originally a minor character) than
with Renata. See Stallone Decl. ¶ 3(e).

          (3) Action scenes. Plaintiff also cites a litany of
action scenes which he describes as "strikingly similar" to
Cordoba. These include the use of the heroine as a human shield
in the accomplice's escape; strategic planting of explosives by
mercenaries in key strategic positions before the coup begins; an
attempted ambush by regime forces against the mercenaries; a

climactic gun battle with sequenced explosions including detonation of a fuel repository to create a "reverse ambush"; the attempted use, and destruction of, the accomplice's escape helicopter; and a one-on-one standoff where the hero kills the accomplice in a surprise shooting tactic after the accomplice puts a gun to the heroine's head. Pl. Opp. Br. at 8. None of these comes anywhere near striking similarity, let alone even close to substantial similarities that are merely probative of copying. To the contrary, these are all simple stock devices that are standard in action movies. They are "scenes a faire" that follow naturally from the theme of the work rather than from the author's creativity. MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 194 (2d Cir. 2004); see Walker v. Time Life Films, Inc., 784 F.2d 44 (2d Cir. 1985) (holding "drunks, prostitutes, vermin, and derelict cars" are scenes a faire in a work about NYPD cops in the South Bronx); see also Zach Baron, Summermetrics: The Death of the Great American Shoot-'em-Up, Grantland, Aug. 16, 2012, http://www.grantland.com/story/_/id/8272930/summermetrics-expendables-2-death-great-american-shoot-em-up (last accessed Oct. 23, 2012) (evaluating production notes for The Expendables 2 as the Expendables' series attempts to revive and pay homage to the genre of 80s-era action films).

While the foregoing includes, <u>inter alia</u>, all the "striking similarities" that plaintiff's counsel identified at oral argument as being the most "egregious," <u>Tr.</u> at 2-6, the Court has carefully examined the entire litany of plaintiff's proffered "striking similarities" and finds none of them remotely striking or legally sufficient. Any reasonable factfinder would have to conclude that these are two very different screenplays built on a familiar theme: mercenaries taking on a Latin American dictator. But where the more specific development of <u>The Expendables</u> can be clearly traced to defendant Callaham's script, <u>Barrow</u>, there is no such link apparent to <u>Cordoba</u>. <u>See also</u> <u>Berkic v. Crichton</u>, 761 F.2d 1289, 1293-94 (9th Cir. 1985). Indeed, whereas <u>Cordoba</u> uses deception and subterfuge as its central plot devices, <u>The Expendables</u> is a pure action movie, with CIA involvement (heavily distilled from <u>Barrow</u>). Stallone's hero (Ross) engages in no trickery -- just shooting.

Whether considered at the high-concept levels of plot, theme, pacing, etc., or at the detailed level of specific points, plaintiff has failed to show <u>Cordoba</u> is so "strikingly similar" to <u>The Expendables</u> "as to preclude any reasonable possibility of independent creation." <u>Dimmie</u>, 88 F. Supp. 2d at 150.[4]

_____

[4] In support of their arguments, the parties submitted reports from their respective expert witnesses, Michael Elias and David McKenna, who offer their opinions on the similarity (or lack thereof) between <u>Cordoba</u> and <u>The Expendables</u>. The Court doubts that these expert reports are admissible under Fed. R. Evid. 702;

17

Because plaintiff has failed to provide evidence of access, and failed to show the <u>Cordoba</u> and <u>Expendables</u> are so strikingly similar as to permit a reasonable juror to infer access, the Court finds the plaintiff's claim fails as a matter of law.[5] Accordingly, the Court reaffirms its "bottom line" Order dated June 22, 2012 granting summary judgment in favor of defendants. The Clerk of the Court is hereby directed to enter judgment in favor of defendants dismissing the complaint with prejudice, and to close the case.

        SO ORDERED.

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          December 26, 2012

---

indeed, they involve no true expertise whatsoever. But neither party moved to strike. Assuming, <u>arguendo</u>, that the reports were admissible, they would not change the Court's conclusion. They simply assert conclusions on similarity based on reading the screenplays, which the Court was more than able to do without the benefit of the reports.

[5] Although the Court therefore does not reach the issue of whether defendants infringed elements of plaintiff's work that are legally protectable, the evidence put forth by plaintiff likewise appears insufficient to show any infringement by <u>The Expendables</u> of protected elements in <u>Cordoba</u>.

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARCUS WEBB,

                    Plaintiff,

        -against-

SYLVESTER STALLONE, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Index No. 1:11-cv-07517 (JSR)

**NOTICE OF APPEAL**

        Notice is hereby given that plaintiff Marcus Webb hereby appeals to the United States Court of

Appeals for the Second Circuit from the Judgment granting Defendants' Motion for Summary

Judgment (Dkt. No. 64) entered in this action on the Twenty-Seventh day of December, 2012.

DATED:  New York, New York
        January 25, 2013

                    COLE, SCHOTZ, MEISEL,
                    FORMAN & LEONARD, P.A.

                    By: _____
                    David M. Kohane
                    Steven R. Klein
                    David S. Gold
                    900 Third Avenue, 16th Floor
                    New York, New York 10022
                    (212) 752-8000

                    -and-

                    By: /s/ Jeffrey A. Sunshine
                    Jeffrey A. Sunshine
                    Jeffrey A. Sunshine, P.C.
                    3000 Marcus Avenue – Suite 2E5
                    Lake Success, NY  11042
                    (516) 352-2100