# 13-324-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◄◄

MARCUS WEBB,

*Plaintiff-Appellant,*

*v.*

SYLVESTER STALLONE, MILLENNIUM FILMS, NU IMAGE FILMS, LIONS GATE FILMS, INC.,
LIONS GATE HOME ENTERTAINMENT, INC., ALTA VISTA PRODUCTIONS, INC.,
ALTA VISTA PRODUCTIONS, LLC, DOUBLE LIFE PRODUCTIONS, INC.,

*Defendants-Appellees,*

*and*

DAVID E. CALLAHAM, LIONS GATE ENTERTAINMENT CORPORATION,

*Defendants.*

―――――――――――

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

Jeffrey A. Sunshine
JEFFREY A. SUNSHINE, P.A.
3000 Marcus Avenue, Suite 2E5
Lake Success, New York 11042
516-352-2100

David M. Kohane
David S. Gold
COLE, SCHOTZ, MEISEL, FORMAN
  & LEONARD, P.A.
900 Third Avenue, 16th Floor
New York, New York 10022
212-752-8000

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES .......................................................... ii

INTRODUCTION ......................................................................... 1

ARGUMENT .................................................................................. 3

I.   MATERIAL CREDIBILITY ISSUES, STRIKING SIMILARITY, EXPERT TESTIMONY, AND OTHER EVIDENCE OF COPYING PRECLUDED SUMMARY JUDGMENT ................................................. 3

   A.   The District Court Found Issues Of Fact As To Access Yet Improperly Granted Summary Judgment ....................................................... 4

   B.   The District Court Found Issues of Fact As To Copying Yet Improperly Granted Summary Judgment ....................................................... 6

   C.   Defendants' Other Arguments Are Insufficient To Preclude Webb From Having A Jury Determine Whether Defendants Copied Cordoba ........... 11

     1.   Where, As Here, Credibility Is At Issue, Summary Judgment Is Inappropriate ....................................................... 11

     2.   Defendants Continue To Ignore That Nearly Every Defendant Denied *Barrow* As The Source Of *Expendables* ............................................... 12

     3.   Webb's Expert's Opinion Was Admissible, As Defendants Previously Conceded ....................................................... 18

II.   *EXPENDABLES* IS SUBSTANTIALLY SIMILAR TO *CORDOBA* ........ 22

   A.   The Elements Misappropriated From *Cordoba* Are Protectable .............. 22

   B.   The Jury Could Easily Find *Cordoba* And *Expendables* Substantially Similar ....................................................... 26

   C.   The Jury Could Find The Characters In *Cordoba* And *Expendables* Substantially Similar ....................................................... 28

CONCLUSION ....................................................................... 31

i

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Arden v. Columbia Pictures, Inc.*, 908 F.Supp. 1248 (S.D.N.Y. 1995) .................23

*Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946)...........................................4, 11, 20

*Attia v. Society of N.Y. Hosp.*, 201 F.3d 50 (2d Cir. 1999), *cert. denied*, 531 U.S. 843 (2000)...................................................................................................27

*Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) ...............................................5

*Cox v. Abrams*, 1997 WL 251531 (S.D.N.Y. May 14, 1997) .................................20

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340 (1991)..............22, 23

*Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988).........................................3, 7, 20

*Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980) .................24

*Hogan v. DC Comics*, 48 F.Supp.2d 298 (S.D.N.Y. 1999) .................................8, 25

*Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005) ..................................................................................................................11

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46 (2d Cir. 2003)..............................3, 7

*Laureyssens v. Idea Group, Inc.*, 964 F.2d 131 (2d Cir.1992) ..................................3

*Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir. 1995) .................................................4, 7

*Mowry v. Viacom Int'l, Inc.*, 2005 WL 1793773 (S.D.N.Y. Jul. 29, 2005) ......20, 21

*Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429 (S.D.N.Y. 2011), *aff'd*, 2012 WL 5439910 (2d Cir. Nov. 8, 2012) ....................................18

*Peter F. Gaito Architecture v. Simone*, 602 F.3d 57 (2d Cir. 2010) ......................26

*Price v. Fox Entm't Group, Inc.*, 499 F.Supp. 2d 382 (S.D.N.Y. 2007) ................20

*Repp v. Webber*, 132 F.3d 882 (2d Cir. 1997), *cert. denied*, 525 U.S. 815 (1998) ................................................................................................................7, 18

49441/0001-9810080v1

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936) .................27

*Tisi v. Patrick*, 97 F.Supp.2d 539 (S.D.N.Y. 2000)...................................21

*Vargas v. Transeau*, 514 F.Supp.2d 439 (S.D.N.Y. 2007), *aff'd*, 352
    Fed.Appx. 458 (2d Cir. 2009)..................................................7

*Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986) .....................24, 25, 28

*Warner Bros. Inc. v. Am. Broadcasting Co., Inc.*, 720 F.2d 231 (2d Cir.
    1983) .........................................................................22, 27

*Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996) ...................................24

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001)............................26

## RULES

Fed. R. Evid. 702 ..................................................................19

## TREATISE

NIMMER ON COPYRIGHT, § 13.03[B][1][a] (2013) .........................................27

NIMMER ON COPYRIGHT, § 13.03[D] (2013) .............................................7, 21

# INTRODUCTION

A reasonable jury could find that copying, not coincidence, produced the numerous striking similarities between Sylvester Stallone's ("Stallone") *The Expendables* ("*Expendables*") and plaintiff Marcus Webb's ("Webb") *The Cordoba Caper* ("*Cordoba*").  A jury could find copying based on the similarities themselves including, for example: (i) a Latin American dictator named General Garza who exploits his peasantry to increase cocaine production and is overthrown by American mercenaries; (ii) a bifurcated villain in the form of Garza's accomplice who is both adverse to and allied with Garza, and fatally shoots Garza following Garza's speech to his countrymen; (iii) a local female freedom fighter who is closely related to Garza but allies herself with the mercenaries, is captured, tortured, and later rescued by the hero; and (iv) the nearly identical manner in which these, and many other strikingly similar elements, unfold in the two works.

A reasonable jury could likewise infer copying from the material credibility issues stemming from Defendants' singularly hypocritical position on *Expendables'* provenance, which led the district court to find issues of fact for the jury on whether Stallone saw *Cordoba* and created *Expendables* independently, *i.e.*, on both access and copying.  Rather than addressing these fundamental credibility issues, Defendants attempt to skirt them by illogically arguing that because Stallone originally copied from one screenplay (*Barrow*), a reasonable

1

jury could not find Stallone copied from a second screenplay (*Cordoba*). Defendants continue to miss the point.  As the district court recognized, "even if Stallone's declaration here is totally truthful, copying from one screenplay (Barrow) does not inoculate Stallone from the claim that he also copied from a second screenplay (Cordoba)."  SPA8.  This was precisely the sentiment of former defendant David Callaham who, upon learning just a few details about *Cordoba*, concluded: "at this point would it be shocking to discover that [Stallone] stole the script from not one but two people?"  A872.  Indeed, the same Defendants who now wrap themselves in *Barrow* previously and vehemently denied any relationship between *Expendables* and *Barrow,* initially used *Barrow* without the permission of its copyright owner, Warner Bros., and only obtained the rights to *Barrow* after Warner Bros. threatened suit.  *See* A814, A820-21, A823, A855.

Defendants' attempt to avoid a jury trial, and the district court's grant of summary judgment, are also flawed because: (i) the district court based its striking similarity analysis almost entirely on the testimony of Stallone (whose credibility had been undermined), hearsay evidence from outside the record (which Defendants fail to address), and the court's subjective interpretation of only three of the many striking similarities presented; (ii) Defendants previously (and correctly) advocated for the admissibility of expert testimony on striking similarity; and (iii) Defendants (and the district court) misapplied well-settled

Second Circuit precedent governing originality and protectability in copyright. Defendants' complete failure to overcome the errors in the district court's Memorandum Order and continued failure to demonstrate the absence of genuine issues of material fact requires reversal and remand for a jury trial.

## **ARGUMENT**

I.   **MATERIAL CREDIBILITY ISSUES, STRIKING SIMILARITY, EXPERT TESTIMONY, AND OTHER EVIDENCE OF COPYING PRECLUDED SUMMARY JUDGMENT**

The issue on appeal is whether a reasonable jury could find actual copying of *Cordoba*. *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). This Court has recognized that "direct evidence of copying is seldom available." *Id.* Thus, "[c]opying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir.1992); *see also Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988) ("Because copiers are rarely caught red-handed, copying has traditionally been proven circumstantially by proof of access and substantial similarity.")  Furthermore, in the context of copyright infringement actions, this Court has repeatedly held that "**where … credibility, including that of the defendant, is crucial, summary judgment becomes improper and trial**

**indispensable**.” *Arnstein v. Porter*, 154 F.2d 464, 471 (2d Cir. 1946) (emphasis supplied); *see also Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995).

Here, the district court correctly held that jury questions exist on both access and copying due to Defendants' lack of credibility when analyzing their independent creation defense. *See* SPA9. The court failed, however, to carry that correct finding forward to its analysis of Webb's affirmative claim, even though access and copying are the very issues on which the district court based its holding that there was *nothing* for the factfinder to decide. That was error in light of Defendants' bald-faced "hypocrisy" (*id.*) and unique history of propagating falsehoods concerning *Expendables*'s origins (including their prior willingness to use copyrighted material without the copyright owner's permission), the numerous striking similarities between *Cordoba* and *Expendables*, and the other admissible evidence from which a jury could have inferred copying. Nothing in Defendants' brief, moreover, justifies the district court's denial of Webb's right to a jury trial.

### A.    The District Court Found Issues of Fact As To Access Yet Improperly Granted Summary Judgment

The district court correctly held that "the question of whether to credit Stallone's declaration that he has never seen <u>Cordoba</u> … is for the factfinder to decide." SPA9. The court's holding that Stallone's denial of access to *Cordoba* was for the jury should have precluded summary judgment on that issue. That is

4

especially so in light of Webb's circumstantial evidence of access, including: (i) Webb's submission of *Cordoba* to eight well-known screenwriting competitions (A781, A794, A804); (ii) Stallone's admission that before writing *Expendables*, he reviewed fifteen screenplays from unknown sources (A457, A733-37); and (iii) Trevor Short of Nu Image's admission that "writing the Expendables was 'chaotic, at times,' with 'contributions,' from 'thousands of people'" (A808, A811).  These facts plus Defendants' history of falsehoods on *Expendables'* origins were more than sufficient to permit a jury to infer Defendants' access to *Cordoba*.

Defendants argue, "Webb knew of no direct evidence that *any* Defendants ever saw *Cordoba*."  (Defs' Br. 29.)  "Direct evidence" is not required.  Access may be inferred, even without striking similarity, where "a party had a **reasonable possibility** of viewing the prior work."  *Boisson v. Banian*, Ltd., 273 F.3d 262, 270 (2d Cir. 2001) (emphasis supplied).  The jury could have found a "reasonable possibility" of access from the circumstantial evidence presented in this case, and Defendants' established dissembling on the origins of *Expendables*.

Defendants belittle Webb and the industry screenplay competitions that received *Cordoba*.  (*See*, *e.g.*, Defs' Br. 1, 24, 31, n.17.)  The acclaim Webb received from two of these competitions aside[1] (*see* Pl's Br. 9), the prominence and

---

[1]  In addition to the commendation received from the PAGE and AAA competitions, judges from the other competitions similarly praised *Cordoba*.  *See*, *e.g.*, A440 ("[t]he story starts off quite well and … the dialogue is quite strong");

function of these competitions was for the jury to weigh in determining whether dissemination, plus the striking similarities between the works, plus Defendants' undisputable falsehoods, supported a finding of "reasonable possibility" of access. Furthermore, Stallone admits that using forgotten screenplays from obscure sources is his *modus operandi*:

> That you take screenplays that have a germ of an idea and that are passed by studios, that are put into turnaround or have dust on them that are never going to be done, you take them, you take the germ of the idea and then you rework it to a point where it's now a produceable screenplay where it was never going to be done ever. … So therein lies what I do.

[A761.]

Callaham's relative lack of notoriety did not stop Defendants from appropriating *Barrow* without permission in the first instance (*see* A814, A820-21, A823, A855), as Webb's relative lack of notoriety did not stop Defendants from copying *Cordoba*.

## B.    The District Court Found Issues of Fact As To Copying Yet Improperly Granted Summary Judgment

The district court held that "the question of whether to credit Stallone's declaration that he … wrote The Expendables entirely independent of Cordoba is for the factfinder to decide."  SPA9.  The court's holding that Stallone's claim that

---

A446 ("well-written" with "very good" "structure" and "good" "premise," "dialogue," "characterization," "originality," and "potential.")

he created *Expendables* independently of *Cordoba* was for the jury should have precluded summary judgment on the issue.  That is especially so in the face of the numerous striking similarities between the works.

"There is an inverse relationship between access and probative similarity such that 'the stronger the proof of similarity, the less the proof of access is required." *Jorgensen*, 351 F.3d at 50, quoting NIMMER ON COPYRIGHT, § 13.03[D] (2013).  Accordingly, this Court has held that "where there are striking similarities probative of copying, proof of access may be inferred: 'If the two works are so strikingly similar as to **preclude the possibility of independent creation**, copying may be proved without a showing of access." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997), *cert. denied*, 525 U.S. 815 (1998), quoting *Lipton*, 71 F.3d at 471 (emphasis supplied).  "**[S]triking similarity is a question of fact to be left to the jury where reasonable minds could differ**." *Vargas v. Transeau*, 514 F.Supp.2d 439, 443 (S.D.N.Y. 2007), *aff'd*, 352 Fed.Appx. 458 (2d Cir. 2009) (emphasis supplied), citing *Repp*, 132 F.3d at 890-91 and *Gaste*, 863 F.2d at 1068-69.  Here, the striking similarities between the works are sufficient for a jury to infer copying.  Moreover, the district court found that "reasonable minds could differ" as to whether Stallone "wrote The Expendables **entirely independent** of Cordoba[,]" and Webb should have been afforded the opportunity

7

to have those "reasonable minds" (the jury) make that determination.   SPA9 (emphasis supplied).

Defendants spend almost five pages "summarizing" *Expendables*[2] and approximately one page summarizing *Cordoba*.  (Defs' Br. 19-25)  Through the improper device of abstracting the works and eliminating protectable details, Defendants skirt the numerous striking similarities between *Cordoba* and *Expendables* that would permit a reasonable jury to find that Stallone copied *Cordoba*.  These striking similarities, many of which Stallone admitted were not in *Barrow* (*see* A743, A744, A748, A767-68), and which are set forth at greater detail in Webb's opening brief (*see* Pl's Br. 31-33; A24-30), include: (1) the identical name of the dictator, General Garza;[3] (ii) a local female freedom fighter closely related to Garza who assists the mercenaries in overthrowing him; (iii) the existence and adverse role of Garza's accomplice, who ultimately fatally shoots

---

[2] Defendants also spend five pages summarizing the September 2008 "first rewrite" of *Expendables* (*see id.* at 13-18).  Defendants' initial misappropriation of *Barrow* is irrelevant because by August 13, 2010, when *Expendables* was released in theaters, *Expendables* included numerous original *Cordoba* elements absent from *Barrow*.

[3] Regardless of whether the identical name of General Garza is *alone* insufficient to establish *actionable* similarity, courts have found an identical name to be "a significant similarity."  *See*, *e.g.*, *Hogan v. DC Comics*, 48 F.Supp.2d 298, 311 (S.D.N.Y. 1999).

him (rather than the hero);[4] (iv) an opening scene involving a hostage rescue at sea; (v) the accomplice rummaging through the heroine's apartment, the heroine's arrest to Garza's dismay and outrage, and the ensuing torture scene (in the same sequence); (vi) cocaine as a source of the Garza regime's wealth and Garza's persecution of peasants to further cocaine production; (vii) the description of the presidential palace; (vii) Garza's speech to his countrymen moments before he is shot and killed by his accomplice; and (viii) the use of the heroine as a human shield in the accomplice's escape.

Rather than recognizing these (and the additional) striking similarities between the works, or the fact that **all of these unique similarities collectively appear in both works and unfold in the same sequence**, the district court improperly based its striking similarity analysis on: (i) the testimony of Stallone (whose credibility had been undermined); (ii) hearsay evidence from outside the record; and (iii) the district court's own subjective interpretation of only three of the many striking similarities presented. (*See* SPA14-17.) In their brief, Defendants ignore the second and third mistakes and repeat the first.

Defendants' improper reliance on Stallone's discredited testimony to deny Webb his right to a jury determination is manifest. For example, Defendants

---

[4] Defendants admit that "Garza is shot … apparently by Torres [Garza's accomplice]." A60.

explain the "coincidental" similarities between many characters in *Cordoba* and *Expendables* by citing to self-serving explanations in Stallone's declaration.  (*See* Def's Br. 12-13, citing A460 (Stallone Declaration).)   Defendants also rely on Stallone's declaration when discussing the "evolution" of the story "through Stallone's rewrites."   (*Id.* at 17-18.)   Finally, Defendants rely on Stallone's declaration in arguing that "[t]he scripts which Stallone reviewed … were given to him by his producer" and that Stallone has "a strict policy of not looking at unsolicited scripts, or any scripts which have not come through Stallone's agents at WMA[.]"   (*Id.* at 12.)   Defendants' assertions are completely undermined by Stallone's admissions that: (i) "[he] does not know where his agents obtain those screenplays"; (ii) "[b]efore writing The Expendables, [he] reviewed fifteen screenplays from unknown sources"; and (iii) that the scripts did not come from one agency, but rather "[t]hey come from many agencies."[5]  (SPA11; A735.)  In light of Stallone's recognized "hypocrisy" (SPA7), the district court properly held

---

[5] In a footnote, Defendants try to overcome Stallone's admission that his scripts come from many unknown sources with declarations from Kevin King Templeton and Scott Lambert.  That contradiction is for the jury to resolve.  Furthermore, Lambert's claim to certainty that he did not forward *Cordoba* to Stallone, while admitting that he could not recall what scripts he *did* provide, is for the jury to consider.  A1000.  Likewise, it was for the jury to decide whether Templeton honored his alleged "policy" of not reviewing unsolicited scripts or, instead, whether *Cordoba* was among the scripts that came from WMA or Stallone's unnamed "*previous agents*."  A998.  Finally, Trevor Short's admission that "thousands of people had contributions to *Expendables* and there were all sorts of different ideas floating around" further undermines Defendants' claim that a jury would *have* to find a single, limited pathway of scripts to Stallone.  A808.

10

the validity of these (and other) statements upon which Defendants continue to rely was "for the factfinder to decide."  SPA9.

### C.   Defendants' Other Arguments Are Insufficient To Preclude Webb From Having A Jury Determine Whether Defendants Copied *Cordoba*

#### 1.   Where, As Here, Credibility Is At Issue, Summary Judgment Is Inappropriate

Rather than recognizing the weight of Second Circuit authority precluding summary judgment where, as here, credibility determinations are "crucial" (*see Arnstein,* 154 F.2d at 471),   Defendants invoke *Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005).  There, this Court held that "[b]road, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" and that the Court "will not, without affirmative evidence warranting an adverse inference, disregard [a witness's] uncontroverted assertions."   *Id.* at 261-62.   Here, however, *specific* (rather than broad or conclusory) credibility concerns going to the heart of this case – the provenance of *Expendables* – correctly led the district court to conclude a jury could reject "Stallone's declaration that he has never seen Cordoba and wrote The Expendables entirely independent of Cordoba[.]"  SPA9.

11

### 2. Defendants Continue To Ignore That Nearly Every Defendant Denied *Barrow* As The Source Of *Expendables*

Equally telling is Defendants' utter failure *even to acknowledge* that before this litigation began, they vehemently denied any similarity between *Expendables* and *Barrow*. (*See* Pl's Br. 11-14.) These denials include not only WGA submissions but also: (i) Defendants' denial of Warner Bros.' allegations that Defendants unlawfully misappropriated *Barrow* (*see* A814, A820-21, A823, A855); (ii) Defendants' unsuccessful attempt to deny production credit to the original *Barrow* producers (*see* A823); and (iii) Defendant Nu Image's insurance application denying any "underlying works" for *Expendables* (*see* A858, 860).

Even a cursory review of *Cordoba*, *Expendables* and *Barrow* illustrates that nearly all of the striking similarities between the works do not exist in *Barrow*. For example:

| SIMILARITY | *CORDOBA* | *EXPENDABLES* | *BARROW* |
|---|---|---|---|
| Opening hostage rescue at sea | YES | YES | NO |
| American mercenary hero who is working-class, middle-aged, wisecracking, has access to unusual weaponry including an aircraft that sprays liquid, and deploys both violence and trickery. | YES | YES | NO |
| Primary villain named General Garza. | YES | YES | NO |

12

| SIMILARITY | *CORDOBA* | *EXPENDABLES* | *BARROW* |
|---|:---:|:---:|:---:|
| Garza and accomplice are allied yet adverse; maintain separate, rival security forces. | YES | YES | NO |
| Garza/accomplice cooperate in cocaine trade, which is to become key source of national wealth. | YES | YES | NO |
| Peasants persecuted to support cocaine production. | YES | YES | NO |
| Garza's palace which includes neo-classical architecture, a prominent balcony in president's office overlooking outdoor central staircase, an outdoor swimming pool, underground tunnels and prison cells that play a role in the works, and a statue of Garza in courtyard. | YES | YES | NO |
| Hero initially rejects mission but accepts mission because a woman's life is at stake. | YES | YES | NO |
| Heroine is a close relative of Garza who works with the mercenaries to overthrow Garza's regime. | YES | YES | NO |
| Accomplice rummages through heroine's home, arrests her, tortures her for information about the mercenaries, and takes her to Garza's office (which upsets him). | YES | YES | NO |
| After heroine's torture, Garza makes speech from palace. | YES | YES | NO |

13

| SIMILARITY | *CORDOBA* | *EXPENDABLES* | *BARROW* |
|---|---|---|---|
| Following speech, accomplice (rather than hero) fatally shoots Garza. | YES | YES | NO |
| Climactic battle featuring a shootout between the rival security forces, sequenced explosions preset by heroes, and detonation of the fuel depository. | YES | YES | NO |
| After fatally shooting Garza, accomplice abducts heroine, is chased from the palace by the hero, runs to a waiting escape helicopter, is caught, uses the heroine as a human shield, and is killed by the hero with a surprise shooting tactic. | YES | YES | NO |
| Hero leaves heroine with client's wealth and hints he will return to see her. | YES | YES | NO |

Seeking to evade the critical credibility issue of how *Expendables* was created, Defendants contend the district court "made a critical error in its discussion of Defendants' independent creation argument, which purported to rely on Stallone's 'signed letter' written to the WGA arbiters, but quoted the wrong document." (Defs' Br. 36.) Specifically, Defendants allege the court erred in "thinking that Stallone had previously signed a statement denying a connection to *Barrow*." (*Id.* at 33, 36-37.)

Defendants' allegation the district court mistakenly "thought" "Stallone had previously signed a statement denying a connection to *Barrow*" is simply wrong. (*Id.* at 36.)  Stallone did sign such a statement.  *See* A827-29, A929.  In his signed statement to the WGA, Stallone stated that he "read and considered 'Barrow', but ultimately set it aside" and "started writing [his] own screenplay for 'The Expendables' in the spring of 2008."  A827.  Stallone's counsel even admitted at oral argument that Stallone signed such a statement:

> THE COURT:  … You are right that [Stallone] says he read Barrow, but then he says that he ultimately set it aside and started from scratch and that the [*sic*] Expendables is an original and "doesn't use one word, one comma, one iota from Barrow."
>
> But that's not your position now, is it?
>
> MR. FERBER:  My position is that that's – and this is what he said about it.  He said that it was written by attorneys, and that is, as he stated, as Martin Singer stated in his declaration, that is and [*sic*] advocacy statement.
>
> THE COURT:  No.  Is this something that was in an affidavit? Testimony?  What form did it take?
>
> MR. FERBER:  It was a letter.
>
> THE COURT:  A letter that he signed?
>
> MR. FERBER:  He did sign it.
>
> THE COURT:  And what law can you point to in the history of the law that says that someone who signs something is not legally responsible for the statements made therein?

15

[Transcript of 4/26/12 Hearing ("Tr."), Dkt. No. 62, at 17-18.]

Thus, the district court wrote:

> Indeed, the admission [that Stallone copied *Barrow*] smacks more than a little of hypocrisy. **Stallone previously asserted in a signed letter submitted in his Writer's Guild of America arbitration with defendant Callaham, Barrow's author, that although he read Barrow, he "set it aside," and that Expendables was "an . . . original . . . and doesn't use one word, one comma, one iota from [Barrow]."** … It is only now, when it is in his self interest, that Stallone admits to copying <u>Barrow</u>.

[SPA8-9 (citations omitted)(emphasis added).]

It is true that the district court's opinion merges two separate Stallone statements denying any similarities between *Expendables* and *Barrow*. The first – that Stallone "read and considered 'Barrow', but ultimately set it aside" – is undisputedly from Stallone's signed statement to the WGA. *See* A827-28. The second – that Stallone "wrote what [he thought] was an original, *The Expendables*, which doesn't use one word, one comma, one iota from [*Barrow*]" – is from Stallone's admission in an interview with *Creative Screenwriting Magazine*. *See* A952, A957. The "critical error" on which Defendants place such weight is nothing but an incomplete citation. It does not undermine the district court's holding that "[i]n the face of such inconsistency, the question of whether to credit Stallone's declaration that he has never seen <u>Cordoba</u> and wrote <u>The Expendables</u> entirely independent of <u>Cordoba</u> is for the factfinder to decide." SPA 8-9.

16

Defendants also try to explain away their previous, false assertions that *Expendables* sprang from Stallone's mind in a footnote arguing that the **20-page submission** by Stallone's attorney in the WGA arbitration appeal was an "obvious error." (Defs' Br. 38, n.21; A831-A854.) There, Stallone, through his lawyer, asserted the complete dissimilarity of *Barrow* and *Expendables* and urged that Callaham should receive no credit whatsoever for *Expendables*. (*See* Pl's Br. 12-13; A832-838.) Defendants can argue that this factual statement, "submitted … on Mr. Stallone's behalf" (A1045, n.3), was an "obvious error" (Defs' Br. 38, n.38) – **but they must do so to the jury**.

Equally disingenuous is Defendants' assertion that "Stallone … acknowledged Callaham from the beginning" because "[h]is first draft … put Callaham's name first." (Defs' Br. 36, n.36.) Whether Stallone "put Callaham's name first" on the September 18, 2008 draft is irrelevant because **less than a month later**, on the October 8, 2008 "First Official Draft," Stallone admits he crossed out Callaham's name and wrote "**Lose**," leaving only himself for credit. A742, A895. Stallone's attorney acknowledged that Defendants originally submitted their Notice of Tentative Writing Credit to the WGA "**with only [Stallone] named and no other writer designated**." A832 (emphasis supplied).

Thus, the record is replete with evidence that Defendants adamantly denied a connection between *Barrow* and *Expendables* before this litigation. It was only

17

after being caught misappropriating a *second* screenplay (*Cordoba*), that it was suddenly in Defendants' "self interest" (SPA9) to attribute all similarities between *Cordoba* and *Expendables* to *Barrow*. It was for the jury to decide whether, in light of Defendants' prior dissembling, *Expendables* was copied from *Cordoba*, *Barrow*, or both.

### 3. <u>Webb's Expert's Opinion Was Admissible, As Defendants Previously Conceded</u>

As established in Webb's opening brief, "[s]triking similarity can be shown through expert testimony." *Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429, 439 (S.D.N.Y. 2011), *aff'd*, 2012 WL 5439910 (2d Cir. Nov. 8, 2012) (permitting expert testimony on issue of striking similarity between a screenplay and film); *see also Repp*, 132 F.3d at 891 (reversing summary judgment where "'striking similarity,' by virtue of the supported opinions of the experts … was shown to be a genuine issue of material fact").

Webb offered the opinion of Michael Elias, a 40-plus-year screenwriting veteran and WGA arbiter and consultant, who presented a detailed analysis demonstrating the striking similarity between *Cordoba* and *Expendables*.[6] (*See*

---

[6] Defendants improperly attempt to discredit Elias's testimony by citing a few lines of Elias's deposition testimony that Defendants' counsel read aloud at oral argument but never properly put into the record (*see* Tr. at 13-14). The dehors-the-record snippet counsel read cannot overcome Elias's Declaration where he clearly explains his methodology in analyzing the similarities between the two works and

18

Pl's Br. 37-39; A959-75.)   Defendants not only failed to object below, they presented their own expert opinion on striking similarity.  *See* A1003-42.

Defendants now contend "that no true expertise was involved and that [Elias's testimony was] inadmissible under Fed. R. Evid. 702."  (Defs' Br. 45.) Defendants took the opposite position below with regard to their own expert:

> MR. FERBER:  To the extent [Defendants' expert] is applying not so much a methodology **but knowledge as an expert**, he is in response to numerous of the alleged elements of **striking similarity,** he is giving examples of why things are classically done and examples of where they have been done, **which most ordinary filmgoers might not know**, but someone who spent his life watching films and spent the last 30 years reviewing screenplays and other materials for studios[.]
>
> [Tr. at 12 (emphasis supplied).]

Defendants should be precluded from taking a contrary position on appeal.

Contrary to Defendants' assertion (Defs' Br. 46), moreover, Rule 702 does not require statistical analysis, and Defendants made no such argument below. Instead, they offered their own expert, using a similar methodology to Elias, who concluded *Expendables* was strikingly similar to *Barrow.*  A1005.  If Defendants' expert could opine that the very different (by Defendants' repeated admissions) *Barrow* and *Expendables* works were strikingly similar, a jury should have been permitted to determine whether *Cordoba* and *Expendables* were strikingly similar.

---

concluding Stallone copied Webb's work.  A960-61.  Defendants can use Elias's deposition on cross-examination, before the jury.

49441/0001-9810080v1

Defendants cite four non-binding district court cases[7] (two unpublished) and ignore Second Circuit precedent permitting expert testimony on striking similarity. These cases, moreover, do not support Defendants' position. In *Cox v. Abrams*, 1997 WL 251531 (S.D.N.Y. May 14, 1997), the district court held that expert testimony is **<u>admissible</u>** in a literary case to show striking similarity. *Id.* at *5, n.2. Defendants also misread *Price v. Fox Entm't Group, Inc.*, 499 F.Supp. 2d 382 (S.D.N.Y. 2007). There, the district court excluded plaintiffs' expert but only because *striking* similarity was not found and expert testimony was not necessary to aid the jury on the question of *probative* similarity.[8] *Id.* at 388-89.

The other two cases cited by Defendants are likewise inapposite. In the unpublished *Mowry* case, the district court mistakenly reads Professor Nimmer as proposing that expert testimony be admissible on striking similarity only in "technical cases." *Mowry v. Viacom Int'l, Inc.*, 2005 WL 1793773, *10 (S.D.N.Y.

---

[7] Defendants rely extensively on district court opinions throughout their brief.

[8] It also appears that *Price*'s striking similarity analysis incorrectly focused on the differences, rather than the similarities, between the two works at issue. *See Price*, 499 F.Supp. 2d at 388. The purpose of the striking similarity analysis is to determine whether "the **<u>similarities</u>** between [works] are so extensive and striking as, *without more*, both to justify an inference of copying and to prove improper appropriation." *Gaste*, 863 F.2d at 1067-68 (emphasis supplied), quoting *Arnstein*, 154 F.2d at 468-69. As a hypothetical, had the only similarity between the works been the names "General Garza," "Barney," and "Sir Reginald Wilson-Thomas," but one work was a mercenary film and the other a children's story about a curious cat named General Garza, the striking similarity between those three names would have been sufficient for a jury to infer access and copying.

Jul. 29, 2005), quoting NIMMER ON COPYRIGHT, § 13.02[B]. Instead, Professor Nimmer suggests only that expert testimony may not be *necessary* in non-technical cases, but does not contend it is *inadmissible* in such cases:

> It has been said that, although expert testimony is not required to establish substantial similarity, it is required to establish striking similarity, such as to dispense with the need for proof of access. The better view, however, would seem to be that, while expert testimony may be necessary to establish striking similarity in 'technical' areas, such as music, in many cases, the trier of fact is equipped to make this determination without expert assistance.

[NIMMER ON COPYRIGHT, § 13.02[B].]

If Professor Nimmer were interpreted to *preclude* expert testimony in non-"technical" cases, that view would contradict the weight of Second Circuit authority and should therefore be afforded no weight. *Id.*

Finally, in *Tisi v. Patrick*, 97 F.Supp.2d 539 (S.D.N.Y. 2000), the court **admitted** expert testimony but noted that "an issue of fact cannot be created by [an expert] merely reciting the magic words 'strikingly similar' and 'no possibility of independent creation.'" *Id.* at 549. Elias's 17-page declaration goes far beyond simply stating the "magic words"; it includes a detailed analysis of similarities that may not be immediately evident to the lay juror and therefore should have been considered.

21

Defendants' new attack on the admissibility of expert testimony contradicts Second Circuit authority and their own position below. Elias's opinion was admissible and should have been submitted to a jury with Defendants' credibility issues, striking similarities, and other evidence of copying.

## II.    *EXPENDABLES* IS SUBSTANTIALLY SIMILAR TO *CORDOBA*

Summary judgment on similarity is appropriate **only** if "the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work'" or if "no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros. Inc. v. Am. Broadcasting Co., Inc.*, 720 F.2d 231, 240 (2d Cir. 1983). Here, the district court did not reach this issue of actionable similarity, relegating its tentative comment to *dictum* in a brief footnote. Defendants nonetheless argue (i) that the similarities between *Expendables* and *Cordoba* concern only non-copyrightable elements (Defs' Br. 47-52, 54-59); and (ii) no reasonable jury could find the works substantially similar. (*Id.* at 52-54.) Neither contention withstands scrutiny.

### A.    The Elements Misappropriated From *Cordoba* Are Protectable

"The *sine qua non* of copyright is originality." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). As the Supreme Court explains:

> Original, as the term is used in copyright, means only that the work was independently created by the author (as

> opposed to copied from other works), and that it
> possesses at least some minimal degree of creativity.  To
> be sure, the requisite level of creativity is extremely low;
> even a slight amount will suffice.  The vast majority of
> works make the grade quite easily, as they possess some
> creative spark, 'no matter how crude, humble or obvious'
> it may be.  Originality does not signify novelty; a work
> may be original even though it closely resembles other
> works so long as the similarity is fortuitous, not the result
> of copying.

[*Id.* at 345-46.]

Other than "the basic idea" of mercenaries overthrowing a third world dictator which, despite Defendants' contentions (*see* Defs' Br. 48, 51), which Webb never claimed was protectable, the elements misappropriated from *Cordoba*, which unfold in the same manner in both works, easily meet the standard for originality.  To veil these protectable similarities, Defendants misapply the *scenes a faire* doctrine.  Defendants attempt to manufacture *scenes a faire* by improperly diluting a limited number of self-selected [9] similarities between *Cordoba* and *Expendables* rather than contending with the unique particulars that make them protectable.  (*See* Defs' Br. 49.)

"Scenes a faire ["scenes that **must** be done"] are elements of a work 'that **necessarily** result from the choice of a setting or situation,' or 'sequences of events which **necessarily** follow from a common theme.'" *Arden v. Columbia Pictures,*

---

[9] Defendants' list of ten elements constitutes fewer than half of the elements in even the partial summary of elements in the complaint (*see* A5-A22), much less a complete analysis of the asserted similarities.

23

*Inc.*, 908 F.Supp. 1248, 1259 (S.D.N.Y. 1995) (emphasis supplied; internal citations omitted); *accord*, *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996). One of the most cited examples of *scenes a faire* comes from *Walker v. Time Life Films, Inc.* where this Court held "[e]lements such as drunks, prostitutes, vermin and derelict cars **would appear** in **any** realistic work about the work of policemen in the South Bronx." 784 F.2d 44, 50 (2d Cir. 1986) (emphasis supplied). Similarly, in *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980), this Court, reviewing three works involving the Hindenburg disaster, held the **only** claimed similarities (other than those based on factual events), including a scene in a German beer hall, the term "Heil Hitler," and songs such as the German National Anthem, were unprotectable *scenes a faire* because it was "**virtually impossible**" to write about that particular theme without employing such elements. *Id.* at 479. Although Defendants initially quote the above "necessarily" language, they immediately water down the test to include any elements that "**would be expected**" to follow from a common theme. (Defs' Br. 49.) "Expectation" is not the test.

Defendants' improper dilution of the elements include, for example: (i) "hostage rescues" rather than an opening scene involving a hostage rescue at sea; (ii) "depictions of torture" rather than a depiction of Garza's accomplice arresting and torturing Garza's daughter/niece for information concerning the mercenaries

24

she has been aiding; (iii) "climactic shootouts" rather than Garza's accomplice killing Garza (as opposed to the hero) following Garza's speech to his countrymen; and (iv) "the dictator being ruthless and violating the rights of (or killing) his people" rather than General Garza's persecution of peasants to further cocaine production.  (Defs' Br. 49; Pl's Br. 31-32.)  Defendants similarly state that "[i]n an action-oriented mercenary story, stock elements would include, *inter alia*, … capture and torture of the heroine, a grand palace for the dictator, and a standoff in which the heroine is used as a 'shield' but the hero prevails."  (Defs' Br. 40.)  **Ironically, none of these purported *scenes a faire* or "stock" elements appear in *Barrow*, undermining Defendants' contention they are "necessary" elements of any mercenary story**.

Like the district court, Defendants ignore that elements that may be deemed unprotectable in isolation are protectable when combined and presented in a unique and original way.  *See Hogan*, 48 F.Supp.2d at 311, citing *Walker*, 784 F.2d at 50.  Here, even if the numerous striking similarities between the works were deemed unprotectable in isolation (which they are not), the specific form, combination, development and presentation of these elements leaves no question that they are protectable.[10]

---

[10] Defendants also cite Webb's presentation of certain "common terms" in both *Cordoba* and *Expendables*.  (Defs. Br. 52.)  Webb presented a limited selection of literal similarities, to complement the myriad of striking similarities, as evidence of

Defendants' contention that none of the similarities between *Cordoba* and *Expendables* are protectable as a matter of law – whether accounting for *Barrow* or not – is based on improper dilution of a limited selection of similarities and a misapplication of the law.  It is patently meritless.

### B.    The Jury Could Easily Find *Cordoba* And *Expendables* Substantially Similar

As discussed in Webb's opening brief (*see* Pl's Br. 45-47), "[t]he standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Peter F. Gaito Architecture v. Simone*, 602 F.3d 57, 66 (2d Cir. 2010), quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001).   Courts applying the "ordinary observer test" are "principally guided by comparing the contested [work's] 'total concept and overall feel' with that of the allegedly infringing work, as instructed by our 'good eyes and common sense.'" *Id.* at 66.  Defendants absurdly contend that "[t]he 'total concept and feel' of *Cordoba* and [*Expendables*] are dissimilar, as are their mood, details and characterizations."  (Defs' Br. 53.)   There is no question that the numerous

---

copying, not to prove actionable similarity.  As Elias notes: "While I would not necessarily consider these elements, in isolation, as strongly indicative of Stallone's access to and copying of *The Cordoba Caper*, I nonetheless view them as direct supporting evidence of copying when viewed as part of the collective whole." A971.

strikingly similar elements between the works, which unfold in a nearly identical manner, could permit a reasonable jury to "regard the aesthetic appeal [of *Cordoba* and *Expendables*] as the same." *Peter F. Gaito Architecture*, 602 F.3d at 66.

Defendants demonstrate their fundamental misunderstanding of copyright law in applying the "total concept and feel" test: they focus their entire argument on alleged **differences** between the works, rather than the similarities. As Professor Nimmer explains:

> It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of a plaintiff's work can be shown. 'No plagiarist can excuse the wrong by showing how much of his work he did not pirate.' If substantial similarity is found, the defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents, nor generally by reason of his work proving more attractive or saleable than the plaintiff's.
>
> [NIMMER ON COPYRIGHT, § 13.03[B][1][a], citing and quoting *Attia v. Society of N.Y. Hosp.*, 201 F.3d 50, 57-58 (2d Cir. 1999), *cert. denied*, 531 U.S. 843 (2000), *Warner*, 720 F.2d at 241, *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936) (additional citations omitted).]

This is precisely why jurors are instructed to evaluate the similarities rather than the differences between works, and why Defendants' (and the district court's)

near-exclusive reliance on the differences,[11] rather than the similarities, between *Cordoba* and *Expendables* should not have precluded a jury from making its own determination as to whether they are substantially similar.[12]

### C. The Jury Could Find The Characters In *Cordoba* And *Expendables* Substantially Similar

Defendants' improper emphasis on the differences, rather than the similarities, between the works, continues with their character analysis. (*See*, *e.g.*, Defs' Br. 55 ("The particularized details and development of these characters are **decidedly different**") (emphasis supplied).) Rather, in analyzing the substantial **similarity** between characters, courts (and later the jury) "must consider the 'totality of [their] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of [characters] in the [prior work]." *Walker*, 784 F.2d at 50. As shown in Webb's opening brief, a jury

---

[11] For example, Defendants misstate what Webb has described as the "linchpin" moment in *Expendables*. (Defs' Br. 59-60.) Through misleading editing, Defendants claim Webb cited Garza's speech as a "linchpin" moment," conveniently ignoring that Webb's "linchpin" included the accomplice's (rather than the hero's) killing of Garza. *See* A29. That is a critical element in both stories. Defendants opine that the "linchpin" takes place when a secondary character gives a speech about lost opportunities much earlier in the film. (Defs' Br. 60.) This purely subjective "linchpin" debate is properly left for the jury.

[12] Defendants' misunderstanding of the applicable standard is further illustrated by their accusation that Webb "ignor[ed] the **differences** in plot, 'overall concept and feel' and characters[.]" (Def's Br. 59 (emphasis supplied).)

could find the "total concept and feel" of the characters in *Cordoba* and *Expendables* to be substantially similar.  (*See* Pl's Br. 50-53.)

Even Defendants' analysis of the **differences** between the characters is flawed.  For example, Defendants attempt to describe General Garza in *Cordoba* as "a tyrant with a distinctly comical side" because, among other things, he is described "as having a bandito-style mustache [that] is strictly Pancho Villa" and calls his niece a "bitch."  (Defs' Br. 57.)  Defendants contrast this alleged persona to that of Garza in *Expendables*, who, despite also having a Pancho Villa-style mustache (*see Expendables* DVD, *passim*), is "neither humorous or in control."  *Id.* As Elias notes, "a dictator-general who persecutes and kills his people and calls his niece a 'bitch' is hardly a comical character, but a deadly serious character." A965-66.  It is similarly preposterous to equate Garza's persona with his mustache, which was donned by a renowned Mexican revolutionary.

Defendants' analysis of the **differences** between Renata and Sandra is similarly flawed.  As discussed in Webb's opening brief, there is no character with a more significant function in the "total concept and feel" of the two works than Renata/Sandra (as opposed to *Barrow's* Sophie, who appears in only three scenes in the entire screenplay[13]).  Defendants attempt to cloud the obvious **similarities**

---

[13] Sophie's role in *Barrow* was so minor that *Barrow*'s author said he "didn't write any female characters" in his screenplay.  A875.

between Renata and Sandra (*see* Pl's Br. 50) by arguing that: (i) the "local female freedom fighter[s]' is a false analogy"; (ii) Sandra "has <u>no</u> secret identity"; (iii) "Renata does not show [the mercenaries] around"; (iv) Sandra "is not an active … rebel, nor is she a partner in the Expendables' attack"; (v) Sandra "is not the 'savior' … she is the one to be saved"; and (vi) "[t]here is no sexual relationship between [Sandra] and Barney."  (Defs' Br. 41, 56.)   In fact: (i) Defendants described Sandra as a "local freedom fighter with a dark secret" (A876); (ii) a version of *Expendables* notes that "'Sandra' is short for Alexandra, which is Greek for 'defender of mankind'" (Dkt. No. 41-5 at 1; A964-65); (iii) Renata shows the mercenaries her rebel headquarters and a Quechua village and gives them intelligence about the regime (*see* A109-120); (iv) Stallone's attorney described Sandra as the "[d]aughter of General Garza, who works against her father's corrupt regime" (A843); and (v) in both works, there is a clear romantic relationship between the hero and the heroine.

As shown in Webb's opening brief (*see* Pl's Br. 50-53), each character and their collection in a single work serves a critical role in the overall "total concept and feel" of *Cordoba* and *Expendables*.  Despite Defendants' efforts to obscure these obvious similarities through abstract analyses of their differences, the jury should be permitted to determine whether *Cordoba* characters' traits and attributes are captured in the "total concept and feel" of the same characters in *Expendables*.

## **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in Webb's moving brief, Plaintiff-Appellant Marcus Webb respectfully requests that the Court reverse the district court's decision granting summary judgment and remand for trial by jury.

DATED:  New York, New York
            August 23, 2013

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: /s/ David M. Kohane
David M. Kohane
David S. Gold
900 Third Avenue, 16th Floor
New York, New York 10022
(212) 752-8000

-and-

Jeffrey A. Sunshine
JEFFREY A. SUNSHINE, P.A.
3000 Marcus Avenue, Suite 2E5
Lake Success, New York 11042
(516) 352-2100

*Attorneys for Plaintiff-Appellant*

31

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii). Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), the brief contains 6,948 words.

The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ David M. Kohane
David M. Kohane, Esq.

49441/0001-9810080v1

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 23rd day of August 2013, I caused a .pdf version

of the foregoing brief to be filed electronically using the *CM/ECF* system.  Prior to

transmittal, the .pdf was scanned for viruses and no viruses were detected.


/s/ David M. Kohane
David M. Kohane, Esq.

49441/0001-9810080v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of August 2013, I caused the foregoing brief to be filed electronically using the *CM/ECF* system, which will send notification of such filing to counsel of record.

/s/ David M. Kohane
David M. Kohane, Esq.